```
                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
-------------------------------X
UNITED STATES of AMERICA    Criminal Case No. 05-394

         v.

I. LEWIS LIBBY,
                  Defendant,
-------------------------------X   Washington, D.C.
                                   Tues., January 16, 2007
                                   2:00 P.M.

          TRANSCRIPT OF TRIAL, AFTERNOON SESSION
          BEFORE THE HONORABLE REGGIE B. WALTON
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: PATRICK FITZGERALD, SPECIAL COUNSEL
                    DEBRA R. BONAMICI, DEPUTY SPEC. COUNSEL
                    U.S. DEPT. OF JUSTICE
                    OFFICE OF SPECIAL COUNSEL
                    219 South Dearborn Street
                    Chicago, IL 60604
                    (312) 353-3741

                    PETER ZEIDENBERG, AUSA
                    KATHLEEN M. KEDIAN, AUSA
                    U.S. DEPT. OF JUSTICE
                    1400 New York Ave., N.W.
                    Room 12-405
                    Washington, D.C. 20005
                    (202) 514-1412

Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6409
                    Washington, D.C. 20001
                    (202) 354-3247

Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

```
APPEARANCES:  (Cont'd.)
FOR THE DEFENDANT:  JOHN CLINE, ESQUIRE
                    JONES DAY
                    555 California Street, 26th Floor
                    San Francisco, CA 94104
                    (415) 626-3939


                    WILLIAM JEFFRESS, ESQUIRE
                    BAKER BOTTS, LLP
                    The Warner
                    1299 Pennsylvania Ave., N.W.
                    Washington, D.C. 20004-2400
                    (202) 639-7751


                    THEODORE WELLS, JR., ESQUIRE
                    PAUL, WEISS, RIFKIND, WHARTON
                       & GARRISON, LLP
                    1285 Avenue of the Americas
                    New York, NY 10019-6064
                    (212) 373-3089
```

FILED

MAR 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

AFTERNOON SESSION

THE COURT: I think I made it clear, but if there are any challenges for cause, they should be made immediately.

MR. WELLS: May I speak, Your Honor?

THE COURT: Yes.

MR. WELLS: We would challenge for cause Ms. Nelson. Ms. Nelson indicated that Mr. Libby would start behind the Government. She indicated that, if Mr. Libby did not produce proof of his innocence, that she would hold it against him.

I understand that, when Your Honor questioned her thereafter, that she gave a different answer. But I think, given the totality of the circumstances, given the seriousness of the issues that Mr. Libby faces, we would move for cause.

THE COURT: Government?

MR. FITZPATRICK: Your Honor, I would oppose that. I think the totality of her answers where she started by saying that she could be fair. She even mentioned that sometimes the Government tries to say people are guilty that are not.

There have been questions where she answered the wrong answer I think where the confusing line of inquiry. I think lining up a track race of who is ahead or behind or even is a bit confusing. It became clear to me she's seen both sides of the issue.

She's seen her father as an investigator. She's seen people convicted and what the consequences are. And she's basically saying I know sometimes the Government tries people who are not guilty. I know that sometimes people are guilty. If the evidence is there, and Mr. Wells put it quite succinctly, if the Government's case fails and the defense doesn't put anything on, what will she do? She made clear she wouldn't convict.

So I think we were talking in very confusing questions at times, but the bottom line is she is someone who basically said if the Government proves it, she'll convict. If they don't, they won't, and I think that's the totality of the circumstances.

THE COURT: That's one reason why I don't like and will not use the written questionnaire, because I think it disadvantages people who don't have a lot of education or who don't articulate themselves well.

And, in reference to Ms. Nelson, my view is that, while she said what she said, that eventually, I mean when she was asked a follow-up question, she said well they start at the same place. I don't know what she meant when she said starts behind or starts ahead.

But I think, considering her life experiences and

5

the fact that she said she thinks the Government can be unfair, and the fact that she's had relatives who've been caught up in the system, I do feel that her answers, in essence, appreciated the fact that the Government has the burden.

And my view is that she would not unfairly hold the defendant to a burden and convict somebody even though she felt that the Government hadn't proven their case. So I understand the concern. But I think you'd have to use a strike for cause concerning her. I will deny the request.

(Juror present.)

THE COURT: Juror Number 1543?

THE JUROR: Yes, sir.

THE COURT: You had two responses, one to Question Number 3B, which asks whether you have heard or read anything about this case in the media. Do you want to tell me what your response is?

THE JUROR: I watch the news. I've heard that it's coming up. I've not read charges. I've not read anything about that. But I've heard about it on the news.

THE COURT: Do you remember exactly what you heard?

THE JUROR: I remember back long time ago there was a dispute over, you know, who disclosed the name of someone. And then the last couple days, they have just been sort of it's coming up. The trial is coming up.

6

THE COURT: Did you form any opinions about the case as a result of what you heard or saw in the media?

THE JUROR: No, sir.

THE COURT: Would you be able to put out of your mind what you heard and saw in the media and judge this case only upon what you hear and see in this courtroom?

THE JUROR: Yes, sir.

THE COURT: You understand that what you would have heard or seen in the media is not evidence and you can't consider that in deciding this case?

THE JUROR: Yes, sir.

THE COURT: And you're confident you can do that?

THE JUROR: Yes, sir.

THE COURT: You also had a response to Question Number 30, which asks whether you, close friends or relatives have ever been a victim of a crime, someone charged with a crime or witness to a crime. Do you want to tell me about that?

THE JUROR: I was charged with a crime at one point. My stepdaughter used my I.D. for a shoplifting thing and it came up as mine.

THE COURT: What happened after you were charged?

THE JUROR: We went to court and it was kind of just sort of, I basically went, they asked me what happened. The last I heard, it sort of went away.

7

THE COURT: How long ago was that?

THE JUROR: Fifteen years.

THE COURT: Were you actually arrested or what?

THE JUROR: Got a summons.

THE COURT: You got a summons telling you to come to court?

THE JUROR: Yes.

THE COURT: Then ultimately it was dropped?

THE JUROR: That's what I think happened. I don't really --

THE COURT: Do you think you were treated fairly in that case?

THE JUROR: Yes.

THE COURT: Did you have a lawyer?

THE JUROR: Yes.

THE COURT: Were you satisfied with the services of your lawyer?

THE JUROR: Yes, sir.

THE COURT: Anything else besides that situation?

THE JUROR: We've been in court over my stepson's custody. So I've testified a number of times over that, but that's it.

THE COURT: Civil case?

THE JUROR: Yes.

THE COURT: Okay. Did your stepdaughter ever get

8

charged?

THE JUROR: No, sir.

THE COURT: You don't harbor any hard feelings towards anyone as a result of that?

THE JUROR: She was a teenager. I don't harbor hard feelings. I think she regrets it, no.

THE COURT: What about the parties or what about the Government or the police? Do you have any hard feelings towards them?

THE JUROR: No, they were just doing their jobs.

THE COURT: Would you use against anyone in this case what happened to you?

THE JUROR: No, sir.

THE COURT: So are you totally confident you can be fair to both sides?

THE JUROR: Yes, sir.

THE COURT: Government?

MR. FITZPATRICK: Good afternoon. Can you just tell us briefly what you do on your job?

THE JUROR: I'm a consultant. I do government relations, represent the insurance industry primarily at the State level. I do some federal mostly on the policy side. So I analyze bills, things like that. Insurance is regulated at the State level, so I deal with like insurance commissioners and State regulators.

9

```
 1              MR. FITZPATRICK:  I'll just ask a few questions
 2   about the prior court proceedings, but if there's something
 3   that's too personal, if you can just let us know about it in
 4   person.
 5              THE JUROR:  Okay.
 6              MR. FITZPATRICK:  How, since you were initially
 7   brought into court in relation to something that you didn't
 8   do, how far along in the process was it before the government
 9   sort of dropped your case?
10              THE JUROR:  I'll be really honest, I don't
11   remember.  It was so long ago.
12              MR. FITZPATRICK:  Was it a big deal at the time?
13              THE JUROR:  It didn't feel like a big deal, no.
14              MR. FITZPATRICK:  And I don't want to know the
15   merits of the custody case.  Just if you testified, were you
16   cross-examined during that proceeding?
17              THE JUROR:  I was examined and cross-examined, yes,
18   sir.
19              MR. FITZPATRICK:  Was it hostile, in your opinion,
20   the proceeding, the cross-examination?
21              THE JUROR:  Was the questioning tough?  Yes.  Were
22   both sides doing their jobs?  I didn't take it personally.
23              MR. FITZPATRICK:  Anything about that proceeding
24   affect your ability to sit and watch a trial where attorneys
25   from both sides will ask questions and just decide it on the
```

10

```
 1   merits?
 2              THE JUROR:  No.
 3              MR. FITZPATRICK:  Okay.  Thank you, Judge.
 4              MR. JEFFRESS:  Ms. Gackenbach, is it?
 5              THE JUROR:  You get the award of the day.
 6              MR. JEFFRESS:  I was guessing.  Let me ask you, do
 7   you tend to read the newspaper every day?
 8              THE JUROR:  I tend to probably scan the newspaper
 9   every day and read what I'm interested in.
10              MR. JEFFRESS:  Do you watch TV news on a regular
11   basis?
12              THE JUROR:  I'll be honest, I really don't.
13              MR. JEFFRESS:  Do you recall ever seeing on
14   television anything any of the participants in this case
15   might have said?
16              THE JUROR:  I mean, I have seen interviews.  You
17   know, I've seen that one side said that he said, she said.
18   The one side said they did it.  The other side said they
19   didn't.  I'll be real honest, it's not one that I've paid
20   much attention to.
21              MR. JEFFRESS:  Have you formed any opinion at all
22   about Scooter Libby as a result of what you've read or heard?
23              THE JUROR:  No, sir.
24              MR. JEFFRESS:  You could give him the presumption
25   of innocence and start out the trial with a completely fair
```

11

```
 1   mind as to him?
 2              THE JUROR:  I can.  I mean, I've really read very
 3   little on background.  I haven't even read the charges, so I
 4   don't know specifically what the charges are, so yes, I could
 5   be completely impartial.
 6              MR. JEFFRESS:  On a somewhat different subject, did
 7   you, you have -- have you read and heard about the
 8   controversy over whether the President and his advisors
 9   misled the country into going to war in Iraq?
10              THE JUROR:  Well, I think, yes, I mean, I live in
11   Washington.
12              MR. JEFFRESS:  It would be hard not to hear about
13   that.
14              THE JUROR:  Yes, I have heard about that.
15              MR. JEFFRESS:  How do you feel about that?  Do you
16   have strong opinions either way about that?
17              THE JUROR:  I'll be really honest.  Since I
18   personally haven't seen any of the information on one side or
19   the other, I don't feel like I know whether they did or they
20   didn't.  Obviously, I would feel like I would need to look at
21   information to make that decision.  And that information is
22   not available to me.  So, I haven't formed an opinion on
23   that.
24              MR. JEFFRESS:  Well, does it, the whole
25   controversy -- have you discussed this with other people?
```

12

```
 1   Have you heard them express opinions, you know, about the
 2   administration misled people?
 3              THE JUROR:  At a cocktail party, I hear people on
 4   both sides of either.  It was a complete snow job or no, it
 5   was not.  It was the most honest of intentions.  I think a
 6   lot of people have their deeply held views about that.  I've
 7   heard them.
 8              I haven't really participated in those
 9   conversations because, like I said, it's just not something I
10   feel like I have enough information about to participate in
11   that conversation.
12              MR. JEFFRESS:  How about, you know, the Vice
13   President, Vice President Cheney?  You know, he could well
14   testify in this case.  Do you hold any opinions about his,
15   about him or about his role in going to war in Iraq that
16   might affect your consideration of his credibility of
17   consideration of his testimony?
18              THE JUROR:  I don't really think so.  I mean, I'll
19   be honest, I think, like every citizen, I support some of the
20   things that the administration and Congress have done.  I
21   oppose some of the things the administration and Congress
22   have done.  I haven't questioned anyone's motives for doing
23   that.  I don't really have an opinion about him one way or
24   the other.
25              MR. JEFFRESS:  That's really what I'm --
```

13

everybody's got different opinions, right? But in terms of him personally, do you have any opinion that would tend to make you believe him less than you would if you didn't know anything about him or didn't have those opinions?

THE JUROR: No, sir. I assume that, if he's going to swear under oath, that he would be bound to tell the truth like anyone else would.

MR. JEFFRESS: Do you remember Judge Walton asked some questions when you were sitting out in the bleachers about memory and about how things affect people's memory. Have you ever had it happen to you that you were absolutely certain you remembered something and then turned out to find you were wrong?

THE JUROR: I think that, yeah, I mean, there have been many times that I'm absolutely certain I put the car keys in my coat and I find them in the freezer or something else. But, yes, I mean I think there have been times that I've been sure, I think I've been sure of something and I turned out to be wrong. I usually try to admit it if I am wrong.

MR. JEFFRESS: Well, have you seen people disagreeing over what happened? One person remembers it one way. One person remembers it the other way. Do you tend to think one of them must be lying?

THE JUROR: No, I don't think that necessarily one

14

person is lying. I think sometimes people see things differently. Some, I mean, something happens quickly. One person sees one thing. One person sees another. No, I don't think that, just because people have different accounts, it necessarily means that someone is deliberately lying.

MR. JEFFRESS: And then one other thing, you mentioned that you did know enough to know that you know the whole question was whether somebody leaked somebody's name or somebody. And you, have you even read enough to remember the name of that person who was, whose wife was involved?

THE JUROR: You know, I can tell you, I can probably tell you her name but not his name.

MR. JEFFRESS: What's her name?

THE JUROR: I think hers was Plame.

MR. JEFFRESS: Have you ever seen her on television or seen anything that she said?

THE JUROR: No.

MR. JEFFRESS: That's all I have.

THE COURT: We're going to release you. I told the other jurors 1:30, but I don't think we're going to need you before 3:00 tomorrow. So we'll have you come back at 3:00 tomorrow. So you can go down to the juror's lounge and tell them you've been excused by me until 3:00 and be back at that time.

Don't talk to anybody about the case and avoid all

15

media. We'll try and get you some papers or something tomorrow, but avoid the paper and avoid listening to the news. Thank you.

THE COURT: You're Number 0863?

THE JUROR: Yes.

THE COURT: You responded to Question Number 36 about the length of the trial?

THE JUROR: About, I'm a freelance photographer, and so the length of the trial would make it hard for me to make a living, to make rent for next month. But that was my reasoning.

THE COURT: Did you express that to the clerk's office previously?

THE JUROR: No.

THE COURT: Well, if you are required to be here during the next four to six weeks, would that impair your ability to fairly judge this case?

THE JUROR: I mean, I would have, it would be on the back of my mind because I'm losing work day by day.

THE COURT: But you could serve on a shorter trial?

THE JUROR: Yes, sir.

THE COURT: Very well, I will let the juror's office know that they should notify you within the next month or so to come back when you can serve on a shorter case.

THE JUROR: Okay.

16

THE COURT: You're excused.

THE JUROR: Thank you so much.

THE COURT: You're Number 1157?

THE JUROR: Yes.

THE COURT: You had a couple responses, one to Question Number 3A, which asks whether you have heard or read anything about this case. Do you want to tell me what your response is in that regard?

THE JUROR: I said yes, I have.

THE COURT: Tell me what have you read or heard?

THE JUROR: What happened?

THE COURT: Yes.

THE JUROR: I basically paid attention to the news for the last two or three years, read lots of articles in the paper, a lot of cable news, blogs, what have you.

THE COURT: Do you remember specifically anything that you would have read or heard that you can share with us?

THE JUROR: About what happened?

THE COURT: Yes.

THE JUROR: Okay. Well, it started with Joe Wilson's article in the paper that he wrote. Then it's been said that Vice President Cheney, what have you, wanted to discredit him because he didn't agree with it and it was not going to help their cause. And Mr. Libby, whatever, supposedly, was involved in that and lots of other

17

1  administration officials.
2           I believe it came out that Richard Armitage was the
3  one that actually disclosed it. Who knows whether it was by
4  accident or not. I don't know, but that's what I know so
5  far.
6           THE COURT: Did you form any opinions as a result
7  of that media contact that might cause you to have some
8  preconceived attitudes about this case?
9           THE JUROR: I mean, I've kind of basically decided
10 in my mind what happened, not whether or not --
11          THE COURT: What do you feel --
12          THE JUROR: Why it was leaked or whatever. But I
13 believe that this isn't about the actual leak of it but more
14 of what happened afterwards. I mean, I have no way of
15 knowing whether anybody lied about anything after the fact
16 when questioned.
17          THE COURT: Let me just ask. Would you in any way
18 use the information that you've heard or read in the media in
19 your assessment of this case?
20          THE JUROR: It's possible. I mean, I'm not really
21 sure.
22          THE COURT: Let me say this. The law requires that
23 you not do that.
24          THE JUROR: Right.
25          THE COURT: Because the information that you would

18

1  have seen or heard in the media was not subject to an oath,
2  not subject to cross examination, and therefore it's not
3  something that can be considered in the context of a trial.
4           THE JUROR: Well then I would have to disregard
5  that.
6           THE COURT: Would you be able to do that?
7           THE JUROR: Yes.
8           THE COURT: Because it would be fundamentally
9  unfair to consider that type of information that was not
10 subject to that scrutiny in your assessment of this case.
11          THE JUROR: Okay. I believe I probably could, yes.
12          THE COURT: Do you have any questions about whether
13 you could?
14          THE JUROR: No.
15          THE COURT: Do you have any opinion as to the guilt
16 or innocence of Mr. Libby on the charges that he has been
17 charged with as a result of the media coverage that you've
18 had contact with?
19          THE JUROR: No. I don't think it's possible to
20 know that.
21          THE COURT: Do you have any feelings about what you
22 heard in reference to the administration and its concern
23 about what was being said by Ambassador Wilson that would in
24 some way impact on how you would judge this case?
25          THE JUROR: Say that again?

19

1           THE COURT: Do you have any feelings about the Bush
2  administration?
3           THE JUROR: Right.
4           THE COURT: Vice President Cheney.
5           THE JUROR: And their reaction to --
6           THE COURT: Anyone else that was part of the Bush
7  administration in reference to what Ambassador Wilson had
8  said and allegedly their response to it that might come into
9  play, an impact on how you would judge this case?
10          THE JUROR: I don't think it should. I don't think
11 it will.
12          THE COURT: Are you confident it won't?
13          THE JUROR: I mean I have my opinions about the way
14 they handled the situation, but I don't think that should --
15          THE COURT: What are your opinions in that regard?
16          THE JUROR: I think it was pretty standard
17 Washington politics, trying to discredit someone. It happens
18 both sides to everybody.
19          THE COURT: Do you see that as a reflection of
20 something inappropriately having been done?
21          THE JUROR: I guess you could say it's possible it
22 was inappropriate, but it doesn't mean it doesn't happen
23 often in this town.
24          THE COURT: Well, you can't consider that --
25          THE JUROR: Right.

20

1           THE COURT: -- based upon what you've heard, in
2  your assessment as to whether or not the Government in this
3  trial, if you're selected as a juror, has proven its case
4  beyond a reasonable doubt. Do you understand that?
5           THE JUROR: Yes.
6           THE COURT: Would you be able to do that, do you
7  think?
8           THE JUROR: I would think I could, yes.
9           THE COURT: Any questions about whether you could?
10          THE JUROR: No.
11          THE COURT: You also had a response to Question
12 Number 19, which asks whether you, close friends or relatives
13 have ever served as a law enforcement official or applied for
14 such a position. Do you want to tell me about that?
15          THE JUROR: Sure. My cousin is a sheriff, Ramsey
16 County Sheriff in Minneapolis.
17          THE COURT: Him or her?
18          THE JUROR: Him.
19          THE COURT: Do you ever talk to him about his work?
20          THE JUROR: Sure, occasionally, at family
21 gatherings.
22          THE COURT: Have you formed any opinions as a
23 result of those discussions that might impact on your ability
24 to fairly judge this case?
25          THE JUROR: No.

21

1  THE COURT: You also had a response to Question
2  Number 30, which asks whether you, close friends or relatives
3  have ever been the victim of a crime, someone charged with a
4  crime or witness to a crime. Do you want to tell me about
5  that?
6  THE JUROR: Sure, my aunt was kidnapped.
7  THE COURT: How long ago was that?
8  THE JUROR: I was pretty young, probably 15 years
9  ago.
10  THE COURT: Was that in this area?
11  THE JUROR: No, it was in Twin Cities.
12  THE COURT: Was anybody arrested for that?
13  THE JUROR: Yes.
14  THE COURT: How long was she held?
15  THE JUROR: Briefly, she escaped.
16  THE COURT: Was she injured?
17  THE JUROR: Yes, but she's all right.
18  THE COURT: Was she seriously injured?
19  THE JUROR: No, but traumatized.
20  THE COURT: And the person who was arrested, what
21  happened to that person?
22  THE JUROR: He went to jail. I believe he was
23  released a few years ago, served less than ten years, I
24  think.
25  THE COURT: Were you satisfied with the result?

22

1  THE JUROR: I would have preferred he be
2  incarcerated longer if that's what you're asking, yes.
3  THE COURT: Do you think that experience that she
4  had would in any way come into play and impact on how you
5  would decide this case?
6  THE JUROR: No.
7  THE COURT: Are you totally confident you can be
8  fair to both sides?
9  THE JUROR: I believe I could.
10  THE COURT: Any questions about whether you can?
11  THE JUROR: No.
12  THE COURT: Government?
13  MR. FITZPATRICK: Are you confident that whatever
14  legal instructions the Judge gives you as to what you should
15  consider and not consider are things that you can follow?
16  THE JUROR: Yes.
17  MR. FITZPATRICK: Nothing further, Judge.
18  THE COURT: Defense?
19  MR. WELLS: Good afternoon, Mr. Murphy.
20  THE JUROR: Good afternoon.
21  MR. WELLS: You indicated to Judge Walton that you
22  had decided in your mind what happened. Could you tell me
23  what you have decided happened?
24  THE JUROR: I don't necessarily mean to say I've
25  decided what happened with the current, with this case. I

23

1  just meant with what led up to it.
2  MR. WELLS: Sure. Could you tell me what you
3  believe led up to it?
4  THE JUROR: From what I understand, from what I've
5  gathered was that the editorial was written. Vice
6  President's office sought to discredit that. Other
7  administration officials were involved.
8  Whether or not they actually were successful in
9  their efforts, I don't know. But Secretary Armitage is the
10  one, I guess, who came out and said that he was actually did
11  it, was the one that leaked it initially. That's what I know
12  of it.
13  MR. WELLS: Sure. When you said you think this
14  case is about what happened afterwards, what did you mean by
15  that?
16  THE JUROR: The impression I have is that this
17  trial is about Mr. Libby and his actions after all the
18  discrediting or whatever. After the leak came out, he was
19  questioned by authorities. They seemed to think he may have
20  lied about something. I don't know. I would have no way of
21  knowing that. And don't really have an opinion on whether or
22  not he did it.
23  MR. WELLS: Do you think that, if you were chosen
24  as a juror in this case and you started deliberations, that
25  you would be able to follow Judge Walton's instructions, that

24

1  you'd have to base your decisions solely on the evidence that
2  you heard in this courtroom
3  And to the extent you may have read something in
4  the newspaper or, even more importantly, you read something
5  on a blog since we all know those blogs can be --
6  THE JUROR: Some of them are pretty good.
7  MR. WELLS: Some of them are very good.
8  THE JUROR: I shy away from the crazies.
9  MR. WELLS: Okay. So the blogs that you recollect
10  reading, they were the good ones?
11  THE JUROR: Yes.
12  MR. WELLS: Okay. But nonetheless, you understand
13  you would have to keep out of the deliberations room anything
14  you had read in the mainstream press or on a blog, no matter
15  how good they may have been? You could do that?
16  THE JUROR: Sure.
17  MR. WELLS: And in terms of sitting as a juror
18  while you were listening to witnesses, do you think you could
19  keep that information out of your mind in terms of how you
20  processed information during the trial, how you might
21  perceive certain witnesses during the trial? Would you be
22  able to separate and forget that perhaps you had read
23  something about that particular witness in the past?
24  THE JUROR: Yes.
25  MR. WELLS: Do you ever watch Meet The Press?

25

1  THE JUROR: I do.
2  MR. WELLS: What are your opinions, if any, about
3  Tim Russert?
4  THE JUROR: I do enjoy his show. What specifically
5  do you mean? Do I think which way does he lean politically?
6  Is that what you mean?
7  MR. WELLS: No, no.
8  THE JUROR: Nice guy. Plays football.
9  MR. WELLS: There's no question that Mr. Russert is
10  going to be a witness in this case.
11  THE JUROR: Okay.
12  MR. WELLS: And one of the things the jurors in
13  this case will have to do is assess what weight they give to
14  Mr. Russert's testimony as to whether Mr. Russert's
15  recollection of certain events is accurate or perhaps
16  Mr. Russert's recollection of events might be mistaken.
17  THE JUROR: Okay.
18  MR. WELLS: Is the fact that you watch Meet The
19  Press and Tim Russert on somewhat of a regular basis, how
20  would that affect how you might judge and weigh Mr. Russert's
21  testimony in this case?
22  THE JUROR: I don't think it would be any different
23  than anybody else who took the stand.
24  MR. WELLS: Okay. So, the fact that you --
25  THE JUROR: I don't think it would sway me one way

26

1  or the other to, you know -- it wouldn't affect my judgment
2  on what he had to say I guess in the deliberations.
3  MR. WELLS: So your mind would start with a clean
4  slate in terms of whether it's possible that Mr. Russert
5  could be mistaken in terms of his recollection of a
6  particular conversation?
7  THE JUROR: Sure, it's possible.
8  MR. WELLS: Okay. What about Andrea Mitchell, are
9  you familiar with Andrea Mitchell?
10  THE JUROR: Yes.
11  MR. WELLS: What opinions, if any, do you have
12  about Andrea Mitchell?
13  THE JUROR: The same as Mr. Russert, that their
14  presence wouldn't affect me in any way on what they had to
15  say I guess.
16  MR. WELLS: Okay. Let me turn to a different
17  subject. What feelings or opinions do you have about
18  allegations that the Bush administration may have misled the
19  American public about the reasons for going to war in Iraq?
20  THE JUROR: Well, I don't think they intentionally
21  tried to mislead anybody. I think there was some poor
22  intelligence that was used and maybe the intelligence that
23  was used was the most convenient for their cause. And that
24  was used to sell to the American public.
25  Freeing Iraq from tyranny wasn't necessarily the

27

1  reason it was sold initially. It was the weapons of mass
2  destruction that was sold to the public, which, you know, did
3  its job. People bought into it. It's a scary thought.
4  I think nothing, nobody lied. I don't think there
5  was intent to lie and mislead. But I think that there was
6  some convenient choice of intelligence used to help the
7  cause. That's what I have to say about that.
8  MR. WELLS: Sure. Tell me about your feelings, if
9  any, about Vice President Cheney? Because he, like
10  Mr. Russert and Ms. Mitchell, may also be a witness in this
11  trial.
12  THE JUROR: I don't have the highest opinion of
13  him. I think he's a, you know -- he's done a lot for this
14  country. But I don't think it would affect how I process
15  what he has to say as a witness. I mean, he's under oath.
16  He should be telling the truth. The way I think of him
17  politically I don't think would affect my judgment on what
18  was said in court.
19  MR. WELLS: Is it fair to say that, with respect to
20  Vice President Cheney, you said you don't have the highest
21  opinion. In contrast to Mr. Russert, is your opinion neutral
22  with Mr. Russert or a high opinion?
23  THE JUROR: I would say neutral on the media with
24  them, yeah, Russert and I think Andrea Mitchell you said.
25  MR. WELLS: Well, the fact that you may not have

28

1  the highest opinion of Vice President Cheney, if it turned
2  out in the trial that there was a dispute between the
3  Government and the defense about how Vice President Cheney's
4  testimony should be interpreted, is the fact that you start
5  off with not having the highest opinion of Vice President
6  Cheney, could that affect how you would view that dispute
7  between the Government and the defense with respect to his
8  testimony?
9  THE JUROR: I don't think it would. I think I
10  could separate the two.
11  MR. WELLS: Okay. Now, as you heard, Mr. Libby was
12  the Chief of Staff to Vice President Cheney. Is the fact
13  that Mr. Libby was the Chief of Staff to a person who you do
14  not have the highest opinion of, might that in some way
15  impact your ability to be a fair and impartial juror in this
16  case where Mr. Libby is the defendant?
17  THE JUROR: I don't think it necessarily would, no.
18  MR. WELLS: Just one second, Your Honor.
19  Can you tell us what blogs you recall reading?
20  THE JUROR: Sure. I read Andrew Sullivan dot com
21  often. Time Magazine on line or Time dot com has a blog I've
22  read recently. You know, for some humor, political humor, I
23  get Wonkette dot com. I check them all out across the
24  spectrum, Powerline occasionally, Huffington Post
25  occasionally. I like to see what's out there.

29

```
 1            MR. WELLS:  Are you familiar with a reporter by the
 2   name of, for Time Magazine, Matthew Cooper?
 3            THE JUROR:  Sure.
 4            MR. WELLS:  Do you have any opinion one way or the
 5   other about Mr. Cooper?
 6            THE JUROR:  Not really, no.
 7            MR. WELLS:  Do you regularly read his stories?
 8            THE JUROR:  Maybe, to be honest, I wouldn't
 9   actually recall ever seeing his name and seeking out his
10   articles or anything like that.  I've read articles he may
11   have written but I don't recall.
12            MR. WELLS:  Tell me, where did you grow up?
13            THE JUROR:  Saint Paul, Minnesota.
14            MR. WELLS:  And any educational background?
15            THE JUROR:  College educated.
16            MR. WELLS:  Where?
17            THE WITNESS:  University of Iowa.
18            MR. WELLS:  Did you go to school after that?
19            THE JUROR:  No.  I moved out here, and I work in
20   finance out here.
21            MR. WELLS:  What was your undergraduate degree in?
22            THE JUROR:  I got a degree in finance and a degree
23   in accounting.
24            MR. WELLS:  Okay.  You moved to D.C. when?
25            THE JUROR:  About three years ago.
```

30

```
 1            MR. WELLS:  Could you tell me what you do on your
 2   job?
 3            THE JUROR:  Sure, I'm a financial analyst.
 4            MR. WELLS:  What exactly do you do?
 5            THE JUROR:  Exactly do I do on a regular basis?
 6   Pretty boring, a lot of number crunching and Excel
 7   spreadsheets right now.  It's an entry level finance job, so
 8   it's not too entertaining, but hopefully it will be down the
 9   road.  I don't know.  Anything else you want me to add about
10   that?
11            MR. WELLS:  In the couple of years that you've been
12   following this case, did you have occasion to discuss the
13   case with friends or relatives?
14            THE JUROR:  Sure.
15            MR. WELLS:  When you discussed the case with
16   friends or relatives during the past couple years, can you
17   tell us what positions or the nature of your discussions?
18            THE JUROR:  A lot of discussions over three years
19   but, you know, various subjects involving the last three
20   years in politics in D.C.  It was all over the place.  I'm
21   not sure what specifically --
22            MR. WELLS:  What I'm trying to understand, if you
23   had read a blog about this case or seen a TV show about this
24   case and you were sitting down with your friends, can you
25   relate to me and the rest of the people in the courtroom what
```

31

```
 1   opinions you expressed, what you said about what you were
 2   hearing?
 3            THE JUROR:  I mean, I don't recall any specific
 4   conversations off the top of my head.  But I had many
 5   conversations with friends that work around here, with my
 6   father, you know, after watching any sort of, you know, one
 7   of the Sunday shows or reading an article or sending each
 8   other articles or something like that.  I don't know.  I'm
 9   not sure.
10            MR. WELLS:  What I'm trying to get at --
11            THE JUROR:  Are you looking for a specific opinion
12   about an actual subject?
13            MR. WELLS:  No, I'm trying to get an understanding
14   of what you might have said about the case to a friend or to
15   your father.
16            THE JUROR:  I'm drawing a blank.  I'm trying to
17   think of something specific I would have said.  I mean I
18   already sort of said what I think about what happened.
19            MR. WELLS:  Right, right.
20            THE JUROR:  It would have been in that same vain I
21   guess.
22            MR. WELLS:  What about your father?  Do you
23   remember what opinion he expressed to you?
24            THE JUROR:  I don't remember a specific one, but
25   he's not a huge fan of Washington politics, but that isn't
```

32

```
 1   something we need to add.
 2            MR. WELLS:  Would that affect your ability to be a
 3   fair and impartial juror in this case in any way?
 4            THE JUROR:  No.
 5            MR. WELLS:  I have no further questions.
 6            THE COURT:  Let me just understand, are you saying
 7   that you differentiate between your political views as it
 8   relates to Vice President Cheney as compared to your
 9   assessment of his believability or credibility as a person?
10            THE JUROR:  I think that, you know, he's going to
11   come into a court of law under oath, and I don't think it
12   would sway me one way or the other what I've come to think
13   about him as a person.  I think you take the facts of the
14   case and make up your mind.  What I'm saying is I guess I
15   wouldn't let that, what I think of him, affect how I would
16   deliberate I guess.
17            THE COURT:  Would you be able to judge his
18   credibility just like anybody else?
19            THE JUROR:  If I put it this way, I guess maybe I
20   would have to say what you're getting at, I would have to say
21   maybe no.
22            THE COURT:  Maybe no?
23            THE JUROR:  Yeah.  What I would say is I would like
24   to think that I'd be impartial.  I think I am impartial.  I
25   would be impartial.  But I'm saying if you're going to say
```

33

1 credibility, if I had to rank people based on their
2 credibility, I wouldn't put him at the top of the list
3 outside of the courtroom. But on the inside of the courtroom
4 everybody is on even playing field.
5     THE COURT: So if he said one thing during this
6 case and somebody else said something totally different and
7 it's clear that one --
8     THE JUROR: Somebody's lying?
9     THE COURT: Somebody wasn't telling the truth,
10 would you disfavor his testimony based upon your impressions
11 of him?
12    THE JUROR: I can't honestly say I wouldn't. I
13 would say that I would, I'd like to think I could not let
14 that affect it. But I don't know, to be honest. I'm not
15 sure.
16    MR. WELLS: Mr. Murphy, the issue is we all agree
17 that all witnesses who come into the courtroom and take an
18 oath are expected to tell the truth. But in most cases,
19 jurors ultimately have to choose sides or decide whose
20 testimony to give more weight to or whose testimony to
21 reject.
22       What we're trying to get at is whether your present
23 feelings about Vice President Cheney might impact you in some
24 way from judging Vice President Cheney's testimony as if you
25 had no opinion.

34

1     THE JUROR: Right.
2     MR. WELLS: Okay. And that's what we're struggling
3 to get at. There is no right answer. All we're trying to do
4 is pick a fair jury and make sure that both sides, and that
5 all the witnesses start out on an even playing -- that's what
6 we struggle with.
7     THE JUROR: I agree. I mean you should have a fair
8 trial with an impartial jury. I guess I'm saying that if I
9 had to, if there were, he was one option and the other option
10 was somebody else, and you had to decide who was the more
11 credible, I can't honestly say that it wouldn't affect me. I
12 would try to let it not.
13       I would like to think that I would be able to sit
14 there and, you know, impartially look at it. I think I
15 would. But I can't say that subconsciously I'm thinking that
16 he's a less credible person than the other. Do you know what
17 I'm saying?
18    MR. WELLS: Sure. No, I understand exactly, and I
19 appreciate your candor. Let me ask this question again. If
20 Mr. Libby, who was the Chief of Staff for Vice President
21 Cheney, if he takes the witness stand and you have to judge
22 his credibility, would you be able to separate in your mind
23 some of the negative feelings you may have about Vice
24 President Cheney from Mr. Libby?
25       Or is it possible that those feelings about Vice

35

1 President Cheney might bleed over, in some subconscious way
2 even, to how you view Mr. Libby?
3     THE JUROR: Some subconscious way, who knows, I
4 mean maybe. But I don't have, I don't know much about Mr.
5 Libby as I do about Mr. Cheney. So I don't have as strong of
6 an opinion about him, much of any, actually. I don't know
7 much about him.
8        So, I don't think there's anything about him
9 specifically that would sway me one way or the other. The
10 fact that he worked for the Vice President, well, I don't
11 think would affect it. But I mean if you're going to state
12 it in some subconscious way that I can't really say I can't,
13 I don't know.
14    MR. WELLS: That's why I used the word struggling
15 because all of us again are trying to select jurors who will
16 start the case fresh, with respect, not only to the
17 defendant, but with respect to the witnesses.
18       And though it's difficult to articulate, what we
19 are concerned about is how your preexisting feelings may
20 operate in some subconscious way to impact on the
21 impartialness of how you view the evidence. It's very
22 difficult. It's difficult for us to get at. It's difficult
23 for you to struggle with. So we all have the same goal.
24    THE JUROR: If it's got to be a yes or a no, I
25 don't know, I guess I would say no. It would make it

36

1 difficult for me I guess.
2     MR. WELLS: To be impartial?
3     THE JUROR: Yeah, I think it wouldn't now. I don't
4 know. I don't think it's left or right about it. I think
5 it's pretty gray.
6     THE COURT: Let me see if I can ask it this way.
7     THE JUROR: I don't want to make this more
8 difficult than it has to be.
9     THE COURT: I understand. It's important. This is
10 one of the most important parts of the trial.
11    THE JUROR: Right.
12    THE COURT: But I guess what I'm trying to get at
13 is, would you be able to put Vice President Cheney on the
14 same footing as another witness in assessing his
15 believability as a witness, or would he have a strike or
16 several against him because of your feelings that you have
17 about him?
18    THE JUROR: Probably Option B there.
19    THE COURT: That he would have a strike against
20 him?
21    THE JUROR: Yeah, but I wouldn't -- yeah.
22    MR. WELLS: Thank you, Your Honor.
23    THE COURT: If you would have a seat over there for
24 a minute, counsel approach.
25       (Bench conference.)

37

```
 1              MR. WELLS:  We would move to have him excused for
 2   cause, Your Honor.
 3              MR. FITZPATRICK:  We won't object.
 4              THE COURT:  Okay.
 5              (Open Court.)
 6              THE COURT:  Okay, sir, we appreciate your candor.
 7   And you can go to the juror lounge and tell them that you
 8   were excused in this case.  Thank you.
 9              THE COURT:  Juror Number 0425?
10              THE JUROR:  Yes, sir.
11              THE COURT:  You had a couple responses, first of
12   all, to Question Number 2, which asks about Mr. Libby.  And I
13   explained to you what position he previously held.  And I
14   asked whether you had any feelings or opinions about the Bush
15   administration and its actions or policies and whether any of
16   those feelings might affect your ability to be a fair and
17   impartial juror in this case.  You want to tell me your
18   response?
19              THE JUROR:  I am completely without objectivity.
20              THE COURT:  You're completely without objectivity?
21              THE JUROR:  Yes, sir.
22              THE COURT:  What do you mean by that?
23              THE JUROR:  That there is probably nothing that
24   they could say or do that would make me think anything
25   positive about them.
```

38

```
 1              THE COURT:  So you feel you could not be a fair and
 2   impartial juror in this case?
 3              THE JUROR:  No, sir.
 4              THE COURT:  Very well, you can go down to the
 5   juror's lounge and tell them that you were excused in this
 6   case.  Thank you.
 7              THE JUROR:  You're welcome.
 8              THE COURT:  You're Juror Number 2027?
 9              THE JUROR:  Yes.
10              THE COURT:  You had a couple of responses.  You had
11   a response to Question Number 3B, which asks whether you have
12   heard or read anything about this case.  Is that right?
13              THE JUROR:  Yes.
14              THE COURT:  You want to tell me what you remember
15   hearing or reading about the case?
16              THE JUROR:  I can't remember any very specific
17   thing.  I mean I know from the news that there was an
18   investigation and an indictment.
19              THE COURT:  Do you remember specifically what you
20   have heard or read or you just don't recall the specifics?
21              THE JUROR:  You know, I don't recall a very
22   specific, you know, article that I read or something that I
23   heard.  I only know generally what you said about the case,
24   you know.  But I don't know if there's anything exact.
25              THE COURT:  Did you form any opinions about the
```

39

```
 1   case as a result of what you heard or read?
 2              THE JUROR:  No.
 3              THE COURT:  If you're selected as a juror in this
 4   case, although you say you can't remember the specifics of
 5   what you heard or read, you cannot consider what you heard or
 6   read in your assessment of this case.  Do you understand
 7   that?
 8              THE JUROR:  Yes, I understand that.
 9              THE COURT:  Would you be able to do that?
10              THE JUROR:  Yes.
11              THE COURT:  And judge this case only upon what you
12   hear and see in this courtroom?
13              THE JUROR:  Yeah.
14              THE COURT:  You also had a response to Question
15   Number 4, which asks whether you knew anybody else in the
16   courtroom.
17              THE JUROR:  Not in here, but when I got to the jury
18   room this morning, she's not really a friend of mine but we
19   both go to the same personal trainer.  And so she comes in
20   after me on Saturday mornings.
21              THE COURT:  So it's one of the jurors?
22              THE JUROR:  It's one of the jurors.
23              THE COURT:  Have you ever had conversations with
24   her besides hi and bye?
25              THE JUROR:  We went for a walk at lunch time, but
```

40

```
 1   that's the only time we've actually been more than I'm
 2   leaving and she's coming in.
 3              THE COURT:  Did you have any discussions about this
 4   case?
 5              THE JUROR:  No.
 6              THE COURT:  If she were by chance selected to this
 7   jury and you were also, would you have any problems serving
 8   with her?
 9              THE JUROR:  No.
10              THE COURT:  If you felt that she was taking a
11   position that you could not agree with, would you disagree
12   with her?
13              THE JUROR:  Yes.
14              THE COURT:  Would you have any problems agreeing
15   with her if you thought that was appropriate?
16              THE JUROR:  Would I have a problem?  No, that would
17   be fine.
18              THE COURT:  You also had a response to Question
19   Number 21, which asks whether you are a lawyer or whether you
20   have ever studied law.
21              THE JUROR:  Yes, I'm a lawyer.
22              THE COURT:  What type of law do you practice or do
23   you practice?
24              THE JUROR:  Consumer protection.
25              THE COURT:  Who do you work for?
```

41

1   THE JUROR: The Federal Trade Commission.
2   THE COURT: How long have you been with the FTC?
3   THE JUROR: Forever, before I had gray hair.
4   THE COURT: Do you practice, have you ever done
5   criminal law?
6   THE JUROR: When I was in law school, I did. I
7   worked in the criminal law clinic, and they had an
8   arrangement with the legal service. It was Legal Aid Society
9   up in New York. So, we did some defense work.
10   Before I went to law school, I worked for a city
11   agency that referred a case for criminal investigation to the
12   U.S. Attorney's office. I went over there on detail. So
13   I've done both as an investigator or as a lawyer, both
14   prosecution and defense work. That was all many years ago.
15   THE COURT: What law school did you go to?
16   THE JUROR: N.Y.U.
17   THE COURT: And I assume you, in law school, took
18   courses on criminal law, criminal procedure and evidence?
19   THE JUROR: Certainly evidence.
20   THE COURT: Constitutional law?
21   THE JUROR: Con'law, yes. That was required.
22   THE COURT: Do you think your knowledge of the law
23   that you gained from studying the law would in any way impair
24   your ability to follow and accept my instructions of law
25   during the trial?

42

1   THE JUROR: No.
2   THE COURT: Do you think your prior experience,
3   either working with the prosecution or doing defense work,
4   would in any way cause you to favor one side or the other in
5   this case?
6   THE JUROR: No.
7   THE COURT: You also had a response to Question
8   Number 22, which asks whether you, close friends or relatives
9   have ever served as a defense lawyer, defense investigator or
10   in some other capacity where services were provided to people
11   charged with crimes or applied for employment in such a
12   position. Besides what you've already told me, anything
13   else?
14   THE JUROR: No. I was referring to the third year
15   in law school.
16   THE COURT: Okay. You also had a response to
17   Question Number 29, which asks whether you've previously
18   served as a grand juror or petit juror in a criminal case.
19   Do you want to tell me about that?
20   THE JUROR: Several years ago, it was maybe three
21   or four years ago, I was on a criminal trial in Superior
22   Court.
23   THE COURT: Do you remember what type of case it
24   was?
25   THE JUROR: It was an individual who had had his

43

1   wallet stolen.
2   THE COURT: Was there a decision rendered?
3   THE JUROR: I don't know. At the conclusion, I
4   turned out to have been the alternate. And I kept meaning to
5   call but I never found out what happened.
6   THE COURT: Is that your only prior experience?
7   THE JUROR: Yes.
8   THE COURT: Was there anything about your
9   experience as a juror in that case that might impair your
10   ability to be a fair and impartial juror in this case?
11   THE JUROR: No.
12   THE COURT: So are you totally confident you can be
13   fair to both sides?
14   THE JUROR: Yes.
15   THE COURT: Government?
16   MR. FITZPATRICK: Good afternoon. Have you ever
17   done trial work yourself?
18   THE JUROR: I have worked on three trials.
19   MR. FITZPATRICK: How many were criminal and how
20   many civil?
21   THE JUROR: You mean as an attorney?
22   MR. FITZPATRICK: Yes.
23   THE JUROR: As an attorney, they were all civil.
24   MR. FITZPATRICK: The other question I had is this
25   other juror that you recognized this morning or this

44

1   afternoon, were you close enough that you knew her name
2   before today or just someone whose face you recognized?
3   THE JUROR: I knew her name because when, you know,
4   when she would come in, Kelly, the person that I was, my
5   trainer always referred to her, said hello to her, so I knew
6   her name.
7   MR. FITZPATRICK: Lastly, do you know what papers
8   you read about, generally about this case, what papers you
9   regularly read?
10   THE JUROR: I guess The Post. We get every morning
11   at the Metro station there's a little paper that The Post
12   puts out. There is another, it's called The Examiner that I
13   get in the morning. I usually do the crossword puzzle on
14   that, but if I have extra time. But occasionally on Sundays,
15   I might get the New York Times, but I haven't recently.
16   MR. FITZPATRICK: If, during the trial you either
17   heard testimony from or testimony about particular Washington
18   Post reporters, including Bob Woodward or Glenn Kessler or
19   Walter Pincus, or New York Times reporter Judith Miller,
20   would you have any preconceived opinions of their credibility
21   as you judge them as a juror?
22   THE JUROR: No.
23   THE COURT: Defense?
24   MR. JEFFRESS: Is it Ms. Russell?
25   THE JUROR: Yes.

45

MR. JEFFRESS: A few more questions about, do you watch television news as well as read the newspapers from time to time?

THE JUROR: Yes, sure.

MR. JEFFRESS: You do? Okay. Do you recall seeing things about this case or the investigation that led to this case on television over the years?

THE JUROR: You know, I'm sure that I did. But, you know, I don't have an actual specific recollection of sitting in front of the television and -- I actually correct myself, this morning I think that they did mention that jury selection was taking place today. Since, you know, I was being called for a special trial, I figured that that's what it was about.

MR. JEFFRESS: That was the first time you realized, hey, that may be me on this case?

THE JUROR: I don't know. I guess generally when you get a notice that says special trial, this was a big case that was coming up.

MR. JEFFRESS: Well, in all the things that you did see on TV and recognize that you don't recall specific facts, did you ever reach an opinion that somebody is guilty of something or somebody must be guilty of something, anything like that?

THE JUROR: No.

46

MR. JEFFRESS: You did not, okay.

There has been controversy over whether the credibility of intelligence or the credibility of statements by the President and his administration prior to the war in Iraq. Have you been following that controversy or watching TV or discussing it with other people?

THE JUROR: I know that there were newspaper articles or news that said that intelligence that led up to the war in Iraq turned out later not to have been correct.

MR. JEFFRESS: Do you have any reason, based on what you have heard, any reason to have an opinion that members of the Bush administration are less credible than other people?

THE JUROR: No.

MR. JEFFRESS: On another subject, Judge Walton asked you, when you were out in the audience, questions about memory and about how memory works. Could I ask you this? Have you ever, in your experience, had a time when you seemed absolutely certain that you remembered something and then that turned out to be wrong?

THE JUROR: Sure.

MR. JEFFRESS: When you hear two people, as I'm sure you have, hear two people disagreeing over what happened or when it happened or who said what, do you tend to think one of them is lying or do you tend to think they could both

47

be telling the truth about what they remember?

THE JUROR: It depends on what the circumstances are. Sometimes it's obvious someone is not telling the truth and sometimes it's obvious that people just remember things differently.

MR. JEFFRESS: The fact that people do disagree about what happened in the past, that doesn't necessarily lead you to conclude that one of them must be lying?

THE JUROR: No.

MR. JEFFRESS: And one other question. Did you ever testify, apart from obviously you've been in court as a lawyer, but have you ever testified as a witness?

THE JUROR: In a trial?

MR. JEFFRESS: In a trial.

THE JUROR: No. I testified as a grand jury witness once 30 years ago. Remember when I said that one of the cases that I worked on, when I worked as an investigator and it got sent over for investigation, I was the investigator on that case for the city health department. So, I did testify about that before a grand jury.

MR. JEFFRESS: You testified in a grand jury but not cross-examined obviously?

THE JUROR: No.

MR. JEFFRESS: Okay. And the final question, have you ever heard anybody express an opinion to you or in your

48

presence about Scooter Libby or about this case?

THE JUROR: I guess I'm not trying to be difficult here, but --

MR. JEFFRESS: There are no right answers.

THE JUROR: If I've read newspaper articles, I'm sure that some of the articles have taken positions. Like, have I had long discussions with any of my friends or in a social, where people had strong views one way or the other, no.

MR. JEFFRESS: That's all I have, Your Honor.

THE COURT: Okay. Don't talk about the case with anybody or what we said in here. Also avoid all media. There may be media coverage about what happened today, so avoid all media coverage about the case.

Be here tomorrow at 3:00. So you can go down and tell the juror's lounge that you have been excused until 3:00 tomorrow. I don't think we'll need you before then.

THE JUROR: Okay.

THE COURT: Have a nice evening.

(Juror out.)

THE COURT: We'll have to break for the day. I apologize. We'll start back at 9:30. Hopefully, we'll be able to move things along. Have a good evening. Thank you very much.

(Whereupon, at 3:00 p.m. the above trial was adjourned.)

```
 1
 2
 3
 4                    CERTIFICATE OF REPORTER
 5        I, Lisa Walker Griffith, certify that the
 6   foregoing is a correct transcript from the record of
 7   proceedings in the above-entitled matter.
 8
 9
10
11
12        [signature]                    1-17-07
13   _____       _____
     Lisa Walker Griffith, RPR
14
15
...
25
```

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 MAR 27  AM 10: 28

NANCY M.
MAYER-WHITTINGTON
CLERK