UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
       GOVERNMENT,     :

VS.              :     CR. NO. 05-394

I. LEWIS LIBBY,     :
       DEFENDANT,     :

**FILED**

MAR 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JANUARY 17, 2007
A. M. SESSION

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE REGGIE B. WALTON

FOR THE GOVERNMENT:     PATRICK FITZGERALD, SPECIAL COUNSEL
                     U. S. DEPARTMENT OF JUSTICE
                     219 SOUTH DEARBORN STREET
                     CHICAGO, ILLINOIS  60604
                     312-353-5300

                     DEBRA R. BONAMICI
                     OFFICE OF SPECIAL COUNSEL
                     219 SOUTH DEARBORN STREET
                     ROOM 500
                     CHICAGO, ILLINOIS   60604
                     312-353-3741

                     PETER ZEIDENBERG, AUSA
                     U. S. DEPARTMENT OF JUSTICE
                     1400 NEW YORK AVE., N. W.
                     ROOM 12-405.
                     WASHINGTON, D. C. 20005
                     202-514-1412

COURT REPORTER:        PHYLLIS MERANA
                     6423 U. S. COURTHOUSE
                     333 CONSTITUTION AVE., N. W.
                     WASHINGTON, D. C. 20001
                     202-354-3243

328

```
1    APPEARANCES:   (CONTINUED.)

2    FOR THE GOVERNMENT          KATHLEEN M. KEDIAN
                                 U. S. DEPARTMENT OF JUSTICE
3                                CRIMINAL DIVISION
                                 COUNTERESPIONAGE SECTION
4                                THE BOND BUILDING
                                 1400 NEW YORK AVE, N. W.
5                                ROOM 9100
                                 WASHINGTON, D. C. 20005
6                                202-353-4473

7    FOR THE DEFENDANT:          JOHN CLINE, ESQ.
                                 JONES DAY
8                                555 CALIFORNIA STREET
                                 26TH FLOOR
9                                SAN FRANCISCO, CA.  94104
                                 415-626-3939
10
                                 WILLIAM JEFFRESS, ESQ.
11                               BAKER BOTTS, LLP
                                 THE WARNER
12                               1299 PENNSYLVANIA AVE., N.W.
                                 WASHINGTON, D. C.  20004
13                               202-639-7751

14                               THEODORE WELLS, JR., ESQ
                                 1285 AVENUE OF THE AMERICAS
15                               PAUL, WEISS, RIFKIND, WHARTON &
                                 GARRISON, LLP
16                               1285 AVENUE OF THE AMERICAS
                                 NEW YORK, N. Y.  10019-6064
17                               212-373-3089

18

19

20

21

22

23

24

25
```

3

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2              (THE DEFENDANT AND COUNSEL WERE PRESENT.)

 3              THE DEPUTY CLERK:  CRIMINAL NUMBER 05-394, UNITED

 4       STATES OF AMERICA VERSUS I. LEWIS LIBBY.

 5              COUNSEL, PLEASE IDENTIFY YOURSELVES FOR THE

 6       RECORD.

 7              MR. ZEIDENBERG:  GOOD MORNING, YOUR HONOR.  PETER

 8       ZEIDENBERG FOR THE UNITED STATES, ALONG WITH MR. FITZGERALD,

 9       WHO WILL BE IN IN JUST A MINUTE, AND MS. KEDIAN.

10              THE COURT:  GOOD MORNING.

11              MR. WELLS:  TED WELLS ON BEHALF OF DEFENDANT LEWIS

12       LIBBY AND BILL JEFFRESS, K. C. MAXWELL, ALEX BOURELLY AND

13       JAMES BROCHIN.

14              THE COURT:  GOOD MORNING.

15              OKAY, LET'S BRING IN THE NEXT JUROR.

16              (PROSPECTIVE JUROR ENTERING THE COURTROOM.)

17              THE COURT:  YOU ARE JUROR NUMBER 2148?

18              THE PROSPECTIVE JUROR:  YES.

19              THE COURT:  GOOD MORNING.

20              THE PROSPECTIVE JUROR:  GOOD MORNING.

21              THE COURT:  YOU HAD A COUPLE RESPONSES.  YOU HAD A

22       RESPONSE -- LET ME JUST SAY, IF I ASK YOU ANY QUESTIONS THAT

23       WOULD BE SENSITIVE AND YOU WOULD WANT TO JUST RELATE THAT TO

24       ME HERE AT THE BENCH, JUST LET ME KNOW.

25              THE PROSPECTIVE JUROR:  OKAY.
```

1      THE COURT:  YOU HAD A RESPONSE TO QUESTION NUMBER

2  3(B) WHICH ASKED WHETHER YOU HAVE HEARD OR READ ANYTHING

3  ABOUT THE CASE.  DO YOU WANT TO TELL ME ABOUT THAT?

4      THE PROSPECTIVE JUROR:  BASICALLY, I JUST HEARD

5  ABOUT IT AS IT DEVELOPED A FEW YEARS AGO.  I DON'T HAVE A

6  LOT OF MEMORY ABOUT THE DETAILS, BUT --

7      THE COURT:  WHAT MEMORY DO YOU HAVE?

8      THE PROSPECTIVE JUROR:  I THINK THAT JUST AS THE

9  CASE UNFOLDED, I KNOW THAT, YOU KNOW, MR. LIBBY WAS SORT OF

10  CHARGED WITH A NUMBER OF THINGS.  BUT OTHER THAN THAT, I

11  REALLY DIDN'T FOLLOW IT.

12      THE COURT:  DID YOU REACH ANY CONCLUSIONS ABOUT

13  HIS GUILT OR INNOCENCE BASED UPON WHAT YOU READ OR HEARD?

14      THE PROSPECTIVE JUROR:  NOT REALLY.  I ALWAYS FEEL

15  LIKE I NEED TO KNOW MORE INFORMATION BEFORE I REACH

16  CONCLUSIONS.

17      THE COURT:  SO YOU'RE SAYING YOU HAVE NO

18  IMPRESSIONS ABOUT HIS GUILT OR INNOCENCE AT THIS TIME?

19      THE PROSPECTIVE JUROR:  UH-HUH.

20      THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

21  NUMBER 21 WHICH ASKED WHETHER YOU HAVE EVER STUDIED LAW OR

22  WHETHER YOU ARE A LAWYER.

23      THE PROSPECTIVE JUROR:  CORRECT.  I AM NOT A

24  LAWYER, ALTHOUGH I DID STUDY LAW IN THE PUBLIC HEALTH -- I

25  DID GRADUATE SCHOOL IN PUBLIC HEALTH, AND I TOOK A COUPLE OF

1  LAW COURSES THAT RELATED TO LAW AND INTERACTIONS WITH PUBLIC

2  HEALTH.

3          THE COURT:  DO YOU THINK THAT KNOWLEDGE THAT YOU

4  ACQUIRED TAKING THOSE COURSES WOULD IN ANY WAY IMPAIR YOUR

5  ABILITY TO ACCEPT AND FOLLOW MY INSTRUCTIONS GIVEN DURING

6  THE TRIAL?

7          THE PROSPECTIVE JUROR:  IMPAIR?

8          THE COURT:  YES.

9          THE PROSPECTIVE JUROR:  NO.

10         THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

11 NUMBER 25 WHICH ASKED WHETHER YOU HAVE EVER HELD A POSITION

12 WHERE YOU HAD ACCESS TO CLASSIFIED INFORMATION.  DO YOU NEED

13 TO TALK TO ME ABOUT THAT HERE AT THE BENCH?

14         THE PROSPECTIVE JUROR:  NO.  ACTUALLY, I DO NOT

15 HAVE ACCESS TO CLASSIFIED INFORMATION AT THE MOMENT.

16 HOWEVER, I HAVE BEEN ASKED TO SUBMIT THE PAPERWORK TO GET

17 THAT SORT OF ACCESS IN MY WORK.

18         THE COURT:  SO YOU HAVE NEVER HAD ACCESS TO IT

19 YOURSELF.  YOU HAVE JUST MADE A REQUEST FOR IT.

20         THE PROSPECTIVE JUROR:  I HAVE BEEN ASKED TO

21 SUBMIT MY PAPERWORK TO HAVE THAT.

22         THE COURT:  DO YOU THINK HAVING DONE THAT WOULD

23 HAVE ANY EFFECT ON YOUR ABILITY TO SIT IN A CASE WHERE THERE

24 WILL BE TESTIMONY ABOUT CLASSIFIED INFORMATION?

25         THE PROSPECTIVE JUROR:  USUALLY -- I THINK GETTING

1  CLEARANCE FOR CLASSIFIED INFORMATION TAKES SEVERAL MONTHS.

2  SO PROBABLY NOT, IF THIS CASE IS HAPPENING IN THE NEXT FEW

3  WEEKS.

4          THE COURT:  I GUESS MY QUESTION IS WHETHER YOUR

5  HAVING BEEN INVOLVED IN THAT TYPE OF WORK WOULD HAVE ANY

6  IMPACT ON YOUR ABILITY TO FAIRLY JUDGE THIS CASE IN LIGHT OF

7  THE FACT THAT THERE WILL BE TESTIMONY AND INFORMATION

8  PRESENTED RELATED TO CLASSIFIED INFORMATION?

9          THE PROSPECTIVE JUROR:  I DON'T KNOW THE ANSWER TO

10  THAT QUESTION.  I DON'T THINK SO, BUT NOT HAVING HAD ACCESS

11  TO CLASSIFIED INFORMATION, I CAN'T ANSWER THE QUESTION

12  UNLESS MAYBE YOU ELABORATE A LITTLE BIT MORE.

13          THE COURT:  WELL, YOU HAVE TO BE ABLE TO JUDGE

14  THIS CASE SOLELY BASED UPON WHAT YOU HEAR AND SAY IN THIS

15  COURTROOM.  IF OTHER EVENTS THAT HAVE TAKEN PLACE IN THE

16  PAST COULD IN SOME WAY CREEP IN AND AFFECT YOUR ABILITY TO

17  JUDGE THIS CASE BASED ONLY UPON WHAT YOU HEAR AND SEE IN THE

18  COURTROOM, THAT WOULD BE A PROBLEM.

19          SO I GUESS I NEED TO KNOW WHETHER THE FACT THAT

20  YOU HAVE BEEN INVOLVED IN WHAT YOU HAVE INDICATED REGARDING

21  CLASSIFIED INFORMATION WOULD HAVE ANY BEARING ON YOUR

22  ABILITY TO FAIRLY JUDGE THIS CASE BASED ONLY UPON WHAT YOU

23  HEAR AND SEE IN THIS COURTROOM.

24          THE PROSPECTIVE JUROR:  NO.

25          THE COURT:  OKAY.  YOU ALSO HAD A RESPONSE TO

1    QUESTION NUMBER 30 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

2    RELATIVES HAVE EVER BEEN THE VICTIM OF A CRIME, SOMEONE

3    CHARGED WITH A CRIME OR A WITNESS TO A CRIME.  DO YOU WANT

4    TO TELL ME ABOUT THAT?

5              THE PROSPECTIVE JUROR:  I WAS HELD UP AT GUNPOINT

6    AND ROBBED, BUT IT WASN'T IN THIS COUNTRY.

7              THE COURT:  WHERE WAS IT?

8              THE PROSPECTIVE JUROR:  IN HAITI.

9              THE COURT:  HOW LONG AGO WAS THAT?

10             THE PROSPECTIVE JUROR:  FIVE YEARS.

11             THE COURT:  WERE YOU INJURED?

12             THE PROSPECTIVE JUROR:  NO.

13             THE COURT:  WAS ANYBODY ARRESTED?

14             THE PROSPECTIVE JUROR:  NO.

15             THE COURT:  DID YOU REPORT IT TO THE POLICE?

16             THE PROSPECTIVE JUROR:  NO.  THERE WAS NO POLICE

17   TO REPORT TO.

18             THE COURT:  DO YOU THINK THAT EXPERIENCE THAT YOU

19   HAD AS A ROBBERY VICTIM WOULD IN ANY WAY AFFECT YOUR ABILITY

20   TO BE A FAIR AND IMPARTIAL JUROR IN THIS CASE?

21             THE PROSPECTIVE JUROR:  NO.

22             THE COURT:  ARE YOU TOTALLY CONFIDENT YOU CAN BE

23   FAIR TO BOTH SIDES IN THIS TRIAL?

24             THE PROSPECTIVE JUROR:  YES.

25             THE COURT:  GOVERNMENT.

1    MR. FITZGERALD:  GOOD MORNING.

2    THE PROSPECTIVE JUROR:  GOOD MORNING.

3    MR. FITZGERALD:  CAN YOU TELL US WHAT YOU DO DAY

4 TO DAY IN YOUR JOB?

5    THE PROSPECTIVE JUROR:  SURE.  I AN AM

6 INTERNATIONAL HEALTH OFFICER IN THE OFFICE OF THE SECRETARY

7 FOR HEALTH AND HUMAN SERVICES.  AND THAT WORK MOSTLY

8 INVOLVES TWO MAIN THINGS:  ONE IS STAFFING THE SECRETARY IN

9 THE INTERNATIONAL TRAVEL THAT HE UNDERTAKES; AND THE OTHER

10 IS HELPING TO DEVELOP U.S. POLICY POSITIONS ON PUBLIC HEALTH

11 MATTERS THAT ARE INTERNATIONALLY-ORIENTED.

12    MR. FITZGERALD:  AND DO YOU TRAVEL WITH THE

13 SECRETARY?

14    THE PROSPECTIVE JUROR:  I HAVE NOT, BUT IT IS A

15 POSSIBILITY.

16    MR. FITZGERALD:  AND HAVE YOU TRAVELED MUCH FOR

17 WORK?

18    THE PROSPECTIVE JUROR:  ONLY A LITTLE BIT.

19    MR. FITZGERALD:  HAVE YOU EVER TRAVELED TO NIGER,

20 BY ANY CHANCE?

21    THE PROSPECTIVE JUROR:  NO, I HAVE NOT.

22    MR. FITZGERALD:  WHAT NEWSPAPERS DO YOU READ DAY

23 TO DAY?

24    THE PROSPECTIVE JUROR:  THE WASHINGTON POST, THE

25 NEW YORK TIMES SOMETIMES.  AS FAR AS NEWSPAPERS, THAT'S IT.

1    MR. FITZGERALD:  AND WHAT T.V. SHOWS DO YOU WATCH
2  REGULARLY, OR NEWS SHOWS?

3    THE PROSPECTIVE JUROR:  I DON'T WATCH NEWS SHOWS.

4    MR. FITZGERALD:  IF I CAN HAVE ONE MOMENT, JUDGE.

5    THE COURT:  YES.

6    MR. FITZGERALD:  THANK YOU.

7    THE COURT:  DEFENSE?

8    MR. WELLS:  GOOD MORNING.

9    THE PROSPECTIVE JUROR:  GOOD MORNING.

10    MR. WELLS:  WHERE DID YOU GROW UP?

11    THE PROSPECTIVE JUROR:  I GREW UP IN SOUTH
12  AMERICA.

13    MR. WELLS:  AND HOW LONG -- WHEN DID YOU MOVE TO
14  THE U.S.?

15    THE PROSPECTIVE JUROR:  WHEN I WAS NINE.

16    MR. WELLS:  NINE, OKAY.  AND WHERE IN THE U.S. DID
17  YOU GROW UP?

18    THE PROSPECTIVE JUROR:  ALL OVER.  PHILADELPHIA,
19  NEW MEXICO, VERMONT.

20    MR. WELLS:  OKAY.  AND HOW LONG HAVE YOU LIVED IN
21  WASHINGTON, D.C.?

22    THE PROSPECTIVE JUROR:  ABOUT A YEAR AND A HALF.

23    MR. WELLS:  COULD YOU GIVE ME YOUR EDUCATIONAL
24  BACKGROUND?

25    THE PROSPECTIVE JUROR:  I WENT TO COLLEGE, TO

1   SWARTHMORE COLLEGE, AND I DID GRADUATE COLLEGE AT EMORY IN

2   ATLANTA IN PUBLIC HEALTH.

3            MR. WELLS:  DID YOU GET A DEGREE FROM EMORY?

4            THE PROSPECTIVE JUROR:  YES.

5            MR. WELLS:  IN PUBLIC HEALTH?

6            THE PROSPECTIVE JUROR:  YES.

7            MR. WELLS:  WHEN DID YOU GRADUATE FROM EMORY?

8            THE PROSPECTIVE JUROR:  2001, I THINK.

9            MR. WELLS:  OKAY.  WHAT OPINIONS OR FEELINGS DO

10  YOU HAVE ABOUT ALLEGATIONS THAT HAVE BEEN MADE THAT THE BUSH

11  ADMINISTRATION WAS NOT CANDID WITH THE AMERICAN PUBLIC ABOUT

12  THE REASONS FOR GOING TO WAR IN IRAQ?

13           THE PROSPECTIVE JUROR:  IN OTHER WORDS, WHAT IS MY

14  OPINION ON THAT ALLEGATION?

15           THE COURT:  DO YOU HAVE AN OPINION ABOUT IT?

16           THE PROSPECTIVE JUROR:  YES, I HAVE AN OPINION.

17  AND I THINK, LIKE, ANY POLITICAL OR ISSUES RELATED TO

18  GOVERNMENT AND GOVERNMENT PROCESSES ARE TOUGH CALLS,

19  BASICALLY.

20           PERSONALLY, I THINK THAT THERE WERE SOME -- THERE

21  IS SOME INFORMATION THAT WAS NOT SHARED WITH THE PUBLIC.  I

22  KNOW THAT OFTEN THAT THERE IS INFORMATION THAT IS

23  INTENTIONALLY NOT SHARED WITH THE PUBLIC FOR THE PUBLIC

24  SAFETY.  BUT, YOU KNOW, I DON'T KNOW IF THAT ANSWERS YOUR

25  QUESTION.

1          MR. WELLS:  IT DOES IN PART.  EXCUSE ME.  THERE IS

2    A REAL POSSIBILITY THAT VICE-PRESIDENT CHENEY WILL BE A

3    WITNESS IN THIS CASE.  WHAT ARE YOUR FEELINGS ABOUT

4    VICE-PRESIDENT CHENEY?

5          THE PROSPECTIVE JUROR:  AS IT RELATES TO THE WAR?

6          MR. WELLS:  AS IT RELATES TO THE WAR AND ALSO AS

7    IT RELATES TO HOW YOU MIGHT VIEW HIS CREDIBILITY AS A

8    WITNESS VERSUS SOMEONE WHO YOU DON'T KNOW WHO IS A PERFECT

9    STRANGER.

10         THE PROSPECTIVE JUROR:  I WOULD CONSIDER HIM A

11   PERFECT STRANGER.  I DON'T KNOW HIM.  I AM NOT PARTICULARLY

12   IMPRESSED WITH A LOT OF HIS MANNERS OF BEING, BUT I DON'T

13   KNOW HIM.  I CAN'T SPEAK TO HIS CREDIBILITY.  SO --

14         MR. WELLS:  IF HE WERE TO BE A WITNESS IN THIS

15   CASE AND YOU HAD TO MAKE A DETERMINATION ABOUT HIS

16   CREDIBILITY, DO YOU THINK THERE IS ANYTHING IN YOUR

17   BACKGROUND OR PRIOR OPINIONS THAT WOULD INHIBIT YOU FROM

18   JUDGING HIM SOLELY ON WHAT YOU OBSERVE WHEN HE TESTIFIES IN

19   THIS COURTROOM?

20         THE PROSPECTIVE JUROR:  I DON'T THINK SO.  THE

21   REASON IS BECAUSE EVEN IF I HAVE OPINIONS ABOUT AN

22   ADMINISTRATION, I FEEL THAT WHEN YOU ARE SITTING AS A

23   WITNESS TO A TRIAL, YOU HAVE TO WORK BASED ON THE

24   INFORMATION THAT'S PRESENTED.  AND SO THE ANSWER IS NO.

25         THE COURT:  YOU MEAN WHEN YOU ARE SITTING AS A

1   JUROR?

2              THE PROSPECTIVE JUROR:  YES.

3              THE COURT:  YOU SAID AS A WITNESS.

4              THE PROSPECTIVE JUROR:  I AM SORRY.  AS A JUROR.

5              MR. WELLS:  SO HE WOULD START OFF JUST LIKE ANY

6   OTHER WITNESS IN A TRIAL?

7              THE PROSPECTIVE JUROR:  YES.

8              MR. WELLS:  OKAY.  LET ME ASK YOU A QUESTION

9   CONCERNING MEMORY.  HAVE YOU EVER BEEN ABSOLUTELY CERTAIN

10  THAT SOMETHING HAPPENED AND THEN COME TO FIND OUT YOU WERE

11  MISTAKEN AND IT DID NOT HAPPEN?

12             THE PROSPECTIVE JUROR:  HAVE I EVER?

13             MR. WELLS:  YES.

14             THE PROSPECTIVE JUROR:  I DON'T THINK SO.

15             MR. WELLS:  IS THAT A CONCEPT THAT, IN YOUR

16  EXPERIENCE, IS SOMETHING THAT HAS HAPPENED TO OTHER PEOPLE

17  WHO YOU KNOW?

18             THE PROSPECTIVE JUROR:  UH-HUH.

19             MR. WELLS:  OKAY.  DO YOU WATCH MEET THE PRESS?

20             THE PROSPECTIVE JUROR:  NO.

21             MR. WELLS:  DO YOU HAVE ANY OPINION ABOUT TIM

22  RUSSERT, WHO IS THE MODERATOR OF MEET THE PRESS?

23             THE PROSPECTIVE JUROR:  I DON'T WATCH IT.

24             MR. WELLS:  WHAT ABOUT ANDREA MITCHELL, WHO IS

25  ALSO AN N.B.C. REPORTER?

```
1            THE PROSPECTIVE JUROR:  I REALLY DON'T WATCH T.V.
2   I KNOW IT'S HARD TO BELIEVE, BUT I DON'T.
3            MR. WELLS:  JUST ONE LAST QUESTION.  WHEN YOU SAID
4   YOU HAD LEARNED SOMETHING ABOUT THE CASE, WAS THAT BASED ON
5   READING THE NEWSPAPERS, WATCHING T.V. OR SEEING SOMETHING ON
6   THE INTERNET?
7            THE PROSPECTIVE JUROR:  READING THE NEWSPAPER AND
8   LISTENING TO THE RADIO.
9            MR. WELLS:  OKAY.  I HAVE NO FURTHER QUESTIONS.
10           THE COURT:  COUNSEL, APPROACH.
11           (AT THE BENCH.)
12           THE COURT:  ANY STRIKES?
13           MR. FITZGERALD:  NO, YOUR HONOR.
14           MR. WELLS:  NO, YOUR HONOR.
15           (IN OPEN COURT.)
16           THE COURT:  APPROACH, COUNSEL.
17           (AT THE BENCH.)
18           THE COURT:  I DON'T WANT THESE PEOPLE TO HAVE TO
19   SIT AROUND ALL DAY.  AT THE PACE WE'RE GOING NOW, MY HOPE IS
20   THAT WE CAN COMPLETE MOST OF THE -- MY HOPE IS THAT WE CAN
21   GET MOST OF THE VOIR DIRE DONE TODAY AND GET MOST OF THE
22   JURORS, IF NOT ALL, QUALIFIED BEFORE 5:00, BUT I AM NOT
23   CONFIDENT THAT IS GOING TO HAPPEN.
24           MY INCLINATION IS TO JUST LET HER GO UNTIL
25   TOMORROW MORNING AND BRING HER BACK AT 9:30.  HOPEFULLY BY
```

1    THEN WE WILL BE PREPARED TO PROCEED WITH THE STRIKES.

2              MR. WELLS:  YES, YOUR HONOR.

3              MR. FITZGERALD:  YES, YOUR HONOR.

4              (IN OPEN COURT.)

5              THE COURT:  OKAY, MISS.  AT THE RATE WE'RE GOING,

6    I AM NOT SURE WE WILL BE ABLE TO GET TO THE FINAL STAGES OF

7    THE JURY SELECTION TODAY.  SO RATHER THAN JUST HAVE YOU SIT

8    AROUND ALL DAY WAITING FOR US, WE'RE GOING TO LET YOU GO

9    HOME UNTIL 9:30 TOMORROW MORNING.  BE BACK AT THAT TIME ON

10   TIME.  THANK YOU.  HAVE A NICE DAY.

11             AND DON'T TALK ABOUT THE CASE AND DON'T --

12   CONTINUE NOT TO LISTEN TO THE NEWS OR READ THE PAPER.

13             THE PROSPECTIVE JUROR:  OKAY.

14             (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

15             (ANOTHER PROSPECTIVE JUROR ENTERING THE

16   COURTROOM.)

17             THE COURT:  OKAY.  YOU ARE JUROR NUMBER 1571?

18             THE PROSPECTIVE JUROR:  YES, SIR.

19             THE COURT:  OKAY.  YOU HAD A COUPLE RESPONSES.

20   AND IF I ASK YOU ANY QUESTIONS THAT WOULD BE SENSITIVE IN

21   NATURE AND YOU WOULD LIKE TO JUST TELL US THAT HERE AT THE

22   BENCH, JUST LET ME KNOW.

23             THE PROSPECTIVE JUROR:  YES, SIR.

24             THE COURT:  YOU HAD A RESPONSE TO QUESTION NUMBER

25   1(A) WHICH ASKED WHETHER YOU KNEW ANY OF THE LAWYERS FOR THE

1   GOVERNMENT.

2            THE PROSPECTIVE JUROR:  RIGHT.  I THINK I ANSWERED

3   YES BECAUSE I THINK YOU USED THE WORD "RECOGNIZE."  AND I

4   RECOGNIZED MR. FITZGERALD FROM TELEVISION.  BUT I DON'T KNOW

5   ANY OF THEM PERSONALLY, NO.

6            THE COURT:  AND DO YOU REMEMBER EXACTLY WHAT

7   YOU -- THE CONTEXT IN WHICH YOU RECOGNIZED HIM?

8            THE PROSPECTIVE JUROR:  IT WAS REGARDING WHEN HE

9   WAS ON TELEVISION AFTER THE GRAND JURY.

10           THE COURT:  DO YOU REMEMBER ANYTHING THAT WAS SAID

11  AT THAT TIME?

12           THE PROSPECTIVE JUROR:  ANYTHING IN PARTICULAR?

13  NO.  NO.

14           THE COURT:  DID YOU FORM ANY OPINIONS OR

15  CONCLUSIONS REGARDING THE CASE AS A RESULT OF WHAT YOU HEARD

16  HIM SAY?

17           THE PROSPECTIVE JUROR:  NO, SIR.

18           THE COURT:  DID YOU REACH ANY CONCLUSIONS AS TO

19  THE STRENGTH OF THE GOVERNMENT'S CASE BASED UPON WHAT YOU

20  HEARD?

21           THE PROSPECTIVE JUROR:  NO.  NO, SIR.

22           THE COURT:  SO YOU HAVEN'T REACHED ANY OPINIONS AT

23  THIS POINT REGARDING THE GUILT OR INNOCENCE OF MR. LIBBY?

24           THE PROSPECTIVE JUROR:  NO, SIR.

25           THE COURT:  YOU ALSO RESPONDED TO QUESTION NUMBER

16

1    3(B) WHICH ASKED WHETHER YOU HAVE HEARD OR READ ANYTHING IN

2    THE MEDIA ABOUT THIS CASE.  DO YOU WANT TO TELL ME ABOUT

3    THAT?

4              THE PROSPECTIVE JUROR:  I DON'T THINK IT'S

5    ANYTHING IN PARTICULAR.  I READ THE NEWSPAPER AND, YOU KNOW,

6    MY NEWS SOURCE OF CHOICE DAILY AND SO --

7              THE COURT:  WHAT NEWSPAPERS?

8              THE PROSPECTIVE JUROR:  I READ THE POST, AND

9    CNN.COM IS PRETTY MUCH ALWAYS UP ON MY COMPUTER.

10             THE COURT:  DO YOU REMEMBER ANYTHING IN PARTICULAR

11   THAT YOU MAY HAVE READ OR HEARD ABOUT THE CASE?

12             THE PROSPECTIVE JUROR:  "IN PARTICULAR" MEANING

13   ANY DETAILS?

14             THE COURT:  YES.  ANY DETAILS, RIGHT.

15             THE PROSPECTIVE JUROR:  NOTHING, I WOULDN'T SAY,

16   IN PARTICULAR.  I JUST TRIED TO KEEP ABREAST OF THE CASE

17   WHEN IT WAS IN THE NEWS.

18             THE COURT:  AND YOU DON'T RECALL EXACTLY WHAT THAT

19   WAS?

20             THE PROSPECTIVE JUROR:  BESIDES, YOU KNOW, THE

21   PEOPLE INVOLVED.  YOU KNOW, I REMEMBERED NAMES THAT WERE

22   MENTIONED DURING -- YOU KNOW, ESPECIALLY THE GRAND JURY TIME

23   WHEN IT WAS IN THE NEWS.  BUT THAT WAS REALLY ABOUT IT.

24             THE COURT:  DO YOU REMEMBER ANYTHING ABOUT THE

25   NATURE OF THE ALLEGATIONS?

1          THE PROSPECTIVE JUROR:  YES.

2          THE COURT:  WHAT DO YOU REMEMBER?

3          THE PROSPECTIVE JUROR:  THE LEAKING OF THE NAME OF

4    VALERIE PLAME TO NEWS SOURCES.  THAT'S WHAT I REMEMBER AS

5    THE MAIN FOCUS OF THE NEWS.

6          THE COURT:  DID YOU -- BASED UPON THAT NEWS

7    COVERAGE THAT YOU HAD CONTACT WITH, DID YOU REACH ANY

8    CONCLUSIONS ABOUT WHETHER THE ALLEGATIONS THAT WERE MADE --

9    BEING MADE BY THE GOVERNMENT AGAINST MR. LIBBY WERE ACCURATE

10   OR NOT?

11         THE PROSPECTIVE JUROR:  NO.

12         THE COURT:  DO YOU HAVE ANY IMPRESSION RIGHT NOW

13   BASED UPON -- WHETHER THE GOVERNMENT HAS SUFFICIENT EVIDENCE

14   TO PROVE HIS GUILT?

15         THE PROSPECTIVE JUROR:  NO, SIR.

16         THE COURT:  SO YOU WOULD BE NEUTRAL IN REFERENCE

17   TO THAT ISSUE AT THIS TIME?

18         THE PROSPECTIVE JUROR:  YES.

19         THE COURT:  CAN YOU PRESUME THAT HE IS INNOCENT?

20         THE PROSPECTIVE JUROR:  YES, SIR.

21         THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

22   NUMBER 19 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

23   RELATIVES EVER SERVED IN A LAW ENFORCEMENT CAPACITY OR

24   APPLIED FOR SUCH A JOB.  DO YOU WANT TO TELL ME ABOUT THAT?

25         THE PROSPECTIVE JUROR:  RIGHT.  THERE ARE THREE

1    THAT I SHOULD MENTION.  MY WIFE IS A CIVIL RIGHTS PROSECUTOR

2    FOR THE DEPARTMENT OF JUSTICE IN THE CRIMINAL DIVISION.  AND

3    ONE GOOD FRIEND OF MINE IS THE DEPUTY CHIEF OF STAFF IN THE

4    CRIMINAL DIVISION, AND ANOTHER GOOD FRIEND OF MINE IS THE

5    ACTING U.S. ATTORNEY HERE IN TOWN, JEFF TAYLOR.

6                 THE COURT:  HOW DO YOU KNOW THESE OTHER -- NOT

7    YOUR WIFE, BUT HOW DO YOU KNOW THESE OTHER TWO PEOPLE?

8                 THE PROSPECTIVE JUROR:  REALLY, NEIGHBORHOOD

9    FRIENDS.

10               THE COURT:  HERE IN D.C.?

11               THE PROSPECTIVE JUROR:  YES.

12               THE COURT:  HAVE YOU EVER TALKED TO ANY OF THESE

13   THREE PEOPLE ABOUT THEIR WORK?

14               THE PROSPECTIVE JUROR:  ABOUT THEIR WORK?  YES.

15               THE COURT:  HAVE YOU FORMED ANY OPINIONS AS A

16   RESULT OF THOSE DISCUSSIONS THAT MIGHT CAUSE YOU TO FAVOR

17   ONE SIDE OR THE OTHER IN THIS CASE?

18               THE PROSPECTIVE JUROR:  NO, SIR.

19               THE COURT:  WOULD YOU FEEL ANY PRESSURE TO DECIDE

20   THIS CASE IN A PARTICULAR WAY BASED UPON YOUR ASSOCIATION

21   WITH THESE PEOPLE?

22               THE PROSPECTIVE JUROR:  NO, NOT AT ALL.

23               THE COURT:  WOULD YOU HAVE ANY DIFFICULTY, IF YOU

24   FELT IT WAS APPROPRIATE TO RULE IN A WAY THAT YOU WOULD

25   THINK WOULD BE MAYBE CONTRARY TO WHAT THEY WOULD THINK,

1    RENDERING THAT DECISION?

2              THE PROSPECTIVE JUROR:  NO, NOT AT ALL.

3              THE COURT:  SO ARE YOU TOTALLY CONFIDENT YOU CAN

4    BE FAIR TO BOTH PARTIES IN THIS CASE?

5              THE PROSPECTIVE JUROR:  YES, SIR.

6              THE COURT:  GOVERNMENT?

7              MR. FITZGERALD:  GOOD MORNING.

8              THE PROSPECTIVE JUROR:  GOOD MORNING.

9              MR. FITZGERALD:  CAN YOU JUST TELL US WHAT YOU DO

10   DAY TO DAY?

11             THE PROSPECTIVE JUROR:  I AM A DATABASE

12   ADMINISTRATOR FOR A SMALL MEDICAL SOFTWARE COMPANY.  I WORK

13   FROM HOME.  THE COMPANY IS BASED IN NEW YORK.  MY

14   DEVELOPMENT TEAM THAT I WORK WITH IS IN NORTH CAROLINA, BUT

15   I WORK FROM HOME AND ADMINISTER DATABASES FOR OUR COMPANY.

16             MR. FITZGERALD:  AND HOW LONG HAVE YOU BEEN DOING

17   THAT?

18             THE PROSPECTIVE JUROR:  ELEVEN YEARS.

19             MR. FITZGERALD:  THANK YOU, JUDGE.

20             THE COURT:  DEFENSE?

21             MR. JEFFRESS:  GOOD MORNING.

22             THE PROSPECTIVE JUROR:  GOOD MORNING.

23             MR. JEFFRESS:  DO YOU KNOW ANY DEFENSE LAWYERS?

24             THE PROSPECTIVE JUROR:  DO I KNOW ANY DEFENSE

25   LAWYERS?  I DON'T BELIEVE SO.

1      MR. JEFFRESS:  HAVE YOU EVER TESTIFIED AS A

2  WITNESS IN COURT?

3      THE PROSPECTIVE JUROR:  NO, SIR.

4      MR. JEFFRESS:  AND I GATHER, SINCE YOU DIDN'T

5  ANSWER THE QUESTION, YOU HAVEN'T SERVED AS A JUROR BEFORE

6  EITHER, RIGHT?

7      THE PROSPECTIVE JUROR:  NO, SIR.

8      MR. JEFFRESS:  CONCERNING WHAT YOU LEARNED -- YOU

9  DO RECALL THE NAME VALERIE PLAME?

10     THE PROSPECTIVE JUROR:  YES.

11     MR. JEFFRESS:  DO YOU REMEMBER HER HUSBAND'S NAME

12  AS WELL?

13     THE PROSPECTIVE JUROR:  YES.  MR. --

14     MR. JEFFRESS:  JOE WILSON?

15     THE PROSPECTIVE JUROR:  -- WILSON, YES.

16     MR. JEFFRESS:  HAVE YOU SEEN THEM ON TELEVISION?

17     THE PROSPECTIVE JUROR:  I HAVE SEEN THEM ON

18  TELEVISION, YES.

19     MR. JEFFRESS:  ON WHAT OCCASION DID YOU SEE THEM

20  ON TELEVISION?  DO YOU REMEMBER WHAT THEY WERE TALKING

21  ABOUT?

22     THE PROSPECTIVE JUROR:  I ACTUALLY DON'T REMEMBER

23  SEEING THEM LIVE ON TELEVISION.  I REMEMBER SEEING THEIR

24  PICTURES ON TELEVISION.

25     MR. JEFFRESS:  OKAY.  YOU DON'T REMEMBER ANY KIND

1   OF PRESS CONFERENCE THEY GAVE OR ANYTHING LIKE THAT?

2          THE PROSPECTIVE JUROR:  NO, I DON'T RECALL EVER

3   SEEING A PRESS CONFERENCE WITH THEM, NO.

4          MR. JEFFRESS:  WHAT DO YOU UNDERSTAND ABOUT

5   VALERIE PLAME'S POSITION OR STATUS?  YOU UNDERSTAND SHE

6   WORKED FOR THE C.I.A.?

7          THE PROSPECTIVE JUROR:  YES.

8          MR. JEFFRESS:  DO YOU BELIEVE THAT YOU KNOW

9   ANYTHING ELSE ABOUT WHAT HER STATUS WAS AT THE C.I.A. OR HER

10  POSITION WAS?

11         THE PROSPECTIVE JUROR:  NO.  THE ABSOLUTE EXTENT

12  OF WHAT I WOULD KNOW IS JUST THAT SHE HAD A POSITION WITH

13  THE C.I.A.  I DON'T KNOW WHAT IT WAS OR WHAT SHE DID, NO.

14         MR. JEFFRESS:  AND WHEN YOU WATCHED

15  MR. FITZGERALD'S PRESS CONFERENCE, DID YOU WATCH IT ON T.V.

16  OR DID YOU READ IT --

17         THE PROSPECTIVE JUROR:  YES.

18         MR. JEFFRESS:  -- IN THE PAPER.  YOU WATCHED IT ON

19  T.V.?

20         THE PROSPECTIVE JUROR:  I WATCHED IT.  OR AT

21  LEAST -- MAYBE NOT LIVE, BUT, YOU KNOW, THROUGH THE -- YOU

22  KNOW, MAYBE A NEWS SEGMENT.  I DON'T RECALL, BUT, YES, I DID

23  WATCH IT ON T.V.

24         MR. JEFFRESS:  AND DO YOU RECALL ANYTHING IN

25  PARTICULAR THAT HE HAD TO SAY ABOUT MR. LIBBY OR WHY CHARGES

1   WERE BROUGHT AGAINST MR. LIBBY?

2          THE PROSPECTIVE JUROR:  NO, I DON'T.

3          MR. JEFFRESS:  OKAY.  AND I UNDERSTAND YOU HAVE

4   FORMED NO OPINION ABOUT THE CHARGES AGAINST MR. LIBBY.  HAVE

5   YOU BEEN READING OR HEARING ABOUT MR. LIBBY OVER THE YEARS

6   IN THE NEWS OR IN CONNECTION WITH THIS INVESTIGATION?

7   EITHER ONE?

8          THE PROSPECTIVE JUROR:  ONLY IN CONNECTION WITH

9   THIS INVESTIGATION.  YOU KNOW, I DON'T KNOW ANYTHING OF HIS

10  CAREER, YOU KNOW, PRIOR TO THIS, NO.

11         MR. JEFFRESS:  WHAT'S YOUR IMPRESSION OF MR. LIBBY

12  BASED ON WHAT YOU READ AND HEARD?

13         THE PROSPECTIVE JUROR:  I REALLY -- I DON'T HAVE

14  AN IMPRESSION OF MR. LIBBY.  THE ONLY THING THAT I KNOW, YOU

15  KNOW, IS THAT HE IS INVOLVED IN THIS CASE AND HE WAS, YOU

16  KNOW, INDICTED.  SO I DON'T HAVE AN IMPRESSION NECESSARILY

17  OF HIM.

18         MR. JEFFRESS:  FROM THE FACT THAT HE IS INDICTED

19  AND FROM WHATEVER YOU MIGHT HAVE HEARD MR. FITZGERALD SAY ON

20  T.V., DO YOU HAVE AN IMPRESSION THAT HE IS PROBABLY GUILTY?

21         THE PROSPECTIVE JUROR:  NO.

22         MR. JEFFRESS:  THAT DOESN'T OCCUR TO YOU?

23         THE PROSPECTIVE JUROR:  NO, NOT AT ALL.

24         MR. JEFFRESS:  YOU BELIEVE HE IS ENTITLED TO

25  PRESUMPTION OF INNOCENCE?

```
1               THE PROSPECTIVE JUROR:  ABSOLUTELY.

2               MR. JEFFRESS:  AND YOU CAN GIVE HIM THAT FULLY,

3    CORRECT?

4               THE PROSPECTIVE JUROR:  YES, SIR.  ABSOLUTELY.

5               MR. JEFFRESS:  LET ME ASK YOU ABOUT DIFFERENT

6    OPINIONS.

7               THE PROSPECTIVE JUROR:  SURE.

8               MR. JEFFRESS:  YOU ARE FAMILIAR WITH THE

9    CONTROVERSY OVER WHETHER -- OVER THE CREDIBILITY OF

10   PRESIDENT BUSH AND OTHERS IN THE ADMINISTRATION ABOUT WHY WE

11   WENT TO WAR IN IRAQ?

12              THE PROSPECTIVE JUROR:  SURE.

13              MR. JEFFRESS:  THAT'S PROBABLY A SUBJECT THAT YOU

14   HAVE DISCUSSED WITH OTHER PEOPLE AND READ AND HEARD ABOUT,

15   RIGHT?

16              THE PROSPECTIVE JUROR:  YES.

17              MR. JEFFRESS:  DO YOU HAVE AN OPINION ON THAT

18   SUBJECT?

19              THE PROSPECTIVE JUROR:  YES, I HAVE AN OPINION.

20              MR. JEFFRESS:  SURE.  AND, LOOK, WE ARE JUST

21   LOOKING -- THERE IS NO RIGHT OR WRONG ANSWER HERE.  IF YOU

22   HAVE AN OPINION, WE WOULD LIKE TO KNOW WHAT THE OPINION IS.

23              THE PROSPECTIVE JUROR:  REGARDING THE REASONS?

24              MR. JEFFRESS:  REGARDING THE CREDIBILITY OF THE

25   ADMINISTRATION ON THE REASONS WE WENT TO WAR IN IRAQ.
```

24

1          THE PROSPECTIVE JUROR:  MY OPINION IS I BELIEVE

2     THAT THE GOVERNMENT -- I DON'T BELIEVE THAT THEY -- HOW DO I

3     SAY THIS?  I DON'T BELIEVE THAT THEY NECESSARILY LIED OR,

4     YOU KNOW, DID ANY SORT OF MISLEADING OF THE PUBLIC, BUT I DO

5     BELIEVE THAT THEY EMPHASIZED CERTAIN FACTS THAT THEY WANTED

6     TO MAKE SURE THAT THE PUBLIC THOUGHT WAS IMPORTANT.  AND

7     WHETHER THOSE -- THE THINGS THAT THEY EMPHASIZED WERE BASED

8     ON GOOD OR BAD INFORMATION, YOU KNOW, THAT IS NOT FOR ME TO

9     DECIDE.

10          BUT IT SEEMS TO ME THAT THE GOVERNMENT LED US INTO

11     THAT SITUATION BY EMPHASIZING CERTAIN THINGS THAT WE NOW

12     KNOW, OR AT LEAST TO THIS POINT WE KNOW NOT TO BE TRUE.

13          MR. JEFFRESS:  LIKE WEAPONS OF MASS DESTRUCTION IN

14     IRAQ?

15          THE PROSPECTIVE JUROR:  THAT'S WHAT I -- YES.

16          MR. JEFFRESS:  AND WHEN YOU SAY "THEY," I ASSUME

17     YOU MEAN THE PRESIDENT AND OTHERS IN THE ADMINISTRATION?

18          THE PROSPECTIVE JUROR:  YES.

19          MR. JEFFRESS:  DO YOU INCLUDE VICE-PRESIDENT

20     CHENEY IN THAT?

21          THE PROSPECTIVE JUROR:  SURE.

22          MR. JEFFRESS:  DOES YOUR OPINION ON THAT

23     SUBJECT -- LET ME TELL YOU FIRST VICE-PRESIDENT CHENEY MAY

24     WELL TESTIFY AS A WITNESS IN THIS CASE.

25          THE PROSPECTIVE JUROR:  UH-HUH.

25

1            MR. JEFFRESS:  AND OTHERWISE, YOU KNOW, HIS --

2  VICE-PRESIDENT CHENEY MAY BE MENTIONED IN THIS CASE.  DO YOU

3  HAVE A VIEW OF HIS CREDIBILITY BASED ON WHAT YOU HAVE READ,

4  HEARD AND OPINIONS YOU HAVE HEARD EXPRESSED ABOUT HIM?

5            THE PROSPECTIVE JUROR:  HIS CREDIBILITY?

6            MR. JEFFRESS:  YES, HIS CREDIBILITY.

7            THE PROSPECTIVE JUROR:  NO, I WOULDN'T HAVE FORMED

8  AN OPINION OF HIS CREDIBILITY BASED ON WHAT HE AND THE

9  ADMINISTRATION DID.  I DON'T FIND IT TO BE NOT CREDIBLE.  I

10 FIND IT TO BE POLITICAL, I GUESS.

11           MR. JEFFRESS:  DO YOU FIND IT TO BE -- I DON'T

12 KNOW HOW TO EXPRESS THIS.  I MEAN, IS IT SOMETHING THAT

13 EVOKES A STRONG REACTION IN YOU THAT YOU THINK THAT

14 VICE-PRESIDENT CHENEY MAY HAVE POLITICALLY EMPHASIZED

15 CERTAIN THINGS RATHER THAN OTHER THINGS IN ORDER TO JUSTIFY

16 A POLICY POSITION?

17           THE PROSPECTIVE JUROR:  NO, IT DOESN'T -- IT

18 DOESN'T -- I DON'T HAVE A STRONG REACTION TOWARDS IT.  I

19 FEEL THAT IT IS -- YOU KNOW, I FEEL LIKE IT'S THE WAY THINGS

20 WORK.

21           MR. JEFFRESS:  SO IF IT'S TRUE, IT'S SOMETHING

22 THAT, HAVING BEEN IN WASHINGTON FOR A WHILE, DOESN'T

23 SURPRISE YOU; IS THAT FAIR TO SAY?

24           THE PROSPECTIVE JUROR:  YES, THAT'S FAIR TO SAY.

25           MR. JEFFRESS:  HOW LONG HAVE YOU BEEN IN

1   WASHINGTON?

2        THE PROSPECTIVE JUROR:  SINCE THE SUMMER OF 2003.

3        MR. JEFFRESS:  WHERE WERE YOU BEFORE THAT?

4        THE PROSPECTIVE JUROR:  BEFORE THAT, NORTH

5   CAROLINA FOR 12 YEARS.

6        MR. JEFFRESS:  OKAY.  THAT'S WHERE YOU GREW UP AND

7   WENT TO SCHOOL?

8        THE PROSPECTIVE JUROR:  I WENT TO COLLEGE THERE.

9   I GREW UP IN NEBRASKA.

10       MR. JEFFRESS:  I SEE.  NOW, HAVE YOU HEARD ANYBODY

11  ELSE EXPRESS AN OPINION ABOUT MR. LIBBY OR ABOUT THE CHARGES

12  AGAINST HIM?

13       THE PROSPECTIVE JUROR:  SPECIFICALLY?  NO.

14       MR. JEFFRESS:  WHEN YOU SAY "SPECIFICALLY" -- AND

15  I AM NOT TALKING ABOUT WHAT YOU MIGHT HAVE SEEN ON T.V. OR

16  READ IN THE NEWSPAPER, BUT I AM TALKING ABOUT FRIENDS -- I

17  WOULD ASK ABOUT WORK, EXCEPT YOU WORK AT HOME.

18       THE PROSPECTIVE JUROR:  RIGHT.

19       MR. JEFFRESS:  BUT JUST OTHER PEOPLE YOU MAY HAVE

20  DISCUSSED THIS MATTER WITH.  HAVE YOU EVER HEARD ANYBODY SAY

21  ANYTHING ABOUT, GEE, YOU KNOW, SCOOTER LIBBY, YOU KNOW, HE

22  MUST BE GUILTY?  OR, GEE, WHY IS IT --

23       THE PROSPECTIVE JUROR:  NO, NOT AT ALL.  NO.

24       MR. JEFFRESS:  AND JUST IN TERMS OF WHAT YOU DO

25  KNOW ABOUT THE CASE -- I KNOW YOU KNOW MR. WILSON'S NAME AND

1    MS. PLAME'S NAME.  HAVE YOU HEARD OTHER PEOPLE'S -- HAVE YOU

2    HEARD MR. ARMITAGE'S NAME MENTIONED, FOR EXAMPLE, OR

3    MR. NOVAK?

4            THE PROSPECTIVE JUROR:  MR. NOVAK, YES.  YOU KNOW,

5    KARL ROVE -- I HAVE HEARD HIS NAME MENTIONED REGARDING THE

6    CASE.

7            MR. JEFFRESS:  HOW ABOUT KARL ROVE?  IF HE WERE TO

8    TESTIFY AS A WITNESS IN THIS CASE, WOULD HIS CREDIBILITY --

9    WOULD YOU START OFF WITH ANY OPINION ONE WAY OR ANOTHER

10   ABOUT HIS CREDIBILITY?

11           THE PROSPECTIVE JUROR:  NO.  YOU KNOW, I FEEL LIKE

12   I WOULD PROBABLY DISAGREE WITH MR. ROVE ON POLITICAL

13   ISSUES --

14           MR. JEFFRESS:  POLITICAL ISSUES.

15           THE PROSPECTIVE JUROR:  -- BUT AS FAR AS

16   CREDIBILITY, NO, SIR.

17           MR. JEFFRESS:  MAY I HAVE A MOMENT, YOUR HONOR.

18           JUST A COUPLE MORE POINTS.  JUDGE WALTON ASKED YOU

19   YESTERDAY MORNING SOME QUESTIONS ABOUT MEMORY AND ABOUT YOUR

20   OPINIONS ABOUT MEMORY.  IN YOUR PERSONAL EXPERIENCE, HAVE

21   YOU EVER, YOU KNOW, HAD AN OCCASION WHEN YOU ABSOLUTELY

22   INSISTED THAT YOU REMEMBERED SOMETHING ONE WAY AND THEN YOU

23   CAME TO FIND OUT IT WAS NOT TRUE?

24           THE PROSPECTIVE JUROR:  ABSOLUTELY, SURE.

25           MR. JEFFRESS:  DO YOU BELIEVE THAT HAPPENS TO

1    PEOPLE?

2              THE PROSPECTIVE JUROR:  YES, SIR.

3              MR. JEFFRESS:  AND ANOTHER THING IS -- WELL, I DID

4    ASK YOU ABOUT YOUR STATUS.

5              THAT'S ALL I HAVE, YOUR HONOR.

6              THE COURT:  COUNSEL APPROACH.

7              SIR, COULD YOU HAVE A SEAT OUT IN ONE OF THOSE

8    BLACK CHAIRS OUT THERE BY THE RAILING.

9              (AT THE BENCH.)

10             THE COURT:  ANY CHALLENGES?

11             MR. FITZGERALD:  NO.

12             MR. JEFFRESS:  NO.

13             THE COURT:  OKAY.

14             (IN OPEN COURT.)

15             THE COURT:  OKAY, SIR.  I DON'T THINK WE ARE GOING

16   TO BE ABLE TO COMPLETE THIS PROCESS TODAY, AND IT WILL

17   PROBABLY BE, HOPEFULLY, TOMORROW MORNING.

18             SO WE ARE GOING TO EXCUSE YOU UNTIL 9:30.  SO YOU

19   ARE FREE TO GO HOME, AND BE BACK ON TIME AT 9:30.  DON'T

20   HAVE ANY CONTACT WITH ANY TYPE OF MEDIA COVERAGE, EITHER

21   RADIO, T.V. OR NEWSPAPER.  AND DON'T TALK TO ANYBODY ABOUT

22   WHAT WE TALKED ABOUT HERE TODAY.

23             HAVE A NICE EVENING.

24             THE PROSPECTIVE JUROR:  THANK YOU.

25             (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

1          (ANOTHER PROSPECTIVE JUROR ENTERING THE

2   COURTROOM.)

3          THE COURT:  YOU ARE NUMBER 1980?

4          THE PROSPECTIVE JUROR:  YES, SIR.

5          THE COURT:  GOOD MORNING.

6          THE PROSPECTIVE JUROR:  GOOD MORNING.

7          THE COURT:  YOU HAD A COUPLE OF RESPONSES.  YOU

8   HAD A RESPONSE TO QUESTION NUMBER 3(B) WHICH ASKED WHETHER

9   YOU HAVE HEARD OR READ ANYTHING ABOUT THIS CASE.  DO YOU

10  WANT TO TELL US ABOUT THAT?

11         THE PROSPECTIVE JUROR:  CERTAINLY, YOUR HONOR.  I

12  GOT A JURY SUMMONS A FEW MONTHS AGO, AND IT SAID TWICE THAT

13  IT WOULD BE A SPECIAL TRIAL AND THAT IT WOULD BE SIX WEEKS.

14  AND WHEN I WOKE UP TUESDAY MORNING, MY HUSBAND SAID TO ME

15  THERE IS GOING TO BE A -- MONDAY MORNING -- JURY SELECTION

16  STARTS TOMORROW FOR A SPECIAL TRIAL THAT WILL LAST SIX

17  WEEKS, AND I READ IT.

18         THE COURT:  YOU READ THAT ARTICLE?

19         THE PROSPECTIVE JUROR:  ABSOLUTELY.

20         THE COURT:  AND DO YOU REMEMBER EXACTLY WHAT THE

21  ARTICLE SAID?  WAS THAT IN THE WASHINGTON POST?

22         THE PROSPECTIVE JUROR:  YES.

23         THE COURT:  DO YOU REMEMBER WHAT THE ARTICLE SAID?

24         THE PROSPECTIVE JUROR:  VAGUELY.

25         THE COURT:  DO YOU WANT TO TELL US WHAT YOU

1   REMEMBER?

2        THE PROSPECTIVE JUROR:  THAT THERE WOULD BE A LOT

3   OF WITNESSES WHOSE NAMES I RECOGNIZED, AND THAT IT DATES

4   BACK TO JULY OF 2003.  I CERTAINLY REMEMBER THE STORY FROM

5   THEN AND PICTURES OF PEOPLE THAT I HADN'T SEEN BEFORE.  YOU

6   KNOW, IMAGES LIKE TIM RUSSERT, WHO IS A FACE THAT I SEE ON

7   THE T.V. SOMETIMES.  SO -- YOU KNOW, I DIDN'T READ IT MORE

8   THAN ONCE, BUT --

9        THE COURT:  LET ME JUST ASK, BASED UPON WHAT YOU

10  READ, DID YOU FORM ANY OPINIONS ABOUT THE CASE?

11       THE PROSPECTIVE JUROR:  CERTAINLY I HAVE OPINIONS,

12  AND CERTAINLY BEFORE I READ IT, I HAD OPINIONS.

13       THE COURT:  SO YOU HAD HAD CONTACT WITH MEDIA

14  COVERAGE ABOUT THIS CASE BEFORE MONDAY?

15       THE PROSPECTIVE JUROR:  WELL, I DON'T KNOW

16  PARTICULARLY ABOUT THE CASE, BUT ABOUT THE STORY.

17       THE COURT:  AND WAS THAT FROM THE MEDIA?

18       THE PROSPECTIVE JUROR:  OH, YES.

19       THE COURT:  AND DO YOU REMEMBER WHAT THAT OTHER

20  MEDIA COVERAGE YOU HAD CONTACT WITH WAS ABOUT?

21       THE PROSPECTIVE JUROR:  WELL, IT WOULD HAVE BEEN

22  THE WASHINGTON POST OR THE TELEVISION EVENING NEWS OR

23  PERHAPS GWEN EIFEL.  AND, YOU KNOW, IT WOULD HAVE BEEN ABOUT

24  THE FACT THAT -- WHEN YOU READ THE MEDIA, MY EXPERIENCE IS

25  THAT USUALLY YOU HAVE ONE SIDE AND THEN YOU HAVE THE OTHER

1  SIDE, AND YOU HAVE TO TRY TO FIGURE OUT WHAT MAKES MORE

2  SENSE.

3          THE COURT:   AND DO YOU RECALL WHAT THAT MEDIA

4  COVERAGE WAS SAYING?

5          THE PROSPECTIVE JUROR:   VAGUELY, THAT VALERIE

6  PLAME WAS -- HER IDENTITY WAS REVEALED AND THAT THERE WAS

7  CONFUSION ABOUT HOW THAT HAPPENED AND WHO DID IT FIRST.

8  AND, YOU KNOW, I WOULDN'T BE AT ALL SURPRISED IF I READ THE

9  NOVAK ARTICLE.

10          AND, YOU KNOW, YOU LOOK AT THESE AND YOU TRY TO

11  UNDERSTAND AND YOU TRY TO FIGURE OUT HOW CAN THESE THINGS

12  HAPPEN AND WHERE IS THE TRUTH?   IT'S WONDERFUL TO HAVE AN

13  OPPORTUNITY TO KIND OF EXPERIENCE WHAT'S GOING ON OUT THERE

14  IN A VERY REMOTE KIND OF WAY, IN MY SENSE.   AND SO I DO PAY

15  ATTENTION, AND CERTAINLY I FORM OPINIONS.   WHETHER I INTEND

16  TO OR NOT, I FORM THEM.

17          THE COURT:   WELL, LET ME JUST ASK.   HAVE YOU

18  FORMED ANY OPINIONS BASED UPON THE MEDIA COVERAGE YOU HAVE

19  HAD CONTACT WITH ABOUT THE GUILT OR INNOCENCE OF MR. LIBBY

20  IN THIS CASE?

21          THE PROSPECTIVE JUROR:   I CERTAINLY HAVE AN

22  OPINION THAT I CAN'T BELIEVE ANY STATEMENT BY THE BUSH

23  ADMINISTRATION.

24          THE COURT:   AND THAT WOULD ALSO APPLY TO

25  MR. LIBBY, AS A FORMER MEMBER?

1         THE PROSPECTIVE JUROR:  CERTAINLY.

2         THE COURT:  VERY WELL.  COUNSEL, APPROACH.

3         (AT THE BENCH.)

4         THE COURT:  ANY OBJECTION?

5         MR. FITZGERALD:  NO.

6         MR. WELLS:  NO OBJECTION.

7         THE COURT:  VERY WELL.

8         (IN OPEN COURT.)

9         THE COURT:  OKAY, MISS.  WE APPRECIATE YOUR

10   CANDOR, BUT WE WILL HAVE TO EXCUSE YOU IN THIS CASE.

11        THE PROSPECTIVE JUROR:  THANK YOU.

12        THE COURT:  THANK YOU.

13        (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

14        THE COURT:  COUNSEL, APPROACH.

15        (AT THE BENCH.)

16        THE COURT:  I UNDERSTAND FROM MY LAW CLERK THAT

17   THERE WAS AN ISSUE ABOUT THE ONE JUROR WHO YOU HAD MOVED TO

18   STRIKE YESTERDAY, AND I DENIED THAT REQUEST, AND THAT THERE

19   IS SOME INDICATION THAT APPARENTLY THERE WAS SOME MEDIA

20   COVERAGE ABOUT THE FACT THAT THAT REQUEST HAD BEEN MADE IN

21   THE MEDIA.

22        MR. WELLS:  YES, YOUR HONOR.  THERE WAS AN ARTICLE

23   IN THIS MORNING'S WASHINGTON POST THAT I HAD MOVED TO STRIKE

24   HER AND MY MOTION WAS DENIED.  ON M.S.N.B.C. T.V. LAST NIGHT

25   THERE WAS EXTENSIVE DISCUSSION OF WHAT SHE SAID ABOUT

1   PRESIDENT BUSH.

2           THE COURT:  WHAT PROGRAM WAS THAT?

3           MR. WELLS:  M.S.N.B.C.  I GAVE MR. BROOKER THE

4   TRANSCRIPT OF THE DISCUSSION.  IT WAS ON THE CHRIS

5   MATTHEWS -- ACTUALLY, IT WASN'T --

6           THE COURT:  HARDBALL.

7           MR. WELLS:  YES, SIR.  AND IT WAS -- HARDBALL WAS

8   ON.  DURING THE SHOW, THEY CUT TO THE REPORTER WHO COVERED

9   THE PROCEEDINGS YESTERDAY.  THE REPORTER INACCURATELY

10  REPORTED THE BASIS OF THE MOTION TO STRIKE, SINCE I MOVED TO

11  STRIKE, BECAUSE SHE SAID MR. LIBBY WOULD HAVE TO PROVE HIS

12  INNOCENCE.

13          THEY REPORTED ON T.V. LAST NIGHT THAT I MOVED TO

14  STRIKE BECAUSE OF HER COMMENTS ABOUT PRESIDENT BUSH BEING

15  HARD AND COLD OR WHAT HAVE YOU.

16          GIVEN THAT IT HAS NOW BEEN IN THE NEWSPAPER THAT

17  THE DEFENSE MOVED TO STRIKE -- MOVED TO STRIKE HER, I WOULD

18  RENEW MY MOTION THAT SHE BE STRICKEN.  THE DEFENSE SHOULD

19  NOT BE IN A POSITION OF HAVING TO WORRY THAT A JUROR MAY

20  RECEIVE NOTICE EITHER FROM THE PAPER OR, EVEN MORE LIKELY,

21  ONE OF HER RELATIVES WHO HEARD SOMETHING TO SAY, YOU KNOW,

22  THE DEFENSE WANTED TO KNOCK YOU OFF THE CASE.

23          THE COURT:  DOES THE GOVERNMENT HAVE A POSITION?

24          MR. FITZGERALD:  YES.  WE OBJECT, YOUR HONOR.  I

25  AM NOT SURE THAT THE JUROR HAS READ THIS OR WILL HAVE READ

1    THIS.  AND YOUR HONOR CAN INQUIRE BEFORE THE JURORS ARE --

2    BEFORE THE FINAL STRIKES WHETHER ANYONE HAS READ ANYTHING

3    ABOUT THE CASE OR ANYTHING ABOUT THE JURY SELECTION PROCESS.

4            THE COURT:  WELL, I WILL RESERVE A RULING RIGHT

5    NOW.  WHAT I WILL DO IS I WILL QUALIFY 37, AND WHEN SHE

6    COMES IN TOMORROW, I WILL CALL HER UP AND ASK IF SHE HAS HAD

7    ANY CONTACT WITH ANY MEDIA COVERAGE ABOUT THIS CASE AND SEE

8    WHERE WE ARE AT THAT POINT.

9            MR. WELLS:  YOUR HONOR, I JUST WANT TO RESPOND TO

10   THE ARGUMENT BECAUSE ASKING HER QUESTIONS ABOUT WHAT SHE MAY

11   HAVE HEARD TODAY OR YESTERDAY DOES NOT REALLY SOLVE THE

12   ISSUE.  SHE CAN BE SELECTED TO BE A JUROR IN THIS CASE, AND

13   A WEEK INTO THE TRIAL OR TWO WEEKS INTO THE TRIAL SOME

14   RELATIVE OR FRIEND CAN SAY, OH, YEAH, YOU KNOW, I READ THAT

15   THE DEFENSE TRIED TO KNOCK YOU OUT.  SO THIS IS SOMETHING

16   THAT WE WOULD HAVE TO LIVE WITH.  AND YOU ARE JUST -- WE

17   SHOULDN'T HAVE TO --

18           THE COURT:  I THINK IT IS A PROBLEM, BUT I THINK I

19   SHOULD INQUIRE OF HER BEFORE I MAKE A FINAL DECISION.  BUT I

20   THINK IT IS A POTENTIAL PROBLEM BECAUSE -- IT IS

21   UNFORTUNATE.  I DIDN'T EVEN THINK ABOUT THE FACT WHEN WE

22   WERE DOING THIS YESTERDAY THAT DOING IT IN OPEN COURT, AS WE

23   DID, WOULD SOMEHOW RESULT IN WHAT OCCURRED.

24           I DO HAVE CONCERNS, OBVIOUSLY, ABOUT IT, BUT I

25   WILL RESERVE A RULING UNTIL TOMORROW.

1      MR. WELLS:  THANK YOU.

2      (IN OPEN COURT.)

3      (ANOTHER PROSPECTIVE JUROR ENTERING THE

4  COURTROOM.)

5      THE COURT:  YOU ARE JUROR NUMBER 1869?

6      THE PROSPECTIVE JUROR:  YES, SIR, YOUR HONOR.

7      THE COURT:  YOU HAD SEVERAL RESPONSES TO THE

8  QUESTIONS THAT WERE ASKED OF YOU:  ONE, 3(A) WHICH ASKED

9  WHETHER YOU HAVE HEARD OR READ ANYTHING ABOUT THIS CASE IN

10  THE MEDIA.  DO YOU WANT TO TELL ME ABOUT THAT?

11      THE PROSPECTIVE JUROR:  WELL, I PRETTY MUCH READ A

12  NEWSPAPER FRONT TO BACK EVERY DAY.

13      THE COURT:  WHICH NEWSPAPER?

14      THE PROSPECTIVE JUROR:  WASHINGTON POST.

15      THE COURT:  ANY OTHERS?

16      THE PROSPECTIVE JUROR:  NOT REALLY.  NEW YORK

17  TIMES OCCASIONALLY, SUNDAYS.

18      THE COURT:  AND DO YOU REMEMBER WHAT YOU -- WAS IT

19  ONLY FROM THE NEWSPAPER THAT YOU HEARD ABOUT THE CASE?

20      THE PROSPECTIVE JUROR:  OH, ON-LINE NEWS.  I MEAN,

21  I AM AN EX-NEWSPAPER REPORTER, SO I PRETTY MUCH AM ADDICTED

22  TO READING NEWS.

23      THE COURT:  WHO DID YOU WORK FOR?

24      THE PROSPECTIVE JUROR:  WELL, HERE'S WHERE MY

25  THREE STRIKES, I'M AFRAID -- WASHINGTON POST.  BOB WOODWARD

1    WAS MY EDITOR FOR A COUPLE YEARS.

2              THE COURT:  DO YOU REMEMBER EXACTLY WHAT THE MEDIA

3    COVERAGE SAID ABOUT THIS CASE?

4              THE PROSPECTIVE JUROR:  ESSENTIALLY THAT VALERIE

5    PLAME WAS OUTED BY SOMEBODY AND THEY WERE LOOKING TO SEE,

6    YOU KNOW, BY WHOM AND WHEN.  AND A NUMBER OF NAMES WERE, YOU

7    KNOW, TALKED ABOUT.  AND I AT THIS MOMENT CAN'T REMEMBER

8    EXACTLY, YOU KNOW, WHAT WAS SAID.  YOU KNOW, I REMEMBER

9    MR. LIBBY'S NAME WAS MENTIONED.  I THINK RICHARD ARMITAGE'S

10   NAME WAS MENTIONED.  DICK CHENEY, ROBERT NOVAK.

11             THE COURT:  DID YOU FORM ANY OPINION ABOUT THIS

12   CASE AND MR. LIBBY'S INNOCENCE OR GUILT BASED UPON WHAT YOU

13   HAD CONTACT WITH?

14             THE PROSPECTIVE JUROR:  I NEVER SAW ANYTHING THAT

15   SEEMED DEFINITIVE ONE WAY OR THE OTHER.

16             THE COURT:  SO IF YOU WERE SELECTED AS A JUROR IN

17   THIS CASE, WOULD YOU BE ABLE TO START OUT WITH THE

18   PRESUMPTION THAT HE IS INNOCENT UNTIL PROVEN GUILTY BY THE

19   GOVERNMENT?

20             THE PROSPECTIVE JUROR:  I MEAN, I THINK ONE THING

21   ABOUT BEING A NEWSPAPER REPORTER FOR ALL THOSE YEARS IS THAT

22   THE ONE THING THAT HAS ALWAYS BEEN IMPORTANT TO ME IS

23   GETTING IT RIGHT, FIGURING IT OUT, YOU KNOW, CHECKING ALL

24   THE FACTS FIRST.  SO I DON'T BELIEVE I HAVE ANY, YOU KNOW,

25   PREJUDICE TO BEGIN WITH ABOUT PRETTY MUCH ANYTHING.

1         THE COURT:  AND I ASSUME YOU UNDERSTAND THAT YOU

2    WOULD HAVE TO DECIDE THIS CASE BASED ONLY UPON WHAT YOU HEAR

3    AND SEE IN THIS COURTROOM.

4         THE PROSPECTIVE JUROR:  SURE.

5         THE COURT:  YOU COULD NOT BE INFLUENCED BY WHAT

6    YOU MAY HAVE HEARD OR SEEN IN THE MEDIA?

7         THE PROSPECTIVE JUROR:  WELL, MY WIFE WAS JOKING

8    WITH ME TODAY AND SAID HAVING THE MEMORY OF WHAT I READ IS

9    NOT NECESSARILY GOING TO BE ALL THAT GREAT BECAUSE I TEND TO

10   FORGET THINGS, YOU KNOW, PRETTY MUCH.

11        THE COURT:  SO YOU WOULD BE ABLE TO PUT THAT MEDIA

12   COVERAGE OUT OF YOUR MIND --

13        THE PROSPECTIVE JUROR:  I THINK I WOULD, YES.

14        THE COURT:  -- AND JUDGE THIS ONLY ON WHAT YOU

15   HEAR AND SEE IN THE COURTROOM?

16        THE PROSPECTIVE JUROR:  YES.

17        THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION --

18   WELL, LET ME JUST ASK, BEFORE I MOVE ON, BASED UPON WHAT YOU

19   SAID -- YOU SAID THAT MR. WOODWARD WAS YOUR EDITOR?

20        THE PROSPECTIVE JUROR:  YES.

21        THE COURT:  FOR HOW LONG OF A PERIOD?

22        THE PROSPECTIVE JUROR:  I'D SAY THREE TO FOUR

23   YEARS.

24        THE COURT:  WOULD THE FACT THAT INFORMATION ABOUT

25   HIM MAY BE REVEALED DURING THE COURSE OF THIS TRIAL OR WOULD

1    THE FACT THAT CONCEIVABLY HE MIGHT BE A WITNESS IN THIS CASE

2    HAVE ANY IMPACT ON YOUR ABILITY TO SERVE AS A JUROR IN THIS

3    CASE?

4         THE PROSPECTIVE JUROR:  I MEAN, I'D SAY RIGHT OUT

5    FRONT THAT I HAVE BEEN IMPRESSED BY HIM, YOU KNOW, AS --

6    JUST READING HIS WORKS.  BUT I DON'T THINK HE IS INFALLIBLE

7    BY ANY MEANS.  YOU KNOW, I THINK -- I THINK I COULD BE

8    IMPARTIAL.  I MEAN, I HAVEN'T WORKED FOR HIM SINCE 1985.

9         THE COURT:  I DON'T KNOW IF THIS WILL BE THE CASE

10   OR NOT, BUT ASSUME THAT HE WERE TO SAY SOMETHING AND THEN

11   SOMEBODY ELSE SAYS SOMETHING TOTALLY DIFFERENT, AND IT IS

12   CLEAR THAT BOTH COULD NOT BE TELLING ACCURATELY WHAT

13   OCCURRED.  WOULD YOU GIVE HIM A STEP UP BECAUSE OF YOUR

14   PRIOR INTERACTION WITH HIM?

15        THE PROSPECTIVE JUROR:  THAT IS HARD TO -- I MEAN,

16   MY IMPULSE IS TO SAY NO.  I MEAN, LET'S FACE IT.  HE HAS

17   WRITTEN TWO BOOKS ABOUT IRAQ IN THE LAST TWO YEARS, AND ONE

18   OF THEM CONTRADICTED THE OTHER IN SOME WAYS.  SO HE

19   OBVIOUSLY WAS WRONG ABOUT SOME THINGS.  AND I THINK HE IS

20   VERY CAPABLE OF BEING, YOU KNOW, HUMAN AND WRONG.

21        THE COURT:  SO COULD YOU JUDGE HIM EQUALLY WITH

22   EVERYBODY ELSE?

23        THE PROSPECTIVE JUROR:  I THINK SO, SURE.

24        THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

25   NUMBER 5.  YOU MAY HAVE ALREADY RESPONDED TO THIS, BUT I

1   INDICATED A NUMBER OF DIFFERENT PEOPLE WHO WOULD EITHER

2   TESTIFY IN THIS CASE, OR THERE WOULD BE INFORMATION REVEALED

3   POSSIBLY ABOUT THEM DURING THE TRIAL.

4         BESIDES THE NAMES THAT YOU HAVE GIVEN US, ANY

5   OTHER NAMES THAT YOU RECALL?

6         THE PROSPECTIVE JUROR:  WELL, UNTIL SIX MONTHS

7   AGO, TIM RUSSERT WAS A NEIGHBOR OF MINE.  YOU KNOW, WE

8   SHARED AN ALLEY, AND SO WE WOULD SEE EACH OTHER.  I WAS AT

9   HIS HOUSE FOR A BIG NEIGHBORHOOD PARTY ONCE OR TWICE.  BUT I

10   WOULDN'T SAY WE ARE FRIENDS.

11         AND WALTER PINCUS IS A WASHINGTON POST REPORTER

12   WHO I HAVE SEEN MAYBE TWICE IN THE LAST FIVE YEARS AT

13   PARTIES, YOU KNOW.  WE KIND OF REINTRODUCE OURSELVES TO EACH

14   OTHER EACH TIME, SO THERE IS NO REAL RELATIONSHIP THERE.

15   BUT I, YOU KNOW, DO ACTUALLY -- YOU KNOW, IF I SAW HIM ON

16   THE STREET, I WOULD PROBABLY RECOGNIZE HIM AND SAY HELLO.

17         THE COURT:  IN REFERENCE TO BOTH OF THESE

18   INDIVIDUALS, DO YOU HAVE ANY IMPRESSIONS ABOUT THEIR

19   BELIEVABILITY?

20         THE PROSPECTIVE JUROR:  SURE.  I MEAN, I'D SAY

21   THEY ARE BELIEVABLE.  BUT IF SOMEONE WAS TO SHOW ME EVIDENCE

22   THAT WHAT THEY WROTE OR SAID WAS NOT TO BE TRUSTED BECAUSE

23   THEY GOT WRONG INFORMATION, I'D TOTALLY BE READY TO ACCEPT

24   THAT AS WELL.

25         THE COURT:  SO COULD YOU REJECT --

1        THE PROSPECTIVE JUROR:  SURE.

2        THE COURT:  -- THEIR TESTIMONY IF YOU THOUGHT IT

3    WAS APPROPRIATE?

4        THE PROSPECTIVE JUROR:  SURE.  YES.

5        THE COURT:  AGAIN, WOULD YOU GIVE THEM A LEG UP IN

6    REFERENCE TO SOMEBODY ELSE WHO YOU DIDN'T KNOW BECAUSE OF

7    YOUR PRIOR ASSOCIATION WITH THEM AS FAR AS CREDIBILITY IS

8    CONCERNED?

9        THE PROSPECTIVE JUROR:  I THINK IT WOULD ALL

10   DEPEND ON WHAT THE TESTIMONY OR THE EVIDENCE WAS, YOU KNOW.

11   I MEAN, I WOULD GO IN THINKING THAT, AS A GENERAL RULE, TIM

12   RUSSERT IS NOT GOING TO TELL LIES INTENTIONALLY, BUT I TEND

13   TO BELIEVE THAT ABOUT MOST PEOPLE.  SO IT'S JUST A MATTER OF

14   WHAT, YOU KNOW, THE EVIDENCE OR THE INFORMATION IS.

15       THE COURT:  SO IF OTHER WITNESSES WERE TESTIFYING

16   IN THIS CASE AND TESTIFIED CONTRARY TO EITHER RUSSERT OR

17   PINCUS, YOU WOULD START OUT WITH THE IMPRESSION THAT THEY

18   WERE BEING TRUTHFUL JUST LIKE RUSSERT AND PINCUS?

19       THE PROSPECTIVE JUROR:  YES, I WOULD WANT TO LOOK

20   AT THEM SIDE BY SIDE AND WEIGH IT.  I WOULDN'T JUMP TO ANY

21   CONCLUSION.

22       THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

23   NUMBER 19 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

24   RELATIVES HAVE EVER HELD A POSITION IN LAW ENFORCEMENT OR

25   APPLIED FOR SUCH A POSITION.  DO YOU WANT TO TELL ME ABOUT

1    THAT?

2          THE PROSPECTIVE JUROR:  WELL, I DON'T KNOW IF THIS

3    IS RELEVANT.  MY BROTHER WAS A JUSTICE DEPARTMENT LITIGATOR

4    FOR EIGHT YEARS.  HE IS NOW IN PRIVATE PRACTICE.

5          THE COURT:  DO YOU KNOW WHERE IN JUSTICE HE

6    WORKED?

7          THE PROSPECTIVE JUROR:  HE WAS -- HE WOULD GO --

8    WHAT HE DID IS HE WOULD GO, LIKE, TO DO THE PG&E STUFF IN

9    CALIFORNIA OR GETTING MONEY BACK FROM A BANKRUPT AIRLINE.

10   SO, YOUR HONOR, I GUESS JUST SORT OF WHITE-COLLAR --

11         THE COURT:  WAS IT CRIMINAL OR CIVIL WORK?

12         THE PROSPECTIVE JUROR:  IT WAS CIVIL WORK.

13         THE COURT:  OKAY.  AND WOULD THE FACT THAT HE

14   FORMERLY WORKED FOR THE JUSTICE DEPARTMENT CAUSE YOU TO

15   FAVOR ONE SIDE OR THE OTHER IN THIS CASE?

16         THE PROSPECTIVE JUROR:  NO.

17         THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

18   NUMBER 30 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

19   RELATIVES HAVE EVER BEEN THE VICTIM OF A CRIME, SOMEONE

20   CHARGED WITH A CRIME OR A WITNESS TO A CRIME.  DO YOU WANT

21   TO TELL ME ABOUT THAT?

22         THE PROSPECTIVE JUROR:  WELL, I MEAN, I WAS

23   ARRESTED --

24         THE COURT:  LET ME JUST SAY, IF YOU HAVE ANY

25   RESPONSES YOU WANT TO TELL ME THAT ARE SENSITIVE AND YOU

1   WANTED TO TELL ME PRIVATELY, YOU CAN DO THAT.

2        THE PROSPECTIVE JUROR:  I WAS ARRESTED AT A

3   MAY DAY DEMONSTRATION IN THE DISTRICT IN 1970 OR '71.  I

4   BELIEVE THAT WAS -- WAS THROWN OUT OR I PAID A FINE OF, YOU

5   KNOW, $20 OR SOMETHING.  BUT THAT'S THE ONLY THING I

6   COULD --

7        THE COURT:  DO YOU HAVE ANY BAD FEELINGS TOWARDS

8   ANYONE AS A RESULT OF THAT EVENT?

9        THE PROSPECTIVE JUROR:  THE GUY NEXT TO ME TOOK MY

10   FOOD.  BUT THAT WAS ABOUT IT.  NO, I DO NOT HAVE ANY, YOU

11   KNOW --

12        THE COURT:  SO YOU DON'T HAVE ANY BAD FEELINGS

13   TOWARDS THE GOVERNMENT AS A RESULT OF THAT?

14        THE PROSPECTIVE JUROR:  NO.  NO.  NO.

15        THE COURT:  DID YOU HAVE A LAWYER?

16        THE PROSPECTIVE JUROR:  NO.  WELL, MY FATHER WAS A

17   LAWYER, AND THE JUDGE, WHEN HE SAW MY NAME ON THE DOCKET, HE

18   SAID TO ME, "YOUR FATHER IS NOT DENIS COLLINS, IS HE?"  AND

19   I SAID, "HE IS."

20        SO HE CALLED MY FATHER TO COME DOWN AND TO TRY TO

21   SHAME ME.  SO I WAS ANNOYED BY THAT.  BUT, NO, I HAVE NO --

22        THE COURT:  YOUR FATHER WAS SORT OF YOUR

23   REPRESENTATIVE IN COURT?

24        THE PROSPECTIVE JUROR:  WELL, YES.

25        THE COURT:  WERE YOU HAPPY WITH HIS

1    REPRESENTATION?

2            THE PROSPECTIVE JUROR:  WELL, I GUESS I WAS HAPPY

3    NOT TO BE IN JAIL, BUT I DIDN'T LIKE THE FACT THAT I WAS

4    BEING, LIKE, SORT OF SPRUNG BECAUSE THIS JUDGE KNEW MY

5    FATHER.  THAT WENT AGAINST ALL THE SORT OF -- YOU KNOW, THE

6    TENOR OF THE TIMES.  YOU DIDN'T WANT TO GET SPRUNG FROM D.C.

7    JAIL BECAUSE YOUR FATHER KNEW SOMEBODY.

8            THE COURT:  SO ARE YOU TOTALLY CONFIDENT YOU CAN

9    BE FAIR TO BOTH SIDES IN THIS CASE?

10           THE PROSPECTIVE JUROR:  I AM CONFIDENT, YES.

11           THE COURT:  GOVERNMENT?

12           MR. FITZGERALD:  GOOD MORNING.

13           IF, DURING THIS TRIAL -- AND I REALIZE THIS IS A

14   HARD QUESTION, BUT IF THERE WAS TESTIMONY ABOUT -- BY OR

15   ABOUT MR. WOODWARD, ARE YOU CONFIDENT THAT YOU COULD PUT OUT

16   OF YOUR MIND HOW YOU KNOW MR. WOODWARD FOR THE THREE YEARS

17   THAT YOU WORKED FOR HIM IF THERE WERE SORT OF GRAY AREAS

18   BETWEEN MR. WOODWARD SAYING, I REMEMBER IT THIS WAY, AND

19   ANOTHER WITNESS MAYBE SAYING, I HEARD IT THAT WAY -- COULD

20   YOU WIPE THE SLATE CLEAN THROUGH YOUR BACKGROUND IN WORKING

21   UNDER HIM?

22           THE PROSPECTIVE JUROR:  I WOULD SAY THE ONE THING

23   THAT BOB WOODWARD -- AND, AGAIN, I WAS ONE OF 30 REPORTERS

24   WHO WORKED UNDER HIM.  BUT THE ONE THING THAT HE SORT OF

25   DRILLED INTO ALL OF US WAS, DON'T TAKE ANYBODY'S, YOU KNOW,

1    WORD FOR ANYTHING UNTIL YOU GET THE FACTS.

2         SO THE FACT THAT -- FOR ME TO GIVE BOB WOODWARD

3    SOME SPECIAL, YOU KNOW, PASS WOULD BE CONTRARY TO EVERYTHING

4    I EVER LEARNED BEING A REPORTER AND A WRITER.  AND I'D FIND

5    IT VERY -- KIND OF SHAMEFUL TO OVERWEIGH ANYTHING ON EITHER

6    SIDE.

7         MR. FITZGERALD:  WHAT AREA DID YOU WRITE IN?

8         THE PROSPECTIVE JUROR:  WELL, I WAS A METRO

9    REPORTER.  I WAS A POLITICAL REPORTER.  I WAS THE OUTDOOR

10   COLUMNIST FOR THREE YEARS.  SPORTS.  I DID PRETTY MUCH

11   EVERYTHING THERE.

12        MR. FITZGERALD:  WHEN YOU WERE A POLITICAL

13   REPORTER, DID YOU COVER ANY PARTICULAR BRANCH OF THE

14   GOVERNMENT?

15        THE PROSPECTIVE JUROR:  I COVERED THE VIRGINIA

16   LEGISLATURE DOWN IN RICHMOND, BUT I WAS ESSENTIALLY A

17   FEATURE WRITER WHO WAS SENT DOWN THERE TO WRITE, YOU KNOW,

18   INTEREST STORIES.  I DIDN'T DO MUCH REAL POLITICAL

19   REPORTING.

20        MR. FITZGERALD:  AND OVER THE LAST COUPLE OF

21   YEARS, HAVE YOU READ MR. WOODWARD'S COMMENTS ABOUT THE CASE

22   AT VARIOUS TIMES?

23        THE PROSPECTIVE JUROR:  I DID NOT READ -- NO.

24   WOODWARD -- I MAY HAVE READ -- HE MIGHT HAVE HAD ONE FRONT

25   PAGE STORY.  I DON'T REMEMBER.

1    MR. FITZGERALD:  OKAY.  DO YOU RECALL ANY COMMENTS

2  THAT HE MAY HAVE MADE ON TELEVISION ABOUT THE CASE?

3    THE PROSPECTIVE JUROR:  AS I RECALL, HE WAS THE

4  LAST PERSON TO MAKE ANY COMMENTS ABOUT THIS.  I MEAN, HE WAS

5  KIND OF CRITICIZED FOR NOT WRITING STORIES THAT HE KNEW, YOU

6  KNOW, WHEN HE KNEW THEM UNTIL AFTER OTHER PEOPLE HAD SORT OF

7  WRITTEN STORIES CONCERNING THESE MATTERS.

8    BUT I DON'T PARTICULARLY RECALL WHAT

9  INFORMATION -- I DON'T REMEMBER ANYTHING HE SAID ABOUT

10  MR. LIBBY, FOR INSTANCE.  I JUST REMEMBER THAT HIS NAME

11  WAS -- HE WAS ONE OF A NUMBER OF PEOPLE WHO WERE BEING, YOU

12  KNOW, TALKED ABOUT.  BUT --

13    MR. FITZGERALD:  DO YOU KNOW WHAT IT IS THAT

14  MR. WOODWARD SAID THAT PEOPLE CRITICIZED HIM FOR NOT SAYING

15  EARLIER?

16    THE PROSPECTIVE JUROR:  THAT HE WAS -- SOMEBODY

17  TOLD HIM ABOUT VALERIE PLAME'S WORK FOR THE C.I.A.  I THINK

18  THAT WAS -- I MAY BE WRONG ABOUT THAT, BUT THAT HE HAD BEEN

19  TOLD, AND THAT MAYBE THEY EXPECTED THAT HE WOULD HAVE

20  WRITTEN ABOUT THAT CONVERSATION.

21    HE LATER, I THINK, SORT OF ADMITTED IN THE POST

22  THAT HE HAD BEEN TOLD, YOU KNOW, MONTHS EARLIER AND HADN'T

23  MADE THAT CLEAR.

24    MR. FITZGERALD:  AND DO YOU RECALL IF MR. WOODWARD

25  MADE CLEAR WHO HAD TOLD HIM THIS INFORMATION?

1          THE PROSPECTIVE JUROR:  I DON'T REALLY REMEMBER

2     THAT.

3          MR. FITZGERALD:  AND DO YOU RECALL IF MR. WOODWARD

4     OR ANYONE ELSE EXPRESSED AN OPINION ABOUT WHETHER OR NOT

5     THAT DEVELOPMENT WAS IMPORTANT AS IT RELATES NOT TO THE

6     WASHINGTON POST BUT TO THIS CASE?

7          THE PROSPECTIVE JUROR:  I AM SORRY.  WOULD THAT

8     BE --

9          MR. FITZGERALD:  DID ANYONE EXPRESS AN OPINION

10    ABOUT WHETHER THE FACT THAT SOMEONE HAD SPOKEN TO

11    MR. WOODWARD ABOUT VALERIE PLAME, WHETHER THAT WAS RELEVANT

12    TO THIS CASE?

13         THE PROSPECTIVE JUROR:  NO.  I MEAN, I WASN'T

14    REALLY -- I DIDN'T SEE THAT IN THE SAME CONTEXT AS THIS

15    CASE.  IT WAS JUST A MATTER OF JOURNALISTIC PRIDE OR

16    SOMETHING THAT A WASHINGTON POST REPORTER WHO HAD SOME STORY

17    SHOULD HAVE COME OUT WITH IT, AND NOT -- I THINK THE NEW

18    YORK TIMES DID SOME STORY FIRST.

19         I WAS ONLY LOOKING AT IT IN TERMS OF, LIKE, SORT

20    OF INTRAMURAL, YOU KNOW, BACK AND FORTH, NOT SO MUCH WHO IS

21    GUILTY OF WHAT OR WHO DID WHAT OR SAID WHAT.

22         MR. FITZGERALD:  DO YOU RECALL IF MR. WOODWARD

23    MADE ANY COMMENTS ABOUT WHAT HE THOUGHT OF THE INDICTMENT IN

24    THIS CASE?

25         THE PROSPECTIVE JUROR:  NO.

47

1          MR. FITZGERALD:  AND DO YOU RECALL IF MR. WOODWARD

2    MADE ANY COMMENTS ABOUT WHAT HE THOUGHT OF ANY OF THE

3    LAWYERS INVOLVED IN THE CASE?

4          THE PROSPECTIVE JUROR:  NO.

5          MR. FITZGERALD:  AND IF THERE WERE TESTIMONY AT

6    THE TRIAL WHERE THERE WAS A DISPUTE ABOUT WHAT HAPPENED

7    BETWEEN A WRITER AND AN EDITOR IN TERMS OF WHETHER OR NOT A

8    WRITER AND AN EDITOR HAD A CERTAIN CONVERSATION, DO YOU

9    THINK YOUR BACKGROUND AS A WRITER WHO WAS EDITED BY EDITORS

10   WOULD COME INTO PLAY IN TRYING TO SORT OUT WHETHER THE

11   WRITER OR THE EDITOR'S VERSION IS MORE BELIEVABLE?

12         THE PROSPECTIVE JUROR:  NO, I HAVE ACTUALLY BEEN

13   AN EDITOR AS WELL, SO I SORT OF KNOW THE FAULTS OF BOTH

14   SIDES.

15         MR. FITZGERALD:  AND WOULD IT BE POSSIBLE FOR YOU

16   TO BLOCK OUT WHAT YOU KNOW AS A WRITER WHO HAS BEEN EDITED

17   AND AN EDITOR WHO HAS EDITED WRITERS FROM DECIDING THE FACTS

18   IF THERE IS A DISPUTE BETWEEN A WRITER AND AN EDITOR AND YOU

19   ARE ASKED BY THE JUDGE ONLY TO RELY UPON WHAT YOU KNOW FROM

20   COURT AND NOT YOUR OTHER EXPERIENCE?

21         THE PROSPECTIVE JUROR:  NO, I REALLY HAVE NO

22   FEELINGS ONE WAY OR THE OTHER ABOUT WRITERS OR EDITORS IN

23   THAT SENSE.

24         MR. FITZGERALD:  AND DO YOU KNOW THE NAME

25   MR. RICHARD ARMITAGE?

48

1      THE PROSPECTIVE JUROR:  I KNOW THE NAME, YES.

2      MR. FITZGERALD:  DO YOU KNOW WHAT, IF ANYTHING, HE

3  HAS TO DO WITH THIS CASE?

4      THE PROSPECTIVE JUROR:  I AM A LITTLE EMBARRASSED

5  TO SAY THAT I KNOW HE IS INVOLVED, BUT I DON'T KNOW -- FOR

6  AS MUCH AS I READ NEWSPAPERS, IT SORT OF PASSES THROUGH ME.

7  YOU KNOW, I REMEMBER WHAT SEEMS INTERESTING, AND THEN -- I

8  DON'T REALLY RECALL IF HE WAS THE ONE WHO SUPPOSEDLY STARTED

9  THE -- YOU KNOW, THE -- LEAKING THE NAME OR IF HE WAS

10  SOMEONE'S MENTOR.  I HAVE NO IDEA WHERE HE FITS IN ALL OF

11  THIS.

12      MR. FITZGERALD:  AND IF WE CAN TALK FOR A MOMENT

13  ABOUT WALTER PINCUS, HOW CLOSELY DID YOU WORK WITH WALTER

14  PINCUS?

15      THE PROSPECTIVE JUROR:  I DON'T REALLY RECALL

16  WORKING WITH WALTER PINCUS.  I KNOW HE WAS, I THINK, A

17  NATIONAL REPORTER AND I WAS A METRO REPORTER.  AND IN THE

18  HIERARCHY OF THE WASHINGTON POST, THE TWAIN DO NOT MEET.

19  YOU KNOW, HE WAS IN A SEPARATE PLACE IN THE NEWS ROOM.  AND

20  I ONLY MET HIM REALLY TO TALK TO HIM WITHIN THE LAST YEAR

21  AT -- A FRIEND OF MINE IS A NATIONAL GEOGRAPHIC EDITOR, AND

22  SHE HAD A PARTY AND HE WAS THERE, AND WE SAID, OH, YOU WORK

23  AT THE POST; SURE, I REMEMBER YOUR NAME.

24      YOU KNOW, WE MOSTLY TALKED ABOUT THE BOOZE AND THE

25  FOOD, I THINK.  WE DIDN'T GET TOO MUCH INTO, YOU KNOW,

1   ANYTHING ELSE.

2           MR. FITZGERALD:  AND IF THERE WERE -- THE

3   SITUATION WERE TO ARISE AT TRIAL WHERE MR. PINCUS WOULD

4   TESTIFY THAT HE RECALLED THINGS HAPPENING A CERTAIN WAY AND

5   ANOTHER WITNESS WOULD TESTIFY THAT HE RECALLS THINGS

6   HAPPENING A COMPLETELY DIFFERENT WAY, AS YOU SAT THERE AND

7   TRIED TO DECIDE WHICH ACCOUNT TO CREDIT, WOULD MR. PINCUS

8   START ON EXACTLY THE SAME PLANE OR WOULD ANY KNOWLEDGE OF

9   HIM, EITHER IN THE SOCIAL SETTING OR THE WASHINGTON POST,

10  MAKE HIM IN ANY WAY DIFFERENT THAN THE OTHER WITNESS?

11          THE PROSPECTIVE JUROR:  I MEAN I THINK I WOULD BE

12  DETERMINED TO START EQUALLY.  AGAIN, YOU KNOW, ONE OF THE

13  THINGS ABOUT BEING A REPORTER ALL THOSE YEARS IS I REALLY

14  HAD TO GO INTO EVERY SITUATION AND SAY I CAN'T TRUST

15  ANYTHING THAT ANYBODY SAYS UNTIL I CHECK IT OUT SOME OTHER

16  WAY AND, YOU KNOW, WEIGH THE BALANCE.  BECAUSE PEOPLE EITHER

17  ARE TRYING TO GET YOU TO WRITE SOMETHING THAT WILL HELP THEM

18  OR THEY -- I MEAN, MEMORY IS A FUNNY THING.  WE ALL THINK WE

19  KNOW THINGS AND DO THINGS.  AND I HAVE JUST FOUND THAT I

20  HAVE BEEN WRONG AND PEOPLE I KNOW HAVE BEEN WRONG.  IT'S

21  JUST -- I AM VERY SKEPTICAL ABOUT PRETTY MUCH EVERYTHING

22  THAT I HEAR UNTIL I SEE IT BACKED UP BY SOME -- YOU KNOW,

23  SOMETHING ELSE.

24          MR. FITZGERALD:  DO YOU KNOW A REPORTER AT THE

25  WASHINGTON POST, GLENN KESSLER?

1    THE PROSPECTIVE JUROR:  I KNOW THE NAME.  IF HE

2  WAS SITTING IN THIS COURTROOM, I WOULDN'T BE ABLE TO

3  RECOGNIZE HIM.

4    MR. FITZGERALD:  DO YOU KNOW A REPORTER BY THE

5  NAME OF MATT COOPER?

6    THE PROSPECTIVE JUROR:  NO.

7    MR. FITZGERALD:  HAVE YOU EVER HEARD THE NAME?

8    THE PROSPECTIVE JUROR:  NO.

9    MR. FITZGERALD:  DO YOU KNOW A REPORTER BY THE

10  NAME OF JUDITH MILLER?

11    THE PROSPECTIVE JUROR:  JUDITH MILLER, YES.  SHE

12  WAS A NEW YORK TIMES REPORTER WHO I THINK WENT TO JAIL FOR A

13  WHILE FOR NOT REPORTING HER SOURCE.  I THINK IT INVOLVED

14  THIS CASE.

15    MR. FITZGERALD:  AND DID YOU FOLLOW THE LITIGATION

16  CONCERNING JUDITH MILLER GOING TO JAIL?

17    THE PROSPECTIVE JUROR:  YES, I FOLLOWED IT, YOU

18  KNOW, SORT OF -- I'D READ THE STORY IN THE NEWSPAPER.  I

19  COULDN'T GIVE YOU TOO MANY DETAILS ABOUT IT, BUT I KNOW

20  SHE -- YOU KNOW, IT WAS ALL ABOUT THE REPORTER'S RIGHT NOT

21  TO, YOU KNOW, BETRAY A SOURCE.

22    AND THEN I GUESS THE CONFLICT WAS THAT THE SOURCE

23  HAD GIVEN HER PERMISSION TO GIVE THE NAME AND SHE STILL

24  REFUSED.  AND -- I CAN'T REALLY REMEMBER WHO HER SOURCE WAS

25  AND WHETHER THAT CAME OUT.

51

1          AGAIN, IT'S SORT OF EMBARRASSING, BUT THAT IS SORT

2     OF LIKE YESTERDAY'S NEWS TO ME.  SO I COULD TELL YOU WHAT,

3     YOU KNOW, I READ -- DETAILS OF LAST WEEK'S STORIES, BUT NOT

4     SOMETHING -- YOU KNOW, I KNOW THE GENERAL SENSE OF THE

5     STORY.  I KNOW, YOU KNOW, THE PLAYERS, MAYBE, AND WHAT'S THE

6     GAME.  BUT I JUST DON'T HAVE TOO MUCH DETAILED KNOWLEDGE OF

7     ANYTHING ELSE ABOUT THAT STORY.

8          MR. FITZGERALD:  AND AS A REPORTER, DID YOU HAVE

9     PARTICULAR FEELINGS ABOUT WHETHER OR NOT A REPORTER HAD A

10    RIGHT NOT TO TESTIFY TO A GRAND JURY ABOUT WHO HER OR HIS

11    SOURCE WAS?

12         THE PROSPECTIVE JUROR:  YES.  I MEAN, I WAS KIND

13    OF BROUGHT UP TO BELIEVE THAT YOU DON'T BETRAY YOUR SOURCES.

14    BUT, YOU KNOW, WHEN YOU WORK IN THAT KIND OF ENVIRONMENT,

15    THAT -- I DON'T THINK I EVER HAD A CONVERSATION ABOUT IT.

16    IT IS JUST LIKE, OF COURSE IF YOU GIVE A SOURCE -- IF YOU

17    TELL THEM YOU ARE NOT GOING TO USE THEIR NAME, THEN YOU

18    DON'T DO IT.

19         I NEVER REALLY THOUGHT OF IT IN THE SENSE OF WOULD

20    I HAVE TO GO TO JAIL FOR THAT, BECAUSE MOST OF WHAT I WROTE

21    WAS NOT IN THAT LEVEL OF -- YOU KNOW, I MEAN, FOR THE LAST

22    THREE YEARS I WAS WRITING ABOUT SKIING AND THE WINTER

23    OLYMPICS.  THERE WERE VERY FEW CASES WHERE I WOULD HAVE TO

24    WORRY ABOUT, YOU KNOW, GOING TO THE GULAG FOR ANYTHING I

25    WROTE IN THOSE SITUATIONS.

1              MR. FITZGERALD:  DID YOU HAVE ANY FEELINGS ABOUT

2   WHETHER OR NOT IT WAS APPROPRIATE FOR THE PROSECUTION IN THE

3   INVESTIGATION TO SUBPOENA REPORTERS AND/OR TO ENFORCE THE

4   SUBPOENAS TO THE POINT THAT REPORTERS WOULD GO TO JAIL?

5              THE PROSPECTIVE JUROR:  WELL, I MEAN, YOU KNOW,

6   THE PROSECUTORS USE THE TOOLS THEY HAVE TO DO WHAT THEY

7   THINK IS RIGHT.  AND THE REPORTERS USE THE TOOLS THEY HAVE

8   TO DO WHAT THEY THINK IS RIGHT.  AND THEN IT IS A MATTER OF,

9   YOU KNOW, WHO IS MORE RIGHT.

10             SO I GUESS I WOULD -- IF ONE OF MY COLLEAGUES WAS

11  BEING, YOU KNOW, THREATENED WITH JAIL, WOULD I BE MORE

12  INCLINED TO SUPPORT THE COLLEAGUE OR THE PROSECUTOR?  MY

13  KIND OF KNEE-JERK REACTION WOULD BE, "HEY, YOU KNOW, I WILL

14  TAKE CARE OF YOUR DOG OR DO WHAT YOU WANT ME TO DO.  I AM

15  WITH YOU.  I HAVE GOT YOUR BACK."

16             I AM NOT GOING TO SAY THAT I WOULD BE TOTALLY

17  HANDS-OFF IN THAT SITUATION.  BUT AS A GENERAL PRINCIPLE, I

18  SORT OF FIGURE, YOU KNOW, EVERYBODY DOES WHAT THEY DO AND

19  WHAT'S LEGAL AND FAIR AND, YOU KNOW, SEE WHAT HAPPENS.

20             MR. FITZGERALD:  DO YOU THINK ANY OF THAT -- THOSE

21  FEELINGS WOULD CARRY OVER IN ANY WAY TO THE ACTUAL TRIAL IF

22  YOU LEARNED THAT THE PROSECUTORS WERE INVOLVED IN GETTING

23  TESTIMONY FROM REPORTERS?

24             THE PROSPECTIVE JUROR:  WELL, I ASSUME THAT HAS

25  ALREADY HAPPENED, SO, NO, I DON'T THINK THAT WOULD BE A --

1  YOU KNOW, I WOULD JUST SORT OF, YOU KNOW, LOOK -- AGAIN,

2  JUDGE IT AND SEE WHAT'S FAIR PLAY THERE.   THAT'S ALL.

3      MR. FITZGERALD:   AND OBVIOUSLY WITHOUT TELLING US

4  WHO THEY ARE, HAVE YOU DEALT WITH A NUMBER OF SOURCES OVER

5  THE YEARS?

6      THE PROSPECTIVE JUROR:   OH, SURE.   I MEAN -- BUT,

7  YOU KNOW, BACK WHEN I STARTED AT THE POST, I WAS DOING --

8  YOU KNOW, AT ONE POINT I WAS A ROVING FEATURE WRITER IN

9  VIRGINIA.   SO I WOULD GO -- ANY BIG STORY, THEY WOULD SEND

10 ME DOWN TO COVER IT.   SO I HAD HUNDREDS AND HUNDREDS OF

11 SOURCES.

12     SOMEBODY MAY BE TELLING ME, YOU KNOW, "THAT GUY,

13 YOU OUGHT TO LOOK AT HIM FOR, YOU KNOW, THAT CRIME, BUT

14 DON'T TELL ANYBODY I SAID THAT."

15     YOU KNOW, IT WAS ON THAT LEVEL.   I WASN'T, YOU

16 KNOW, GOING INTO VAULTS AND TAKING -- YOU KNOW, LOOKING AT

17 SECRET INFORMATION THAT ANYBODY HAD.

18     MR. FITZGERALD:   AND IF THERE WAS TESTIMONY OR A

19 DISPUTE AT TRIAL AS TO WHAT GROUND RULES MEANT IN TERMS OF

20 ON THE RECORD, OFF THE RECORD, OR BACKGROUND, WOULD YOU BE

21 ABLE TO PUT ASIDE YOUR PRIOR EXPERIENCE AS A REPORTER IN

22 INTERPRETING THE RULES AS THE WITNESSES TELL YOU THEY

23 UNDERSTOOD THEM?

24     THE PROSPECTIVE JUROR:   YES.   I THINK I WOULD NEED

25 TO GET A REFRESHER COURSE ON ALL THREE OF THOSE TERMS, WHAT

1   THEY ACTUALLY MEAN, BECAUSE THEY SEEM TO HAVE CHANGED A LOT

2   SINCE -- YOU KNOW, DEEP BACKGROUND.  YOU KNOW, I WOULD HATE

3   TO BE QUIZZED RIGHT NOW ON THE MEANING OF ANY OF THOSE

4   ANYMORE BECAUSE IT SEEMS LIKE THEY TAKE ON NEW NUANCES ALL

5   THE TIME.

6           MR. FITZGERALD:  RETURNING TO JUDITH MILLER,

7   BESIDES THE FACT THAT YOU KNOW SHE WAS INVOLVED IN GOING TO

8   JAIL, DO YOU HAVE ANY PARTICULAR OPINION AS TO HER

9   CREDIBILITY AS A REPORTER?

10          THE PROSPECTIVE JUROR:  NO.

11          MR. FITZGERALD:  DID YOU READ ANY -- HAVE YOU READ

12  MUCH ABOUT JUDITH MILLER'S CAREER OVER THE LAST FIVE YEARS?

13          THE PROSPECTIVE JUROR:  I DON'T THINK SO.  I

14  COULDN'T TELL YOU REALLY WHERE SHE CAME FROM OR WHAT -- IT

15  WAS PRETTY MUCH THAT STORY WAS THE ONLY ONE THAT I FOCUSED

16  ON.  YOU KNOW, I MEAN, I HAVE NO OPINION ABOUT HER AS A

17  REPORTER.  IS SHE WELL LIKED?  IS SHE RESPECTED?  IS SHE --

18  YOU KNOW, IT JUST WASN'T -- I WASN'T INTERESTED ENOUGH.

19          I MEAN, THE ONLY REPORTERS I KNOW AT THE NEW YORK

20  TIMES ARE, YOU KNOW, MAUREEN DOWD.  SHE DOESN'T DO THAT KIND

21  OF -- I WENT TO GRADE SCHOOL WITH HER.  SHE IS NOT

22  TESTIFYING HERE, I ASSUME.  SO THAT'S NOT A PROBLEM.

23          MR. FITZGERALD:  AND DO YOU STAY IN TOUCH WITH

24  MAUREEN DOWD?

25          THE PROSPECTIVE JUROR:  NOT REALLY.

1          MR. FITZGERALD:  WHEN WAS THE LAST TIME YOU SPOKE

2    TO HER?

3          THE PROSPECTIVE JUROR:  OH, PROBABLY MY MOTHER'S

4    WAKE A FEW YEARS AGO.

5          MR. FITZGERALD:  AND WHERE DID YOU GROW UP?

6          THE PROSPECTIVE JUROR:  WASHINGTON, D.C.

7          MR. FITZGERALD:  GOING BACK IN TIME TO THE FALL OF

8    2003, DID YOU HAVE AN UNDERSTANDING YOURSELF AS TO WHAT THE

9    SCOPE OF THE INVESTIGATION WAS WHEN IT WAS ANNOUNCED?

10         THE PROSPECTIVE JUROR:  WELL, I THINK IT WAS THAT

11   A C.I.A. OPERATIVE HAD BEEN -- BOB NOVAK, IN A COLUMN, HAD

12   USED HER NAME AND SAID THAT SHE WAS WORKING WITH THE C.I.A.

13   AND THE REPERCUSSIONS OF THAT WERE THAT HER CAREER WAS --

14   THAT ASPECT OF HER CAREER WAS OVER, AND THE POSSIBLE FALLOUT

15   WOULD BE THAT PEOPLE THAT SHE HAD BEEN IN CONTACT WITH OVER

16   THE YEARS WHILE DOING THAT MAY BE -- WOULD BE AT RISK

17   BECAUSE NOW PEOPLE WOULD SAY, OH, SO SHE WAS C.I.A., SO WHY

18   WAS SHE HAVING LUNCH WITH, YOUR KNOW, OUR GUY 20 TIMES A

19   YEAR?  MAYBE WE OUGHT TO LOOK AT HIM.  YOU KNOW, I MEAN,

20   THAT SEEMED TO BE THE IDEA OF THE STORY, THAT THAT WAS A

21   PROBLEM, OR COULD BE A POTENTIAL PROBLEM.

22         MR. FITZGERALD:  AND DO YOU KNOW IF THE SCOPE OF

23   THE INVESTIGATION WAS LIMITED TO WHO TOLD MR. NOVAK?  OR DID

24   IT INCLUDE WHO TOLD ANY OTHER JOURNALISTS, IF YOU REMEMBER?

25         THE PROSPECTIVE JUROR:  I SEEM TO REMEMBER THAT

1    THERE WERE KIND OF LINES SNAKING OUT IN ALL DIRECTIONS

2    TRYING TO FIND -- ASKING OTHER REPORTERS WHO TOLD THEM AND

3    HOW THEY FOUND OUT THE SAME INFORMATION AND -- BUT AS FAR AS

4    DETAILS, I COULDN'T REALLY TELL YOU RIGHT NOW WHEN ALL THAT

5    WAS.

6             MR. FITZGERALD:  AND HOW OFTEN DO YOU SPEAK TO TIM

7    RUSSERT?

8             THE PROSPECTIVE JUROR:  WELL, HE MOVED AWAY SIX

9    MONTHS AGO, SO I HAVEN'T SEEN HIM SINCE.

10            MR. FITZGERALD:  WHEN YOU SHARED AN ALLEY, WERE

11   YOU NEXT-DOOR NEIGHBORS?

12            THE PROSPECTIVE JUROR:  WELL, NO.  MY BACK YARD

13   AND HIS BACK GATE, YOU KNOW, WERE HERE.  AND IN BETWEEN WAS

14   AN ALLEY AND A BASKETBALL HOOP.  AND HIS SON AND MY SON

15   WOULD SOMETIMES PLAY BASKETBALL OUT THERE.  AND I WOULD RUN

16   INTO TIM OR HIS WIFE, MAUREEN, EVERY ONCE IN A WHILE, AND WE

17   WOULD SAY "HI, HOW'S THINGS?  GOOD.  NICE TO SEE YOU."

18            YOU KNOW, WE WEREN'T BOSOM BUDDIES BY ANY MEANS.

19   WE WERE JUST FRIENDLY AND THAT WAS ABOUT IT.

20            MR. FITZGERALD:  DO YOU FOLLOW ANY BLOGS IN

21   PARTICULAR?

22            THE PROSPECTIVE JUROR:  NO.  I AM ALLERGIC TO

23   BLOGS.

24            MR. FITZGERALD:  AND FINALLY ABOUT MEMORY, YOU

25   SAID THAT YOUR WIFE MADE A JOKE THE OTHER DAY ABOUT HOW YOU

1    FORGET THINGS.  HOW WOULD YOU DESCRIBE YOUR OWN MEMORY?

2            THE PROSPECTIVE JUROR:  YOU KNOW, I CAN REMEMBER

3    ANYTHING THAT'S IMPORTANT TO ME.  I CAN TELL YOU WHAT I DID

4    IN THE 8TH GRADE IN THE THIRD FOOTBALL GAME OF THE SEASON.

5    YOU KNOW, I DON'T HAVE A PROBLEM WITH LOSING MY MEMORY.  I

6    JUST HAVE A PROBLEM WITH KEEPING INFORMATION THAT I DON'T

7    FIND INTERESTING.

8            IT JUST SORT OF, YOU KNOW, ROLLS DOWNHILL.  SO I

9    HAVE NEVER -- MY WIFE JUST -- I WILL TURN TO HER AND SAY,

10   "WHAT'S, YOU KNOW, BETTY'S DAUGHTER'S NAME?"

11           AND SHE'LL LOOK AT ME AND SAY, "WE WENT ON A SKI

12   VACATION WITH THEM TWO YEARS AGO."

13           I SAY, "YES, BUT THAT WAS TWO YEARS AGO.  NOW,

14   REFRESH MY MEMORY."

15           BUT I DON'T HAVE ANY, YOU KNOW, ACTUAL MEMORY

16   PROBLEMS IN THE SENSE THAT YOU WOULD FORGET YOUR SOCIAL

17   SECURITY NUMBER OR ANYTHING LIKE THAT.

18           MR. FITZGERALD:  LET ME ASK IT IN A DIFFERENT WAY,

19   THEN.  IF YOU WERE SITTING IN A TRIAL WHERE A PERSON GAVE AN

20   ACCOUNT OF CERTAIN EVENTS, AND IF IT WOULD TURN OUT TO BE

21   THAT THEIR ACCOUNT OF EVENTS WAS NOT ACCURATE, AND THINGS

22   HAPPENED COMPLETELY DIFFERENT, HOW WOULD YOU GO ABOUT

23   FIGURING OUT WHETHER WHAT THE PERSON SAID WAS JUST AN HONEST

24   MISTAKE OF MEMORY, THEY DESCRIBED SOMETHING THEY THOUGHT WAS

25   RIGHT AND IT TURNED OUT TO BE WRONG, OR WHETHER THEY LIED?

1    WHAT THOUGHT PROCESS WOULD YOU GO THROUGH?

2            THE PROSPECTIVE JUROR:  WELL, I WOULD HOPE THAT,

3    BECAUSE THERE ARE TWO SIDES IN THIS CASE, THAT WHATEVER SIDE

4    HAD THE PERSON WHO WAS MAKING THE COMMENTS, THE OTHER SIDE

5    WOULD SAY, WELL, THAT'S NOT TRUE, AND WE CAN -- WE'RE GOING

6    TO TRY TO PROVE THAT ACTUALLY IT'S NOT A MEMORY PROBLEM;

7    IT'S AN INTENTIONAL FALSEHOOD.  AND I WOULD WAIT TO HEAR

8    SOMEBODY GIVE ME SOME EVIDENCE ONE WAY OR THE OTHER.

9            IT WOULD BE VERY HARD FOR ME TO HEAR SOMEONE SAY

10   SOMETHING THAT TURNS OUT NOT TO BE TRUE AND KNOW FOR

11   CERTAINTY THAT THEY WERE LYING UNLESS THERE WAS SOME -- YOU

12   KNOW, SOME EVIDENCE OF SOME KIND THAT SAID THEY -- SHOWED

13   THAT POSSIBLY THEY WERE, OR THAT THERE WAS COMPELLING REASON

14   THEY HAD TO LIE, AND SO THEN JUST KIND OF WEIGH IT ALL AND

15   SEE WHERE IT COMES OUT.  I MEAN, THAT'S ABOUT AS GOOD AS I

16   COULD DO.

17           MR. FITZGERALD:  OKAY.  ONE LAST QUESTION.  GIVEN

18   THAT YOU HAVE BEEN INVOLVED IN THE NEWSPAPER BUSINESS AND

19   UNDERSTAND BOTH BEING A WRITER AND AN EDITOR AND HAVE DEALT

20   WITH SOME PEOPLE WHO MAY BE WITNESSES IN THE CASE OR WHO MAY

21   BE DISCUSSED, INCLUDING MR. WOODWARD WAS YOUR EDITOR AT ONE

22   POINT, AND MR. RUSSERT WAS ACROSS AN ALLEY -- RECOGNIZING

23   THAT YOU NO DOUBT WILL TRY TO SORT OF WIPE AWAY WHATEVER YOU

24   KNOW EXTERNAL TO THE CASE WHEN YOU HEAR THE WITNESSES ON THE

25   STAND, IF YOU WERE SITTING WHERE THE LAWYERS ON BOTH SIDES

1    ARE SITTING NOW AND TRYING TO FIGURE OUT WHETHER OR NOT ANY

2    OF THAT INFORMATION MIGHT EVEN SUBCONSCIOUSLY BLEED OVER

3    INTO YOUR THINKING AND AFFECT WHETHER YOU BELIEVED A WITNESS

4    MORE OR LESS BECAUSE OF YOUR PERSONAL EXPERIENCE, HOW

5    COMFORTABLE DO YOU FEEL THAT YOU COULD BLOCK THAT ALL OUT

6    AND JUST DECIDE THE CASE AS IF YOU HAD NEVER BEEN A

7    NEWSPAPER REPORTER, NEVER KNEW ANY OF THESE PEOPLE, NEVER

8    BEEN AN EDITOR AND HAD NEVER SOCIALIZED WITH MR. RUSSERT,

9    WITH MR. PINCUS OR WORKED FOR MR. WOODWARD?

10         THE PROSPECTIVE JUROR:  WELL, I MEAN, IF I WAS IN

11   EITHER OF YOUR TABLE'S CASE, I WOULD BE SKEPTICAL BECAUSE

12   YOU HAVE GOT TO FIGURE IF I HAVE DONE ALL THIS NEWSPAPER, I

13   MUST HAVE AN AFFINITY FOR THESE PEOPLE IN THIS SITUATION.

14   BUT -- AND I AM JUST -- I WOULD BE INSULTED TO THINK THAT

15   PERSONALLY THAT I COULDN'T LOOK AT THIS BECAUSE, YOU KNOW, I

16   AM NOT -- I'M NOT -- MY WHOLE CAREER HAS BEEN DOING IT

17   RIGHT.

18         I MEAN, I STARTED IN THE BASEMENT OF THE POST

19   LOADING THE PRESSES WITH PAPER.  THAT WAS MY FIRST JOB.  AND

20   I WORKED MY WAY UP THROUGH THERE.  AND I DIDN'T GET THERE

21   BECAUSE I WAS GOING ALONG -- I MEAN, I WAS VERY AGGRESSIVE,

22   VERY AMBITIOUS AND SORT OF RUTHLESSLY HONEST WITH MY OWN

23   SORT OF APPROACH TO THINGS AND LOOKING -- HOW DO I LEARN TO

24   DO THIS?  YOU KNOW, HOW DO I LEARN TO BE A REPORTER?

25         SO ALL I CAN TELL YOU IS THAT -- I MEAN, I AM NOT

1   MAKING A PITCH TO BE ON THIS JURY.  I AM JUST SAYING I DO

2   NOT LEAN ONE WAY OR THE OTHER ON ANYTHING THAT HAS TO DO

3   WITH FINDING OUT THE TRUTH BECAUSE THAT'S -- IN AN VERY

4   OLD-FASHIONED WAY, I MEAN, THAT'S ALL WE HAVE.  THAT'S ALL I

5   HAVE.

6        SO, YOU KNOW, I WOULDN'T BLAME YOU IF YOU WERE --

7   LOOKED AT ME AND SAID, WELL, I DON'T KNOW IF THIS GUY IS --

8   YOU KNOW, IT MIGHT BLEED OVER.  BUT I AM JUST TELLING YOU I

9   WOULD DO EVERYTHING IN MY POWER NOT TO HAVE THAT HAPPEN.

10        MR. FITZGERALD:  AND LET ME ASK YOU IT A SLIGHTLY

11   DIFFERENT WAY BECAUSE -- HERE IS WHAT I MEAN.  YOU MENTIONED

12   YOUR SON PLAYS BASKETBALL.

13        THE PROSPECTIVE JUROR:  YES.

14        MR. FITZGERALD:  IF YOU WERE ASKED TO REFEREE YOUR

15   SON'S BASKETBALL GAME BECAUSE NO ONE ELSE WAS AVAILABLE,

16   IT'S ONE THING TO SAY, I'M NOT OBVIOUSLY GOING TO MAKE THE

17   CALLS IN MY SON'S FAVOR, BUT THEN IF IT'S A CLOSE CALL, IS

18   YOUR BRAIN GOING TO BE THINKING, WELL, I'M NOT SURE WHICH

19   WAY IT GOES, BUT MY SON IS ON THIS TEAM AND I AM CONCERNED

20   ABOUT DOING SOMETHING THAT LOOKS LIKE I AM FAVORING MY SON,

21   AND THEN YOU'RE THINKING, WELL, WAIT A MINUTE; I DON'T WANT

22   TO CALL IT AGAINST MY SON.  AND YOU'RE GOING THROUGH A

23   PROCESS OF SAYING, WAS THAT A FOUL OR WAS THAT NOT A FOUL?

24   AND IT JUST MAKES IT HARD BECAUSE YOU'RE TRYING TO DO THE

25   RIGHT THING.

```
 1            THE PROSPECTIVE JUROR:  RIGHT.

 2            MR. FITZGERALD:  AND MY ONLY QUESTION IS, IF YOU

 3   SAT DOWN AND SAID, I AM GOING TO BE A JUROR IN THIS CASE,

 4   BLOCK OUT ALL THIS STUFF, AND BE FAIR TO BOTH SIDES, DO YOU

 5   THINK AT ANY POINT YOU WOULD HAVE TO BE WRESTLING WITH

 6   PUSHING THIS STUFF OUT OF YOUR BRAIN SO YOU COULD DO EXACTLY

 7   WHAT YOU WANTED, WHICH IS TO FOCUS ON THE TRUTH?  AND WOULD

 8   YOU BE WORRIED ABOUT TRYING TO COMPENSATE FOR KNOWING

 9   MR. WOODWARD OR RUSSERT OR BEING A REPORTER OR BEING AN

10   EDITOR?  WOULD THAT BE TOUGH FOR YOU?

11            THE PROSPECTIVE JUROR:  WELL, ALL I CAN SAY IS

12   I'VE BEEN A REFEREE AT MY SON'S GAME, AND I THINK

13   AFTERWARDS, IF YOU ASKED HIM, HE WOULD PROBABLY THINK I GAVE

14   CALLS AGAINST HIM, YOU KNOW.  I JUST -- YOU KNOW, I CAN'T

15   REALLY ANSWER THAT BECAUSE I ONLY KNOW WHAT I KNOW AND

16   BELIEVE.  AND IF THERE ARE SOME OTHER FACTORS AT WORK THAT

17   ARE GOING TO SWAY ME, I REALLY -- I CAN'T IMAGINE THEM, BUT

18   I WOULD TELL YOU THAT I WOULD BE EXTREMELY UPSET WITH MYSELF

19   TO THINK LATER THAT I GAVE SOMEBODY A PASS OR -- YOU KNOW,

20   IT JUST GOES AGAINST EVERYTHING I WAS TAUGHT BY MY FATHER.

21   YOU KNOW, IT JUST WOULDN'T HAPPEN.

22            MR. FITZGERALD:  THANK YOU.

23            THE COURT:  DEFENSE?

24            MR. WELLS:  HELLO.

25            THE PROSPECTIVE JUROR:  HI.
```

62

1      MR. WELLS:  HAVE YOU EVER BEEN IN MR. RUSSERT'S

2  HOUSE?

3      THE PROSPECTIVE JUROR:  YES.  HE USED TO HAVE AN

4  ANNUAL NEIGHBORHOOD BARBECUE -- I AM NOT SURE I ACTUALLY

5  WENT IN THE HOUSE.  WE WOULD GO IN THE BACK YARD AND, YOU

6  KNOW, HAVE FOOD -- I MEAN, THERE WOULD BE 50 PEOPLE THERE.

7      MR. WELLS:  SURE.  AND HOW MANY TIMES OVER THE

8  YEARS DID YOU ATTEND THE BARBECUE AT MR. RUSSERT'S?

9      THE PROSPECTIVE JUROR:  I AM THINKING TWICE.  IT'S

10 POSSIBLE IT WAS ONLY -- I THINK IT WAS TWICE.  AND THAT WAS

11 IN SIX, SEVEN YEARS, OR SOMETHING.

12     MR. WELLS:  HAS MR. RUSSERT EVER BEEN IN YOUR

13 HOUSE?

14     THE PROSPECTIVE JUROR:  NO.

15     MR. WELLS:  HAVE YOU EVER SOCIALIZED WITH HIM IN

16 ANY WAY OTHER THAN THE BARBECUE?

17     THE PROSPECTIVE JUROR:  NO.

18     MR. WELLS:  WHAT DO YOU UNDERSTAND MR. RUSSERT'S

19 ROLE IS IN THIS PARTICULAR CASE?

20     THE PROSPECTIVE JUROR:  I HAVE NO IDEA.  I HAVE

21 NEVER SEEN HIS NAME MENTIONED IN THIS CASE THAT I AM AWARE

22 OF.

23     MR. WELLS:  WELL, LET ME ASK YOU THIS.  IF YOU, AS

24 A JUROR, ARE REQUIRED TO COMPARE THE RECOLLECTION OF

25 MR. RUSSERT ABOUT CERTAIN EVENTS WITH THE RECOLLECTION OF

1    MR. LIBBY, WHO IS THE DEFENDANT, CAN YOU GUARANTEE US AS YOU

2    SIT THERE NOW THAT YOU WON'T LET YOUR PRIOR INVOLVEMENT WITH

3    MR. RUSSERT, RELATIONSHIP WITH MR. RUSSERT, YOUR RESPECT FOR

4    MR. RUSSERT IN SOME WAY BLEED OVER SUCH THAT YOU WOULD

5    SUBCONSCIOUSLY FAVOR MR. RUSSERT'S VERSION OF EVENTS AS

6    OPPOSED TO MR. LIBBY?

7         THE PROSPECTIVE JUROR:  YOU KNOW, I CAN'T

8    GUARANTEE ANYTHING BECAUSE I JUST DON'T KNOW.  BUT I WOULD

9    BE EXTREMELY HARD ON MYSELF MAKING SURE I DIDN'T.  I MEAN,

10   YOU KNOW, I HAVE HEARD GOOD THINGS ABOUT MR. LIBBY.  A

11   FRIEND OF MINE PLAYED FOOTBALL WITH HIM IN THE OVER-40

12   LEAGUE AND TOLD ME THE OTHER DAY -- HE SAID, "HE HAS A GREAT

13   ARM AND CAN REALLY THROW THE FOOTBALL."

14        SO, YOU KNOW, I HAVE PREJUDICE OR BOTH SIDES,

15   PROBABLY.  I KNOW WHAT YOU'RE --

16        MR. WELLS:  BUT I'LL BE CANDID WITH YOU.  I AM NOT

17   CONCERNED ABOUT HIS THROWING ARM.  I AM CONCERNED ABOUT THIS

18   ISSUE OF TRUST --

19        THE PROSPECTIVE JUROR:  SURE.

20        MR. WELLS:  -- AND CREDIBILITY.  AND WHAT YOU SAID

21   TO US IS THAT NOT ONLY BECAUSE HE WAS YOUR NEIGHBOR, BUT

22   THAT YOU HAVE WATCHED MR. RUSSERT OVER THE YEARS AND HE HAS

23   A CERTAIN DEGREE OF CREDIBILITY.  AND AS YOU SAID, YOU WOULD

24   NOT EXPECT MR. RUSSERT TO EVER SAY ANYTHING INTENTIONALLY

25   WRONG.

1          SO ON MR. RUSSERT'S SIDE, THE CHARACTERISTICS YOU

2     GIVE HIM GO RIGHT TO THE HEART OF THE CASE:  HIS

3     CREDIBILITY.  ON MR. LIBBY'S SIDE, I HAVEN'T HEARD ANYTHING

4     ABOUT HIS CREDIBILITY.  HE MAY HAVE A GOOD ARM IN THE

5     OVER-40 LEAGUE, BUT THAT'S REALLY APPLES AND ORANGES.

6          THE PROSPECTIVE JUROR:  RIGHT.  YOU ARE RIGHT.

7     YOU ARE RIGHT.  YOU KNOW, I MEAN, LIKE I NEVER -- I DON'T

8     WATCH MEET THE PRESS.  I DON'T THINK I HAVE EVER SEEN THAT

9     SHOW WITH MR. RUSSERT AS HOST.  SO, YOU KNOW, I HAVE NO --

10    IT IS NOT LIKE I AM A BIG FAN OF HIS.  SURE, I THINK HE

11    SEEMS LIKE A GOOD GUY AND IS ENTERTAINING.  BUT IN A COURT

12    CASE, I DON'T THINK THAT REALLY IS VERY RELEVANT.  YOU KNOW,

13    IS HE A NICE, FRIENDLY -- WHATEVER, YOU KNOW.  AGAIN, I

14    WOULD JUST HAVE TO RELY ON WHAT I TRUST IS MY JOB IN THIS

15    SITUATION AND SORT OF LOOK AT THINGS DISPASSIONATELY AND

16    JUST TO TRY TO FIGURE OUT, YOU KNOW, WHERE THE PIECES FIT OR

17    DON'T FIT.

18          MR. WELLS:  NOW, YOU SAID YOU WENT TO GRADE SCHOOL

19    WITH MAUREEN DOWD.  YOU KNOW MAUREEN DOWD; SHE IS PRETTY

20    HARD ON PRESIDENT BUSH AND HIS ADMINISTRATION, RIGHT?

21          THE PROSPECTIVE JUROR:  YES, BUT SHE WAS PRETTY

22    HARD ON, YOU KNOW -- PRETTY MUCH ANY PRESIDENT.  THAT IS

23    KIND OF HER JOB IS TO BE -- I MEAN, CLINTON -- SHE ROASTED

24    HIM.  SO --

25          MR. WELLS:  BUT THERE ARE ROASTS AND THERE ARE

1   ROASTS, AND I GUESS EVERYTHING IS RELATIVE.  BUT LET ME ASK

2   YOU THIS QUESTION.

3          THE PROSPECTIVE JUROR:  SURE.

4          MR. WELLS:  WHAT IS YOUR OPINION, IF ANY, WITH

5   RESPECT TO THE ISSUE OF WHETHER THE BUSH ADMINISTRATION WAS

6   CANDID WITH THE AMERICAN PUBLIC ABOUT THE JUSTIFICATIONS FOR

7   GOING TO WAR WITH IRAQ?

8          THE PROSPECTIVE JUROR:  WHETHER THEY INTENTIONALLY

9   LIED, YOU MEAN, ABOUT WHETHER -- WEAPONS OF MASS

10  DESTRUCTION?

11         MR. WELLS:  YES.

12         THE PROSPECTIVE JUROR:  I HAVE THIS DEBATE WITH

13  SOME OF MY FRIENDS.  I DON'T NECESSARILY THINK THEY

14  INTENTIONALLY LIED.  BUT READING THE BOOKS AFTER IRAQ, I AM

15  INCLINED TO BELIEVE THAT THEY FOUND -- USED -- THEY PROBABLY

16  THOUGHT THERE WERE WEAPONS OF MASS DESTRUCTION.  THEY DIDN'T

17  HAVE ANY REAL PROOF OF IT, BUT THEY FOUND THINGS THAT -- YOU

18  KNOW, SO THEY USED INFORMATION THEY THOUGHT WOULD MAKE THE

19  CASE.

20         MR. WELLS:  AND YOU SAID YOU READ TWO OF

21  MR. WOODWARD'S BOOKS?

22         THE PROSPECTIVE JUROR:  NO.  I JUST SAID I SAW

23  THAT HE HAD THESE BOOKS, AND ONE OF THEM -- I READ EXCERPTS

24  IN THE POST OF PROBABLY BOTH OF THEM, BUT I HAVE NEVER READ

25  THE WHOLE BOOKS.

1          MR. WELLS:  OKAY.  OTHER THAN READING THE EXCERPTS

2   FROM THE POST -- WELL, FIRST QUESTION:  DID YOU BUY THE

3   BOOKS?

4          THE PROSPECTIVE JUROR:  NO.

5          MR. WELLS:  YOU DON'T HAVE THE BOOKS AT HOME?

6          THE PROSPECTIVE JUROR:  NO.

7          MR. WELLS:  HAVE YOU READ THE BOOK, HUBRIS?

8          THE PROSPECTIVE JUROR:  NO.

9          MR. WELLS:  HAVE YOU READ THE BOOK, FIASCO?

10          THE PROSPECTIVE JUROR:  YES.

11          MR. WELLS:  OKAY.  AND WHEN DID YOU READ THE BOOK,

12   FIASCO?

13          THE PROSPECTIVE JUROR:  OH, I DON'T KNOW.  WITHIN

14   THE LAST YEAR.

15          MR. WELLS:  OKAY.  YOU SAID YOU GREW UP IN

16   WASHINGTON, D.C.  WHAT NEIGHBORHOOD?

17          THE PROSPECTIVE JUROR:  16TH STREET, NEAR CARTER

18   BARON.

19          MR. WELLS:  AND WHERE DID YOU GO TO HIGH SCHOOL?

20          THE PROSPECTIVE JUROR:  GONZAGA.

21          MR. WELLS:  AND AFTER YOU WENT TO GONZAGA, WHERE

22   DID YOU GO?

23          THE PROSPECTIVE JUROR:  FORDHAM UNIVERSITY IN THE

24   BRONX, NEW YORK.

25          MR. WELLS:  AND AFTER FORDHAM?

1          THE PROSPECTIVE JUROR:  WENT TO WORK.

2          MR. WELLS:  OKAY.  AND GIVE ME YOUR EMPLOYMENT

3   HISTORY RIGHT UP UNTIL THE PRESENT.

4          THE PROSPECTIVE JUROR:  OKAY.  TAXICAB DRIVER IN

5   NEW YORK FOR A YEAR AND A HALF.  YOU KNOW, I WORKED IN THE

6   WASHINGTON POST IN A VARIETY OF JOBS.  LIKE I SAID, I

7   STARTED OFF AS A BLUE-COLLAR WORKER.  THEY HIRED ME TO

8   INTEGRATE -- THE PAPER HANDLERS WERE ALL BLACK.  THE

9   PRESSMEN WERE ALL WHITE.  I HAD GONE TO A BLACK COLLEGE IN

10  ALABAMA AS AN EXCHANGE STUDENT, SO I WAS THE PERFECT

11  CANDIDATE TO INTEGRATE THE PAPER HANDLERS.

12         AND WHILE I WAS IN THERE, I JUST STARTED BRINGING

13  STORIES UPSTAIRS TO TRY TO GET THEM PUBLISHED.

14         SO, ANYWAY, I EVENTUALLY GOT A SUMMER INTERNSHIP

15  AT THE MIAMI HERALD FOR A YEAR, AND THE WASHINGTON POST --

16  BACK AGAIN UNTIL 1985.  I WENT TO CALIFORNIA AND WORKED FOR

17  THE SAN JOSE MERCURY NEWS UNTIL 1990 OR SO.

18         AND SINCE THEN, I HAVE BEEN FREELANCING.  AND I

19  WROTE A BOOK ON SPYING.  I WROTE A NOVEL.  I HAVE BEEN

20  TEACHING FOR THREE YEARS AT A SCHOOL OVER IN NORTHEAST D.C.,

21  CREATIVE WRITING.

22         MR. WELLS:  TELL ME ABOUT THE BOOK ON SPYING.

23         THE PROSPECTIVE JUROR:  IT WAS JUST A PUBLISHER

24  CALLED ME UP AND SAID, "WE HAVE GOT A DEAL WITH THE

25  INTERNATIONAL SPY MUSEUM TO USE THEIR ART WORK AND ALL THEIR

1  STUFF. WOULD YOU LIKE TO WRITE THE BOOK?"

2         I SAID, "SURE. WHAT'S THE ANGLE?"

3         THEY SAID, "I DON'T KNOW. WHATEVER YOU WANT."

4         SO I JUST WROTE BASICALLY -- IT'S CALLED, SPYING:

5  THE SECRET HISTORY OF HISTORY. IN OTHER WORDS, THE STORIES

6  BEHIND THE STORIES, LIKE WHAT WE THINK HAPPENED IN WORLD

7  WAR II, MAYBE SOME OF THESE STORIES THAT NOBODY HAS HEARD

8  OF. YOU KNOW, IT WAS REALLY NOT -- JUST INTERESTING STORIES

9  WITH A LOT OF PICTURES.

10         MR. WELLS: DID IT INVOLVE SPYING BY THE C.I.A.?

11         THE PROSPECTIVE JUROR: YES.

12         MR. WELLS: AND TELL ME ABOUT THAT PART OF THE

13  BOOK.

14         THE PROSPECTIVE JUROR: WELL, IT SORT OF TOLD THE

15  GOOD, THE BAG AND THE UGLY. YOU KNOW, GUATEMALA. WE -- THE

16  C.I.A. MANAGED TO GET THE PRESIDENT OF GUATEMALA TO ABANDON

17  HIS COUNTRY BECAUSE HE THOUGHT HE WAS BEING INVADED WHEN, IN

18  FACT, IT WAS SOME RECORDING DEVICES ON ROOFTOPS NEARBY THAT

19  HAD ALL THIS RAT-A-TAT MACHINE-GUN FIRE, AND THEY WERE

20  DROPPING SMOKE BOMBS. SO, REALLY, IT WAS A COUP THAT

21  HAPPENED WITHOUT ANY BULLETS BEING FIRED.

22         MR. WELLS: WHAT ARE YOUR FEELINGS AT PRESENT

23  ABOUT THE C.I.A.?

24         THE PROSPECTIVE JUROR: I REALLY DON'T -- I MEAN,

25  I AM SURE THEY DO A GREAT JOB AT WHAT THEY DO WELL, AND

1    PROBABLY DO A TERRIBLE JOB AT OTHER THINGS.  I DON'T KNOW.

2            MR. WELLS:  THERE WILL BE MULTIPLE WITNESSES IN

3    THIS TRIAL WHO WORK FOR OR DID WORK FOR THE C.I.A.  WILL

4    YOUR EXPERIENCE IN WRITING YOUR BOOK AND YOUR EXPERIENCE IN

5    RESEARCHING YOUR BOOK OR YOUR LIFE EXPERIENCES IMPACT YOUR

6    ABILITY TO BE FAIR AND IMPARTIAL IN TERMS OF HOW YOU JUDGE

7    THE CREDIBILITY OF THE C.I.A. WITNESSES?

8            THE PROSPECTIVE JUROR:  NO.  I MEAN, IN MY BOOK I

9    WROTE ABOUT THESE TWO WOMEN WHO, JUST THROUGH INCREDIBLE

10   HARD WORK, OUTED -- I FORGET WHICH SPY IT WAS.  AMES, I

11   THINK -- ALDRICH AMES.  I HAVE GREAT ADMIRATION FOR THEM.

12   YOU KNOW, I DON'T HAVE ANY SORT OF FEELING ABOUT THE C.I.A.

13            YOU KNOW, STORIES I READ ABOUT THE C.I.A. TRYING

14   TO KILL CASTRO BY PUTTING, YOU KNOW, SOME EXPLODING

15   SEASHELLS ON THE BEACH OR THE BAY OF PIGS MAKE ME LESS

16   HAPPY.  THAT, YOU KNOW, WAS A BAD IDEA.  BUT, ON THE OTHER

17   HAND, THEY HAVE DONE GREAT THINGS.  SO I AM TOTALLY NEUTRAL

18   IN TERMS OF THE GENERAL IDEA OF THE C.I.A.  I THINK THEY DO

19   A GOOD JOB.

20            MR. WELLS:  NOW, WHAT, IF ANYTHING, DO YOU KNOW

21   ABOUT THE SO-CALLED NEWSMAN'S PRIVILEGE?

22            THE PROSPECTIVE JUROR:  I AM NOT SURE WHAT THAT --

23            MR. WELLS:  WELL, IN TERMS OF THE PRIVILEGE THAT

24   NEWS REPORTERS HAVE TO PROTECT THEIR SOURCES, WHAT IS YOUR

25   KNOWLEDGE OF THAT PRIVILEGE?  WHAT IS YOUR OPINION OF THAT

1    PRIVILEGE?

2          THE PROSPECTIVE JUROR:  WELL, IN GENERAL, I THINK

3    IT'S A GOOD IDEA, I MEAN, ESPECIALLY WHEN YOU ARE DEALING

4    WITH GOVERNMENT, NOT JUST THE UNITED STATES, BUT, I MEAN, TO

5    GET PEOPLE TO TELL YOU THINGS.  IF THEY -- IF THEY ARE FOUND

6    OUT TO TELL YOU, THEY ARE FIRED OR GO TO JAIL, SO I THINK --

7    I MEAN, I THINK THAT IS HOW THE PRIVILEGE -- YOU KNOW,

8    CHECKS AND BALANCES, THE WHOLE -- YOU KNOW, THE FREEDOM OF

9    THE PRESS I SUPPORT.

10          AND IN CASES WHERE IT'S PROVEN THAT THAT PRINCIPLE

11   DID NOT APPLY, I THINK A REPORTER PROBABLY SHOULD -- YOU

12   KNOW, IS COMPELLED TO GIVE UP THAT -- YOU KNOW, THE

13   INFORMATION.

14          MR. WELLS:  AND YOU MENTIONED THAT YOU WENT TO A

15   BLACK COLLEGE IN THE SOUTH --

16          THE PROSPECTIVE JUROR:  YES.

17          MR. WELLS:  -- DURING THE PERIOD YOU WERE AT

18   FORDHAM?

19          THE PROSPECTIVE JUROR:  YES, 1968.

20          MR. WELLS:  AND YOU WERE AT FORDHAM WHEN?

21          THE PROSPECTIVE JUROR:  FROM '67 TO '71.

22          MR. WELLS:  THAT IS LIKE THE CHARLIE YELVERTON AND

23   DEAN MEMINGER YEARS?

24          THE PROSPECTIVE JUROR:  OH, YES.  SURE.

25          MR. WELLS:  AND WHAT BLACK COLLEGE DID YOU GO TO?

1    THE PROSPECTIVE JUROR:  TALLADEGA.

2    MR. WELLS:  IN WHAT -- JUNIOR YEAR?

3    THE PROSPECTIVE JUROR:  IT WAS SOPHOMORE YEAR.

4    MR. WELLS:  NO FURTHER QUESTIONS.

5    THE COURT:  YES?

6    MR. FITZGERALD:  JUST A QUESTION.  YOU MENTIONED A

7  FRIEND OF YOURS PLAYS FOOTBALL OR AT LEAST ONCE PLAYED

8  FOOTBALL WITH MR. LIBBY.  WITHOUT TELLING US YOUR FRIEND'S

9  NAME, HOW CLOSE ARE YOU TO THIS PERSON?

10    THE PROSPECTIVE JUROR:  PRETTY CLOSE.  I MEAN, IT

11  WAS A THROWAWAY LINE.  HE DIDN'T CLAIM TO KNOW MR. LIBBY.

12  HE JUST SAID THAT HE PLAYED A COUPLE OF TOUCH FOOTBALL GAMES

13  WITH HIM.

14    MR. FITZGERALD:  IF YOU WERE TO HEAR EVIDENCE FROM

15  A WITNESS WHO HAD DISCUSSED TOUCH FOOTBALL GAMES WITH

16  MR. LIBBY OR MAYBE EVEN PLAYED WITH HIM, WOULD YOU BE ABLE

17  TO STAY AWAY FROM YOUR FRIEND AND NOT DISCUSS THE MATTER?

18    THE PROSPECTIVE JUROR:  OH, SURE.  HE IS A LAWYER.

19  HE PROBABLY WOULDN'T WANT TO TALK ABOUT ANYTHING LIKE THAT

20  ANYWAY.

21    MR. FITZGERALD:  OKAY.  THANK YOU.

22    THE COURT:  IF YOU CAN HAVE A SEAT AT ONE OF THOSE

23  BLACK CHAIRS BY THE RAILING.

24    APPROACH.

25    (AT THE BENCH.)

1      THE COURT:  ANY CHALLENGE?

2      MR. FITZGERALD:  NO.

3      MR. WELLS:  NO.

4      (IN OPEN COURT.)

5      THE COURT:  THANK YOU, SIR.  WE ARE NOT GOING TO

6  BE ABLE TO COMPLETE THIS PROCESS TODAY, SO HOPEFULLY WE WILL

7  GET TO IT TOMORROW MORNING, THE FINAL STAGES.  SO YOU ARE

8  FREE TO GO UNTIL 9:30 TOMORROW MORNING.

9      DON'T TALK TO ANYBODY.  DON'T HAVE ANY CONTACT

10  WITH MEDIA COVERAGE REGARDING THIS CASE.

11      (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

12      THE COURT:  OKAY.  WE'LL TAKE A TEN-MINUTE BREAK.

13      (A RECESS WAS TAKEN.)

14      (AFTER RECESS.)

15      (PROSPECTIVE JUROR ENTERING THE COURTROOM.)

16      THE COURT:  YOU ARE JUROR NUMBER 1660?

17      THE PROSPECTIVE JUROR:  YES.  GOOD MORNING.

18      THE COURT:  GOOD MORNING.  YOU HAD TWO RESPONSES,

19  ONE TO QUESTION NUMBER 3(A) WHICH ASKED WHETHER YOU HAVE

20  READ OR HEARD ANYTHING ABOUT THIS CASE IN THE MEDIA.

21      THE PROSPECTIVE JUROR:  YES.

22      THE COURT:  AND DO YOU REMEMBER WHAT IT WAS THAT

23  YOU READ OR HEARD?

24      THE PROSPECTIVE JUROR:  JUST RANDOM STUFF, HEARING

25  ON THE RADIO ABOUT THE CASE, I GUESS, PROBABLY A COUPLE

1 YEARS AGO.

2 THE COURT:  DO YOU REMEMBER EXACTLY WHAT IT WAS

3 YOU HEARD OR READ?

4 THE PROSPECTIVE JUROR:  THIS WHOLE PROCESS IS

5 DESIGNED TO SHOW MY IGNORANCE OF CURRENT EVENTS.  JUST THAT

6 THERE HAD BEEN TALK THAT SOMEBODY IN THE ADMINISTRATION HAD

7 LEAKED A C.I.A. OPERATIVE'S NAME.

8 THE COURT:  ANYTHING ELSE YOU REMEMBER?

9 THE PROSPECTIVE JUROR:  WELL, YOU DON'T FORGET A

10 NAME LIKE SCOOTER, SO I REMEMBER HEARING THAT NAME A LOT,

11 BUT NOTHING, YOU KNOW, SPECIFICALLY.

12 THE COURT:  OKAY.  IF YOU HAVE ANY RESPONSES THAT

13 YOU WANT TO JUST TELL ME PRIVATELY UP HERE, YOU CAN DO THAT.

14 SO IF THAT --

15 THE PROSPECTIVE JUROR:  OH, NO.

16 THE COURT:  -- OCCURS, LET ME KNOW.

17 THE PROSPECTIVE JUROR:  NOT THAT I AM AWARE OF.

18 THE COURT:  DID YOU FORM ANY OPINIONS ABOUT THE

19 GUILT OR INNOCENCE OF MR. LIBBY AS A RESULT OF WHAT YOU

20 HEARD OR READ IN THE PRESS?

21 THE PROSPECTIVE JUROR:  NO.

22 THE COURT:  SO AT THIS POINT YOU HAVE NO

23 IMPRESSIONS OF THAT ONE WAY OR THE OTHER?

24 THE PROSPECTIVE JUROR:  NONE.

25 THE COURT:  DO YOU PRESUME THAT HE IS INNOCENT?

1          THE PROSPECTIVE JUROR:  YES.

2          THE COURT:  AND WOULD YOU REQUIRE THE GOVERNMENT

3   TO PROVE HIS GUILT?

4          THE PROSPECTIVE JUROR:  YES.  IT WOULD NEED TO BE

5   PROVEN THAT HE WAS GUILTY.

6          THE COURT:  OKAY.  YOU ALSO HAD A RESPONSE TO

7   QUESTION NUMBER 30 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

8   RELATIVES HAVE EVER BEEN THE VICTIM OF A CRIME, SOMEONE

9   CHARGED WITH A CRIME OR A WITNESS TO A CRIME.  DO YOU WANT

10  TO TELL TELL ME ABOUT THAT?

11         THE PROSPECTIVE JUROR:  I HAD MY CAR STOLEN THREE

12  TIMES IN ONE SUMMER.  AND I DON'T KNOW THE SPECIFICS, BUT I

13  AM QUITE CERTAIN MY BROTHER HAS BEEN CHARGED WITH AT LEAST

14  ONE CRIME IN HIS LIFE.

15         THE COURT:  DO YOU KNOW WHAT THAT CRIME WOULD HAVE

16  BEEN?

17         THE PROSPECTIVE JUROR:  HE DIDN'T STEAL MY CAR,

18  BUT I KNOW HE STOLE SOMEBODY ELSE'S.  BUT THAT WAS, YOU

19  KNOW, 20 YEARS AGO.

20         THE COURT:  DID HE EVER HAVE TO GO TO JAIL OR

21  ANYTHING OF THAT NATURE?

22         THE PROSPECTIVE JUROR:  NO, HE DID NOT.

23         THE COURT:  HE STRAIGHTENED HIS LIFE UP?

24         THE PROSPECTIVE JUROR:  I AM NOT GOING TO GO THAT

25  FAR.

1    THE COURT:   DO YOU HAVE ANY BAD FEELINGS TOWARDS

2    ANYONE AS A RESULT OF WHAT HAPPENED TO YOUR BROTHER IN THOSE

3    SITUATIONS?

4    THE PROSPECTIVE JUROR:   JUST HIM.   NO, I DON'T

5    HAVE ANY BAD FEELINGS TOWARDS ANYBODY ABOUT IT.

6    THE COURT:   ARE YOU CONFIDENT THAT YOU CAN BE FAIR

7    TO BOTH SIDES?

8    THE PROSPECTIVE JUROR:   SURE.

9    THE COURT:   GOVERNMENT?

10    MR. FITZGERALD:   GOOD MORNING.

11    THE PROSPECTIVE JUROR:   GOOD MORNING.

12    MR. FITZGERALD:   WHAT DO YOU DO FOR WORK?

13    THE PROSPECTIVE JUROR:   I AM A HOTEL SALESPERSON.

14    I BOOK CONVENTIONS.

15    MR. FITZGERALD:   AND JUST GENERALLY, WHAT

16    NEIGHBORHOOD DO YOU LIVE IN?

17    THE PROSPECTIVE JUROR:   I LIVE IN NORTHEAST

18    WASHINGTON, D.C.

19    MR. FITZGERALD:   WHERE DID YOU GROW UP?

20    THE PROSPECTIVE JUROR:   I GREW UP IN CONNECTICUT.

21    I HAVE LIVED IN ARIZONA.   I HAVE LIVED IN COLORADO AND LIVED

22    IN GEORGIA.   A LOT OF PLACES.

23    MR. FITZGERALD:   HAVE YOU ALWAYS BEEN IN SALES?

24    THE PROSPECTIVE JUROR:   I WAS IN HOTEL SERVICE FOR

25    A NUMBER OF YEARS, AND I HAVE BEEN A HOTEL SALESPERSON FOR

1    ABOUT EIGHT YEARS.

2              MR. FITZGERALD:  AND YOU MENTIONED THAT YOU HEARD

3    SOMEBODY ON THE RADIO.  DO YOU LISTEN TO ONE PARTICULAR

4    RADIO STATION REGULARLY?

5              THE PROSPECTIVE JUROR:  NO.

6              MR. FITZGERALD:  DO YOU LISTEN TO ANY PARTICULAR

7    RADIO PROGRAMS?

8              THE PROSPECTIVE JUROR:  I LISTEN -- NO, I DON'T

9    LISTEN TO ANY SPECIFIC RADIO PROGRAMS.  I LISTEN TO A BUNCH

10   OF DIFFERENT RADIO STATIONS AND --

11             MR. FITZGERALD:  OKAY.  DO YOU SURF THE NET?

12             THE PROSPECTIVE JUROR:  OH, ABSOLUTELY.

13             MR. FITZGERALD:  ANY PLACE IN PARTICULAR?

14             THE PROSPECTIVE JUROR:  ANYTHING RELATED TO

15   CELEBRITY GOSSIP, AND BY THAT I MEAN ACTORS AND ACTRESSES.

16             MR. FITZGERALD:  OKAY.

17             THE PROSPECTIVE JUROR:  I AM A MASTER OF ALL

18   THINGS POP CULTURE, BUT NOTHING ABOUT CURRENT EVENTS THAT

19   HAVE TO DO WITH RESPONSIBLE ADULT THINGS.

20             MR. FITZGERALD:  OKAY.  THANK YOU.

21             THE PROSPECTIVE JUROR:  YOU'RE WELCOME.

22             THE COURT:  DEFENSE.

23             MR. JEFFRESS:  GOOD MORNING.

24             THE PROSPECTIVE JUROR:  GOOD MORNING.

25             MR. JEFFRESS:  DID YOU GO THE SCHOOL IN

1    CONNECTICUT?

2             THE PROSPECTIVE JUROR:  I WENT TO HIGH SCHOOL IN

3    CONNECTICUT, ELEMENTARY AND HIGH SCHOOL.

4             MR. JEFFRESS:  DID YOU GO ON TO COLLEGE AFTER

5    THAT?

6             THE PROSPECTIVE JUROR:  I DID.  I WENT TO

7    NORTHEASTERN UNIVERSITY IN BOSTON.

8             MR. JEFFRESS:  OKAY.  AND THEN YOU HAVE BEEN DOWN

9    IN D.C. HOW LONG?

10            THE PROSPECTIVE JUROR:  WE MOVED HERE IN 2000.

11            MR. JEFFRESS:  DO YOU HAVE ANY INFORMATION ABOUT

12   MR. LIBBY AT ALL OTHER THAN WHAT THE JUDGE TOLD YOU

13   YESTERDAY, THAT HE WAS ASSISTANT TO THE VICE-PRESIDENT?

14            THE PROSPECTIVE JUROR:  NO.

15            MR. JEFFRESS:  DO YOU HAVE ANY OPINIONS ABOUT

16   VICE-PRESIDENT CHENEY?

17            THE PROSPECTIVE JUROR:  HE SEEMS LIKE A

18   RESPONSIBLE, SLIGHTLY COLD MAN.  THAT'S ABOUT IT.

19            MR. JEFFRESS:  HAVE YOU READ OR HEARD OR DISCUSSED

20   WITH ANYBODY A CONTROVERSY ABOUT THE CREDIBILITY OF THE

21   REASONS GIVEN FOR GOING TO WAR IN IRAQ?

22            THE PROSPECTIVE JUROR:  SURE.  YES, I HAVE HEARD

23   ABOUT --

24            MR. JEFFRESS:  YOU HAVE HEARD PEOPLE TALK ABOUT

25   THAT?

1        THE PROSPECTIVE JUROR:  YES.

2        MR. JEFFRESS:  DO YOU HAVE AN OPINION ON THAT

3   SUBJECT, THE CREDIBILITY OF THE ADMINISTRATION?

4        THE PROSPECTIVE JUROR:  I DON'T -- I THINK THAT

5   MAYBE NOW PEOPLE KNOW THAT -- MAYBE THE REASONS WE WENT TO

6   WAR WEREN'T THE REASONS WE SHOULD HAVE GONE TO WAR.  I DON'T

7   HAVE AN INFORMED OPINION ABOUT IT; I DON'T REALLY HAVE AN

8   OPINION.

9        MR. JEFFRESS:  HOW ABOUT THAT CONTROVERSY, OR

10  ANYTHING ELSE -- ANY OTHER OPINIONS OR INFORMATION YOU THINK

11  HAVE -- DO YOU HAVE AN OPINION ABOUT THE CREDIBILITY OF THE

12  BUSH ADMINISTRATION OR THE VICE-PRESIDENT IN PARTICULAR?

13       THE PROSPECTIVE JUROR:  NO.  I THINK THAT, YOU

14  KNOW, BEING SOMEONE WHO DOESN'T REALLY FOLLOW THE NEWS THAT

15  CLOSELY BUT BEING IN D.C., THERE ARE TWO SIDES TO -- ANYONE

16  CAN MAKE A CASE FOR ANYTHING.

17       MR. JEFFRESS:  LET ME ASK YOU A QUESTION ABOUT --

18  DO YOU REMEMBER JUDGE WALTON ASKED YOU QUESTIONS ABOUT

19  MEMORY WHEN YOU WERE HERE YESTERDAY MORNING?

20       THE PROSPECTIVE JUROR:  YES, I DO REMEMBER THAT.

21       MR. JEFFRESS:  IT HAS ONLY BEEN A DAY.

22       BUT HAVE YOU EVER HAD IT HAPPEN THAT YOU WERE

23  ABSOLUTELY CERTAIN THAT SOMETHING HAPPENED AND THEN COME TO

24  FIND OUT YOU WERE WRONG?

25       THE PROSPECTIVE JUROR:  SURE.  YES.

1    MR. JEFFRESS:  IF YOU SEE TWO PEOPLE DISAGREEING

2  ABOUT WHETHER SOMETHING HAPPENED, YOU KNOW, LAST MONTH --

3  JUST VIOLENTLY DISAGREEING ABOUT IT, DO YOU TEND TO CONCLUDE

4  THAT ONE OF THEM IS LYING?

5    THE PROSPECTIVE JUROR:  IT DEPENDS ON THE

6  SITUATION AND IT DEPENDS ON -- WHEN YOU SAY THEY WERE

7  VIOLATING DISAGREEING, I GUESS I WOULD NEED TO HAVE HEARD

8  FROM -- YOU KNOW, A WHOLE STORY FROM EACH OF THEM ABOUT WHAT

9  THEY ARE DISAGREEING ABOUT.  YOU KNOW, IF I HAVE KNOWLEDGE

10  ABOUT THE INCIDENT, I CAN SAY, WELL, NO, ACTUALLY, THIS IS

11  WHAT HAPPENED; I WAS THERE ALSO.  BUT -- SO --

12    MR. JEFFRESS:  WELL, HOW READILY WOULD YOU

13  CONCLUDE THAT WHEN TWO PEOPLE HAVE A DISAGREEMENT ABOUT

14  SOMETHING, THAT BOTH OF THEM COULD JUST BE GIVING THEIR

15  HONEST RECOLLECTION?

16    THE PROSPECTIVE JUROR:  THEY DEFINITELY COULD BOTH

17  BE GIVING THEIR HONEST RECOLLECTION AND THEY COULD BOTH BE

18  WRONG.

19    MR. JEFFRESS:  HAVE YOU EVER TESTIFIED AS A

20  WITNESS IN COURT?

21    THE PROSPECTIVE JUROR:  NO.

22    MR. JEFFRESS:  I HAVE NOTHING FURTHER, YOUR HONOR.

23    THE COURT:  YES.

24    MR. FITZGERALD:  IF SOMEONE GAVE AN ACCOUNT OF

25  EVENTS AND DESCRIBED HOW THINGS HAPPENED AND INDICATED VERY

1   STRONGLY THAT'S WHAT HAPPENED, IF YOU WERE TO HEAR EVIDENCE

2   THAT SHOWED THAT EVENTS HAPPENED COMPLETELY DIFFERENTLY, HOW

3   WOULD YOU GO THROUGH THE PROCESS OF FIGURING OUT WHETHER

4   THIS PERSON MADE AN HONEST GOOD FAITH MISTAKE AND JUST

5   DESCRIBED SOMETHING INACCURATELY BUT UNINTENTIONALLY, OR

6   WHETHER THEY LIED AND MADE UP THIS ACCOUNT?  HOW WOULD YOU

7   GO ABOUT RESOLVING THAT?

8          THE PROSPECTIVE JUROR:  WELL, I MEAN, YOU -- YOU

9   WOULD WEIGH EVERYTHING THAT YOU HEAR AND TRY TO REASON THAT

10  EVERYTHING EVERYONE IS SAYING IS TRUE -- BECAUSE I MEAN WE

11  ARE SUPPOSED TO ASSUME EVERYTHING IS TRUE; I THINK THAT IS

12  WHAT WE HAVE BEEN TOLD -- YOU JUST -- DOES IT LOGICALLY MAKE

13  SENSE WHAT THE PERSON IS SAYING?

14         YOU KNOW, YOU TRY TO DRAW UPON YOUR OWN

15  EXPERIENCES:  HAS SOMETHING LIKE THAT EVER HAPPENED TO ME?

16  OBVIOUSLY, IT IS NOT GOING TO BE THE SAME SITUATION, BUT IT

17  IS SOMETHING YOU MIGHT BE ABLE TO DRAW A PARALLEL FROM.

18         MR. FITZGERALD:  AND IF YOU WERE CONVINCED THAT

19  THE PERSON'S ACCOUNT WAS WRONG, HOW WOULD YOU FIGURE OUT

20  WHETHER IT WAS WRONG BY MISTAKE OR BY INTENTION?

21         THE PROSPECTIVE JUROR:  BY LISTENING TO THE PERSON

22  AND THEM TELLING THE STORY AND YOU WOULD, I THINK, BE ABLE

23  TO DRAW CONCLUSIONS FROM THAT.

24         MR. FITZGERALD:  OKAY.  THANK YOU.

25         THE COURT:  ANYTHING ELSE?

1      MR. JEFFRESS:  ON THAT SUBJECT, IF YOU WERE CALLED

2  UPON TO DO THAT AS A JUROR, DO YOU UNDERSTAND -- HAVE YOU

3  HEARD THE TERM "REASONABLE DOUBT"?

4      THE PROSPECTIVE JUROR:  ABSOLUTELY.

5      MR. JEFFRESS:  AND WOULD YOU BE ABLE TO FOLLOW THE

6  JUDGE'S INSTRUCTION THAT, IN MAKING THAT DECISION, YOU WOULD

7  REQUIRE THE GOVERNMENT TO PROVE ITS CASE BEYOND A REASONABLE

8  DOUBT?

9      THE PROSPECTIVE JUROR:  YES.

10      MR. JEFFRESS:  THANK YOU.

11      THE COURT:  THANK YOU, MISS.  IF YOU CAN HAVE A

12  SEAT DOWN IN ONE OF THOSE CHAIRS RIGHT IN FRONT OF THE

13  RAILING.

14      THE PROSPECTIVE JUROR:  SURE.

15      THE COURT:  APPROACH, COUNSEL.

16      (AT THE BENCH.)

17      THE COURT:  ANY STRIKES?

18      MR. JEFFRESS:  NO.

19      MR. FITZGERALD:  NO.

20      (IN OPEN COURT.)

21      THE COURT:  THANK YOU, MISS.  WE ARE NOT GOING TO

22  BE ABLE TO COMPLETE THIS PROCESS UNTIL, HOPEFULLY, TOMORROW.

23  SO WE WON'T NEED YOU UNTIL TOMORROW.  SO YOU CAN BE EXCUSED

24  AND WE WILL SEE YOU AT 9:30 TOMORROW MORNING.

25      DON'T TALK ABOUT THE CASE.  DON'T READ ANYTHING OR

```
1   LISTEN TO ANYTHING RELATED TO NEWS.  THANK YOU.

2           THE PROSPECTIVE JUROR:  HALF DAY.  THANK YOU.

3           (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

4           (ANOTHER PROSPECTIVE JUROR ENTERING THE

5   COURTROOM.)

6           THE COURT:  GOOD MORNING.

7           THE PROSPECTIVE JUROR:  GOOD MORNING.

8           THE COURT:  YOU ARE JUROR NUMBER 0410?

9           THE PROSPECTIVE JUROR:  YES.

10          THE COURT:  YOU HAD A COUPLE OF RESPONSES TO THE

11  QUESTIONS.  FIRST, QUESTION NUMBER 3(B) WHICH ASKED WHETHER

12  YOU HAVE HEARD OR READ ANYTHING ABOUT THIS CASE IN THE

13  MEDIA.  DO YOU WANT TO TELL ME ABOUT THAT?

14          THE PROSPECTIVE JUROR:  I REMEMBER HEARING

15  SOMETHING ABOUT IT IN THE MEDIA.

16          THE COURT:  NOW, LET ME JUST TELL YOU, IF THERE

17  ARE ANY RESPONSES YOU WANT TO GIVE ME THAT YOU THINK SHOULD

18  BE PRIVATE, YOU CAN JUST TELL ME THAT AND WE WILL DO IT HERE

19  AT THE BENCH.

20          THE PROSPECTIVE JUROR:  OKAY.

21          THE COURT:  AND DO YOU REMEMBER EXACTLY WHAT YOU

22  READ OR HEARD?

23          THE PROSPECTIVE JUROR:  NO.  AS A MATTER OF FACT,

24  WHEN YOU MENTIONED SOME THINGS, THEN IT KIND OF TRIGGERED

25  A -- SOME MEMORY, BUT I DON'T HAVE A LOT OF MEMORY ABOUT
```

1    WHAT HAPPENED.

2           THE COURT:  DO YOU REMEMBER ANYTHING THAT YOU CAN

3    TELL US THAT YOU RECALL?

4           THE PROSPECTIVE JUROR:  NO, OTHER THAN WHAT YOU

5    SAID.

6           THE COURT:  DID YOU FORM ANY OPINIONS ABOUT THE

7    SITUATION BASED UPON WHAT YOU READ OR SAW IN THE MEDIA?

8           THE PROSPECTIVE JUROR:  NO, I DID NOT.

9           THE COURT:  DO YOU HAVE ANY OPINIONS RIGHT NOW

10   ABOUT THE CASE BASED UPON WHAT YOU READ OR HEARD?

11          THE PROSPECTIVE JUROR:  NO.  JUST CURIOUS.

12          THE COURT:  AND CAN YOU PRESUME THAT MR. LIBBY IS

13   INNOCENT UNTIL PROVEN GUILTY BEYOND A REASONABLE DOUBT?

14          THE PROSPECTIVE JUROR:  YES.

15          THE COURT:  OKAY.  YOU ALSO HAD A RESPONSE TO

16   QUESTION NUMBER 19 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

17   RELATIVES HAVE EVER HELD A POSITION IN LAW ENFORCEMENT OR

18   APPLIED FOR SUCH A POSITION.  DO YOU WANT TO TELL ME ABOUT

19   THAT?

20          THE PROSPECTIVE JUROR:  YES.  I KNOW SEVERAL

21   PEOPLE WHO WORK FOR THE UNITED STATES PARK POLICE, ONE

22   PERSON WHO WORKS FOR THE -- HE IS AN AGENT WITH THE UNITED

23   STATES SECRET SERVICE -- AND ONE PERSON WITH THE C.I.A.

24          THE COURT:  DO YOU EVER TALK TO THESE PEOPLE ABOUT

25   THEIR WORK?

1    THE PROSPECTIVE JUROR:  WE DON'T DISCUSS THEIR

2    WORK.

3        THE COURT:  WOULD THE FACT THAT YOU HAVE THESE

4    FRIENDS WHO ARE IN LAW ENFORCEMENT POSITIONS -- WOULD THAT

5    CAUSE YOU TO FAVOR ONE SIDE OR THE OTHER IN THIS CASE?

6        THE PROSPECTIVE JUROR:  NO.  IT WOULD NOT.

7        THE COURT:  WOULD IT CAUSE YOU TO FAVOR THE

8    TESTIMONY OF SOMEONE WHO WAS A LAW ENFORCEMENT PERSON AS

9    COMPARED TO SOMEBODY WHO WAS NOT?

10        THE PROSPECTIVE JUROR:  NO.

11        THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

12    NUMBER 24 WHICH ASKED WHETHER YOU OR ANY OF YOUR CLOSE

13    FRIENDS OR RELATIVES HAVE EVER BEEN EMPLOYED WITH THE C.I.A.

14    OR SOME OTHER NATIONAL INTELLIGENCE AGENCY.  IS THAT THE

15    SAME PERSON YOU JUST TOLD US ABOUT?

16        THE PROSPECTIVE JUROR:  YES.  YES.

17        THE COURT:  DO YOU HAVE ANY IDEA WHAT THAT PERSON

18    DOES AT THE C.I.A.?

19        THE PROSPECTIVE JUROR:  NO, SHE DOESN'T TALK ABOUT

20    IT.  I HAVE NO IDEA.

21        THE COURT:  THERE IS GOING TO BE SOME TESTIMONY

22    ABOUT THE C.I.A. AS IT RELATES TO THIS CASE.  WOULD THE FACT

23    THAT YOU HAVE THIS FRIEND WHO WORKS FOR THE C.I.A. HAVE ANY

24    IMPACT ON YOUR ABILITY TO SIT AND BE FAIR IN THIS CASE?

25        THE PROSPECTIVE JUROR:  NO.

1    THE COURT:  WOULD YOU BE ABLE TO AVOID CONTACT

2  WITH THAT PERSON DURING THE COURSE OF THE TRIAL IF YOU ARE

3  SELECTED AS A JUROR IN THIS CASE?

4    THE PROSPECTIVE JUROR:  YES.

5    THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

6  NUMBER 25 WHICH ASKED -- AND THIS MAY BE THE SAME THING --

7  WHETHER YOU HAVE EVER HELD A POSITION WHERE YOU HAD ACCESS

8  TO CLASSIFIED INFORMATION.

9    THE PROSPECTIVE JUROR:  I WORKED AT THE EXECUTIVE

10 RESIDENCE.

11   THE COURT:  WHERE?

12   THE PROSPECTIVE JUROR:  I WORKED AT THE EXECUTIVE

13 RESIDENCE.  SO, YES, I DID.

14   THE COURT:  WHAT'S THE EXECUTIVE RESIDENCE?

15   THE PROSPECTIVE JUROR:  WHITE HOUSE.

16   THE COURT:  OH, YOU WORKED AT THE WHITE HOUSE?

17   THE PROSPECTIVE JUROR:  YES.

18   THE COURT:  WHEN DID YOU WORK THERE?

19   THE PROSPECTIVE JUROR:  STARTED THE LAST YEAR OF

20 THE REAGAN ADMINISTRATION AND LEFT RIGHT AFTER THE INAUGURAL

21 OF PRESIDENT BUSH, THIS PRESIDENT BUSH.

22   THE COURT:  WHAT DID YOU DO THERE?

23   THE PROSPECTIVE JUROR:  I WORKED IN -- I WAS AN

24 ADMINISTRATIVE ASSISTANT IN THE GROUNDS OFFICE.

25   THE COURT:  SO DID YOU ACTUALLY HAVE IN YOUR

1    POSSESSION CLASSIFIED INFORMATION?

2          THE PROSPECTIVE JUROR:  NO.  THAT WAS THE LITTLE

3    QUESTION MARK FOR ME BECAUSE YOU WOULD HAVE ACCESS TO

4    PERSONS WHO HAD, YOU KNOW, BACKGROUND CHECKS AND THINGS OF

5    THAT SORT, BUT NOTHING OF NATIONAL SECURITY.  NOTHING LIKE

6    THAT.

7          THE COURT:  WOULD THAT POSITION THAT YOU HELD IN

8    THE WHITE HOUSE HAVE ANY IMPACT ON YOUR ABILITY TO FAIRLY

9    JUDGE THIS CASE IN LIGHT OF THE FACT THAT THERE MAY BE SOME

10   TESTIMONY IN THIS CASE ABOUT CLASSIFIED INFORMATION?

11         THE PROSPECTIVE JUROR:  NO, IT WOULD NOT.

12         THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

13   NUMBER 30 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

14   RELATIVES HAVE EVER BEEN THE VICTIM OF A CRIME, SOMEONE

15   CHARGED WITH A CRIME OR A WITNESS TO A CRIME.  DO YOU WANT

16   TO TELL ME ABOUT THAT?

17         THE PROSPECTIVE JUROR:  VICTIMS OF CRIME.  SMALL

18   THINGS.  CAR BROKEN INTO, CAR STOLEN, AND THINGS OF THAT

19   SORT.

20         THE COURT:  DID YOU REPORT THESE INCIDENTS TO THE

21   POLICE?

22         THE PROSPECTIVE JUROR:  YES.

23         THE COURT:  ANYBODY EVER ARRESTED IN THOSE CASES?

24         THE PROSPECTIVE JUROR:  NOT THAT I KNOW OF.

25         THE COURT:  WERE YOU SATISFIED WITH THE EFFORTS

1   TAKEN BY THE POLICE?

2            THE PROSPECTIVE JUROR:  NO, NOT TOTALLY.

3            THE COURT:  WOULD YOU HOLD AGAINST ANYBODY IN THIS

4   CASE THE FACT THAT YOU THINK THE POLICE DID NOT DO WHAT THEY

5   WERE SUPPOSED TO DO?

6            THE PROSPECTIVE JUROR:  NO, NOT HERE.

7            THE COURT:  WOULD THE FACT THAT YOU WERE A CRIME

8   VICTIM IN ANY WAY CAUSE YOU TO FAVOR ONE SIDE OR THE OTHER

9   IN THIS CASE?

10           THE PROSPECTIVE JUROR:  NO, IT WOULD NOT.

11           THE COURT:  ARE YOU TOTALLY CONFIDENT YOU CAN BE

12   FAIR TO BOTH SIDES?

13           THE PROSPECTIVE JUROR:  I BELIEVE I CAN.

14           THE COURT:  GOVERNMENT?

15           MR. FITZGERALD:  GOOD MORNING.  WHAT DO YOU DO

16   NOW?

17           THE PROSPECTIVE JUROR:  I AM THE ADMINISTRATIVE

18   OFFICER AT NATIONAL CAPITAL PARKS EAST, NATIONAL PARK

19   SERVICE.

20           MR. FITZGERALD:  AND CAN YOU BRIEFLY DESCRIBE WHAT

21   YOU DO DAY TO DAY?

22           THE PROSPECTIVE JUROR:  DAY TO DAY, I OVERSEE THE

23   FISCAL MATTERS OF THE PARK, PROPERTY, INFORMATION

24   TECHNOLOGY, BUDGET, H.R. -- HUMAN RESOURCES ACTIVITIES.

25           MR. FITZGERALD:  AND WHEN YOU WORKED AT THE WHITE

1  HOUSE AS AN ADMINISTRATIVE ASSISTANT, WHERE PHYSICALLY IN

2  THE WHITE HOUSE DID YOU WORK?

3          THE PROSPECTIVE JUROR:  WE WORKED ON THE GROUNDS

4  OF THE WHITE HOUSE IN THE CRAFT AREAS WHERE THE GROUNDS

5  OFFICE IS.  IT WAS ON THE GROUNDS -- RIGHT IN THE RESIDENCE

6  ON THE GROUND FLOOR.

7          MR. FITZGERALD:  OKAY.  AND YOUR FRIEND -- I'M NOT

8  ASKING ANY OF YOUR FRIENDS' NAMES.  BUT YOUR FRIEND WHO

9  WORKS AT THE C.I.A., DOES SHE TELL OTHER PEOPLE SHE WORKS AT

10 THE C.I.A.?

11         THE PROSPECTIVE JUROR:  NO.  I ONLY KNOW BECAUSE I

12 KNOW HER FATHER.  THAT'S ALL.

13         MR. FITZGERALD:  OKAY.

14         THANK YOU, JUDGE.

15         THE COURT:  DEFENSE?

16         MR. WELLS:  GOOD MORNING.

17         THE PROSPECTIVE JUROR:  GOOD MORNING.

18         MR. WELLS:  WHERE DID YOU GROW UP?

19         THE PROSPECTIVE JUROR:  IN CAMDEN, NEW JERSEY.

20         MR. WELLS:  OKAY.  AND WHEN DID YOU MOVE TO

21 WASHINGTON, D.C.?

22         THE PROSPECTIVE JUROR:  I THINK IT WAS IN 1975,

23 '76.  SOMETHING LIKE THAT.

24         MR. WELLS:  AND WHAT NEIGHBORHOOD DO YOU RESIDE IN

25 NOW?

1    THE PROSPECTIVE JUROR:  I LIVE IN SOUTHEAST,

2  WASHINGTON, D.C.

3    MR. WELLS:  AND CAN YOU GIVE ME YOUR EDUCATIONAL

4  BACKGROUND?

5    THE PROSPECTIVE JUROR:  I HAVE A MASTER'S IN LABOR

6  STUDIES.

7    MR. WELLS:  FROM WHERE?

8    THE PROSPECTIVE JUROR:  I'M FINISHING UP A

9  MASTER'S IN PUBLIC ADMINISTRATION.

10    MR. WELLS:  AND WHERE IS THE MASTER'S IN LABOR

11  STUDIES?

12    THE PROSPECTIVE JUROR:  UNIVERSITY OF THE DISTRICT

13  OF COLUMBIA.  AND THE WORK I AM DOING NOW IS AT SOUTHEASTERN

14  UNIVERSITY.

15    MR. WELLS:  AND WHAT ABOUT YOUR UNDERGRADUATE

16  DEGREE?

17    THE PROSPECTIVE JUROR:  HOWARD UNIVERSITY.

18    MR. WELLS:  AND WHEN DID YOU GET OUT OF HOWARD?

19    THE PROSPECTIVE JUROR:  '76, I THINK IT WAS.

20    MR. WELLS:  OKAY.  AND COULD YOU JUST BRIEFLY

21  DESCRIBE FOR ME YOUR EMPLOYMENT HISTORY?

22    THE PROSPECTIVE JUROR:  FROM THE BEGINNING?

23    MR. WELLS:  WELL, AFTER YOU GOT OUT OF HOWARD,

24  JUST KIND OF TAKE ME THROUGH IT IN ROUGH FORM.  I AM NOT

25  LOOKING FOR --

1          THE PROSPECTIVE JUROR:  OH, OKAY.  I WORKED WITH

2    HOWARD UNIVERSITY HOSPITAL AS A -- LIKE A MEDICAL

3    TECHNICIAN.  I WORKED DOWN IN CENTRAL SUPPLY.

4          AND THEN I TOOK A JOB WITH THE NATIONAL PARK

5    SERVICE AT ROCK CREEK PARK WHERE I WAS THE ENVIRONMENTAL

6    EDUCATION COORDINATOR WITH THE YOUTH PROGRAM YCC.

7          FROM THERE, I WENT TO THE NATIONAL PARK SERVICE

8    WITH YACC, WHICH WAS ANOTHER YOUTH PROGRAM.

9          MR. WELLS:  I'M SORRY.  WHAT DOES IT STAND FOR?

10         THE PROSPECTIVE JUROR:  YOUNG ADULT CONSERVATION

11   CORPS.  AND THE OTHER ONE, YCC, WAS THE YOUTH CONSERVATION

12   CORPS.  I AM A LITTLE NERVOUS.  SORRY.

13         AFTER THAT, I TOOK A JOB AT THE FREDERICK DOUGLAS

14   HOME WHERE I WAS A PARK RANGER -- WE WERE PARK TECHNICIANS

15   THEN.  I DID INTERPRETIVE TOURS AT THE FREDERICK DOUGLAS

16   HOME.

17         AFTER THAT, I WORKED IN CONTRACTING.  I WAS A

18   PURCHASING AGENT.  I LEFT THERE AND BECAME AN ADMINISTRATIVE

19   TECHNICIAN AT THE EXECUTIVE RESIDENCE.

20         AND FROM THAT POSITION, I BECAME A BUDGET ANALYST

21   UNDER WHITE HOUSE LIAISON, BUT AT THE NATIONAL PARK SERVICE.

22   FROM THAT POSITION, I BECAME WHAT I AM NOW, ADMINISTRATIVE

23   OFFICER FOR NATIONAL CAPITAL PARKS EAST.

24         MR. WELLS:  OKAY.  THANK YOU.  WHAT OPINION, IF

25   ANY, DO YOU HAVE WITH RESPECT TO THE ISSUE OF WHETHER OR NOT

THE BUSH ADMINISTRATION WAS HONEST WITH THE AMERICAN PUBLIC
ABOUT THE REASONS FOR GOING TO WAR IN IRAQ?

THE PROSPECTIVE JUROR:  WELL, I AM A LITTLE TORN,
TO BE HONEST.  THERE ARE SOME PLUSES AND THERE ARE SOME
NEGATIVES.  I JUST FEEL THAT, AS TIME GOES ON AND HISTORY
REBUILDS ITSELF, THE TRUTH WILL REALLY SURFACE.  I AM A
LITTLE IN THE MIDDLE.

MR. WELLS:  OKAY.  WHAT FEELINGS, IF ANY, DO YOU
HAVE ABOUT THE CREDIBILITY OF VICE-PRESIDENT CHENEY?

THE PROSPECTIVE JUROR:  RIGHT NOW I DON'T HAVE A
LOT OF REASON TO DOUBT HIS CREDIBILITY.  I MEAN, I JUST
DON'T.

MR. WELLS:  OKAY.  NOW, MR. LIBBY WAS THE CHIEF OF
STAFF TO VICE-PRESIDENT CHENEY.  WOULD ANY FEELINGS YOU HAVE
ABOUT THE BUSH ADMINISTRATION PREVENT YOU FROM BEING A FAIR
AND IMPARTIAL JUROR IN MR. LIBBY'S TRIAL?

THE PROSPECTIVE JUROR:  I COULD BE FAIR AND
IMPARTIAL.

MR. WELLS:  OKAY.  HAVE YOU EVER HAD A SITUATION
IN YOUR LIFE WHERE YOU THOUGHT WITH GREAT CONFIDENCE THAT
SOMETHING HAD HAPPENED AND THEN IT TURNED OUT LATER ON THAT
YOU FOUND OUT YOU WERE WRONG IN TERMS OF YOUR MEMORY, WHAT
YOU RECOLLECTED?

THE PROSPECTIVE JUROR:  I REALLY THOUGHT IT
HAPPENED AND THEN LATER ON I THOUGHT IT WAS WRONG?

1          MR. WELLS:  NO, NO, NO.  IT TURNED OUT THAT YOU

2    WERE MISTAKEN ABOUT WHAT YOU THOUGHT HAD HAPPENED AND IT

3    TURNED OUT SOMETHING ELSE HAD HAPPENED.

4          THE PROSPECTIVE JUROR:  USUALLY IF I AM THINKING

5    ABOUT SOMETHING THAT HAPPENED IN THE PAST, IT PROBABLY

6    HAPPENED.

7          MR. WELLS:  OKAY.  SO YOU CAN'T THINK BACK IN YOUR

8    LIFE EXPERIENCE ON A SITUATION WHERE YOU WERE MISTAKEN ABOUT

9    WHAT HAD TAKEN PLACE?

10         THE PROSPECTIVE JUROR:  THAT'S KIND OF HARD FOR ME

11   TO ANSWER RIGHT NOW.

12         MR. WELLS:  OKAY.

13         THE PROSPECTIVE JUROR:  I AM TRYING TO THINK OF A

14   PARTICULAR SITUATION, AND I CAN'T.

15         MR. WELLS:  WELL, HAVE YOU EVER HAD A

16   DISAGREEMENT -- A FRIENDLY DISAGREEMENT WITH A FRIEND OF

17   YOURS AND YOU SAID TO YOUR FRIEND, NO, IT HAPPENED THIS WAY.

18   AND YOUR FRIEND SAID, NO, I THINK YOU ARE WRONG; I THINK IT

19   HAPPENED THAT WAY.  AND IT TURNED OUT THAT ONE OF YOU, OF

20   COURSE, WAS WRONG AND ONE OF YOU WAS RIGHT -- I MEAN, DO YOU

21   HAVE EXPERIENCE WITH THAT TYPE OF SITUATION?

22         THE PROSPECTIVE JUROR:  YES.

23         MR. WELLS:  OKAY.  AND THE PERSON WHO TURNED OUT

24   TO BE WRONG, THAT PERSON YOU WOULDN'T CONCLUDE WAS LYING;

25   THAT PERSON JUST HAD A MISRECOLLECTION ABOUT WHAT TOOK

1    PLACE.

2           THE PROSPECTIVE JUROR:  NOT NECESSARILY LYING, BUT

3    POSSIBLY THEY COULD HAVE MISINTERPRETED THEIR FACTS.  I

4    MEAN, I DON'T KNOW.

5           MR. WELLS:  SURE.  OKAY.

6           I DON'T HAVE ANY FURTHER QUESTIONS.

7           THE COURT:  APPROACH.

8           MISS, YOU CAN HAVE A SEAT ON ONE OF THOSE SEATS AT

9    THE RAILING OUT THERE.

10          (AT THE BENCH.)

11          THE COURT:  ANY CHALLENGES?

12          MR. WELLS:  NO.

13          MR. FITZGERALD:  NO.

14          (IN OPEN COURT.)

15          THE COURT:  OKAY, MISS.  WE ARE NOT GOING TO BE

16   ABLE TO COMPLETE THIS PROCESS UNTIL, HOPEFULLY, TOMORROW.

17   SO WE WILL NEED YOU BACK AT 9:30.  YOU CAN BE EXCUSED UNTIL

18   9:30.

19          DON'T READ THE PAPER.  DON'T LISTEN TO ANY NEWS,

20   AND DON'T TALK TO ANYBODY ABOUT WHAT YOU SAID TO US HERE

21   TODAY.  HAVE A NICE DAY.

22          THE PROSPECTIVE JUROR:  OKAY.

23          (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

24          (ANOTHER PROSPECTIVE JUROR ENTERING THE

25   COURTROOM.)

94

1      THE COURT:  YOU ARE JUROR NUMBER 1707?

2      THE PROSPECTIVE JUROR:  YES, SIR.

3      THE COURT:  HAVE A SEAT.  GOOD MORNING.

4      THE PROSPECTIVE JUROR:  GOOD MORNING.

5      THE COURT:  YOU HAD TWO RESPONSES, ONE TO QUESTION

6  NUMBER 3(A) WHICH ASKED WHETHER YOU HAVE READ OR HEARD

7  ANYTHING ABOUT THIS CASE IN THE MEDIA.

8      THE PROSPECTIVE JUROR:  RIGHT.

9      THE COURT:  DO YOU WANT TO TELL ME ABOUT THAT?

10     THE PROSPECTIVE JUROR:  THE ONLY THING I HEARD IN

11 THE MEDIA WAS WHEN THE PROSECUTOR ANNOUNCED THE INDICTMENT,

12 AND I THINK I SAW THE DEFENDANT GOING TO A HEARING.  HE WAS

13 ON CRUTCHES.  THAT'S THE ONLY THING I KNOW ABOUT IT.

14     THE COURT:  DO YOU REMEMBER WHAT THE PROSECUTOR

15 SAID DURING THAT PRESS CONFERENCE?

16     THE PROSPECTIVE JUROR:  NOT NECESSARILY, SIR.

17     THE COURT:  DID YOU FORM ANY OPINIONS ABOUT THIS

18 CASE AS A RESULT OF WHAT WAS SAID?

19     THE PROSPECTIVE JUROR:  NO, SIR.

20     THE COURT:  SO DO YOU HAVE ANY CONCLUSIONS NOW --

21 OR OPINIONS NOW ABOUT THE GUILT OR INNOCENCE OF MR. LIBBY?

22     THE PROSPECTIVE JUROR:  NO, SIR.

23     THE COURT:  CAN YOU PRESUME THAT HE IS INNOCENT?

24     THE PROSPECTIVE JUROR:  YES, SIR.

25     THE COURT:  AND DO YOU DO THAT?

1          THE PROSPECTIVE JUROR:  YES, SIR.

2          THE COURT:  YOU ALSO HAD A RESPONSE TO QUESTION

3   NUMBER 29 WHICH ASKED WHETHER YOU, CLOSE FRIENDS OR

4   RELATIVES HAVE EVER BEEN A MEMBER OF A GRAND JURY OR A PETIT

5   JURY IN A CRIMINAL CASE.

6          THE PROSPECTIVE JUROR:  YES, SIR.

7          THE COURT:  TELL ME ABOUT THAT.

8          THE PROSPECTIVE JUROR:  THE FIRST CASE THAT I EVER

9   SAT ON WAS -- IT WAS AN OLD GENTLEMAN THAT THEY HAD TO --

10  WHETHER HE COULD HANDLE HIS AFFAIRS.

11         THE COURT:  SO IT WAS A MENTAL HEALTH CASE?

12         THE PROSPECTIVE JUROR:  RIGHT.

13         THE COURT:  OKAY.

14         THE PROSPECTIVE JUROR:  THE SECOND ONE WAS DEALING

15  WITH DRUGS.

16         THE COURT:  AND BOTH OF THOSE WOULD HAVE BEEN THE

17  SUPERIOR COURT OR HERE?

18         THE PROSPECTIVE JUROR:  AT THE SUPERIOR COURT.

19         THE COURT:  SO YOU HAVE SAT AS A PETIT JUROR IN

20  TWO CASES?

21         THE PROSPECTIVE JUROR:  THREE CASES.

22         THE COURT:  WHAT WAS THE THIRD CASE?

23          THE PROSPECTIVE JUROR:  THE THIRD CASE WAS -- OH,

24  IT WAS A WEAPONS CASE.  IT WAS A GENTLEMAN -- THEY SAID HE

25  PULLED A WEAPON OUT OF HIS LAPEL OR SOMETHING AND DROPPED

1    IT.  BUT THE WEAPON DIDN'T HAVE ANY FINGERPRINTS ON IT, SO

2    WE FOUND THE GUY NOT GUILTY.

3           THE COURT:  WHAT ABOUT IN THE DRUG CASE?  DID YOU

4    REACH A DECISION IN THAT CASE?

5           THE PROSPECTIVE JUROR:  HE WAS GUILTY.

6           THE COURT:  WAS THERE ANYTHING ABOUT YOUR

7    EXPERIENCE IN ANY OF THOSE CASES WHERE YOU SERVED AS A JUROR

8    THAT YOU THINK MIGHT AFFECT YOUR ABILITY TO BE A FAIR JUROR

9    IN THIS CASE?

10           THE PROSPECTIVE JUROR:  NO, SIR.

11           THE COURT:  SO ARE YOU TOTALLY CONFIDENT YOU CAN

12    BE FAIR TO BOTH SIDES?

13           THE PROSPECTIVE JUROR:  ABSOLUTELY.

14           THE COURT:  GOVERNMENT?

15           MR. FITZGERALD:  GOOD MORNING, SIR.

16           THE PROSPECTIVE JUROR:  GOOD MORNING, SIR.

17           MR. FITZGERALD:  COULD YOU TELL US WHAT YOU DID

18    FOR WORK BEFORE YOU RETIRED?

19           THE PROSPECTIVE JUROR:  I WAS AN INFORMATION

20    SPECIALIST, AND I RETIRED AS A FINANCIAL MANAGEMENT

21    SPECIALIST.

22           MR. FITZGERALD:  AND WHO DID YOU WORK FOR?

23           THE PROSPECTIVE JUROR:  THE U.S. ENVIRONMENTAL

24    PROTECTION AGENCY.

25           MR. FITZGERALD:  HOW LONG DID YOU WORK FOR E.P.A.?

1    THE PROSPECTIVE JUROR:  WELL, I WORKED FOR THE

2 GOVERNMENT FOR 33 YEARS.

3    MR. FITZGERALD:  OKAY.  CAN YOU TELL US WHAT

4 AGENCIES YOU WORKED AT FOR ANY SIGNIFICANT LENGTH OF TIME?

5    THE PROSPECTIVE JUROR:  I WORKED FOR THE OLD

6 H.E.W., HEALTH AND HUMAN SERVICES.  THEN THEY TOOK PARTS OUT

7 OF THAT AND MADE IT E.P.A.  SO I WORKED THE REST OF THE DAYS

8 FOR E.P.A.

9    MR. FITZGERALD:  AND WHAT DID YOU DO DAY TO DAY

10 WHEN YOU WERE AN INFORMATION SPECIALIST?

11    THE PROSPECTIVE JUROR:  I HELPED WRITE SPEECHES.

12 I ANSWERED LETTERS TO THE PUBLIC AND THINGS OF THAT NATURE.

13    MR. FITZGERALD:  AND WHERE DID YOU GROW UP?

14    THE PROSPECTIVE JUROR:  I GREW UP IN COLUMBIA,

15 NORTH CAROLINA, AND LILLINGTON, NORTH CAROLINA, AND

16 WASHINGTON, D.C.

17    MR. FITZGERALD:  AND DAY TO DAY, DO YOU READ ANY

18 PARTICULAR NEWSPAPERS?

19    THE PROSPECTIVE JUROR:  NO, SIR.  I ONLY READ THE

20 BIBLE.

21    MR. FITZGERALD:  OKAY.  THANK YOU.

22    THE COURT:  DEFENSE.

23    MR. JEFFRESS:  GOOD MORNING.  JUST A FEW MORE

24 QUESTIONS.  WHATEVER YOU -- WHATEVER THE PROSECUTOR SAID ON

25 THIS PRESS CONFERENCE THAT YOU SAW, COULD YOU PUT THAT

1    TOTALLY OUT OF YOUR MIND AND ASSUME MR. LIBBY TO BE INNOCENT

2    OF THESE CHARGES AGAINST HIM?

3              THE PROSPECTIVE JUROR:  YES, SIR.

4              MR. JEFFRESS:  YOU COULD START OUT THIS TRIAL THAT

5    WAY, WITH A PRESUMPTION OF INNOCENCE?

6              THE PROSPECTIVE JUROR:  YES.

7              MR. JEFFRESS:  DO YOU HAVE ANY OPINIONS ABOUT THE

8    CREDIBILITY OF PRESIDENT BUSH OR VICE-PRESIDENT CHENEY OR

9    PEOPLE WHO ARE IN THE ADMINISTRATION?

10             THE PROSPECTIVE JUROR:  NO, SIR.  I MEAN, I HAVE

11   AN OPINION, BUT IT WOULDN'T HAVE ANYTHING TO DO WITH THIS

12   CASE.

13             MR. JEFFRESS:  WELL, LET'S -- JUST PUT IT THIS

14   WAY.  I AM NOT GOING TO REQUIRE YOU TO SAY WHAT YOUR OPINION

15   IS BECAUSE YOU ARE ENTITLED TO YOUR OPINION.  BUT WOULD YOUR

16   OPINION ABOUT THE CREDIBILITY OF THE BUSH ADMINISTRATION --

17   DO YOU THINK THAT WOULD CARRY OVER AT ALL TO MR. LIBBY, WHO

18   IS ON TRIAL HERE?

19             THE PROSPECTIVE JUROR:  NO, SIR.

20             MR. JEFFRESS:  DO YOU TEND TO WATCH THE NEWS A

21   LOT?  DO YOU WATCH T.V. NEWS OR READ THE NEWSPAPER?

22             THE PROSPECTIVE JUROR:  I WATCH THE NEWS SOME.  I

23   DON'T READ THE NEWSPAPER.

24             MR. JEFFRESS:  OKAY.  AND DO ANY PARTICULAR FACTS

25   ABOUT THIS TRIAL, OR ABOUT WHO SAYS WHAT, STICK OUT IN YOUR

1    MIND THAT YOU MIGHT HAVE READ OR HEARD?

2          THE PROSPECTIVE JUROR:  NO, SIR.

3          MR. JEFFRESS:  ONE MOMENT, YOUR HONOR.

4          THAT'S ALL, YOUR HONOR.

5          THE COURT:  APPROACH.

6          SIR, COULD YOU HAVE A SEAT OUT BY THE RAILING IN

7    ONE OF THOSE BLACK SEATS.

8          (AT THE BENCH.)

9          THE COURT:  ANY STRIKES?

10         MR. JEFFRESS:  NO.

11         MR. FITZGERALD:  NO.

12         (IN OPEN COURT.)

13         THE COURT:  SIR, WE ARE NOT GOING TO BE ABLE TO

14   COMPLETE THIS PROCESS UNTIL, HOPEFULLY, TOMORROW.  SO WE

15   WILL NEED YOU BACK AT 9:30 TOMORROW MORNING AT THE JURY

16   LOUNGE WHERE YOU CAME TODAY.

17         DON'T TALK ABOUT THE CASE AND DON'T WATCH THE NEWS

18   AND DON'T READ THE PAPER.  THANK YOU.  HAVE A NICE DAY.

19         (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

20         (ANOTHER PROSPECTIVE JUROR ENTERING THE

21   COURTROOM.)

22         THE COURT:  YOU ARE JUROR NUMBER 0819?

23         THE PROSPECTIVE JUROR:  YES.

24         THE COURT:  YOU CAN HAVE A SEAT.  GOOD MORNING.

25         THE PROSPECTIVE JUROR:  GOOD MORNING.

1          THE COURT:  ONE OF THE -- AND IF YOU WANT TO

2   RESPOND TO ANY QUESTIONS IN PRIVATE, YOU CAN LET ME KNOW AND

3   WE CAN DO IT UP HERE IN PRIVATE.

4          THE PROSPECTIVE JUROR:  OKAY.

5          THE COURT:  BUT YOU RESPONDED TO ONE QUESTION

6   ABOUT MEDICATION?

7          THE PROSPECTIVE JUROR:  YES.  I TAKE -- I HAVE TO

8   TAKE MEDICINE THREE TIMES -- EVERY THREE HOURS.  I HAVE

9   PARKINSON'S.

10          THE COURT:  AND WHAT, IF ANY, IMPACT OR EFFECT

11   DOES THAT MEDICATION HAVE ON YOU?

12          THE PROSPECTIVE JUROR:  I MIGHT HAVE TO TAKE IT

13   WHILE I AM ON THE STAND --

14          THE COURT:  WELL, I MEAN, ALL YOU HAVE TO DO IS

15   LET ME KNOW; RAISE YOUR HAND AND TELL ME YOU NEED A BREAK

16   AND WE WOULD BREAK SO YOU COULD TAKE YOUR MEDICATION.

17          THE PROSPECTIVE JUROR:  OKAY.

18          THE COURT:  WITH THAT, WOULD YOU BE ABLE TO SERVE?

19          THE PROSPECTIVE JUROR:  YES.

20          THE COURT:  THE MEDICATION DOESN'T IN ANY WAY

21   IMPAIR YOUR ABILITY TO FOCUS?

22          THE PROSPECTIVE JUROR:  NO.  NO.  IT ACTUALLY

23   HELPS.

24          THE COURT:  OKAY.  YOU HAD A RESPONSE TO QUESTION

25   NUMBER 29 ALSO WHICH ASKED ABOUT PRIOR JURY SERVICE.  DO YOU

1   WANT TO TELL US ABOUT THAT?

2          THE PROSPECTIVE JUROR:  WELL, I HAVE BEEN CALLED

3   MANY TIMES, BUT I WAS ONLY ON TWO TRIALS.

4          THE COURT:  IN THIS COURT OR ACROSS THE STREET?

5          THE PROSPECTIVE JUROR:  ACROSS THE STREET.

6          THE COURT:  WHAT TYPE OF TRIALS DID YOU SIT ON?

7          THE PROSPECTIVE JUROR:  THE FIRST ONE WAS A

8   MALPRACTICE SUIT.

9          THE COURT:  WHAT ABOUT THE OTHER ONE?

10          THE PROSPECTIVE JUROR:  IT WAS A MURDER OF A YOUNG

11   BOY.

12          THE COURT:  AND WAS A DECISION REACHED BY THE JURY

13   IN THE MURDER CASE?

14          THE PROSPECTIVE JUROR:  YES.

15          THE COURT:  WAS THERE ANYTHING ABOUT YOUR

16   EXPERIENCE IN THAT CASE AS A JUROR THAT MIGHT AFFECT YOUR

17   ABILITY TO BE A FAIR JUROR IN THIS CASE?

18          THE PROSPECTIVE JUROR:  WELL, IT WAS REALLY

19   DIFFICULT BECAUSE -- YOU KNOW, OUR DECISION WAS GOING TO

20   AFFECT THE REST OF THIS BOY'S LIFE, SO IT WAS HARD.

21          THE COURT:  BUT WERE YOU STILL ABLE -- IT SHOULD

22   BE HARD.

23          THE PROSPECTIVE JUROR:  YES.

24          THE COURT:  WERE YOU STILL ABLE TO DO WHAT YOU

25   THOUGHT WAS APPROPRIATE?

102

1          THE PROSPECTIVE JUROR:  YES.

2          THE COURT:  AND WOULD YOU BE ABLE TO DO THE SAME

3    THING HERE?

4          THE PROSPECTIVE JUROR:  I THINK SO, YES.

5          THE COURT:  DO YOU HAVE ANY QUESTIONS ABOUT YOUR

6    ABILITY TO DO WHAT YOU WOULD BE OBLIGATED TO DO AS A JUROR

7    IF YOU ARE SELECTED IN THIS CASE?

8          THE PROSPECTIVE JUROR:  NO.

9          THE COURT:  ARE YOU TOTALLY CONFIDENT YOU CAN BE

10   FAIR TO BOTH SIDES?

11         THE PROSPECTIVE JUROR:  YES.

12         THE COURT:  GOVERNMENT?

13         MR. FITZGERALD:  GOOD MORNING.

14         THE PROSPECTIVE JUROR:  GOOD MORNING.

15         MR. FITZGERALD:  AND COULD YOU DESCRIBE TO US WHAT

16   YOU DO DAY TO DAY AT WORK?

17         THE PROSPECTIVE JUROR:  I WORK FOR IONA SENIOR

18   SERVICES.  IT'S A NONPROFIT TO HELP SENIORS.  WE HAVE SOCIAL

19   WORKERS, CASE MANAGERS.  WE ALSO PROVIDE EXERCISE CLASSES.

20   WE HAVE AN ADULT DAY-CARE CENTER.

21         AND I AM IN ADMINISTRATION.  I DO ACCOUNTING AND A

22   LOT OF DATA ENTRY AND JUST ADMINISTRATIVE HELP.

23         MR. FITZGERALD:  AND HOW LONG HAVE YOU DONE THAT

24   JOB?

25         THE PROSPECTIVE JUROR:  I HAVE BEEN THERE FOR 14

1    YEARS.

2            MR. FITZGERALD:  OKAY.  AND CAN YOU BRIEFLY

3    DESCRIBE WHERE YOU GREW UP?

4            THE PROSPECTIVE JUROR:  I GREW UP ON THE EASTERN

5    SHORE.  IT'S A LITTLE PLACE CALLED DONCASTER BETWEEN

6    ST. MICHAEL'S AND EASTON ON THE RIVER.

7            MR. FITZGERALD:  OKAY.  AND WHEN DID YOU MOVE TO

8    D.C.?

9            THE PROSPECTIVE JUROR:  AFTER I GRADUATED FROM

10   HIGH SCHOOL, I CAME TO D.C. TO A ONE-YEAR CAREER COLLEGE.

11   THEN I GOT AN APARTMENT WITH SOME GIRLFRIENDS, AND WE LIVED

12   AROUND THE AREA AND STARTED WORKING.  AND I HAVE BEEN HERE

13   EVER SINCE.

14           MR. FITZGERALD:  YOU MENTIONED IN YOUR PRIOR JURY

15   EXPERIENCE THERE WAS A MURDER CASE INVOLVING A YOUNG BOY.

16   WAS THE DEFENDANT A YOUNG BOY?

17           THE PROSPECTIVE JUROR:  YES.

18           MR. FITZGERALD:  WHAT ABOUT THE VICTIM?

19           THE PROSPECTIVE JUROR:  IT WAS ANOTHER -- ANOTHER

20   TEEN-AGER.

21           MR. FITZGERALD:  AND HOW LONG AGO DID YOU SIT ON

22   THAT JURY?

23           THE PROSPECTIVE JUROR:  I DON'T REMEMBER.  IT

24   WAS --

25           THE COURT:  APPROXIMATELY HOW MANY YEARS AGO?

1    THE PROSPECTIVE JUROR:  SEVERAL YEARS AGO.  I JUST

2  DON'T REMEMBER.

3    MR. FITZGERALD:  AND ARE YOU GLAD YOU SAT ON THE

4  JURY OR DO YOU WISH YOU HAD NOT SAT ON THE JURY?  HOW DID

5  YOU FEEL ABOUT THE EXPERIENCE AFTERWARDS?

6    THE PROSPECTIVE JUROR:  WELL, I FELT SAD.  I MEAN,

7  BUT IT WAS -- I THOUGHT I LEARNED A LOT.

8    MR. FITZGERALD:  AND -- EXPLAIN WHAT YOU MEAN BY

9  THAT.  I AM JUST CURIOUS.

10    THE PROSPECTIVE JUROR:  WELL, I JUST -- I LEARNED

11  A LOT, AND IT WAS QUITE AN EXPERIENCE.

12    MR. FITZGERALD:  AND DAY TO DAY, DO YOU READ ANY

13  PARTICULAR NEWSPAPERS?

14    THE PROSPECTIVE JUROR:  I USUALLY LOOK AT THE

15  FUNNIES.  I DON'T -- IN THE WASHINGTON POST.  BUT I DON'T

16  REALLY READ THE NEWS.

17    MR. FITZGERALD:  DO YOU FOLLOW ANY PARTICULAR NEWS

18  SHOWS?

19    THE PROSPECTIVE JUROR:  I USUALLY WATCH CHANNEL 7

20  NEWS, EVENING NEWS.

21    MR. FITZGERALD:  OKAY.  THANK YOU.

22    THE COURT:  DEFENSE?

23    MR. WELLS:  GOOD MORNING.

24    THE PROSPECTIVE JUROR:  GOOD MORNING.

25    MR. WELLS:  COULD YOU GIVE ME BRIEFLY YOUR

1   EDUCATIONAL BACKGROUND.

2         THE PROSPECTIVE JUROR:  I GRADUATED HIGH SCHOOL

3   AND THEN I WENT TO A ONE-YEAR CAREER COLLEGE.

4         MR. WELLS:  OKAY.  COULD YOU RELATE YOUR

5   EMPLOYMENT HISTORY?

6         THE PROSPECTIVE JUROR:  WELL, AFTER THE CAREER

7   COLLEGE, MY FIRST JOB WAS A RECEPTIONIST FOR A PHOTOGRAPHER.

8   I WORKED FOR HIM ABOUT THREE MONTHS, AND THEN HE LEFT THE

9   AREA.

10        AND IN THE MEANTIME, HE HAD TAKEN ME TO THIS

11   LITTLE RESTAURANT CALLED FOSTER'S.  IT WAS IN CLARENDON.

12   AND I STARTED SINGING AND PLAYING THE GUITAR IN THE EVENING.

13   SO WHEN THIS PHOTOGRAPHER LEFT, FOSTER SAID, OH, WHY DON'T

14   YOU COME WORK FOR ME FULL-TIME.  SO I DID.  AND I DID

15   EVERYTHING FROM MOP THE FLOORS, DO THE DISHES, DO THE SALAD,

16   AND WAIT TABLES.  AND IN THE EVENING I PLAYED MY GUITAR AND

17   SANG.

18        THEN I GOT A JOB AT THE ROYAL TYPEWRITER COMPANY

19   WHICH DOESN'T EXIST ANYMORE.  AND I WAS THERE FOR ABOUT FOUR

20   YEARS.  THEN I WORKED FOR U.S. NEWS AND WORLD REPORT FOR

21   FOUR YEARS.  I HAD MY FIRST SON, AND I WENT BACK AND I

22   WORKED ANOTHER FOUR YEARS.

23        MR. WELLS:  WHAT DID YOU DO AT U.S. NEWS AND WORLD

24   REPORT?

25        THE PROSPECTIVE JUROR:  I WORKED IN THE ECONOMIC

1    DEPARTMENT FOR THE ECONOMISTS.  I DID A LOT OF TYPING FOR

2    THEM.  AND THEN AFTER MY SECOND SON WAS BORN, I STAYED HOME

3    FOR 11 YEARS TO RAISE THEM.

4            AND THEN I WENT BACK TO U.S. NEWS AND WORLD REPORT

5    AND WORKED FOR ANOTHER FOUR YEARS.  AND THEY ELIMINATED MY

6    JOB.  AND THEN THAT'S WHEN I GOT THE JOB AT IONA.

7            MR. WELLS:  OKAY.  DO YOU HAVE ANY OPINION ONE WAY

8    OR THE OTHER AS TO THE ONGOING CONTROVERSY, AS TO WHETHER OR

9    NOT THE BUSH ADMINISTRATION HAS BEEN CANDID WITH THE

10   AMERICAN PUBLIC ABOUT THE REASONS FOR GOING TO WAR IN IRAQ?

11           THE PROSPECTIVE JUROR:  DO I THINK THAT THEY WERE

12   TELLING US THE TRUTH?  IS THAT WHAT YOU MEAN?

13           MR. WELLS:  YES.  ONE WAY OR THE OTHER.

14           THE PROSPECTIVE JUROR:  NO, I DON'T THINK THEY

15   WERE CANDID.  NO.

16           MR. WELLS:  OKAY.  DO YOU HAVE AN OPINION ABOUT

17   THE CANDOR OR CREDIBILITY OF VICE-PRESIDENT CHENEY?

18           THE PROSPECTIVE JUROR:  NO, I DON'T.

19           MR. WELLS:  TO WHAT EXTENT DOES YOUR BELIEF THAT

20   THE BUSH ADMINISTRATION MAY NOT HAVE BEEN CANDID ABOUT THE

21   REASONS TO GO TO WAR IMPACT, IF AT ALL -- OR HOW WOULD IT

22   IMPACT AT ALL ON HOW YOU MIGHT VIEW VICE-PRESIDENT CHENEY IF

23   HE WERE TO BE A WITNESS IN THIS CASE?

24           THE PROSPECTIVE JUROR:  I DON'T UNDERSTAND.

25           MR. WELLS:  WELL, YOU SAID, IF I HEARD YOU

1  CORRECTLY -- I THOUGHT I HEARD YOU SAY YOU DO NOT THINK THE

2  BUSH ADMINISTRATION HAS BEEN CANDID WITH THE AMERICAN PUBLIC

3  ABOUT THE REASONS FOR GOING TO WAR, CORRECT?

4        THE PROSPECTIVE JUROR:  RIGHT.

5        MR. WELLS:  AND --

6        THE PROSPECTIVE JUROR:  I MEAN, I THINK BUSH WAS

7  NOT CANDID, YES.

8        MR. WELLS:  OKAY.  SO IF PRESIDENT BUSH WAS A

9  WITNESS, YOU MIGHT HAVE SOME PROBLEMS WITH PRESIDENT BUSH?

10        THE PROSPECTIVE JUROR:  RIGHT.

11        MR. WELLS:  OKAY.  AND -- WELL, MY QUESTION, THEN,

12  IS, IF PRESIDENT BUSH'S VICE-PRESIDENT WERE TO SIT IN THAT

13  WITNESS CHAIR AND YOU WOULD HAVE TO JUDGE HIS CREDIBILITY,

14  WOULD THERE BE A POSSIBILITY THAT YOUR FEELINGS ABOUT THE

15  CREDIBILITY OF PRESIDENT BUSH WOULD BLEED OVER AND AFFECT IN

16  SOME WAY YOUR ABILITY TO FAIRLY JUDGE THE CREDIBILITY OF

17  VICE-PRESIDENT CHENEY?

18        THE PROSPECTIVE JUROR:  NO.  I DON'T THINK SO.

19        MR. WELLS:  OKAY.  NOW, MR. LIBBY, WHO IS THE

20  DEFENDANT IN THIS CASE, WAS THE CHIEF OF STAFF TO

21  VICE-PRESIDENT CHENEY, AND HE ALSO HELD THE TITLE OF

22  ASSISTANT TO PRESIDENT BUSH.  WOULD THE FACT THAT MR. LIBBY

23  HELD THOSE POSITIONS IN THE BUSH ADMINISTRATION -- WOULD

24  THAT AFFECT IN ANY WAY YOUR ABILITY TO BE A FAIR AND

25  IMPARTIAL JUROR IN MR. LIBBY'S CASE?

1      THE PROSPECTIVE JUROR:  NO.

2      MR. WELLS:  HAVE YOU EVER HAD A SITUATION WHERE

3  YOU THOUGHT WITH SOME DEGREE OF CONFIDENCE THAT SOME EVENT

4  HAD HAPPENED AND IT TURNED OUT LATER YOU WERE WRONG BECAUSE

5  YOU MISRECOLLECTED THE FACTS?

6      THE PROSPECTIVE JUROR:  I DON'T THINK SO.

7      MR. WELLS:  HAVE YOU EVER HAD A SITUATION WHERE

8  YOU AND A FRIEND HAD A DISAGREEMENT ABOUT SOMETHING THAT

9  HAPPENED IN THE PAST AND YOU TOOK ONE POSITION AND YOUR

10  FRIEND TOOK THE OTHER, AND IT TURNED OUT THAT ONE OF YOU WAS

11  RIGHT AND ONE OF YOU WAS WRONG?  HAVE YOU HAD THAT

12  EXPERIENCE?

13      THE PROSPECTIVE JUROR:  NO.

14      MR. WELLS:  OKAY.  DO YOU BELIEVE THAT PEOPLE

15  SOMETIMES FORGET THINGS?

16      THE PROSPECTIVE JUROR:  SURE.

17      MR. WELLS:  DO YOU BELIEVE THAT SOMETIMES WHEN

18  PEOPLE FORGET THINGS, THEY CAN MISRECOLLECT WHAT ACTUALLY

19  HAPPENED?

20      THE PROSPECTIVE JUROR:  OH, YES.

21      MR. WELLS:  OKAY.  DO YOU EVER WATCH THE NEWS SHOW

22  MEET THE PRESS WITH TIM RUSSERT?

23      THE PROSPECTIVE JUROR:  NO.

24      MR. WELLS:  DO YOU KNOW ANYTHING ABOUT TIM

25  RUSSERT?

1     THE PROSPECTIVE JUROR:  NO.

2     MR. WELLS:  DO YOU HAVE ANY FEELINGS ABOUT THE

3  CREDIBILITY, OR LACK THEREOF, OF REPORTERS IN GENERAL?

4     THE PROSPECTIVE JUROR:  NO, I DON'T HAVE ANY.

5     MR. WELLS:  OKAY.

6     I HAVE NO FURTHER QUESTIONS.

7     THE COURT:  APPROACH, PLEASE.

8     MISS, YOU CAN HAVE A SEAT ON ONE OF THOSE SEATS

9  RIGHT IN FRONT OF THE RAILING.

10     (AT THE BENCH.)

11     THE COURT:  STRIKES?

12     MR. FITZGERALD:  NO.

13     MR. WELLS:  NO.

14     (IN OPEN COURT.)

15     THE COURT:  OKAY, MISS.  WE ARE NOT GOING TO NEED

16  YOU UNTIL, HOPEFULLY, SOMETIME TOMORROW MORNING, SO YOU CAN

17  BE EXCUSED UNTIL 9:30.  REPORT TO THE JURORS LOUNGE WHERE

18  YOU CAME TODAY AT 9:30 TOMORROW.

19     DON'T TALK ABOUT THE CASE AND DON'T HAVE ANY

20  CONTACT WITH ANY NEWS MEDIA COVERAGE.  DON'T WATCH THE T.V.

21  DON'T READ THE NEWSPAPER.

22     THANK YOU.  HAVE A NICE DAY.

23     (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

24     (ANOTHER PROSPECTIVE JUROR ENTERING THE

25  COURTROOM.)

110

1          THE COURT:  OKAY.  YOU ARE JUROR NUMBER 1170?

2          THE PROSPECTIVE JUROR:  YES, YOUR HONOR.

3          THE COURT:  YOU HAD ONE RESPONSE TO QUESTION

4   NUMBER 3(B) WHICH ASKED WHETHER YOU HAVE READ OR HEARD

5   ANYTHING ABOUT THIS CASE IN THE MEDIA.  DO YOU WANT TO TELL

6   ME ABOUT THAT?

7          THE PROSPECTIVE JUROR:  I WATCH T.V., AND I HAVE,

8   YOU KNOW, BEEN AWARE OF THIS CASE.  I DON'T REALLY KNOW ANY

9   DETAIL ABOUT WHAT IT ENTAILS.  AND WHAT I LEARNED I REALLY

10  WAS NOT REALLY PAYING ATTENTION BECAUSE IT WAS NOT SOMETHING

11  THAT I WAS NECESSARILY FOLLOWING.

12         SO TO THE EXTENT THAT I HAVE KNOWLEDGE OF THIS

13  CASE, I WOULD SAY IT'S MINIMAL TO NOTHING.

14         THE COURT:  CAN YOU TELL US WHAT, IF ANY,

15  RECOLLECTION OF SPECIFICS YOU HAVE ABOUT THIS CASE, IF ANY?

16         THE PROSPECTIVE JUROR:  WELL, THE ONLY

17  RECOLLECTION THAT I HAVE IS THAT THERE IS A WOMAN -- AND,

18  AGAIN, I AM ONLY GOING BY WHAT THE MEDIA SAID; IT IS NOT

19  THAT I KNOW THAT THIS IS TRUE -- THAT A WOMAN WAS EXPOSED

20  THROUGH SOME SITUATION, AND SHE WAS A MEMBER OF THE C.I.A.

21  THAT'S ALL I KNOW.

22         THE COURT:  WOULD YOU BE ABLE TO, IF YOU WERE

23  SELECTED AS A JUROR IN THIS CASE, DISREGARD THAT INFORMATION

24  THAT YOU HEARD AND JUDGE THIS CASE SOLELY UPON WHAT YOU SEE

25  AND HEAR IN THIS COURTROOM?

1    THE PROSPECTIVE JUROR:  ABSOLUTELY.

2    THE COURT:  HAVE YOU -- OR DID YOU FORM ANY

3  OPINION ABOUT THE CASE BASED UPON WHAT YOU HEARD?

4    THE PROSPECTIVE JUROR:  NO, I DIDN'T, BECAUSE

5  THERE WASN'T ENOUGH INFORMATION FOR ME TO MAKE A

6  DETERMINATION.

7    THE COURT:  SO ARE YOU TOTALLY CONFIDENT YOU CAN

8  BE FAIR TO BOTH SIDES IN THIS CASE?

9    THE PROSPECTIVE JUROR:  ABSOLUTELY.

10    THE COURT:  GOVERNMENT?

11    MR. FITZGERALD:  GOOD MORNING.

12    THE PROSPECTIVE JUROR:  GOOD MORNING.

13    MR. FITZGERALD:  CAN YOU TELL US WHAT YOU DO DAY

14  TO DAY AT YOUR JOB?

15    THE PROSPECTIVE JUROR:  YES.  I WORK FOR LOCKHEED

16  MARTIN CORPORATION, AND I WORK IN BUSINESS DEVELOPMENT.  MY

17  JOB IS TO GO AFTER BIG JOBS FOR THE COMPANY.  CURRENTLY, I

18  AM CHASING ABOUT A BILLION DOLLARS WORTH OF BUSINESS.

19    MR. FITZGERALD:  OKAY.  DO YOU NEED A SECURITY

20  CLEARANCE IN THE COURSE OF YOUR JOB?

21    THE PROSPECTIVE JUROR:  NO, I DO NOT.  IT WOULD BE

22  HELPFUL IF I HAD ONE, AND I AM ACTUALLY GOING TO REQUEST

23  THAT I GET ONE BECAUSE SOME OF MY CUSTOMERS DO TALK IN

24  CLOSED ENVIRONMENTS AND THEY DO LIKE TO KNOW THAT THE FOLKS

25  THAT THEY ARE TALKING TO HAVE CLEARANCES.  SO I AM GOING TO

1    REQUEST THAT I GET ONE.  I AM NOT ANXIOUS ABOUT GETTING IT.

2    IF I GET ONE, IT WOULD BE HELPFUL IN DOING MY DAY-TO-DAY

3    WORK.

4           MR. FITZGERALD:  AND WHY ARE YOU NOT ANXIOUS TO

5    GET ONE?

6           THE PROSPECTIVE JUROR:  IT'S NOT THAT I AM NOT

7    ANXIOUS.  IT DOESN'T PREVENT ME OR PRECLUDE ME FROM GOING

8    AFTER THE BUSINESS THAT I AM DOING NOW.  BUT THERE IS ONE

9    PARTICULAR JOB THAT I AM WORKING ON NOW THAT I AM NOT ABLE

10   TO GO AND VISIT WITH THE CUSTOMER BECAUSE I DON'T HAVE THE

11   CLEARANCE.  BUT I CAN SEND SOMEONE ELSE ON MY BEHALF.

12          MR. FITZGERALD:  AND I TAKE IT YOU WERE NOT BORN

13   IN WASHINGTON, D.C.

14          THE PROSPECTIVE JUROR:  I WAS NOT.

15          MR. FITZGERALD:  OKAY.  CAN YOU TELL US WHERE YOU

16   GREW UP AND HOW YOU CAME TO LIVE IN D.C.

17          THE PROSPECTIVE JUROR:  YES.  I WAS BORN AND

18   RAISED IN AN AREA CALLED WORSTESHIRE IN ENGLAND.  AND I

19   MARRIED MY EX-HUSBAND.  WE CAME TO THIS COUNTRY BECAUSE HE

20   IS A SCIENTIST AND HE DID HIS WORK AT M.I.T. IN BOSTON.  AND

21   WE LIVED TOGETHER FOR MORE THAN 25 YEARS IN THE

22   MASSACHUSETTS AREA.  AND THEN, AS A RESULT OF HIS WORK AND

23   THE AMOUNT OF DEVOTION THAT HE HAD WITH HIS WORK, WE DECIDED

24   TO MUTUALLY PART WAYS.  AND THEN I GOT A JOB OFFER IN D.C.

25   TO GO AND WORK AT THE U.S. SENATE WHERE I MANAGED ALL OF THE

1    I.T. FOR ALL OF THE SENATE OFFICES, THE COMMITTEES, AND THE

2    STATES AROUND THE COUNTRY.  AND I DID THAT JOB FOR TWO

3    YEARS.

4          MR. FITZGERALD:  AND WHAT YEARS DID YOU WORK AT

5    THE SENATE?

6          THE PROSPECTIVE JUROR:  2000 TO 2002.

7          MR. FITZGERALD:  WAS THAT WHEN YOU FIRST MOVED TO

8    D.C.?

9          THE PROSPECTIVE JUROR:  YES.

10         MR. FITZGERALD:  AND CAN YOU TELL US WHAT

11   NEWSPAPERS YOU READ DAY TO DAY?

12         THE PROSPECTIVE JUROR:  I DON'T NORMALLY READ

13   NEWSPAPERS DAY TO DAY.

14         MR. FITZGERALD:  OKAY.  DO YOU FOLLOW ANY

15   PARTICULAR NEWS PROGRAMS ON T.V.?

16         THE PROSPECTIVE JUROR:  I DO FOLLOW SOME THAT I

17   LIKE.  I LIKE MEET THE PRESS ON SUNDAYS.  I WATCH THAT

18   OCCASIONALLY.  I MAY WATCH, YOU KNOW, THE NORMAL EVENING

19   NEWS BUT NOT ALWAYS.  I HAVE OTHER -- WHEN I COME HOME FROM

20   WORK, YOU KNOW, I HAVE OTHER OBLIGATIONS.  I HAVE TWO DOGS

21   THAT I TAKE CARE OF.  I HAVE TO WALK THEM, AND -- WELL, I

22   DON'T HAVE TO, BUT I DO WALK THEM, AND THAT USUALLY TAKES

23   ABOUT AN HOUR OF MY TIME.  SO -- BUT USUALLY BY THE TIME I

24   GET BACK, THE NEWS IS OVER.

25         MR. FITZGERALD:  AND IF A PARTICULAR PROGRAM ON

1   MEET THE PRESS WERE TO BE PART OF THE EVIDENCE IN THIS CASE,

2   THE FACT THAT SOMEONE APPEARED ON MEET THE PRESS AND IF

3   MR. RUSSERT FROM MEET THE PRESS WERE TO APPEAR AS A WITNESS,

4   WOULD YOU BE ABLE TO PUT ASIDE THAT MR. RUSSERT YOU KNOW

5   THROUGH THE T.V. SET AND JUDGE HIM ON THE WITNESS STAND AS

6   ANY OTHER WITNESS AND JUDGE HIS CREDIBILITY BASED UPON WHAT

7   HE SAID?

8           THE PROSPECTIVE JUROR:  WELL, I WOULD BECAUSE I

9   THINK THAT TIM RUSSERT, WHEN HE HAS, YOU KNOW, FOLKS ON HIS

10  SHOW, THAT HE TENDS TO RUN A BALANCED SHOW, AND HE GIVES --

11  ALLOWS OPINIONS FROM BOTH SIDES WHO ARE TALKING.  SO I DON'T

12  BELIEVE THAT WHAT HE HAS TO SAY OR HIS BIASES WOULD

13  INFLUENCE MINE IN TERMS OF THIS TRIAL.

14          MR. FITZGERALD:  OKAY.  THANK YOU.

15          THE COURT:  DEFENSE?

16          MR. JEFFRESS:  I THINK IT IS ACTUALLY GOOD

17  AFTERNOON.

18          THE PROSPECTIVE JUROR:  GOOD AFTERNOON.

19          MR. JEFFRESS:  DO YOU -- IN YOUR JOB AT LOCKHEED

20  MARTIN, DO YOU DEAL PRIMARILY WITH THE PENTAGON?  WITH THE

21  DEFENSE DEPARTMENT?

22          THE PROSPECTIVE JUROR:  NO, I DON'T.  PRIMARILY

23  THE JOBS THAT I AM WORKING ON RIGHT NOW, ONE IS SOUTHCOM,

24  WHICH IS IN MIAMI, AND THAT IS A JOINT EFFORT.

25          AND THEN THE OTHER TWO THAT I AM WORKING ON I AM

1  NOT OBVIOUSLY INVOLVED INTIMATELY.  I KNOW OF THE JOBS, BUT

2  ONE -- BUT THEY ARE BOTH IN IRAQ AND AFGHANISTAN.

3          MR. JEFFRESS:  IS THIS LOCKHEED MARTIN INFORMATION

4  SYSTEMS OR ANOTHER --

5          THE PROSPECTIVE JUROR:  IT'S L.M.I.T.  I DON'T

6  KNOW IF YOU'RE --

7          MR. JEFFRESS:  IT'S L.M.I.T.?

8          THE PROSPECTIVE JUROR:  YES.

9          MR. JEFFRESS:  DO YOU KNOW WHO THE GENERAL COUNSEL

10  OF LOCKHEED IS?

11          THE PROSPECTIVE JUROR:  NOT INTIMATELY.  I MEAN,

12  AT MY LEVEL, I KNOW THE LADY THAT IS AT MY LEVEL, BUT NOT AT

13  THE HIGHER LEVEL, NO.

14          MR. JEFFRESS:  I UNDERSTAND.  SO -- JUST ONE OTHER

15  THING.  I ASKED YOU ABOUT THE DEFENSE DEPARTMENT.  YOU SAY

16  YOU HAVE, I THINK YOU SAID, A BILLION DOLLARS WORTH OF WORK

17  THAT YOU ARE PUSHING RIGHT NOW.

18          THE PROSPECTIVE JUROR:  THAT I AM CHASING, YES.

19          MR. JEFFRESS:  CHASING.

20          THE PROSPECTIVE JUROR:  YES.

21          MR. JEFFRESS:  IS ANY OF THAT WITH THE STATE

22  DEPARTMENT?

23          THE PROSPECTIVE JUROR:  NO, IT'S -- WELL, ONE OF

24  THEM IS WITH THE STATE DEPARTMENT, BUT I AM NOT ULTIMATELY

25  RESPONSIBLE FOR THAT JOB.  I DID THE PRE-R.F.P. RESPONSE.

1   IF IT BECOMES A REAL R.F.P., A REQUEST FOR PROPOSAL, THEN

2   THAT MAY BE TURNED OVER TO SOMEONE ELSE BECAUSE I DID A -- I

3   WROTE A WHITE PAPER RESPONSE TO THE REQUEST.  AND THIS JOB

4   IS ACTUALLY QUITE SMALL FOR LOCKHEED.

5            MR. JEFFRESS:  HAVE YOU CHASED ANY BUSINESS WITH

6   THE -- OR FOR THE C.I.A.?

7            THE PROSPECTIVE JUROR:  NO.

8            MR. JEFFRESS:  NOW, I RECALL YOU SAID THAT YOU

9   HAVE BEEN AWARE OF THE CASE FROM T.V. BUT REALLY DON'T

10  BELIEVE THAT YOU REMEMBER, AT LEAST, ANY OF THE DETAILS

11  ABOUT IT.  IN WATCHING T.V., HAVE YOU SEEN ANYTHING THAT ANY

12  OF THE LAWYERS IN THE CASE HAVE SAID ABOUT THE CHARGES

13  AGAINST MR. LIBBY?

14           THE PROSPECTIVE JUROR:  NO, I HAVE NOT.

15           MR. JEFFRESS:  HAVE YOU SEEN ON T.V. ANYTHING

16  ABOUT WHAT JOURNALISTS, MR. RUSSERT OR ANY OTHER JOURNALIST,

17  HAS SAID ABOUT THIS CASE?

18           THE PROSPECTIVE JUROR:  I DON'T RECALL THAT I HAVE

19  HEARD ANY OF THESE FOLKS DISCUSS THIS CASE AT ALL.  I JUST

20  HEARD THIS ON THE NEWS MAYBE A YEAR AGO.  I FORGET HOW LONG

21  AGO THIS WAS.  AND THEN I REALLY DISMISSED IT.  I DIDN'T

22  REALLY PAY ANY ATTENTION TO IT.

23           MR. JEFFRESS:  DO YOU REMEMBER WHETHER THAT WAS

24  TELEVISION OR RADIO OR NEWSPAPER?

25           THE PROSPECTIVE JUROR:  NO, IT WAS ON THE NEWS.

117

1      MR. JEFFRESS:  ON THE T.V. NEWS?

2      THE PROSPECTIVE JUROR:  YES.

3      MR. JEFFRESS:  YES.  AND DO YOU REMEMBER WHO YOU

4  WERE LOOKING AT?

5      THE PROSPECTIVE JUROR:  NOT REALLY.  I DO NOT.

6      I MEAN, IF YOU WERE GOING TO ASK ME TO SIT ON THE

7  STAND NOW AND SAY, WHAT DO YOU RECALL OF THESE EVENTS, I --

8  THEY ARE SO VAGUE I WOULD NOT BE ABLE TO, YOU KNOW, GIVE YOU

9  SOMETHING CATEGORICAL THAT I CAN RECALL OTHER THAN WHAT I

10  JUST STATED WHEN I FIRST STARTED TALKING.

11      MR. JEFFRESS:  AND KNOWING THAT YOU -- DO YOU

12  WATCH MEET THE PRESS REGULARLY, PRETTY MUCH EVERY SUNDAY?

13      THE PROSPECTIVE JUROR:  I WATCH IT, LIKE, TWICE A

14  MONTH.

15      MR. JEFFRESS:  DO YOU RECALL SEEING A MR. WILSON,

16  JOSEPH WILSON, AN EX-AMBASSADOR -- DO YOU RECALL EVER SEEING

17  HIM ON THE MEET THE PRESS SHOW?

18      THE PROSPECTIVE JUROR:  NO, I DON'T EVEN KNOW WHO

19  HE IS.

20      MR. JEFFRESS:  AND YOUR OPINION OF TIM RUSSERT --

21  HE MAY TESTIFY AS A WITNESS IN THIS CASE.

22      THE PROSPECTIVE JUROR:  UH-HUH.

23      MR. JEFFRESS:  KNOWING THAT YOU DO HAVE AN OPINION

24  ABOUT HIM, THAT HE IS BALANCED, WOULD YOU TEND TO GIVE HIM

25  GREATER CREDIBILITY THAN YOU MIGHT GIVE TO SOME WITNESS THAT

118

```
1   YOU HAVE NEVER HEARD OF OR NEVER SEEN WHO DISAGREES WITH

2   HIM?

3            THE PROSPECTIVE JUROR:  NO, I WOULDN'T HAVE ANY

4   OPINIONS ON HIS TESTIMONY BECAUSE WHEN I SAY THAT -- WHEN

5   I -- IF I GET TO FIND OUT WHAT THE BIG PICTURE IS IN TERMS

6   OF ALL OF THE FACTS THAT ARE PRESENTED TO ME ABOUT THIS

7   CASE, I WOULD WEIGH IN HIS STATEMENTS WITH OTHER STATEMENTS

8   THAT ARE BEING MADE.  I WOULDN'T BE BIASED ABOUT WHAT HE HAS

9   TO SAY, OR UNBIASED.

10           I WOULD LISTEN TO THE STATEMENTS THAT -- WELL, THE

11  QUESTIONS THAT HE IS BEING ASKED AND THEN WEIGH THOSE

12  QUESTIONS AND ANSWERS WITH ALL OF THE INFORMATION THAT IS

13  PRESENTED TO ME.

14           MR. JEFFRESS:  WELL, LET ME BE VERY SPECIFIC.  I

15  MEAN, LET'S SUPPOSE THAT TIM RUSSERT TESTIFIED THAT

16  SOMETHING HAPPENED ONE WAY, AND LET'S SUPPOSE THAT

17  MR. LIBBY, WHO IS ON TRIAL HERE, TESTIFIED THAT HE RECALLS

18  IT HAPPENED A DIFFERENT WAY.

19           NOW, WOULD MR. LIBBY -- KIND OF KNOWING WHAT YOU

20  KNOW ABOUT MR. RUSSERT -- WOULD HE START WITH KIND OF A

21  STRIKE AGAINST HIM IN YOUR JUDGMENT OF THE CREDIBILITY OF

22  THOSE TWO WITNESSES?

23           THE PROSPECTIVE JUROR:  ABSOLUTELY NOT.

24           MR. JEFFRESS:  ALL RIGHT.  HOW ABOUT YOUR VIEWS OF

25  THE CREDIBILITY OF THE BUSH ADMINISTRATION?  YOU ARE
```

1   FAMILIAR WITH THE CONTROVERSY OVER WHETHER -- OVER THE

2   CREDIBILITY OF STATEMENTS THAT WERE MADE ABOUT WEAPONS OF

3   MASS DESTRUCTION AND SO FORTH BEFORE THE IRAQ WAR?  YOU HAVE

4   PROBABLY DISCUSSED THAT; CERTAINLY YOU HAVE READ ABOUT THAT?

5           THE PROSPECTIVE JUROR:  YES.

6           MR. JEFFRESS:  DO YOU HAVE AN OPINION ABOUT THAT,

7   ABOUT THE CREDIBILITY OF THE ADMINISTRATION AND ITS REASONS

8   FOR GOING TO WAR?

9           THE PROSPECTIVE JUROR:  WELL, I RESPECT THE

10  COMMANDER IN CHIEF FOR MAKING THE DECISION TO GO TO IRAQ.  I

11  SUPPORT THAT DECISION.  OBVIOUSLY -- I MEAN, YOU ARE NOT

12  AWARE OF THIS, BUT MY HUSBAND IS A RESERVIST -- A MOBILIZED

13  RESERVIST, AND HE IS ACTIVE DUTY AND HE HAS ALREADY BEEN

14  MOBILIZED TO IRAQ, SO I HAVE OBVIOUSLY SOME PERSONAL, YOU

15  KNOW, EMOTION, I GUESS.  BUT I AM NOT BIASED AS FAR AS, YOU

16  KNOW, HOW IT'S BEING HANDLED AND HOW WE ARE ATTEMPTING TO

17  GET OUT OF THIS SITUATION.

18          I FEEL THAT IT IS SOMETHING THAT, YOU KNOW, THE

19  ADMINISTRATION IS HANDLING, AND I AM NOT BIASED ABOUT HOW

20  THEY ARE HANDLING THAT IN ANY WAY.

21          MR. JEFFRESS:  AS TO THE VICE-PRESIDENT, YOU KNOW

22  MR. LIBBY WAS CHIEF ASSISTANT TO VICE-PRESIDENT CHENEY.  DO

23  YOU HAVE AN OPINION AS TO HIS CREDIBILITY, THE

24  VICE-PRESIDENT?

25          THE PROSPECTIVE JUROR:  I DON'T HAVE AN OPINION

1    ABOUT HIS CREDIBILITY.

2          MR. JEFFRESS:  DO YOU HAVE AN OPINION -- LET'S SAY

3    HE WERE TO COME AND TESTIFY.  WHATEVER OPINION YOU MIGHT

4    HAVE ABOUT HIM, HIS POLICIES, HIS CREDIBILITY, WHATEVER,

5    WOULD YOU -- IS THERE ANYTHING THAT MIGHT MAKE YOU DOUBT HIS

6    CREDIBILITY AS A WITNESS ON THE STAND?

7          THE PROSPECTIVE JUROR:  I DON'T HAVE ANY REASON TO

8    BELIEVE THAT.

9          MR. JEFFRESS:  DO YOU LISTEN TO N.P.R.?

10          THE PROSPECTIVE JUROR:  NO.

11          MR. JEFFRESS:  AND WHICH OF THE NEWS PROGRAMS DO

12    YOU TEND TO -- OTHER THAN MEET THE PRESS -- I MEAN, DO YOU

13    TEND TO WATCH THE EVENING NEWS ON A DAILY BASIS?

14          THE PROSPECTIVE JUROR:  I WATCH N.B.C. EVENING

15    NEWS FROM 7:00 TO 7:30.  AND THAT'S THE ONLY NEWS I WATCH.

16    I WATCH THE NEWS IN THE MORNING BEFORE I GO TO WORK MAINLY

17    TO SEE WHAT THE WEATHER IS.  AND, YOU KNOW, I'M NOT -- I

18    WATCH THE LOCAL NEWS, BUT NOT, YOU KNOW -- I DON'T FLIP

19    AROUND THE CHANNELS.  I DON'T REALLY HAVE TIME TO DO THAT IN

20    THE MORNING.

21          MR. JEFFRESS:  TWO OTHER QUESTIONS -- TWO OTHER

22    AREAS.  ONE IS YOU REMEMBER -- YOU DID REMEMBER THAT THERE

23    WAS A WOMAN WHO WORKED FOR THE C.I.A. WHO WAS OUTED, I THINK

24    YOU SAID, AND THAT IS WHAT THIS INVESTIGATION WAS ALL ABOUT.

25          THE PROSPECTIVE JUROR:  UH-HUH.

1    MR. JEFFRESS:  ARE YOU FAMILIAR -- DO YOU BELIEVE

2  THAT YOU ARE FAMILIAR WITH THE C.I.A. AT LEAST TO THE EXTENT

3  OF KNOWING HOW MANY PEOPLE WHO WORK FOR THE C.I.A. ARE

4  COVERT?

5    THE PROSPECTIVE JUROR:  I HAVE NO IDEA.

6    MR. JEFFRESS:  NO IDEA?

7    THE PROSPECTIVE JUROR:  NO IDEA AT ALL.

8    MR. JEFFRESS:  DO YOU EVEN RECOGNIZE THE WORD

9  "COVERT"?

10    THE PROSPECTIVE JUROR:  I DO.

11    MR. JEFFRESS:  WHAT DOES THAT MEAN TO YOU?

12    THE PROSPECTIVE JUROR:  UNDERCOVER.

13    MR. JEFFRESS:  OKAY.  AND THEN, FINALLY, JUDGE

14  WALTON ASKED YOU YESTERDAY MORNING SOME QUESTIONS ABOUT

15  MEMORY.  DO YOU REMEMBER THAT?

16    THE PROSPECTIVE JUROR:  YES.

17    MR. JEFFRESS:  HAS IT EVER HAPPENED TO YOU THAT

18  YOU HAVE BEEN -- ABSOLUTELY INSISTED THAT SOMETHING HAPPENED

19  ONE WAY AND THEN COME TO FIND OUT LATER YOU WERE WRONG?

20    THE PROSPECTIVE JUROR:  I HAVE.

21    MR. JEFFRESS:  DO YOU TEND TO BELIEVE THAT IF TWO

22  PEOPLE DISAGREE ABOUT SOMETHING THAT -- SOME EVENT IN THE

23  PAST, THAT ONE OF THEM MUST BE LYING?

24    THE PROSPECTIVE JUROR:  NOT NECESSARILY.

25    MR. JEFFRESS:  HOW WOULD YOU GO ABOUT TRYING TO

122

1   DECIDE WHETHER THIS IS AN HONEST RECOLLECTION OR WHETHER

2   SOMEBODY IS SIMPLY DELIBERATELY NOT TELLING THE TRUTH?

3           THE PROSPECTIVE JUROR:  I WOULD WANT TO GET ALL

4   THE FACTS IN FRONT OF ME TO MAKE A DECISION.

5           MR. JEFFRESS:  YOU HAVE NEVER SERVED ON A JURY, I

6   BELIEVE; IS THAT RIGHT?

7           THE PROSPECTIVE JUROR:  NO, I HAVE NOT.

8           MR. JEFFRESS:  HAVE YOU HEARD THE TERM "REASONABLE

9   DOUBT"?

10          THE PROSPECTIVE JUROR:  YES, I HAVE.

11          MR. JEFFRESS:  DO YOU KNOW WHAT THAT MEANS?  OR DO

12  BELIEVE YOU KNOW WHAT THAT MEANS?

13          THE PROSPECTIVE JUROR:  I BELIEVE I DO.

14          MR. JEFFRESS:  COULD YOU, IF YOU SAT ON A JURY IN

15  THIS CASE, BASED ON EVERYTHING YOU HAVE READ OR HEARD OR ANY

16  OPINIONS YOU MAY HAVE ABOUT THE BUSH ADMINISTRATION OR

17  OTHERWISE, REQUIRE THE GOVERNMENT TO PROVE TO YOU BEYOND A

18  REASONABLE DOUBT THE GUILT OF MR. LIBBY BEFORE YOU WOULD

19  FIND HIM GUILTY?

20          THE PROSPECTIVE JUROR:  COULD YOU REPEAT THAT?

21          MR. JEFFRESS:  YES.  DO YOU BELIEVE, BASED ON

22  EVERYTHING YOU KNOW OR MAY THINK YOU KNOW ABOUT THE CHARGES

23  IN THIS CASE AND ALL OPINIONS YOU HAVE, IF YOU SERVED AS A

24  JUROR IN THIS CASE, COULD YOU REQUIRE THE GOVERNMENT TO

25  PROVE BEYOND A REASONABLE DOUBT THE CHARGES THAT IT HAS MADE

1   BEFORE YOU WOULD VOTE TO FIND MR. LIBBY GUILTY?

2          THE PROSPECTIVE JUROR:  WELL, I WOULD HOPE THAT

3   THAT WOULD BE THE CASE, THAT THE PROSECUTION WOULD WANT TO

4   LAY THEIR CASE OUT IN FRONT OF THE JURY SO THAT WE COULD

5   MAKE A REASONABLE DETERMINATION AS TO WHETHER THE

6   INFORMATION THAT THEY ARE PROVIDING IS ENOUGH FOR US TO MAKE

7   A DETERMINATION.

8          MR. JEFFRESS:  WOULD YOU EXPECT MR. LIBBY TO COME

9   FORWARD WITH EVIDENCE?

10         THE PROSPECTIVE JUROR:  I WOULD EXPECT THAT

11  MR. LIBBY WOULD COME FORWARD WITH EVIDENCE, YES.

12         MR. JEFFRESS:  LET'S SUPPOSE HE DIDN'T.

13         THE PROSPECTIVE JUROR:  OR -- WELL, MAYBE I

14  SHOULDN'T SAY EVIDENCE.  MAYBE THAT'S THE WRONG CHOICE OF

15  WORDS.  BUT CERTAINLY TO BE ABLE TO DEFEND HIMSELF.

16         MR. JEFFRESS:  IF YOU ONLY HEARD THE GOVERNMENT'S

17  CASE AND YOU -- OF COURSE I CAN'T TELL YOU WHAT THAT WOULD

18  BE OR NOT BE.  BUT LET'S SAY MR. LIBBY HAS DECIDED NOT TO

19  CALL ANY WITNESSES OF HIS OWN AND DECIDED NOT TO TESTIFY.

20  IS THAT SOMETHING THAT YOU WOULD WEIGH IN YOUR DECISION

21  WHETHER HE WAS GUILTY OR NOT GUILTY?

22         THE PROSPECTIVE JUROR:  I WOULDN'T -- I WOULD NOT

23  ASSUME THAT HE WAS GUILTY BASED ON THE FACT THAT HE DECIDES

24  NOT TO BRING WITNESSES FORTH.  THAT'S HIS PREROGATIVE.  IF

25  HE CHOOSES NOT TO BRING WITNESSES FORWARD, THAT'S HIS

1   CHOICE.

2           AND I THINK, AS THE CASE IS LAID OUT, WE WOULD BE

3   ABLE TO DETERMINE WHY HE CHOSE NOT TO DO THAT BASED ON THE

4   INFORMATION THAT WE GET.

5           MR. JEFFRESS:  OKAY.  I JUST -- I DON'T MEAN TO

6   REPEAT MYSELF, BUT I JUST AM NOT SURE I UNDERSTOOD YOUR

7   PRIOR ANSWER.  DO YOU -- COULD YOU ASSURE US THAT BEFORE YOU

8   WOULD VOTE AS A JUROR TO CONVICT MR. LIBBY OF ANY CHARGES,

9   THAT YOU WOULD REQUIRE THE GOVERNMENT TO PROVE THOSE CHARGES

10  TO YOU BEYOND A REASONABLE DOUBT?

11          THE PROSPECTIVE JUROR:  ABSOLUTELY.

12          MR. JEFFRESS:  THANK YOU.

13          MR. FITZGERALD:  MAY I ASK A COUPLE BRIEF

14  QUESTIONS?

15          I UNDERSTAND THAT YOU DON'T HAVE ANY FEELINGS --

16  YOU SUPPORT THE COMMANDER IN CHIEF'S DECISION TO GO INTO

17  IRAQ AND TO CONDUCT HIMSELF THE WAY HE HAS.  MY QUESTION IS,

18  IF YOU WERE TO HEAR EVIDENCE IN THIS CASE THAT THERE WAS A

19  DISPUTE WHERE SOME PEOPLE WERE CRITICIZING THE PRESIDENT'S

20  DECISION TO GO TO WAR, DO YOU HAVE STRONG FEELINGS ABOUT

21  PEOPLE THAT WOULD CRITICIZE THE COMMANDER IN CHIEF?

22          THE PROSPECTIVE JUROR:  NO, I DO NOT.

23          MR. FITZGERALD:  AND THE SECOND QUESTION IS WITH

24  REGARD TO THE VICE-PRESIDENT --

25          THE PROSPECTIVE JUROR:  CAN I FOLLOW UP WITH WHY I

125

1    SAY THAT?

2           MR. FITZGERALD:  SURE.

3           THE PROSPECTIVE JUROR:  BECAUSE THEY DON'T

4    NECESSARILY HAVE ALL THE FACTS BECAUSE WHAT IS BEING

5    PRESENTED TO US IN THE MEDIA AND WHAT IS GOING ON BEHIND

6    CLOSED DOORS AT THE WHITE HOUSE -- WITHOUT YOU BEING THERE

7    AND WITHOUT KNOWING WHAT DISCUSSIONS ARE BEING HAD, HOW CAN

8    YOU HAVE OPINIONS ON THAT?

9           MR. FITZGERALD:  AND WITH REGARD TO THE

10   VICE-PRESIDENT, IF THE VICE-PRESIDENT WERE TO COME IN HERE

11   AND TESTIFY AND SIT IN THE VERY SEAT YOU ARE SITTING IN NOW

12   AND YOU WERE SITTING IN THE JURY BOX, WOULD YOU BE ABLE TO

13   JUDGE HIS CREDIBILITY LIKE ANY OTHER WITNESS AND PUT ASIDE

14   THE FACT THAT HE IS THE SECOND HIGHEST-RANKING OFFICIAL IN

15   THE COUNTRY AND JUST JUDGE HIS CREDIBILITY THE WAY YOU WOULD

16   A WITNESS WHO DIDN'T EVEN WORK FOR THE GOVERNMENT?

17          THE PROSPECTIVE JUROR:  ABSOLUTELY.  BECAUSE HE IS

18   A MAN, AND HE HAS SET ASIDE HIS JOB TITLE OR WHERE HE IS

19   WORKING -- HE IS HERE TO SPEAK HONESTLY ABOUT WHATEVER

20   QUESTIONS YOU ARE ASKING HIM, AND HE IS GOING TO GIVE THOSE

21   HONEST ANSWERS BACK.

22          SO I WOULD SAY THAT THAT WOULD HAVE NO BEARING ON

23   IT.

24          MR. FITZGERALD:  AND IF YOU HAD TO DETERMINE

25   WHETHER HIS TESTIMONY WAS ACCURATE VERSUS SOMEBODY ELSE'S

1   TESTIMONY WAS ACCURATE, WOULD HE STAND EITHER AHEAD OR

2   BEHIND THE OTHER WITNESSES?

3           THE PROSPECTIVE JUROR:  I CANNOT ANSWER THAT IT

4   WOULD BE LEFT OR RIGHT.  I MEAN, AGAIN, WITHOUT HAVING ALL

5   THE FACTS PRESENTED TO YOU, IT WOULD BE DIFFICULT TO WEIGH

6   HIM IN OVER SOMEONE ELSE.

7           MR. FITZGERALD:  OKAY.  THANK YOU.

8           THE COURT:  WOULD HE START OUT JUST LIKE SOMEBODY

9   ELSE?

10          THE PROSPECTIVE JUROR:  ABSOLUTELY.

11          THE COURT:  MISS, CAN YOU HAVE A SEAT ON ONE OF

12  THOSE SEATS RIGHT IN FRONT OF THE RAILING?  THANK YOU.

13          THE PROSPECTIVE JUROR:  THANK YOU.

14          (AT THE BENCH.)

15          THE COURT:  ANY REQUEST FOR STRIKES?

16          MR. FITZGERALD:  NO.

17          MR. JEFFRESS:  NO.

18          (IN OPEN COURT.)

19          THE COURT:  WE WON'T NEED YOU UNTIL TOMORROW,

20  HOPEFULLY SOMETIME TOMORROW MORNING.  SO YOU WILL NEED TO BE

21  BACK AT 9:30 IN THE JURORS LOUNGE WHERE YOU CAME TO TODAY ON

22  THE 4TH FLOOR.

23          DON'T TALK ABOUT THE CASE WITH ANYBODY.  DON'T

24  TALK ABOUT WHAT YOU TOLD US HERE TODAY.  AND DON'T HAVE ANY

25  CONTACT WITH ANY MEDIA COVERAGE, NEWSPAPER, RADIO, OR T.V.

1    THANK YOU.  HAVE A NICE DAY.

2              (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

3              THE COURT:  THIS WILL BE THE LAST ONE WE WILL DO

4    BEFORE LUNCH.

5              (ANOTHER PROSPECTIVE JUROR ENTERING THE

6    COURTROOM.)

7              THE COURT:  MISS, YOU ARE JUROR NUMBER 0677?

8              THE PROSPECTIVE JUROR:  THAT'S RIGHT.

9              THE COURT:  GOOD AFTERNOON.

10             THE PROSPECTIVE JUROR:  GOOD AFTERNOON.

11             THE COURT:  YOU HAD A RESPONSE TO QUESTION NUMBER

12   3(A) WHICH ASKED WHETHER YOU HAVE HEARD OR READ ANYTHING

13   ABOUT THIS CASE IN THE MEDIA.  DO YOU WANT TO TELL US ABOUT

14   THAT?

15             THE PROSPECTIVE JUROR:  YES.  I HAVE READ ABOUT

16   THE CASE IN THE MEDIA AND SEEN IT ON TELEVISION.

17             THE COURT:  AND DO YOU REMEMBER EXACTLY WHAT YOU

18   READ AND HEARD?

19             THE PROSPECTIVE JUROR:  THIS IS, OF COURSE, BEFORE

20   I CAME TO BECOME A JUROR.  I DON'T REMEMBER EXACTLY.  I PAID

21   CIRCUMFERENTIAL ATTENTION TO THE CASE.

22             THE COURT:  DO YOU REMEMBER ANY SPECIFICS?

23             THE PROSPECTIVE JUROR:  NOT REALLY ANYTHING THAT

24   WOULD BE OUT OF THE ORDINARY.

25             THE COURT:  DO YOU THINK ANYTHING THAT YOU READ OR

1   HEARD WOULD HAVE ANY IMPACT ON YOUR ABILITY TO DECIDE THIS

2   CASE?

3            THE PROSPECTIVE JUROR:  NO, I DON'T THINK SO.

4            THE COURT:  SO WOULD YOU BE ABLE TO JUDGE THIS

5   CASE SOLELY UPON WHAT YOU HEAR AND SEE IN THIS COURTROOM?

6            THE PROSPECTIVE JUROR:  YES.

7            THE COURT:  OKAY.  YOU ALSO RESPONDED TO QUESTION

8   NUMBER 5 WHICH INDICATED THAT YOU KNEW SOME OF THE PEOPLE

9   WHO I IDENTIFIED WHO MIGHT BE WITNESSES IN THIS CASE.

10           THE PROSPECTIVE JUROR:  YES, THAT'S RIGHT.  I AM A

11  PRODUCER FOR A ROUND-TABLE TELEVISION PROGRAM FOR THE

12  INTERNATIONAL BROADCASTING BUREAU, WHICH IS WITH VOICE OF

13  AMERICA.  AND WE HAVE HAD A COUPLE OF THE TIME MAGAZINE

14  CORRESPONDENTS WHO ARE LISTED ON THE WITNESS LIST AS GUESTS

15  ON OUR PROGRAM.  SO WE HAVE HAD --

16           THE COURT:  DO YOU KNOW WHICH ONES THEY WERE?

17           THE PROSPECTIVE JUROR:  WE HAVE HAD JAY CARNEY A

18  NUMBER OF TIMES AS A GUEST ON OUR PROGRAM.  AND I THINK

19  THERE WAS ANOTHER TIME MAGAZINE CORRESPONDENT WHO I CHECKED

20  ON THE LIST.  IT WAS -- I AM SORRY.

21           THE COURT:  MATTHEW COOPER?

22           THE PROSPECTIVE JUROR:  YES, THAT'S RIGHT.  IT WAS

23  MATTHEW COOPER.  AND AS FAR AS PEOPLE WHO I HAVE PERSONALLY

24  MET, THAT WOULD BE THOSE TWO GENTLEMEN.

25           I ALSO KNOW SOMEBODY WHO WORKS IN MR. NOVAK'S

1  OFFICE.  BUT THAT IS JUST A CASUAL ACQUAINTANCE.  AND I HAVE

2  MET MR. NOVAK ONCE SEVERAL YEARS AGO, PROBABLY ABOUT TEN

3  YEARS AGO.

4          THE COURT:  IN REFERENCE TO MATTHEW COOPER AND

5  MR. CARNEY AND MR. NOVAK, DO YOU HAVE ANY IMPRESSIONS ABOUT

6  THEIR CREDIBILITY BASED UPON YOUR PRIOR CONTACT WITH THEM?

7          THE PROSPECTIVE JUROR:  NO MORE THAN I THINK I

8  WOULD IN THE CASE OF ANYBODY THAT I HAD MET AND, YOU KNOW,

9  THOUGHT GENERALLY WELL OF.

10         THE COURT:  WOULD YOU TEND TO GIVE THEM A LEG UP

11 OR A LEG DOWN IN REFERENCE TO ASSESSING CREDIBILITY AS

12 COMPARED TO SOMEONE WHO YOU DIDN'T KNOW OR HAD NO PRIOR

13 CONTACT WITH?

14         THE PROSPECTIVE JUROR:  I DON'T THINK SO.

15         THE COURT:  OKAY.  YOU ALSO HAD A QUESTION MARK BY

16 QUESTION NUMBER 25 WHICH ASKED WHETHER YOU HAVE EVER HELD A

17 POSITION WHERE YOU HAD ACCESS TO CLASSIFIED INFORMATION.

18         THE PROSPECTIVE JUROR:  YES.  IN MY POSITION AT

19 VOICE OF AMERICA, I WORK IN THE POLICY OFFICE.  AND THAT

20 POSITION REQUIRES -- FROM WHAT I UNDERSTAND, I HAVE A SECRET

21 CLEARANCE, OR WHATEVER THE LOWEST LEVEL OF CLEARANCE IS.  I

22 HAVEN'T ACTUALLY, HOWEVER, SEEN OR BEEN PRIVY TO CLASSIFIED

23 INFORMATION WHILE IN THAT POSITION AS FAR AS I KNOW.

24         THE COURT:  WOULD YOU HAVE ANY DIFFICULTY SITTING

25 IN A CASE WHERE THERE WILL BE TESTIMONY PRESENTED ABOUT

1   CLASSIFIED INFORMATION?

2        THE PROSPECTIVE JUROR:  NO.

3        THE COURT:  YOU ALSO CHECKED NUMBER 30 WHICH ASKED

4   ABOUT WHETHER YOU HAVE PREVIOUSLY BEEN THE VICTIM OF A

5   CRIME, A WITNESS TO A CRIME OR SOMEONE CHARGED WITH A CRIME.

6   DO YOU WANT TO TELL ME ABOUT THAT?

7        THE PROSPECTIVE JUROR:  YES.  ABOUT 11 YEARS AGO,

8   I WAS A VICTIM OF IDENTITY THEFT ON A LARGER SCALE.  MY

9   IDENTITY WAS STOLEN.  A NUMBER OF BANK ACCOUNTS WERE OPENED,

10   TICKETS SIGNED WITH D.M.V., AND THINGS LIKE THAT.

11        THE COURT:  WAS ANYBODY EVER ARRESTED FOR THAT?

12        THE PROSPECTIVE JUROR:  YES.  THERE WAS A WOMAN --

13   THERE WAS A CASE IN CALIFORNIA REGARDING THE FORGERY WITH

14   THE D.M.V.  IT WAS STATE OF CALIFORNIA VERSUS -- I DID

15   NOT -- IT WAS ALL DONE IN MY ABSENCE.  I DIDN'T TESTIFY OR

16   ANYTHING IN THE CASE.

17        THE COURT:  DO YOU KNOW WHAT THE RESULT WAS IN

18   THAT CASE?

19        THE PROSPECTIVE JUROR:  I BELIEVE THAT THE

20   DEFENDANT WOUND UP WITH PROBATION.

21        THE COURT:  WERE YOU SATISFIED WITH THE RESULT?

22        THE PROSPECTIVE JUROR:  YES.

23        THE COURT:  DO YOU THINK LAW ENFORCEMENT CONDUCTED

24   THEMSELVES APPROPRIATELY IN INVESTIGATING YOUR COMPLAINT

25   ABOUT IDENTITY THEFT?

1    THE PROSPECTIVE JUROR:  YES, AS MUCH AS THEY COULD

2    AT THE TIME.  IT WASN'T AS WELL -- THE PROCESS WASN'T AS

3    GOOD AS IT IS NOW.

4    THE COURT:  WOULD YOU IN ANY WAY HOLD AGAINST

5    ANYONE IN THIS CASE WHAT HAPPENED TO YOU IN THAT SITUATION?

6    THE PROSPECTIVE JUROR:  NO.

7    THE COURT:  SO ARE YOU TOTALLY CONFIDENT YOU CAN

8    BE FAIR TO BOTH SIDES?

9    THE PROSPECTIVE JUROR:  YES, I AM.

10    THE COURT:  GOVERNMENT?

11    MR. FITZGERALD:  GOOD AFTERNOON.

12    THE PROSPECTIVE JUROR:  GOOD AFTERNOON.

13    MR. FITZGERALD:  DO YOU RECALL WHAT THE TOPIC OF

14    THE ROUND-TABLE DISCUSSION WAS IF MR. COOPER APPEARED ON THE

15    SHOW YOU PRODUCED?

16    THE PROSPECTIVE JUROR:  YES.  I BELIEVE IT WAS --

17    LET'S SEE.  WE HAVE HAD HIM ON A COUPLE OF DIFFERENT SHOWS

18    ON DIFFERENT TOPICS.  I AM TRYING TO REMEMBER -- I AM

19    GUESSING IT WAS PROBABLY ABOUT THE WAR IN IRAQ.

20    MR. FITZGERALD:  OKAY.  AND DO YOU HAVE A SPECIFIC

21    MEMORY OF THE SHOW?

22    THE PROSPECTIVE JUROR:  LET'S SEE HERE.  IT WOULD

23    HAVE BEEN A FEW MONTHS AGO.  AND I THINK IT WOULD HAVE BEEN

24    MR. COOPER AND ANOTHER JOURNALIST, PROBABLY.  WE HAVE A SHOW

25    EVERY WEEK.  BUT I WOULD IMAGINE IT WAS PROBABLY MR. COOPER

132

1   AND ANOTHER JOURNALIST AND, YOU KNOW, JUST ASKING THEIR

2   OPINIONS ON THE WAR.

3          WE MIGHT HAVE HAD HIM ON ANOTHER TOPIC.  WE DO A

4   LOT OF SHOWS REGARDING VISITS OF OFFICIALS TO OTHER

5   COUNTRIES.  AND SINCE MR. COOPER COVERS THAT BEAT, WE TEND

6   TO HAVE HIM ON FROM TIME TO TIME.

7          MR. FITZGERALD:  AS FAR AS YOU KNOW, HAS

8   MR. COOPER OR ANY OTHER TIME MAGAZINE CORRESPONDENT APPEARED

9   ON YOUR SHOW TO DISCUSS ANYTHING RELATED TO THIS CASE?

10         THE PROSPECTIVE JUROR:  ABSOLUTELY NOT.

11         MR. FITZGERALD:  DO YOU KNOW IF MR. COOPER OR ANY

12  OTHER REPORTERS HAVE APPEARED ON YOUR SHOW TO DISCUSS FIRST

13  AMENDMENT ISSUES CONCERNING REPORTERS' PRIVILEGE AT ANY

14  TIME?

15         THE PROSPECTIVE JUROR:  NO, THEY HAVEN'T.

16         MR. FITZGERALD:  IS THAT AN ISSUE THAT YOU

17  PERSONALLY FOLLOW CLOSELY?

18         THE PROSPECTIVE JUROR:  NO, IT IS NOT.  OUR SHOW

19  IS STRICTLY ON FOREIGN POLICY.

20         MR. FITZGERALD:  AND WHEN IT COMES TO YOUR BELIEF

21  THAT YOU HAVE A SECRET CLEARANCE AS PART OF YOUR JOB, DID

22  YOU HAVE TO FILL OUT ANY EXTRA APPLICATIONS TO GET THAT

23  CLEARANCE, AS FAR AS YOU REMEMBER?

24         THE PROSPECTIVE JUROR:  TO TELL YOU THE TRUTH, I

25  AM NOT EVEN SURE WHAT MY STATUS IS ON THAT AT THIS POINT,

1  BUT I KNOW I FILLED OUT A LOT OF -- THE USUAL GOVERNMENT

2  EMPLOYEE PAPERWORK, PLUS I THINK THEY SENT SOME PEOPLE

3  AROUND TO ASK SOME QUESTIONS FROM VARIOUS FOLKS.  AND THAT

4  WAS FIVE YEARS AGO WHEN I FIRST STARTED.

5         MR. FITZGERALD:  AND DO YOU KNOW IF THEY HAVE COME

6  AROUND TO DO IT AGAIN AS PART OF A RENEWAL AT ANY POINT?

7         THE PROSPECTIVE JUROR:  AS FAR AS I KNOW, NO.

8         MR. FITZGERALD:  ARE YOU AWARE OF WHETHER OR NOT

9  THEY PLAN TO DO THAT EVERY FEW YEARS, AS FAR AS YOU KNOW?

10         THE PROSPECTIVE JUROR:  NOBODY HAS MADE ME AWARE

11  OF ANYTHING LIKE THAT.

12         MR. FITZGERALD:  DID ANYTHING ABOUT THE PROCESS BY

13  WHICH THEY DID A BACKGROUND CHECK CONCERNING YOU GIVE YOU

14  ANY DISCOMFORT IN TERMS OF HOW IT WAS HANDLED BY THE

15  GOVERNMENT?

16         THE PROSPECTIVE JUROR:  NO, NOT AT ALL.

17         MR. FITZGERALD:  WHAT NEWSPAPERS DO YOU READ?

18         THE PROSPECTIVE JUROR:  I TEND TO READ THE

19  WASHINGTON POST ON-LINE.  I ACTUALLY TOUCH ON MOST -- YOU

20  KNOW, I WILL READ THE POST, THE WASHINGTON TIMES, AND THE

21  WALL STREET JOURNAL.  THE POST WOULD BE MY MAIN SOURCE OF

22  NEWS.  AND THEN OCCASIONALLY I WILL GO TO THE NEW YORK TIMES

23  AS WELL.  LET'S SEE HERE.  YES.

24         MR. FITZGERALD:  AND WHEN YOU READ THOSE PAPERS,

25  DO YOU READ THE WHOLE THING COVER TO COVER OR DO YOU FOCUS

1    ON PARTICULAR SECTIONS?

2          THE PROSPECTIVE JUROR:  I WILL FOCUS ON THE

3    FOREIGN POLICY FOR THE MOST PART.  I REALLY DON'T PAY MUCH

4    ATTENTION TO THE OTHER SECTIONS SIMPLY BECAUSE THE FOREIGN

5    POLICY KEEPS ME BUSY ENOUGH.  AND I LIKE TO -- SINCE I WORK

6    IN NEWS, I LIKE TO TRY TO NOT FOCUS ON IT ALL THE TIME

7    OUTSIDE OF WORK.

8          MR. FITZGERALD:  OKAY.  IF YOU WILL EXCUSE ME ONE

9    SECOND.

10          THANK YOU.

11          MR. WELLS:  GOOD AFTERNOON.

12          THE PROSPECTIVE JUROR:  GOOD AFTERNOON.

13          MR. WELLS:  WHERE DID YOU GROW UP?

14          THE PROSPECTIVE JUROR:  I GREW UP IN OJAI,

15    CALIFORNIA.  IT'S A SMALL TOWN WITH 7,000 PEOPLE.

16          MR. WELLS:  AND WHEN DID YOU FIRST COME TO

17    WASHINGTON, D.C.?

18          THE PROSPECTIVE JUROR:  FIVE YEARS AGO.

19          MR. WELLS:  AND WHERE DID YOU LIVE BEFORE THAT?

20          THE PROSPECTIVE JUROR:  VENTURA COUNTY,

21    CALIFORNIA.

22          MR. WELLS:  COULD YOU GIVE ME YOUR EDUCATIONAL

23    BACKGROUND?

24          THE PROSPECTIVE JUROR:  SURE.  I HAVE A LIBERAL

25    ARTS DEGREE.  IT'S A GREAT BOOKS CURRICULUM VITAE FROM

1    THOMAS AQUINAS COLLEGE, WHICH IS A SMALL CATHOLIC LIBERAL

2    ARTS COLLEGE IN CALIFORNIA.

3             MR. WELLS:  AND WHEN YOU GOT OUT OF THOMAS

4    AQUINAS, WHERE DID YOU GO?

5             THE PROSPECTIVE JUROR:  I WENT TO -- WELL, I

6    WORKED AT A HIGH SCHOOL FOR A YEAR.  AND THEN I WANTED TO

7    GET INVOLVED IN JOURNALISM.  AND I WENT TO A JOURNALISM

8    INTERNSHIP PROGRAM CALLED THE NATIONAL JOURNALISM CENTER

9    WHICH WAS, AT THE TIME, HERE IN WASHINGTON, D.C.

10            I WAS AN INTERN WITH THAT PROGRAM FOR THREE

11   MONTHS.  AND AT THE TIME, I INTERNED WITH THE WASHINGTON

12   TIMES -- THEY HAVE A MAGAZINE CALLED, "THE WORLD AND I"

13   WHICH IS NO LONGER IN EXISTENCE.  SO I DID THAT FOR THREE

14   MONTHS.  AND THEN I WORKED FOR THE VENTURA COUNTY STAR OUT

15   IN CALIFORNIA AFTER THAT FOR TWO YEARS.

16            MR. WELLS:  WHAT DID YOU DO FOR THAT NEWSPAPER?

17            THE PROSPECTIVE JUROR:  FOR THE VENTURA COUNTY

18   STAR, I WAS A WRITER -- WELL, I STARTED OUT AS COPY EDITOR,

19   ACTUALLY.  AND I WORKED ON THEIR DESK FOR I THINK ABOUT A

20   YEAR.  AND THEN I WORKED AS A SECTION EDITOR AND WRITER,

21   WRITING ACTUALLY ABOUT AUTOMOBILES, HOUSES AND RESTAURANTS.

22            MR. WELLS:  WAS THAT YOUR FIRST JOB AS A REPORTER?

23            THE PROSPECTIVE JUROR:  YES.

24            MR. WELLS:  OKAY.  AND THEN AFTER THAT JOB, WHERE

25   DID YOU GO?

1       THE PROSPECTIVE JUROR:  I CAME HERE TO WASHINGTON

2   TO WORK FOR VOICE OF AMERICA.

3       MR. WELLS:  AND THAT WAS AS A PRODUCER?

4       THE PROSPECTIVE JUROR:  YES.  ACTUALLY, IT STARTED

5   OUT -- MY TITLE IS, OFFICIALLY, WRITER.  AND THE POSITION

6   HAS KIND OF -- I HAVE TAKEN ON PRODUCER DUTIES AND BECOME --

7   THE PRODUCER TITLE HAS BEEN ADDED OVER THE YEARS.

8       MR. WELLS:  I MEAN, IN TERMS OF HOW YOU THINK

9   ABOUT YOURSELF, DO YOU THINK ABOUT YOURSELF AS A JOURNALIST

10  WHO HAPPENS AT THE MOMENT TO BE ON THE PRODUCTION SIDE, OR

11  DO YOU THINK MORE OF YOURSELF AS A PRODUCER AS OPPOSED TO A

12  JOURNALIST?

13      THE PROSPECTIVE JUROR:  AT THIS POINT, I THINK

14  MORE OF MYSELF AS A PRODUCER BECAUSE I TEND TO STAY AWAY

15  FROM -- WHILE I DO BOOK THE GUESTS FOR MY PROGRAM, I AM NOT

16  HEAVILY INVOLVED IN THE EDITORIAL CONTENT OF THE PROGRAM.

17  SO I THINK OF MYSELF AS A LINE PRODUCER WHICH IS -- I TAKE

18  CARE OF STUDIO ISSUES.  I DEAL WITH FOOTAGE.  I TAKE CARE OF

19  ANYTHING THAT HAS TO DO WITH SORT OF THE MECHANICS OF

20  THINGS, THE GETTING THINGS DONE.

21      MR. WELLS:  SURE.  THERE WILL BE A NUMBER OF

22  WITNESSES WHO ARE FULL-TIME REPORTERS, JOURNALISTS IN THIS

23  CASE.  DO YOU THINK YOUR PRIOR WORK AS A REPORTER WILL IN

24  ANY WAY CAUSE YOU TO GIVE MORE CREDIBILITY TO THE TESTIMONY

25  OF THE JOURNALISTS AS OPPOSED TO THE NON-JOURNALISTS?

1      THE PROSPECTIVE JUROR:  I DON'T THINK SO.

2      MR. WELLS:  LET'S TALK ABOUT MATT COOPER.  MATT

3  COOPER WILL BE A WITNESS IN THIS CASE, AS YOU HAVE HEARD.

4  AND YOU MAY BE REQUIRED, AS A JUROR IN THIS CASE, TO EXAMINE

5  AND PERHAPS EVEN RESOLVE DIFFERENCES IN MR. COOPER'S

6  RECOLLECTION OF CERTAIN EVENTS VERSUS MR. LIBBY'S

7  RECOLLECTION.

8      IS THE FACT THAT YOU HAVE PRIOR WORK CONTACT WITH

9  MR. COOPER -- WILL THAT CREATE A SITUATION WHERE YOU WOULD

10  TEND, EITHER CONSCIOUSLY OR SUBCONSCIOUSLY, TO PERHAPS GIVE

11  MR. COOPER A LEG UP IN TERMS OF HOW YOU ANNALIZE ANY

12  DISPUTES IN HIS RECOLLECTION VERSUS MR. LIBBY'S?

13      THE PROSPECTIVE JUROR:  I DON'T THINK SO SINCE

14  MR. COOPER'S APPEARANCES ON OUR SHOW -- HE HAS BEEN ON MAYBE

15  TWO OR THREE TIMES.  HE HASN'T BEEN A REGULAR GUEST.  I

16  MEAN -- SO -- AND I HAVEN'T HAD VERY LONG CONVERSATIONS WITH

17  HIM.  THE TIMES THAT WE HAVE HAD HIM, IT HAS BEEN A

18  HANDSHAKE, HELLO, THANKS FOR COMING KIND OF SITUATION.  SO

19  IN HIS CASE, I DON'T THINK SO.

20      MR. WELLS:  OKAY.  SO AS I UNDERSTAND IT, IN TERMS

21  OF THE PRIOR WORK RELATIONSHIP, IT IS LIMITED TO TWO, THREE,

22  FOUR APPEARANCES ON THE SHOW, CORRECT?

23      THE PROSPECTIVE JUROR:  THAT'S RIGHT, IN

24  MR. COOPER'S CASE.  MR. CARNEY HAS APPEARED A LITTLE MORE

25  FREQUENTLY ON OUR PROGRAM.

1        MR. WELLS:  AND IN TERMS OF MR. COOPER, YOU HAVE

2   NEVER HAD THE OCCASION TO GO OUT WITH HIM SOCIALLY IN TERMS

3   OF PEOPLE GOING OUT AFTER THE SHOW FOR DRINKS OR DINNER OR

4   ANYTHING LIKE THAT?

5        THE PROSPECTIVE JUROR:  NO.

6        MR. WELLS:  OKAY.  WHAT ABOUT MEET THE PRESS?  DO

7   YOU WATCH THE SHOW MEET THE PRESS?

8        THE PROSPECTIVE JUROR:  TO TELL YOU THE TRUTH, NO.

9        MR. WELLS:  OKAY.  DO YOU HAVE ANY OPINION OF THE

10  CREDIBILITY OF THE MODERATOR OF MEET THE PRESS, TIM RUSSERT?

11       THE PROSPECTIVE JUROR:  NO, NO OPINION.

12       MR. WELLS:  WHAT ABOUT ANDREA MITCHELL?

13       THE PROSPECTIVE JUROR:  NOT REALLY.  NO OPINION.

14       MR. WELLS:  OKAY.  YOU INDICATED THAT YOUR SHOW

15  FOCUSED ON FOREIGN AFFAIRS.  WHAT IS YOUR OPINION ABOUT THE

16  CONTROVERSY CONCERNING WHETHER OR NOT THE BUSH

17  ADMINISTRATION HAS BEEN CANDID WITH THE AMERICAN PUBLIC

18  ABOUT THE JUSTIFICATIONS FOR GOING TO WAR IN IRAQ?

19       THE PROSPECTIVE JUROR:  WELL, MY OPINION REGARDING

20  THAT CONTROVERSY -- IT MIGHT TAKE A WHILE.  NO.  I HAVE

21  THOUGHT, ESPECIALLY BEING IN WASHINGTON -- BEING A NEW

22  PERSON IN WASHINGTON AT THE BEGINNING OF THE WAR, I DID

23  CAREFULLY THINK AND TRY TO FORM MY OWN OPINION ABOUT THE WAR

24  AND WHAT WAS GOING ON.

25       I FELT THAT THE ISSUE WAS VERY MUCH NOT BLACK AND

1    WHITE AND A DIFFICULT DECISION FOR ALL CITIZENS TO DECIDE

2    WHERE THEY STOOD ON THAT.  I MEAN, DO YOU WANT ME TO TELL

3    YOU --

4         MR. WELLS:  WELL, THE REASON I ASKED THE QUESTION

5    IS BECAUSE THAT ISSUE SORT OF FRAMES SOME OF THE BACKGROUND

6    IN THIS CASE.  AND WHAT WE ARE TRYING TO UNDERSTAND IS HOW

7    ANY OPINIONS YOU FORMED ON THAT ISSUE MIGHT AFFECT HOW YOU

8    VIEWED THE CREDIBILITY OF A NUMBER OF WITNESSES IN THIS

9    CASE.  YOU DON'T HAVE TO RESOLVE THAT ISSUE IN THIS CASE,

10   BUT IT'S A BACKGROUND ISSUE AGAINST WHICH MANY OF THE ISSUES

11   YOU DO HAVE TO RESOLVE ARISE.

12        THE PROSPECTIVE JUROR:  RIGHT.

13        MR. WELLS:  SO THAT'S WHY WE ASK THE QUESTION.

14   LET ME PUT IT THIS WAY.  LET'S TAKE VICE-PRESIDENT CHENEY.

15        THE PROSPECTIVE JUROR:  RIGHT.

16        MR. WELLS:  OKAY.  THERE IS A HIGH PROBABILITY

17   VICE-PRESIDENT CHENEY WILL BE A WITNESS IN THIS CASE.  WHAT

18   ARE YOUR FEELINGS, IF ANY, ABOUT THE CREDIBILITY OF

19   VICE-PRESIDENT CHENEY?

20        THE PROSPECTIVE JUROR:  I WOULD HAVE TO SEE THE

21   EVIDENCE.  I MEAN, I WOULD HAVE TO HEAR HIS TESTIMONY BEFORE

22   I COULD -- IN THIS PARTICULAR -- I DON'T HAVE ANY OBJECTIVE

23   FEELINGS AT THIS POINT ABOUT WHETHER HE IS MORE OR LESS --

24   WHETHER HE WOULD BE MORE OR LESS CREDIBLE IN THIS CASE

25   BECAUSE OF THE WAR.

1        MR. WELLS:  WELL, LET'S TAKE VICE-PRESIDENT CHENEY

2   AND MATT COOPER.  ASSUME BOTH OF THEM ARE WITNESSES IN THE

3   CASE.  IN TERMS OF HOW YOU EVALUATE THE CREDIBILITY OF EACH,

4   WOULD YOU BE ABLE TO SET ASIDE WHATEVER FEELINGS YOU HAVE

5   ABOUT VICE-PRESIDENT CHENEY AND WHATEVER FEELINGS YOU HAVE

6   ABOUT MATT COOPER AND JUDGE EACH OF THEM ON EQUAL FOOTING?

7        THE PROSPECTIVE JUROR:  I FEEL THAT I WOULD BE

8   ABLE TO.  OF COURSE, BEING IN WASHINGTON, YOU KNOW,

9   EVERYBODY HAS FEELINGS ABOUT EVERYBODY IN THIS TOWN.  BUT I

10  FEEL THAT I WOULD BE ABLE TO BE OBJECTIVE, YES.

11       MR. WELLS:  OKAY.  WHAT FEELINGS, IF ANY, DO YOU

12  HAVE ABOUT THE REPORTERS' PRIVILEGE IN TERMS OF THE

13  PRIVILEGE THAT SOME REPORTERS ASSERT EXIST FOR PURPOSES OF

14  PROTECTING THEIR SOURCES?

15       THE PROSPECTIVE JUROR:  I GUESS I WOULD SAY THAT

16  THAT WOULD HAVE TO BE TAKEN AS A CASE-BY-CASE BASIS, BUT I

17  DON'T THINK THAT REPORTERS' PRIVILEGE SHOULD GO SO FAR AS TO

18  OBSTRUCT THE LAW.

19       MR. WELLS:  OKAY.

20       THE PROSPECTIVE JUROR:  BUT I ALSO DON'T THINK THE

21  LAW SHOULD OBSTRUCT REPORTERS' PRIVILEGE, YOU KNOW, SO

22  IT'S --

23       MR. WELLS:  SURE.  WHAT, IF ANYTHING, DO YOU KNOW

24  ABOUT THE RULES GOVERNING THE HANDLING OF CLASSIFIED

25  INFORMATION?

1          THE PROSPECTIVE JUROR:  IT'S NOT SOMETHING I HAVE

2   MADE A STUDY OF.  I DON'T KNOW A LOT ABOUT IT.

3          MR. WELLS:  OKAY.  AND TO THE EXTENT THERE IS

4   TESTIMONY CONCERNING HOW CLASSIFIED INFORMATION WAS HANDLED

5   OR SHOULD BE HANDLED, YOU WOULD COME TO THAT ISSUE WITH A

6   CLEAN SLATE AND NOT REACH BACK INTO YOUR PAST AND BRING INTO

7   THE DELIBERATIONS ROOM OR YOUR OWN MENTAL ANALYSIS ANYTHING

8   YOU HAVE HEARD ABOUT IN THE PAST IN TERMS OF HOW SUCH

9   INFORMATION WOULD BE HANDLED?

10          THE PROSPECTIVE JUROR:  YES, I DEFINITELY WOULD

11   HAVE A CLEAN SLATE ON THAT.

12          MR. WELLS:  OKAY.

13          I HAVE NO FURTHER QUESTIONS.

14          MR. FITZGERALD:  ONE AREA, JUDGE.

15          JUST A BRIEF FOLLOW-UP ON THE REPORTERS'

16   PRIVILEGE.  DID YOU FOLLOW THE CASE OF JUDITH MILLER AT ALL?

17          THE PROSPECTIVE JUROR:  YES.  CIRCUMFERENTIALLY.

18          MR. FITZGERALD:  AND HOW DID YOU FOLLOW JUDITH

19   MILLER'S CASE?

20          THE PROSPECTIVE JUROR:  WELL, I MEAN, MY

21   UNDERSTANDING IS THAT SHE WAS -- SHE REFUSED TO REVEAL HER

22   SOURCE AND SHE WAS JAILED BECAUSE OF IT, AND THEN LATER

23   DECIDED TO REVEAL IT, I GUESS.

24          MR. FITZGERALD:  OKAY.

25          THE PROSPECTIVE JUROR:  SO -- I MEAN, DO YOU MEAN

1    WHAT WAS MY OPINION ON THAT?

2            MR. FITZGERALD:  DO YOU HAVE ANY STRONG FEELINGS

3    ON JUDITH MILLER OR WHAT HAPPENED?

4            THE PROSPECTIVE JUROR:  I GUESS I DON'T HAVE

5    STRONG FEELINGS ABOUT IT.  I GUESS I DIDN'T DELVE INTO IT

6    ENOUGH TO HAVE REALLY, YOU KNOW -- I WOULD HAVE HAD TO DO

7    MORE SERIOUS BACKGROUND RESEARCH ON IT TO REALLY FEEL ONE

8    WAY OR THE OTHER.  BUT, I MEAN, I GUESS I -- YES.

9            MR. FITZGERALD:  LET ME ASK YOU THIS.  DID YOU

10   FEEL AT ALL THAT IT WAS INAPPROPRIATE FOR THE PROSECUTORS IN

11   THAT CASE TO SEEK TO COMPEL MS. MILLER TO DIVULGE WHO HER

12   SOURCES WERE?

13           THE PROSPECTIVE JUROR:  I FELT THAT IT COULD BE

14   INAPPROPRIATE, BUT I HADN'T REALLY MADE A DECISION ON THAT.

15           MR. FITZGERALD:  AND IF YOU WERE TO COME TO LEARN

16   THAT THE LAWYERS FOR THE GOVERNMENT WHO WERE INVOLVED IN

17   COMPELLING HER TO TESTIFY WERE THE SAME LAWYERS TRYING THIS

18   CASE, WOULD THAT AFFECT HOW YOU WOULD PERCEIVE THE CASE AS

19   IT CAME IN?

20           THE PROSPECTIVE JUROR:  I DON'T THINK SO.

21           MR. FITZGERALD:  OKAY.  AND DID YOU PERCEIVE

22   WHETHER OR NOT MS. MILLER DID ANYTHING INAPPROPRIATE BY

23   REFUSING TO TESTIFY?

24           THE PROSPECTIVE JUROR:  I THINK SHE HAD THAT

25   RIGHT.  YOU KNOW, I WOULD HAVE TO GO BACK AND WEIGH BOTH

1   SIDES TO REALLY GIVE YOU A SERIOUSLY OBJECTIVE OPINION ON

2   THAT.

3         MR. FITZGERALD:  AND RECOGNIZING THAT YOU ARE NOT

4   GOING TO BE ASKED TO DECIDE WHAT SHOULD HAVE HAPPENED OR

5   WHETHER SHE SHOULD HAVE TESTIFIED, BUT JUST AS A BACKDROP,

6   CAN YOU PUT THAT OUT OF YOUR MIND AND JUST FOCUS ON THE CASE

7   AND WHETHER OR NOT THE GOVERNMENT PROVES ITS CASE?

8         THE PROSPECTIVE JUROR:  I THINK I CAN.

9         MR. FITZGERALD:  AND IF -- JUDITH MILLER WILL BE A

10  WITNESS, AND IF SHE SITS IN THE CHAIR YOU ARE SITTING IN AND

11  YOU ARE SITTING IN THE JURY BOX, WOULD SHE COME INTO THE

12  COURTROOM AND, IN YOUR MIND, WOULD SHE START EITHER AHEAD OR

13  BEHIND THE OTHER WITNESSES IN THE CASE BECAUSE OF WHAT YOU

14  HAVE READ ABOUT HER EXPERIENCE WITH THIS CASE?

15        THE PROSPECTIVE JUROR:  I THINK I COULD GIVE HER A

16  CLEAN STARTING POINT AS WELL.  YOU KNOW, I THINK THAT -- I

17  DON'T THINK SHE WOULD BE AHEAD OR BEHIND.

18        MR. FITZGERALD:  OKAY.  AND THE BOTTOM LINE BEING

19  WHAT YOU KNOW ABOUT HER -- THE LITIGATION OVER JUDITH

20  MILLER'S SUBPOENA, THAT IS -- YOU FEEL CONFIDENT THAT THAT

21  IS SOMETHING THAT YOU COULD TAKE OUT OF YOUR MIND WHEN YOU

22  CONSIDER THE FACTS OF THIS CASE?

23        THE PROSPECTIVE JUROR:  YES, I THINK THAT'S RIGHT.

24        MR. FITZGERALD:  THANK YOU.

25        THE COURT:  MISS, CAN YOU HAVE A SEAT ON ONE OF

1   THOSE BLACK SEATS RIGHT IN FRONT OF THE RAILING THERE?

2            THE PROSPECTIVE JUROR:   OKAY.

3            (AT THE BENCH.)

4            THE COURT:   ANY CHALLENGES?

5            MR. WELLS:   NO.

6            MR. FITZGERALD:   NO.

7            (IN OPEN COURT.)

8            THE COURT:   THANK YOU, MISS.   WE WON'T BE ABLE TO

9   COMPLETE THIS PROCESS UNTIL, HOPEFULLY, TOMORROW.   SO WE

10  WILL NEED YOU BACK AT 9:30.   YOU SHOULD REPORT TO THE JURORS

11  LOUNGE AT 9:30 TOMORROW MORNING.

12            DON'T TALK ABOUT THE CASE.   DON'T HAVE ANY CONTACT

13  WITH ANY TYPE OF MEDIA BETWEEN NOW AND WHEN YOU COME BACK:

14  NEWSPAPER, RADIO, T.V.   THANK YOU.   HAVE A NICE DAY.

15            (PROSPECTIVE JUROR LEAVING THE COURTROOM.)

16            THE COURT:   WE WILL RECESS UNTIL TEN MINUTES TO

17  2:00.

18            (WHEREUPON, THE ABOVE-ENTITLED MATTER WAS RECESSED

19  FOR LUNCH AT 12:50 P.M.)

20

21                   CERTIFICATE OF REPORTER

22       THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO

23  BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

24

25                        PHYLLIS MERANA