UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
------------------------X

UNITED STATES OF AMERICA     Criminal Case No. 05-394

v.

I. LEWIS LIBBY,

                    Defendant,

------------------------X     Washington, D.C.
                              Wed., January 17, 2007
                              2:00 P.M.

TRANSCRIPT OF TRIAL, AFTERNOON SESSION
BEFORE THE HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:   PATRICK FITZGERALD, SPECIAL COUNSEL
                      DEBRA R. BONAMICI, DEPUTY SPEC. COUNSEL
                      U.S. DEPT. OF JUSTICE
                      OFFICE OF SPECIAL COUNSEL
                      219 South Dearborn Street
                      Chicago, IL 60604
                      (312) 353-3741

                      PETER ZEIDENBERG, AUSA
                      KATHLEEN M. KEDIAN, AUSA
                      U.S. DEPT. OF JUSTICE
                      1400 New York Ave., N.W.
                      Room 12-405
                      Washington, D.C.  20005
                      (202) 514-1412

Court Reporter:       Lisa Walker Griffith, RPR
                      U.S. District Courthouse
                      Room 6409
                      Washington, D.C.  20001
                      (202) 354-3247

Proceedings recorded by mechanical stenography, transcript
produced by computer.

---

APPEARANCES:  (Cont'd.)

FOR THE DEFENDANT:   JOHN CLINE, ESQUIRE
                     JONES DAY
                     555 California Street, 26th Floor
                     San Francisco, CA  94104
                     (415) 626-3939

                     WILLIAM JEFFRESS, ESQUIRE
                     BAKER BOTTS, LLP
                     The Warner
                     1299 Pennsylvania Ave., N.W.
                     Washington, D.C.  20004-2400
                     (202) 639-7751

                     THEODORE WELLS, JR., ESQUIRE
                     PAUL, WEISS, RIFKIND, WHARTON
                       & GARRISON, LLP
                     1285 Avenue of the Americas
                     New York, NY  10019-6064
                     (212) 373-3089

**FILED**

MAR 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

AFTERNOON SESSION

          THE COURT:  Counsel approach please.

          (Bench conference.)

          THE COURT:  Regarding Ms. Nelson, the juror, she
now wants to talk to me about apparently a problem that she
said she is going to have with her job.  I would have to
query her with reference to that.

          Two of the jurors, we have learned from the records
check, did not reveal that they have records, Juror Number
0317, Juror Number 1543.

          MR. JEFFRESS:  Have they already been questioned?

          THE COURT:  Yes, they've been questioned and
qualified.  One was the soprano singer from North Carolina I
think it was.

          MR. WELLS:  Is this the juror?

          THE COURT:  Yes.

          MR. WELLS:  That's not the soprano singer.

          THE COURT:  That's not the soprano singer?

          MR. WELLS:  No, the soprano singer was right in
front of her.  She was like an insurance broker.  The one
who --

          MR. JEFFRESS:  The other one was Number 1.

          MR. WELLS:  The first person.

          THE COURT:  Right.  She actually said that she was
charged with a crime.

---

          MR. WELLS:  She wasn't sure.

          THE COURT:  She actually did reveal that.  I guess
her daughter, she said her daughter had used her name, her
stepdaughter.  She didn't know what happened to the case.
But according to this, she was convicted of false pretenses
and larceny, September 8, 1992.  So that's about 15 years ago
in Fairfax County.

          So I don't know if that disqualifies her.  The fact
that she did reveal it, I guess it is conceivable that she
may not have remembered the specifics.  But I think I
probably have to query her further if counsel wants.

          MR. WELLS:  That's up to you.  I don't care.

          MR. FITZPATRICK:  Can we have a chance to --

          THE COURT:  You can do it later.

          MR. FITZPATRICK:  It said a conviction?

          THE COURT:  Yes, a conviction.  It said guilty,
Fairfax County.

          MR. FITZPATRICK:  Does it have her date of birth?

          THE COURT:  Yes.  It is May 18, 1960.

          MR. WELLS:  I guess what I would be concerned
about -- you can do it in private.  At least with her, she
did reveal it.  There was some confusion.  That's my
recollection.  I don't mind inquiry.  I don't want to
embarass her.

          THE COURT:  It is not inconceivable that she may

329

6

1  have been mistaken.  Who knows how those matters are somehow
2  dealt with?  She may have -- but I can query her if you want.
3  I'll do it at the bench.
4        MR. FITZPATRICK:  If Your Honor would ask her
5  questions about it by yourself, then the parties could have
6  it read back, that would be less intrusive on her.
7        THE COURT:  That's up to you all.  If you want it
8  to be private, okay.  I'll do it that way.
9        The other person, according to probation, was
10 convicted of shoplifting May 26, 1997, received a fine of $10
11 and court costs of $100 -- 1977, I'm sorry, 1977.  And that
12 looks like that was in Millersville.  Is that Maryland?
13       MR. ZEIDENBERG:  Yes.
14       MR. FITZPATRICK:  Your Honor, what is his date of
15 birth again?
16       THE COURT:  Date of birth was November 15, 1955.
17       MR. WELLS:  Is there some kind of presumption or
18 rule?
19       THE COURT:  I don't put a limitation on the time.
20 Again, I can query him with reference to it if you all want
21 me to.
22       MR. ZEIDENBERG:  I don't think we have, for the
23 Government's perspective, we feel a need, given that it is a
24 ten year old $10 fine on a shoplifting offense that he might
25 well have gotten.

7

1  talked to a lady saying that I didn't have to come back
2  tomorrow.  I asked her what lady she talked to.  She said she
3  didn't know.
4        So, I said well, I just came this morning to find
5  out.  I stayed down here for a while.  So then she told me,
6  the reception told me that I had to come back at 9:00.  So I
7  said okay.  So then, she said that she would fax my boss, my
8  boss said she would fax you all something, to talk to you to
9  say that I didn't have to come back.  So, I don't know.
10       THE COURT:  Well, you need us to contact your boss
11 and let her know?
12       THE JUROR:  Yes.
13       THE COURT:  Let me just ask, if you're selected as
14 a juror in this case, you're required to be here for six
15 weeks.  Is that going to create a problem for you on your
16 job?
17       THE JUROR:  It might.
18       THE COURT:  Why do you say that?
19       THE JUROR:  Because the job I do, I clean houses.
20 And the houses that I do is like D.C., Maryland and Virginia.
21       THE COURT:  You think your boss would find somebody
22 else in your place?  So you think you might lose your job?
23       THE JUROR:  I might.
24       THE COURT:  Have you talked to her about that?
25       THE JUROR:  I talked to her.  I called her

8

1        MR. JEFFRESS:  I'm concerned about his credibility
2  when he is asked a question and doesn't answer it.  I feel
3  different about the lady because she said something.
4        THE COURT:  If you want me to query him, I will.
5  Maybe he has a reasonable explanation.
6        MR. JEFFRESS:  But it turns out, yeah, I didn't --
7  find out what he says.
8        MR. ZEIDENBERG:  Do you have any objection to the
9  Court doing it?
10       MR. JEFFRESS:  And then show us the transcript --
11       MR. WELLS:  With respect to Ms. Nelson?
12       THE COURT:  Is she here?  I'll have to query her
13 with reference to her job situation.  I assume she is saying
14 that her job, it would be a problem for her, I guess, to be
15 here but I'll ask her.
16       MR. WELLS:  Very well.
17       THE COURT:  Okay.
18       (Open Court.)
19       THE COURT:  If you could have a seat, Miss, you're
20 Juror Number 0173?
21       THE JUROR:  Yes.
22       THE COURT:  You wanted to tell me something?
23       THE JUROR:  Yes.  I had called my boss and I had
24 asked her, I told her that they wanted, you all wanted me to
25 come back tomorrow at 9:00 o'clock.  She said she had just

1  yesterday and told her that I supposed to be here today.  And
2  then I called her today and told her I had to be here
3  tomorrow.  She didn't take that so well.
4        THE COURT:  She didn't take that so well?
5        If you give us -- do you have her phone number?
6        THE JUROR:  Yes.
7        THE COURT:  If you give --
8        THE JUROR:  Mattie?
9        THE COURT:  Mattie, yes, the phone number, I'll
10 have her call and talk to your boss and see what her position
11 will be if you have to be here for six weeks.  Just give that
12 to Mattie and we'll have her make that call and then we'll
13 get back to you.
14       Did counsel want to have some discussions with me
15 before we proceed further?
16       Okay.  We're going to check to see what her
17 supervisor is going to say about her job.  We can start with
18 the next one while you're doing that.
19       The next juror we're going to take, I understand,
20 says he has to catch a 6:00 o'clock flight for some event
21 where he's receiving some award this evening.  I assume he
22 can be back tomorrow.  My inclination, considering the pace
23 that we're moving at, I had hoped we would be finished by the
24 end of the day today.  I don't think that's realistic.  So my
25 hope is maybe tomorrow.

10

```
 1        At the pace we're going, I don't see us maybe being
 2   able to get to the actual strikes until 3:00 o'clock.  So I'm
 3   inclined to let the jurors, who we qualified already which we
 4   brought in at 1:30, go home and come back at 3:00 with the
 5   hope that we'll be finished.
 6        If we, by chance, finish earlier than that, we do
 7   have some other matters we could address while we're waiting
 8   for the panel to come back.  But I assume if they get back at
 9   3:00, that would be enough time to complete the strikes
10   before we have to recess at the end of the day tomorrow.  So
11   hopefully that is a realistic time table, but it's hard to
12   predict considering the amount of questioning that has to be
13   done of the jurors.
14        (Juror present.)
15        THE COURT:  You're Juror Number 0459?
16        THE JUROR:  That's correct.
17        THE COURT:  You had a number of responses.  But
18   I'll deal with two of them specifically.  You say that the
19   length of the trial will be a problem for you?
20        THE JUROR:  Yes, Your Honor.  I'm a producer with
21   National Public Radio, and I do most of my work in the Middle
22   East and Iraq.  I'm supposed to be in the Middle East on
23   March 4.
24        THE COURT:  March 4?
25        THE JUROR:  March 4, and when you said six weeks, I
```

11

```
 1        THE COURT:  You also had a response to Question
 2   Number 1A, which asks whether you knew or recognized any of
 3   the Government's lawyers.  You also had a response to
 4   Question Number 1B, which asks about Mr. Libby and whether
 5   you heard anything or knew him?
 6        THE JUROR:  I recognize them both from, Patrick
 7   Fitzgerald and Mr. Libby, from news coverage.  I don't know
 8   them personally at all, just from, you know, being abreast of
 9   the news.
10        THE COURT:  Do you recall the context in which you
11   became familiar with them?
12        THE JUROR:  The incidents surrounding this case and
13   also the lead up to the Iraq war, Mr. Libby was a major
14   player in the administration.
15        THE COURT:  Do you remember specifically what you
16   may have heard or read as it relates to this case regarding
17   both Mr. Fitzgerald and Mr. Libby?
18        THE JUROR:  I've read profiles of Mr. Fitzgerald
19   just in the newspaper as being a very well respected
20   prosecutor from Chicago to run this case.  Mr. Libby, I do
21   remember, you know, as it was coming out in the media, I
22   remember the issue, especially surrounding Judith Miller when
23   she was in prison for not giving up her source.
24        And when he gave her permission to release some of
25   that information, I remember that.  I also remember that he
```

12

```
 1   was being charged with obstruction of justice with relative
 2   to the leaking of Ms. Plame's name.
 3        THE COURT:  Did you form any opinions as a result
 4   of that contact that you've had with the media as it relates
 5   to this case that has caused you to form any opinions, either
 6   about Mr. Fitzgerald or about Mr. Libby?
 7        THE JUROR:  I would say positive about
 8   Mr. Fitzgerald, but that's I, I read a glowing profile of
 9   him.  And Mr. Libby is a member, well respected member of the
10   Bush Administration.  I don't have any personal animus.  I
11   just followed the story in the news.
12        THE COURT:  Do you think the profile that you heard
13   or read about Mr. Fitzgerald would in any way cause you to
14   favor his side of the case because of that?
15        THE JUROR:  No, I don't think so.
16        THE COURT:  It wouldn't give him an advantage?
17        THE JUROR:  Not really.  Mr. Libby also has many
18   supporters and is very well respected by much of this
19   country.
20        THE COURT:  So, do you at this point have the
21   ability to presume that Mr. Libby is not guilty?
22        THE JUROR:  Yes.
23        THE COURT:  Would you hold the Government to its
24   burden of establishing his guilt beyond a reasonable doubt?
25        THE JUROR:  Yes, Your Honor.
```

```
 1   believe that runs right up against it.  I could certainly
 2   serve until then.  But I have a letter from my employer if
 3   that makes any difference.
 4        THE COURT:  I would hope that we would be finished
 5   by then.
 6        THE JUROR:  That was my only concern.
 7        THE COURT:  My hope is that we'll be finished by
 8   then.  We'll have four alternates in this case.  So in the
 9   event we would not finish, which I don't think will be the
10   case, we could always substitute somebody for you if you are
11   not.  So we will not make you miss that assignment.
12        THE JUROR:  Thank you.
13        THE COURT:  You also have checked Question Number
14   37 regarding news media coverage.  I had asked whether you
15   had any problem --
16        THE JUROR:  Right.  The issue is I do need to keep
17   abreast of issues going on in Iraq every day because I work
18   there extensively.  When I go in, I need to have the coverage
19   in my mind, knowing what's happening there.
20        THE COURT:  Well, considering the fact that you
21   have to stay abreast of that information, do you think
22   there's any potential that having contact with that
23   information could conceivably have any impact on your ability
24   to fairly judge this case?
25        THE JUROR:  No, I don't see that, sir.
```

14

1    THE COURT:  You also had a response, this maybe the
2  same thing, to Question Number 3B, which indicates that
3  you've had media coverage or had contact with media coverage
4  about this case.  Anything else you need to tell us about
5  your knowledge of this case based upon what you've read or
6  heard in the media?
7    THE JUROR:  I don't think so, sir.  I mean I've
8  been involved in also producing coverage, not specifically on
9  this case but I've produced programs that obviously have
10  elements when this case was broken.
11    THE COURT:  What type of programs?
12    THE JUROR:  "All Things Considered" and "Morning
13  Edition," the programs that National Public Radio puts out
14  every day.  And I may at times, when I'm not in Iraq, will
15  produce these programs.
16    THE COURT:  Do you remember specifically what the
17  programs that you produced regarding this case were about?
18    THE JUROR:  I would just, I remember a reporter I
19  believe it was Art Shapiro.  At the time was we had a piece
20  that it was more in the thing, okay, got to put a four-minute
21  Art Shapiro piece on the Libby case into the show.
22    THE COURT:  As a result of the work that you did in
23  putting that show together, did you form any opinions about
24  this case?
25    THE JUROR:  Not other than just, you know, this is

15

1    THE JUROR:  Judith Miller, the New York Times
2  reporter, and Bob Woodward and John Dickerson is another
3  person.
4    THE COURT:  Were the comments about them and their
5  veracity favorable or unfavorable?
6    THE JUROR:  About Mr. Woodward and Mr. Dickerson
7  were very favorable, about Ms. Miller were very unfavorable.
8    THE COURT:  Have you formed, as a result of what
9  you were told by those people, do you have an opinion about
10  their veracity?
11    THE JUROR:  I have an opinion about their veracity
12  and their capability as journalists.  And certainly I still
13  have strong -- strong might be too strong a word -- but I
14  certainly have opinions about Ms. Miller's reporting leading
15  up to the Iraq war and how well she did that or failed to do
16  that accurately.
17    THE COURT:  Do you think your opinions about them
18  that you've just indicated would have a bearing of your
19  assessment of the credibility of what they would say during
20  the course of this trial?
21    THE JUROR:  I can't imagine, she wouldn't be here
22  as a reporter.  She would be here as, somebody told me this
23  or didn't tell me that.  I think I could probably say, it's a
24  different --
25    THE COURT:  So you wouldn't use the reporting that

16

1  what the press releases are saying.  This is what the
2  Government's saying, just sort of information.
3    THE COURT:  Would you be able to disregard that
4  press information if you were selected in this case and judge
5  this case solely upon what you hear and see in this
6  courtroom?
7    THE JUROR:  I believe I could, Your Honor.
8    THE COURT:  You also had a response to Question
9  Number 5, which asks about the list of names that I read,
10  whether you knew or recognized any of them.
11    THE JUROR:  Obviously, I recognize, and I don't
12  know them personally, but I know many of the journalists on
13  that list.  I know people who know them  Some of them know
14  them well.  I personally do not.  I'm not their friends, but
15  I know people who are.
16    THE COURT:  The fact that you have these associates
17  who know some of those individuals well, would that in any
18  way affect your ability to fairly judge their believability
19  as witnesses?
20    THE JUROR:  I don't think so, sir.
21    THE COURT:  Have any of those associates that you
22  have ever commented to you about the veracity of these people
23  that you say they know?
24    THE JUROR:  Yes, they have, sir.
25    THE COURT:  Which individuals are we talking about?

1  you had trouble with in your assessment of her credibility on
2  the witness stand?
3    THE JUROR:  No, sir, I would not.
4    THE COURT:  What if, for example, she said
5  something about an event that one of the other two people
6  that you mentioned, who you have a favorable view about or at
7  least what you were told by your associates, they have a
8  favorable impression of them, and they said something that
9  was totally different, and it was clear that both could not
10  be telling the truth, do you think she would be at a
11  disadvantage in your assessment of her credibility based upon
12  what you have indicated?
13    THE JUROR:  Yes, sir, she would.
14    THE COURT:  Approach counsel.
15    (Bench conference.)
16    THE COURT:  Any position based on what he said?
17    MR. JEFFRESS:  I think we could spend an hour with
18  this fellow.  I think ultimately he would be disqualified is
19  my guess.
20    THE COURT:  Okay, I'll let him go.
21    (Open Court.)
22    THE COURT:  Sir, we appreciate your candor.  Based
23  upon what you've indicated, since this case has to be decided
24  based upon what's taking place in the courtroom itself, we
25  would have to excuse you.

18

1        THE JUROR:  Okay.

2        THE COURT:  Thank you.  I understand you are

3   getting an award this evening.

4        THE JUROR:  Yes, actually we won the Dupont Award

5   for coverage in Iraq.

6        THE COURT:  Congratulations, have a nice trip.

7        I'm going to bring Ms. Nelson back in.  The

8   courtroom deputy has called her boss.  And her boss said she

9   won't get fired, but she's not going to get paid.

10       So, she's only going to get the $30 or $35 that she

11  gets here, which I assume will be considerably less than what

12  she makes on her job.  So I'll query her as to whether that

13  would be a problem for her.  If she's here for that long of a

14  period, I assume it may be, but I'll find out what she says.

15       (Juror present.)

16       THE COURT:  Miss, we contacted your boss, and she

17  indicated you're not going to lose your job, but when you're

18  not there to work and you would have to be here Monday

19  through Thursday, you're not going to get paid.

20       THE JUROR:  Okay.  That's fine with me.

21       THE COURT:  So you don't mind losing that money?

22  Are you sure?

23       If you lose that money, is that going to have any

24  impact on your ability to focus on this case?  Because all

25  you're going to get from us is what, $35.  We pay you $35 a

---

19

1        MR. FITZPATRICK:  No objection.

2        MR. WELLS:  No objection.

3        THE COURT:  Okay, Miss, we appreciate your

4   willingness to serve.  That's the kind of good citizen we

5   like, but we understand the financial hardship it would be.

6   So we appreciate your willingness to be here.  Maybe we can

7   get you on a shorter case sometime.

8        THE JUROR:  Sure.

9        THE COURT:  Thank you.  You're excused and you go

10  to work.

11       THE JUROR:  Okay.

12       THE DEPUTY CLERK:  Counsel, the next qualifier will

13  be Number 4.

14       THE COURT:  You're Juror Number 0121?

15       THE JUROR:  Yes, Your Honor.

16       THE COURT:  Let me take Question Number 33 first.

17  Let me just say, if what you're going to respond to me would

18  be embarassing to you, you can ask me to come up here and do

19  it in private.

20       THE JUROR:  All right.

21       THE COURT:  Because I'm going to ask you about the

22  medical condition and the medication.  Are you willing to do

23  that here sitting from the witness stand or you want to do it

24  here at the bench?

25       THE JUROR:  No, we can just go ahead.

---

18

1   day.  I assume you make more than that on your job.  Would

2   that difference create a real problem for you financially?

3   Is that yes?

4        THE JUROR:  Yes.

5        THE COURT:  How would that affect your ability to

6   be here and give your full time and attention and do the job

7   you're supposed to do as a juror?

8        THE JUROR:  Because I won't have the transportation

9   to get back and forth here or pay my bills.

10       THE COURT:  So you couldn't pay your bills?

11       THE JUROR:  Right.

12       THE COURT:  So would that be a problem for you?

13       THE JUROR:  Yes.

14       THE COURT:  So what's your position about serving?

15  Do you want to stay here and serve or would you rather be

16  excused in light of your job situation?

17       THE JUROR:  I wouldn't mind serving at all.  I

18  don't have a problem with it, but it's just that I have to

19  look at my finances.

20       THE COURT:  I understand that.  That's what I'm

21  asking you.  What do you want to do?  Do you want to be here

22  and serve and lose that money or do you want to be excused so

23  you can work?

24       THE JUROR:  I want to be excused.

25       THE COURT:  Any objections?

---

20

1        THE COURT:  You have indicated that you take

2   medication and you think that medication might affect your

3   ability to be here.

4        THE JUROR:  Yes, sort of makes me drowsy sometimes.

5        THE COURT:  It does?  What kind of medication for

6   what type of problem?

7        THE JUROR:  This program that I'm in, and it's like

8   Methadone.

9        THE COURT:  Methadone?  How often do you have to

10  take it?

11       THE JUROR:  Every day.

12       THE COURT:  Every day, what time every day?

13       THE JUROR:  Usually between 9:00 o'clock, then I

14  have a problem getting here.  So sometimes I go at 2:00, the

15  time it closes.

16       THE COURT:  So you have to get it either at 9:00 or

17  2:00?

18       THE JUROR:  Yes.

19       THE COURT:  When you take it, you say it makes you

20  drowsy?

21       THE JUROR:  Yes, and I would hate to be, not in

22  quite control or alert.

23       THE COURT:  Right.  Counsel, approach.

24       (Bench conference.)

25       THE COURT:  Any objection?

21

1     MR. WELLS:  No objection.

2     MR. FITZPATRICK:  No objection.

3     (Open Court.)

4     THE COURT:  Okay, sir, we appreciate your

5  willingness to serve, but we understand your situation.  So,

6  we'll excuse you.  Maybe you can serve at some point in the

7  future.  Good luck to you.

8     THE JUROR:  Thank you.

9     THE COURT:  You're Number 1432?

10    THE JUROR:  Yes, sir.

11    THE COURT:  You had two responses.  One was the

12  Question Number 1A, which asks about whether you knew or

13  recognized any of the Government's lawyers in this case.

14    THE JUROR:  Yes, I recognize one.

15    THE COURT:  Who do you recognize?

16    THE JUROR:  Mr. Fitzgerald, I believe it is.

17    THE COURT:  How do you recognize him?

18    THE JUROR:  From news reports, I believe.

19    THE COURT:  News reports?

20    THE JUROR:  Yes.

21    THE COURT:  Do you remember exactly what type of

22  news reports they were?

23    THE JUROR:  It had something to do with this case.

24    THE COURT:  Do you remember exactly --

25    THE JUROR:  No.

22

1     THE COURT:  Did you hear him say something?

2     THE JUROR:  Yes, it was on I think a Sunday morning

3  talk show.  And I don't recall the gist of it, but I do

4  recognize him and I recognize the name.

5     THE COURT:  Do you remember anything that he said?

6     THE JUROR:  I do not.

7     THE COURT:  Would the fact that you previously

8  heard him make some statements about this case, would that

9  have any impact on your ability to fairly judge this case?

10    THE JUROR:  No, sir.

11    THE COURT:  It wouldn't give him an advantage or

12  disadvantage in this trial?

13    THE JUROR:  No, sir, no.

14    THE COURT:  You also indicated a response to

15  Question Number 3A, indicated that you have heard or read

16  things about this case.  Other than what you saw in reference

17  to Mr. Fitzgerald, did you hear other things about the case?

18    THE JUROR:  I do.  It's been a couple of years, but

19  I do recall the news of it.

20    THE COURT:  Do you remember the specifics of what

21  you heard?

22    THE JUROR:  Something about say I think a New York

23  Times reporter who had a source that she wouldn't reveal or

24  something.  And some of the news organizations, some of the

25  talk news commentators had said something about a leak from

23

1  the CIA, and it was a couple of years ago.

2     THE COURT:  Do you remember anything else besides

3  that or that's it?

4     THE JUROR:  No.

5     THE COURT:  Did you form any opinions about this

6  case?

7     THE JUROR:  I didn't hear enough about it to form

8  any.

9     THE COURT:  So you haven't formed any opinions?

10    THE JUROR:  No, no.

11    THE COURT:  Do you have any impression about Mr.

12  Libby's innocence or guilt based upon what you've heard?

13    THE JUROR:  I do not.  I haven't heard any facts.

14    THE COURT:  Do you presume him to be innocent?

15    THE JUROR:  Absolutely.

16    THE COURT:  Would you hold the Government to its

17  burden of proving him guilty beyond a reasonable doubt?

18    THE JUROR:  I would.

19    THE COURT:  So, are you totally confident you could

20  be fair to both sides?

21    THE JUROR:  I think so.  I was a public school

22  teacher.  I'm a retired math teacher, and I think one of the

23  key -- objectivity is one of the keys to my successful

24  career, I think, and I've always tried to listen to the

25  facts, not make any snap judgments and weigh the evidence.

24

1     THE COURT:  So you're confident you could do that

2  in this case?

3     THE JUROR:  I had for 30 years, I feel sure I do.

4     THE COURT:  Government?

5     MR. FITZPATRICK:  Thank you, Judge.  Good

6  afternoon.

7     THE JUROR:  Good afternoon.

8     MR. FITZPATRICK:  Where did you teach school?

9     THE JUROR:  In North Carolina.

10    MR. FITZPATRICK:  When did you move to D.C.?

11    THE JUROR:  In 1992.  I retired in '93, a year

12  after a debilitating illness that I had.  I had a

13  misdiagnosed Rocky Mountain spotted fever.  And it went

14  undiagnosed for several months until it affected my nerves.

15  I developed a peripheral neuropathy.

16    THE COURT:  Let me just say, if you want to tell me

17  about that in private, you can.  If you want to talk about it

18  in open court, you can do that.

19    THE JUROR:  It doesn't matter.

20    THE COURT:  Okay.

21    THE JUROR:  That's the reason.  My wife, we

22  researched, it left me unable to walk or talk.  And we

23  researched and found that there was medical, some doctors

24  here in the District that had some promise for treatment, and

25  we sought that, as well as we wanted to be close to N.I.H.

26

1  for any, you know, experimental drugs and so forth that might
2  help and it has.  And I'm under medication, but I'm able to
3  function.  And that's the reason we're here, that I'm here.
4      MR. FITZPATRICK:  Great.  When you read about the,
5  you said you recall something about a New York Times reporter
6  being involved in this case.  Do you remember the name of
7  that reporter?
8      THE JUROR:  If I saw it, I would.  I recognized it
9  on the list that we were shown yesterday.  I don't recall it
10  at this time, though, but I recognized it.
11      As a matter of fact, I was confused as to whether
12  you said do you know any of these folks.  I don't know any of
13  them, but probably two-thirds of them I recognized the names
14  and maybe half would recognize the faces of the list there.
15      THE COURT:  Part of the question was do you know
16  them.  The other one was, have you heard about them.  And if
17  you only have heard about them, whether your knowledge of
18  them would in any way impair your ability to be fair and
19  impartial.
20      THE JUROR:  Right.  It would not, and I answered
21  that it would not.
22      MR. FITZPATRICK:  Okay.  So, if a reporter named
23  Judith Miller were to testify --
24      THE JUROR:  Judith Miller was the name.
25      MR. FITZPATRICK:  Okay.  If she sat in the seat

26

1  where you're sitting now and testified and you sat as a
2  juror, would she start out ahead of other witnesses or behind
3  other witnesses or just the same as everybody else, in terms
4  of your approaching whether or not to believe whether her
5  account is accurate?
6      THE JUROR:  Well, I'd want to hear everyone, the
7  same as everyone else.
8      MR. FITZPATRICK:  What newspapers do you read day
9  to day?
10      THE JUROR:  The Washington Post, The New York Times
11  and The Raleigh News and Observer, periodical.
12      MR. FITZPATRICK:  Thank you very much.
13      MR. JEFFRESS:  Good afternoon.  You taught for 30
14  years in North Carolina?
15      THE JUROR:  Twenty-nine.
16      MR. JEFFRESS:  Twenty-nine.
17      THE JUROR:  One of the years I was disabled as I
18  said.  In '92, I developed this illness.  The following year,
19  in '93, I was on disability, but I retired in '93.
20      MR. JEFFRESS:  Was that high school?
21      THE JUROR:  It was both junior high school and high
22  school.
23      MR. JEFFRESS:  Math, mathematics?
24      THE JUROR:  Algebra, geometry, calc.
25      MR. JEFFRESS:  You have a, what, do you have a

27

1  Master's degree perhaps?
2      THE JUROR:  I have a Bachelor, a B.S. degree.
3      MR. JEFFRESS:  Where did you grow up?
4      THE JUROR:  North Carolina.
5      MR. JEFFRESS:  You have a Bachelors from one of the
6  colleges in North Carolina?
7      THE JUROR:  North Carolina University in
8  Greenville, yes.
9      MR. JEFFRESS:  Since you've been here, obviously
10  you've been in rehabilitation and treatment and so forth.  Do
11  you work at all as it is?
12      THE JUROR:  No, I do not.
13      MR. JEFFRESS:  What's the source of the news?  Do
14  you read the news every day or watch TV news?
15      THE JUROR:  I watch TV news.  I generally like the
16  Discovery channel, Animal Planet.  That's my preference as
17  far as television goes.  I have a couple grandchildren that
18  I'm quite proud of.
19      MR. JEFFRESS:  Are they here in the area?
20      THE JUROR:  Six-year-old boy, Cameron, and a
21  15-month-old girl, Raleigh, and generally they interrupt any
22  TV watching if they're with me.  But, most mornings I start
23  with The Washington Post and to the Style section and do the
24  crossword puzzle.
25      And from there, depending on what I need to do that

28

1  day, it may be the afternoon or evening before I get to the
2  Metro section or the front section.  But I use the television
3  and the newspaper for my source of what's happening.
4      MR. JEFFRESS:  When you do watch the news on
5  television, what programs do you tend to watch?
6      THE JUROR:  The evening news.  Again, Sunday
7  morning, if the kids, you know, aren't to play computer games
8  or whatever, I watch some of the morning news shows.
9      MR. JEFFRESS:  Do you ever watch Meet The Press?
10      THE JUROR:  I have.
11      MR. JEFFRESS:  Do you know who Tim Russert is?
12      THE JUROR:  I do.
13      MR. JEFFRESS:  Do you have an opinion about Tim
14  Russert, about his credibility?
15      THE JUROR:  No opinion, he seems to be on the ball,
16  but --
17      MR. JEFFRESS:  It's a popular show, right?
18      THE JUROR:  Yes.
19      MR. JEFFRESS:  Do you know, you said you recognized
20  a lot of the names that the Judge read the other day.  But do
21  you recognize the names, let me just give you, you said
22  Judith Miller you recognized.  How about Matt Cooper?
23      THE JUROR:  I do not.
24      MR. JEFFRESS:  Bob Woodward.
25      THE JUROR:  Yes.

29

1   MR. JEFFRESS:  From reading The Washington Post?

2   THE JUROR:  Well, from the Watergate business.

3   MR. JEFFRESS:  Okay, Walter Pincus?

4   THE JUROR:  No.

5   MR. JEFFRESS:  Andrea Mitchell?

6   THE JUROR:  Yes.

7   MR. JEFFRESS:  From TV?

8   THE JUROR:  Yes.

9   MR. JEFFRESS:  Now, let me ask you, if Tim Russert

10  were to testify as a witness in this case, and he had a

11  memory of an event that is different from the memory that Mr.

12  Libby has, would you tend to credit Mr. Russert, based on,

13  you know, what opinion you've formed of him, would you tend

14  to credit his testimony over Mr. Libby's?

15  THE JUROR:  No, I don't think so.  I'd want to

16  know, you know, I would prefer to know more about the facts

17  before I make any determination about who said what, when and

18  who to believe.

19  MR. JEFFRESS:  You said earlier that you recognized

20  Judith Miller as somebody who didn't want to reveal her

21  source.  Correct?

22  THE JUROR:  Yes.

23  MR. JEFFRESS:  And do you remember that she

24  actually went to jail for a while?

25  THE JUROR:  Yes, she did, yes.

30

1   MR. JEFFRESS:  Do you have the impression, based on

2   what you read and heard, that the reason she went to jail had

3   anything to do with Mr. Libby?

4   THE JUROR:  I thought it was courageous of her to

5   do that.  I did not know it had anything to do with Mr. Libby

6   at the time, though.

7   MR. JEFFRESS:  At the time?  What source, I mean as

8   you sit here today, what source do you believe Ms. Miller was

9   seeking to protect?

10  THE JUROR:  Her source is what I thought, who had

11  revealed whatever it was to her that she was not, had

12  reported about but was not at liberty to reveal.

13  MR. JEFFRESS:  Do you have an impression of who her

14  source was that she wasn't at liberty to reveal?  Does that

15  come out now?  Have you learned that?

16  THE JUROR:  I think Mr. Libby, I think.

17  MR. JEFFRESS:  Okay.  And you heard that on the

18  news or read that somewhere in The Post perhaps?

19  THE JUROR:  Yes.

20  MR. JEFFRESS:  And what impression, do you have an

21  impression that somehow Mr. Libby didn't want her to testify?

22  THE JUROR:  Did not want her to?

23  MR. JEFFRESS:  Is that the impression you formed?

24  THE JUROR:  No, I understood that he agreed to let

25  her reveal her source.

31

1   MR. JEFFRESS:  When she got out, right?

2   THE JUROR:  I don't know if it was when she got out

3   or it was the result of her getting out or what.  But I think

4   it was reported that her source released her, I think it was

5   called.

6   MR. JEFFRESS:  Okay.  Let me ask you this.  You

7   mentioned you wanted to hear all the sides, both sides, hear

8   all the evidence.  Based on what you've read or heard about

9   the charges and whatever you've seen Mr. Fitzgerald say on

10  TV, does that -- do you believe that, in order to -- do you

11  believe that you would expect or want to hear from the

12  defense, hear from Mr. Libby?

13  THE JUROR:  Would I want to hear from the defense?

14  MR. JEFFRESS:  Yes.

15  THE JUROR:  Absolutely.  I would want to hear from

16  both sides.

17  MR. JEFFRESS:  Well, suppose though that, suppose

18  that the defense decided not to call any witnesses and Mr.

19  Libby decided not to testify.  Is that something that you

20  would hold against Mr. Libby or against the defense?

21  THE JUROR:  No.  That's part of what the Judge said

22  yesterday.  That's part of the judicial process, I think.

23  MR. JEFFRESS:  I gather you've never served on a

24  jury either here or in North Carolina?

25  THE JUROR:  I have been in jury pools but never

32

1   selected.

2   MR. JEFFRESS:  Never chosen, okay.

3   Have you ever heard anybody, I mean just any friend

4   or family member, express any opinion about this case or

5   about Mr. Libby or about Mr. Fitzgerald?

6   THE JUROR:  No.  I'm often alone by myself here.

7   We travel a lot.  We have a home in Carolina also.  My wife

8   is also retired.  I call her bionic woman.

9   In April of '04 she had her right knee replaced.

10  And then in May of '06, her left hip replaced.  Then this

11  past December her left knee replaced.  So she's got a lot of

12  bad joints, but a pure gold heart.

13  MR. JEFFRESS:  Hopefully they're all good joints

14  now.

15  THE JUROR:  She has one left, the left hip.

16  MR. JEFFRESS:  Are you familiar with the

17  controversy that has been discussed on the news about the

18  credibility of the reasons given by the President and the

19  Administration for going to war in Iraq?

20  THE JUROR:  I hear it discussed.  Are you asking my

21  opinion?

22  MR. JEFFRESS:  Yes, well, first, I was just going

23  to ask you, obviously you've heard that discussion?

24  THE JUROR:  Yes.

25  MR. JEFFRESS:  Do you have an opinion about that?

1       THE JUROR:  I do.  At least I have some concerns.

2 I don't always agree with his Iraq policy.  He has more

3 information than I do, certainly, but it seems to me that, if

4 it were me making the decision, I would have gone in with

5 500,000 troops if I were to invade rather than a smaller

6 amount to make sure that had all bases covered.

7       MR. JEFFRESS:  On a somewhat different issue, you

8 recall that, prior to the war in Iraq, the President gave a

9 speech and a lot of other people, Colin Powell, the Secretary

10 of State gave a speech and others gave speeches about the

11 intelligence concerning weapons of mass destruction in Iraq.

12 Do you remember all that at that time?

13       THE JUROR:  Oh, yes.

14       MR. JEFFRESS:  After the war, we didn't find

15 weapons of mass destruction in Iraq.  Now, the question is,

16 do you have any opinion about the credibility of what the

17 President and others in the Administration were saying before

18 the war about weapons of mass destruction and intelligence

19 concerning Iraq?

20       THE JUROR:  Well, as time goes on, I'm beginning to

21 have less faith in him or the intelligence.  That's my

22 opinion.  You know, I want to believe him and know that he

23 has access to much more information certainly than I do or we

24 do and would like to trust him that he's acting and has been

25 acting in our best interest, but I'm becoming leery.

1       MR. JEFFRESS:  Well, the reason I ask this question

2 obviously is, you know Vice President Cheney, he may be

3 testifying as a witness in this case, okay.  Others who may

4 testify are, serve the Administration, including Mr. Libby

5 served the President and the Vice President.

6       Now, does your view about the credibility of what

7 they said prior to the war in Iraq, would that have an effect

8 on your judgment of their credibility if they testified as a

9 witness in the case?

10       THE JUROR:  I don't think so.  I think the Vice

11 President that was, I think, played a bigger role in the

12 Desert Storm, the first war.  And I think he, as the Defense

13 Secretary, I think he deserves a lot of credit for that.

14       However, I'm not sure about his health in serving

15 as Vice President, I mean, with his heart and whatever.  And

16 I'm not sure I would like to burden him with it either.

17       MR. JEFFRESS:  Well, I'll leave that one alone and

18 just focus back in on one thing.  If everything that you know

19 about the Vice President, and obviously you've been following

20 the Vice President's career for a long time, but everything

21 you know about the Vice President, does any of that, would

22 any of that make you, cause you to question his credibility

23 when he first appears as a witness on the stand in this case?

24       THE JUROR:  No, I don't think so.  I'd want to hear

25 what he had to say.

1       MR. JEFFRESS:  Do you remember Judge Walton asked

2 you some questions about memory yesterday when you were

3 sitting out here?

4       THE JUROR:  Yes.

5       MR. JEFFRESS:  How the memory works?

6       THE JUROR:  Yes.

7       MR. JEFFRESS:  How the mind works?

8       THE JUROR:  Yes.

9       MR. JEFFRESS:  Have you had experiences in your

10 life where you were absolutely certain you remembered things

11 one way and then came out to find that was not true?

12       THE JUROR:  The absolute reverse, yes.

13       MR. JEFFRESS:  That's all I have, Your Honor.

14       THE COURT:  Just one.

15       MR. FITZPATRICK:  Just one question.  If you were

16 to find out that someone gave an account of events and said

17 it certainly happened this way, then if you were to be

18 convinced that it happened a very different way, how would

19 you go about, in your mind, trying to determine whether the

20 person made an honest mistake and remembered it wrong or that

21 they were lying?

22       THE JUROR:  Well, I think I'd want to hear what

23 they had to say and what others had to say about the events.

24 And whether there was compelling evidence that it might not

25 have been as they remembered or not.  I would want to weigh

1 everyone's opinion and information first, I think.

2       MR. FITZPATRICK:  Okay.  Thank you.

3       THE COURT:  Thank you, sir.

4       If you could have a seat --

5       THE JUROR:  I have pictures of the grandchildren if

6 you'd like to see them.

7       THE COURT:  I see why you're proud.

8       (Bench conference.)

9       THE COURT:  Any positions?

10       MR. FITZPATRICK:  No.

11       MR. JEFFRESS:  No.

12       (Open court.)

13       THE COURT:  Okay.  Sir, I hope we can finish this

14 up tomorrow, but I'm not sure.  But we're not going to need

15 you back until 3:00 o'clock tomorrow.  So come back at 3:00

16 o'clock.  You can leave today, but go to the juror's lounge

17 before you leave.  Let them know you're leaving and be back

18 at 3:00 o'clock to the juror's lounge.

19       Don't talk about the case and don't have any

20 contact with the media, okay?  Thank you.

21       You're Juror Number 0783?

22       THE JUROR:  Yes.

23       THE COURT:  You had three responses, one to

24 Question Number 19, which asks whether you, close friends or

25 relatives have ever served in a law enforcement capacity or

37

1  applied for such a job. You want to tell me about that?
2          THE JUROR: Well, my cousin was a former, he's a
3  retired D.C. police officer. He was a commander for the
4  Fifth District here.
5          THE COURT: What was his name?
6          THE JUROR: Reginald Smith.
7          THE COURT: Anybody else?
8          THE JUROR: No.
9          THE COURT: Did you ever talk to him about his
10  work?
11          THE JUROR: No.
12          THE COURT: Would the fact that he used to occupy
13  that position cause you to favor one side or the other in
14  this case?
15          THE JUROR: No.
16          THE COURT: Would it have any impact on your
17  ability to fairly judge the credibility or the believability
18  of someone who's a law enforcement official?
19          THE JUROR: No.
20          THE COURT: You also had a response to Question
21  Number 27, which asks whether you've ever participated in any
22  type of inmate assistance or ex-offender programs. You want
23  to tell me about that?
24          THE JUROR: I used to work for a non profit
25  organization. We had a, were involved in a work release

38

1  program with some of the inmates from Lorton. I used to
2  administer the work release program for the organization I
3  worked for.
4          THE COURT: Did you actually have interaction with
5  the inmates?
6          THE JUROR: Yes, they worked in our office.
7          THE COURT: Did you form any opinions about them as
8  a result of your contact with them that might have any impact
9  on your ability to judge a criminal case?
10          THE JUROR: No.
11          THE COURT: You also had a response to Question
12  Number 29 about prior jury service. You want to tell me
13  about that?
14          THE JUROR: On prior jury service, I think I sort
15  of misunderstood the question.
16          THE COURT: Have you ever served as a grand juror?
17          THE JUROR: No.
18          THE COURT: As a petit juror?
19          THE JUROR: Yes.
20          THE COURT: In a criminal case?
21          THE JUROR: No. That's where, it was a criminal
22  case that took place first. And secondly, we did, it was a
23  civil case.
24          THE COURT: You did the civil part of it?
25          THE JUROR: Yes.

39

1          THE COURT: You didn't have anything to do with the
2  criminal case?
3          THE JUROR: No.
4          THE COURT: So are you totally confident that you
5  can be fair to both sides in this case?
6          THE JUROR: Yes.
7          THE COURT: You haven't heard anything about this
8  case?
9          THE JUROR: No.
10          THE COURT: Government?
11          MR. FITZPATRICK: Good afternoon.
12          THE JUROR: Good afternoon.
13          MR. FITZPATRICK: Can you tell us where you grew
14  up?
15          THE JUROR: I grew up in western, southwestern
16  Pennsylvania, in Fayette County, in a little town called
17  Allison, Pennsylvania.
18          MR. FITZPATRICK: Can you briefly just trace your
19  history of school, work, and how you got to D.C.?
20          THE JUROR: I came to Washington, D.C. in 1966. I
21  came here basically to go to school and to work for the
22  United States Air Force. The Air Force came to our school
23  and recruited, well, the Civil Service Commission came and
24  recruited people to come to work for the Government here in
25  Washington. So that's basically how I came to Washington.

40

1          In coming here, I went to school. I went to the
2  old Federal City College. And then I also took classes at
3  the U.S. Department of Agriculture undergraduate school. I
4  also attended the University of Maryland. I took classes
5  when I worked at the Pentagon there.
6          MR. FITZPATRICK: How long did you work for the Air
7  Force or the Pentagon?
8          THE JUROR: I worked for the Air Force probably
9  for, that was so long ago, probably about three years. I
10  left working for the Air Force, I went to work for the Navy
11  department. Then from there, I worked in the Federal
12  Government overall for maybe about 20 years. Then I left and
13  I went and started working for non profits primarily.
14          MR. FITZPATRICK: How long have you worked with non
15  profits?
16          THE JUROR: Fifteen years. I retired this summer
17  in June.
18          MR. FITZPATRICK: At any time when you worked for
19  the Federal Government did you have to apply for a security
20  clearance?
21          THE JUROR: I had a top secret clearance for when I
22  worked for the Air Force and when I worked for the Navy
23  department.
24          MR. FITZPATRICK: Having that clearance, did you
25  actually come into contact with top secret information often?

41

1          THE JUROR:  Yes, I did.

2          MR. FITZPATRICK:  And anything about that

3    experience would that color anything, how you would view the

4    evidence in the case where people might talk about how they

5    handled classified information?

6          THE JUROR:  No, it wouldn't.  Basically, it's been

7    so long ago, I really don't remember a lot about that, other

8    than I remember working there and the work.  But no, I don't

9    think that it would.

10         MR. FITZPATRICK:  What papers do you read day to

11   day?

12         THE JUROR:  The Washington Post, and I read that

13   online usually.

14         MR. FITZPATRICK:  Do you read any blogs online?

15         THE JUROR:  No.

16         MR. FITZPATRICK:  Do you watch any particular TV

17   news shows?

18         THE JUROR:  Normally, I watch the news in the

19   morning, Channel 5 news that comes on like at 5:00 o'clock.

20   I'm usually up.  So I usually just watch that.

21         MR. FITZPATRICK:  And in your reading The

22   Washington Post, have you read anything about this case in

23   particular?

24         THE JUROR:  Well, no, I haven't really read The

25   Post.  The last couple weeks or so, I haven't really read the

42

1    paper, because I've been away.  I've had illness in my

2    family, so I've been away to spend time with my family

3    members, so I haven't read the paper.

4          MR. FITZPATRICK:  Thank you.

5          THE COURT:  You still have that southwestern

6    Pennsylvania accent.  I grew up out there too, Donora.

7          Defense?

8          MR. WELLS:  Good afternoon.

9          THE JUROR:  Good afternoon.

10         MR. WELLS:  What did you do when you were working

11   for the non profits?

12         THE JUROR:  I was a director of administration and,

13   as a director of administration, I had human resources was a

14   part of our department, events and primarily office

15   management, office services, stuff like that.  Primarily

16   though, I did most of the national and local events for the

17   organization.

18         MR. WELLS:  What was the name of the organization?

19         THE JUROR:  Communities in Schools.

20         MR. WELLS:  It's a national organization?

21         THE JUROR:  Yes, it is.

22         MR. WELLS:  What does it do?

23         THE JUROR:  Well, it's known as the nation's number

24   one stay-in-school network.  Primarily, they deal with

25   at-risk youth and children in trying to encourage them to

43

1    keep them to stay in school.  So basically that's what they

2    do.

3          MR. WELLS:  Do you have any opinion about the

4    controversy as to whether or not the Bush Administration has

5    been candid with the American public about the reasons for

6    going to war in Iraq?

7          THE JUROR:  Well, I do have an opinion and that is

8    that I don't think that they have been truthful or forthright

9    about the real reasons for engaging in a war.

10         MR. WELLS:  Do you think that opinion might impact

11   in any way how you might judge the credibility of witnesses

12   who are high ranking members in the Bush Administration?

13         THE JUROR:  No.

14         MR. WELLS:  There's a real possibility Vice

15   President Cheney may be a witness in this case.  My first

16   question is what opinion, if any, do you have right now of

17   Vice President Cheney's credibility?

18         THE JUROR:  I don't have one.

19         MR. WELLS:  If Vice President Cheney were to

20   testify, you would be able to treat him like any other

21   witness?

22         THE JUROR:  Yes.

23         MR. WELLS:  He'd start off with a clean slate?

24         THE JUROR:  Yes.

25         MR. WELLS:  Now, to the extent you have concerns

44

1    that the Bush Administration has not been truthful with the

2    American public about the reasons for going to war, in this

3    case, my client, Mr. Libby, was the Chief of Staff for Vice

4    President Cheney and he also was the assistant to President

5    Bush.

6          Would your feelings about the credibility or

7    truthfulness of the Bush Administration impair your ability

8    to be a fair and impartial juror in a case where Mr. Libby is

9    the defendant?

10         THE JUROR:  No, I don't think it would.

11         MR. WELLS:  Would you be able to follow Judge

12   Walton's instructions that Mr. Libby is presumed innocent,

13   that the Government has to prove its case beyond a reasonable

14   doubt and that, if Mr. Libby were to decide not to put in any

15   evidence at all, not to call any witnesses, even not to

16   testify, that you would not hold that against him?

17         THE JUROR:  Yes, I would be able to follow the

18   instruction.

19         MR. WELLS:  Okay.  Do you ever watch Tim Russert,

20   Meet The Press?

21         THE JUROR:  No.

22         MR. WELLS:  You don't know anything about

23   Mr. Russert one way or the other?

24         THE JUROR:  No.

25         MR. WELLS:  Okay.  I want to ask you a question

45

1   about memory.  Have you ever experienced a situation where
2   you had a recollection that a particular event or
3   circumstance had taken place and then found out later you
4   were mistaken?
5        THE JUROR:  No, I don't think so, not that I can
6   recall.
7        MR. WELLS:  Have you ever had a disagreement with a
8   friend about something that happened, maybe something in high
9   school and the two of you are sitting there and you say no,
10  it happened this way.  Your friend says no, it happened that
11  way.  And it turns out that you were wrong and she was right?
12       THE JUROR:  Not necessarily with a friend, with my
13  husband, I have, not necessarily with a friend in school from
14  way back.
15       MR. WELLS:  It happens to me all the time, too.
16       I assume in most cases, you're right and your
17  husband is wrong, right?
18       THE JUROR:  Not all the time.
19       MR. WELLS:  Let me ask you.  When the two of you
20  are sitting there having that discussion, he remembers it one
21  way and you remember it the other, is it fair to say that
22  both of you have your recollections in good faith and with a
23  degree of confidence?  It's not a situation where one of you
24  is lying and one of you is telling the truth.  You just have
25  different recollections.  Is that fair?

46

1        THE JUROR:  Yes, that's fair.
2        MR. WELLS:  Okay.  I don't have any other
3   questions.
4        MR. FITZPATRICK:  And if you were to hear an
5   account that someone gave of events where they said they
6   were, they were describing how things happened, and if you
7   were to be convinced that things happened completely
8   differently, how would you, in your mind, sort out whether
9   that person made an honest mistake in describing things wrong
10  or whether or not they lied?
11       THE JUROR:  You said if I were to have to recount
12  that?
13       MR. FITZPATRICK:  If you heard someone else give an
14  account of events and then you also were convinced by other
15  proof that what they said wasn't correct, and then you had to
16  decide whether they made a mistake, an honest mistake by
17  remembering it wrong or whether they were lying about what
18  they said, who would you figure that out?
19       THE JUROR:  Well, I would go by the information
20  that I was given and compare it to what they said basically,
21  as to whether or not to me they would be lying.
22       MR. FITZPATRICK:  Thank you.
23       MR. WELLS:  May I have one more?
24       THE COURT:  Yes.
25       MR. WELLS:  But if you had to figure out the issue

47

1   that Mr. Fitzgerald just described to you, would you be able
2   to follow Judge Walton's instructions that the sole function
3   of the jurors is to decide if the Government has proven
4   whether or not Mr. Libby intentionally lied beyond a
5   reasonable doubt?
6        Because it's not a situation of just which one do
7   you think may have happened.  The sole question that the
8   jurors have to decide is whether or not the proof is
9   established beyond a reasonable doubt an intentional
10  falsehood.  Would you be able to follow that instruction?
11       THE JUROR:  Yes, I would.
12       MR. WELLS:  No further questions.
13       THE COURT:  You may have a seat on one of those
14  black seats there in the first row by the railing.
15       (Bench conference.)
16       THE COURT:  Any position?
17       MR. WELLS:  No, Your Honor.
18       MR. FITZPATRICK:  No, Your Honor.
19       (Open court.)
20       THE COURT:  Okay.  Miss, we hopefully will be able
21  to get back to the final stages of this trial by tomorrow at
22  around 3:00 o'clock.  So we need to have you back at 3:00
23  o'clock.  Go to the juror's lounge like you did today at 3:00
24  o'clock.  Don't talk to anybody about the case, and don't
25  have any media coverage.  Don't listen to the news and don't

48

1   read the newspaper, okay?
2        THE JUROR:  Okay.
3        THE COURT:  Thank you, have a nice evening.
4        You're Juror Number 1298?
5        THE JUROR:  Yes.
6        THE COURT:  You had a number of responses.  Let me
7   specifically ask you regarding Response Number 6A -- I'm
8   sorry, 6B and 6C.  6B asks would you have any difficulty
9   fairly judging the believability of a former or present
10  member of the Bush Administration.
11       6C asks do you have any feelings or opinions about
12  Vice President Cheney, whether positive or negative, that
13  might affect your ability to be fair in this case or that
14  might affect your ability to fairly judge Vice President
15  Cheney's believability.  Do you want to tell me your feelings
16  in that regard regarding both of those questions?
17       THE JUROR:  Well, I feel very strongly about the
18  current Administration and their policies.  I also feel very
19  strongly about our judicial system and the concept of
20  innocent until proven guilty.  I would like to think that
21  that would override my feelings about the Administration, but
22  I can't be sure of that.
23       THE COURT:  Your concerns about the judicial
24  system, where you think somebody should be assumed guilty
25  until they prove their innocence?

49

1          THE JUROR:  I believe that very strongly that they
2  are innocent until proven guilty.
3          THE COURT:  Oh, you do agree with that?
4          THE JUROR:  Yes.
5          THE COURT:  But you don't know if that would
6  override your concerns about the Bush Administration?
7          THE JUROR:  I would like to think that I'm mature
8  enough that it would, but I don't know.
9          THE COURT:  Do you have sufficient concerns about
10  that, that you feel that you might not be able to let your
11  feelings about the presumption of innocence override your
12  positions or feelings about the Bush Administration?
13          THE JUROR:  Probably not.  I think that I let -- my
14  feelings about the presumption of innocence would override.
15          THE COURT:  Well, if somebody from the Bush
16  Administration or Vice President Cheney were to testify in
17  this case, would they have a strike against them as compared
18  to somebody else who was not a member of the Administration?
19          THE JUROR:  Probably.
20          THE COURT:  Very well.  Any objection?
21          MR. WELLS:  No objection.
22          MR. FITZPATRICK:  No objection.
23          THE COURT:  We appreciate your being here, but
24  we'll have to excuse you.
25          THE JUROR:  Thank you.

50

1          THE COURT:  Thank you.
2          You're Juror Number 1593?
3          THE JUROR:  Yes, sir.
4          THE COURT:  You had a couple responses.  One,
5  Question Number 3B, which asks about whether you had any
6  prior media contact with information about this case?
7          THE JUROR:  Media contact?
8          THE COURT:  Yes.  Have you read or heard about this
9  case in the media?
10          THE JUROR:  Not exactly.  I have read some of the
11  stories that came out before all of this happened but just a
12  very basic familiarity with it.
13          THE COURT:  Do you remember exactly what you had
14  heard?
15          THE JUROR:  No, it's just general background.
16          THE COURT:  What's that general background?
17          THE JUROR:  That there was some story about an FBI
18  agent or a CIA agent who had their cover exposed.
19          THE COURT:  Did you form any opinions about the
20  guilt or innocence of anyone as a result of what you heard or
21  read?
22          THE JUROR:  No.
23          THE COURT:  Do you have any feelings right now
24  about Mr. Libby's guilt or innocence?
25          THE JUROR:  No, I do not.

51

1          THE COURT:  So you presume that he is innocent?
2          THE JUROR:  Yes.
3          THE COURT:  You also had a response in reference to
4  Question Number 22, which asks whether you, close friends or
5  relatives have ever served as defense lawyer, defense
6  investigator or some other capacity where services were
7  provided to people charged for a crime or applied for
8  employment in such a position.  Do you want to tell me about
9  that?
10          THE JUROR:  Yes, sir.  My partner is a federal
11  public defender.  She works in the appeals court.
12          THE COURT:  Do you ever talk to her about her work?
13          THE JUROR:  Occasionally.
14          THE COURT:  Have you formed any opinions about the
15  criminal justice system or about the players in the criminal
16  justice system that might affect your ability to be fair and
17  impartial as a juror in this case?
18          THE JUROR:  No, I do not have any opinions that
19  would affect my ability to be impartial here.
20          THE COURT:  Would your relationship to her cause
21  you to favor one side or the other in this case?
22          THE JUROR:  No, sir.  She speaks of an honor and a
23  duty to the court to discharge her duties as an officer of
24  the court.  So, my assumption would be that we would not talk
25  about this case as it proceeded.

52

1          THE COURT:  If you had to make a decision, based
2  upon what was presented to you during the course of this
3  trial, that would be perceived by her as adverse to the
4  position that she advocates as a lawyer, would you have any
5  problems doing that?
6          THE JUROR:  No, none at all.
7          THE COURT:  Any problems telling her that you had
8  to make that decision?
9          THE JUROR:  No, no problems at all.  She's very
10  understanding.
11          THE COURT:  You also had a response to Question
12  Number 30, which asks whether you, close friends or relatives
13  have ever been the victim of a crime, someone charged with a
14  crime or witness to a crime?
15          THE JUROR:  Yes, someone threw a brick through my
16  car window one night.
17          THE COURT:  Were you injured?
18          THE JUROR:  No.
19          THE COURT:  Did you report it to the police?
20          THE JUROR:  Yes.
21          THE COURT:  Anybody arrested?
22          THE JUROR:  No.
23          THE COURT:  Do you think the police did what they
24  should have done to try to solve the case?
25          THE JUROR:  Sure.  Yeah, they came out, took

53

1  fingerprints and looked at it, and filed a report.
2  Basically, there was very little damage, but it was a brick.
3  　　　　THE COURT:  Do you have any feelings about that
4  experience that might in some way affect your ability to give
5  these parties a fair trial?
6  　　　　THE JUROR:  None at all.
7  　　　　THE COURT:  So are you totally confident you could
8  be fair to both sides?
9  　　　　THE JUROR:  Yes, sir.
10 　　　　THE COURT:  Government?
11 　　　　MR. FITZPATRICK:  Good afternoon.
12 　　　　THE JUROR:  Hi.
13 　　　　MR. FITZPATRICK:  Where did you grow up?
14 　　　　THE JUROR:  I grew up in Richmond, Virginia.
15 　　　　MR. FITZPATRICK:  When did you move to D.C.?
16 　　　　THE JUROR:  I moved here in 2003.
17 　　　　MR. FITZPATRICK:  Can you tell us what you do in
18 your day-to-day work?
19 　　　　THE JUROR:  Yes.  I am a web architect for a
20 federal contractor at the General Services Administration.
21 　　　　MR. FITZPATRICK:  How long have you done that?
22 　　　　THE JUROR:  About three years now.
23 　　　　MR. FITZPATRICK:  Do you have a security clearance
24 in connection with your work?
25 　　　　THE JUROR:  No.

54

1  　　　　MR. FITZPATRICK:  Can you tell us what papers you
2  read day to day?
3  　　　　THE JUROR:  The Washington Post, The New York
4  Times, of course none of them now, but, and on the internet
5  occasionally I look at other newspapers that might come up on
6  news articles, but basically those two, The Times and The
7  Post.
8  　　　　MR. FITZPATRICK:  And has your partner ever
9  expressed an opinion, positive or negative, about her
10 dealings with federal prosecutors?
11 　　　　THE JUROR:  No.
12 　　　　MR. FITZPATRICK:  Anything about her commitment to
13 serve as a public defender that you think would carry over
14 into your role sitting as a juror to decide this case?
15 　　　　THE JUROR:  Well, she's very committed to her work.
16 And I take away from that that being in a place like this is
17 very important to her and very important to all the
18 participants involved.  So I would also assume some of that
19 myself.  That this is a very important undertaking that's
20 occurring here.  And that, whatever I do has to be as
21 unbiased as possible.
22 　　　　MR. FITZPATRICK:  Thank you.
23 　　　　THE COURT:  Defense?
24 　　　　MR. JEFFRESS:  Good afternoon.
25 　　　　THE JUROR:  Hi.

55

1  　　　　MR. JEFFRESS:  Do you remember, I want to probe a
2  little bit more about what you might have read or heard about
3  this case, okay?
4  　　　　THE JUROR:  Okay.
5  　　　　MR. JEFFRESS:  And before coming in yesterday and
6  receiving Judge Walton's instructions, did you have an idea
7  what this case was about, what Mr. Libby was charged with,
8  and what the background is?
9  　　　　THE JUROR:  Only some vague notions.  I must admit
10 that there has been a lot of discussion about it in the
11 press.  And because of the way it's been presented, when
12 somebody has gone back and said, well it didn't quite happen
13 this way, it's been a little difficult for me to mentally get
14 a grasp on what the actual timeline is, what actually
15 happened when, and how it happened.
16 　　　　MR. JEFFRESS:  Well, have you seen anything on TV
17 or read anything in the news that Joe Wilson has said about
18 the case?  Do you recognize that name?
19 　　　　THE JUROR:  Yes, sir.  I do recognize the name.  I
20 do recall that he had some things to say that were not very
21 flattering.  But, other than that, I don't really recall the
22 nature of his statements.
23 　　　　MR. JEFFRESS:  Do you remember what right reaction
24 you had to his statements when he made these unflattering
25 statements?

56

1  　　　　THE JUROR:  Well, he seemed pretty upset and,
2  because I don't really understand everything that happened,
3  it seemed to be kind of a he-said-she-said type of thing.
4  　　　　MR. JEFFRESS:  What did you do in Richmond?  You
5  spent a lot of your life there; is that right?
6  　　　　THE JUROR:  Well, I grew up there.
7  　　　　MR. JEFFRESS:  Did you work for UNISYS?
8  　　　　THE JUROR:  No.  I grew up there.  I went to high
9  school there.  Graduated from high school.  Went off as an
10 exchange student.  Came back for college.  Actually I've been
11 in northern Virginia for a long time, since the early
12 eighties.  When you asked the question, why I moved to D.C.,
13 I thought you meant when I moved to D.C. proper.
14 　　　　MR. JEFFRESS:  I thought you came from Richmond to
15 D.C.?
16 　　　　THE JUROR:  No.
17 　　　　MR. JEFFRESS:  No, okay.  So you grew up in
18 Richmond, but you basically spent your working life in
19 northern Virginia or D.C.?
20 　　　　THE JUROR:  Yes, sir, since about 1982.
21 　　　　MR. JEFFRESS:  Okay.  When you mentioned about, in
22 answers to the Judge about this CIA agent had her cover
23 exposed, do you have any knowledge about the workings of the
24 CIA?
25 　　　　THE JUROR:  No, I do not.

57

1    MR. JEFFRESS:  Do you have an assumption about how
2  many people who work for the CIA are covert or undercover and
3  how many are open and well-known that they work at the CIA?
4    THE JUROR:  How many?
5    MR. JEFFRESS:  Yes, do you have some idea about
6  that?
7    THE JUROR:  I really have no clue as to numbers.
8    MR. JEFFRESS:  You make no assumptions?
9    THE JUROR:  No.
10    MR. JEFFRESS:  Supposing you were to be told,
11  instructed by the Court in this case, that whether or not Joe
12  Wilson's wife was covert or not is not an issue for the jury
13  and you're to make no assumption either way, is that
14  something you think you could do in light of what you've read
15  or heard previously?
16    THE JUROR:  Well, if it had nothing to do with the
17  proceedings here, I'm sure I could set it aside.  Since it's
18  not really, if it's not really part of the central issue
19  that's being addressed here, then of course it has to be set
20  aside.
21    MR. JEFFRESS:  Have you heard anybody express
22  opinions, either about Mr. Libby generally or about the case
23  in particular?
24    THE JUROR:  Not as such.  Probably a year or so
25  ago, it might have been water cooler talk, but that kind of

58

1  talk comes and goes pretty quickly, and it's forgotten the
2  next week.
3    MR. JEFFRESS:  Anything you've read or heard that
4  you would consider negative about Mr. Libby, other than that
5  a case has been brought against him?  But anything that you
6  heard that would make you think, have any negative opinions
7  or feelings about Mr. Libby?
8    THE JUROR:  No, sir.
9    MR. JEFFRESS:  If you were to serve as a juror in
10  this case, could you start out giving him the full
11  presumption of innocence?
12    THE JUROR:  Absolutely.  Absolutely.  I believe we
13  all owe him that.
14    MR. JEFFRESS:  Let me ask in a little bit different
15  area.  You're familiar with the controversy over the
16  credibility of the President and members of his
17  Administration in statements made prior to the war in Iraq?
18    THE JUROR:  Yes, sir.
19    MR. JEFFRESS:  You've heard people talk about that
20  and read it in the news, right?  Do you have a opinion about
21  that?
22    THE JUROR:  Well, my gut feeling is that it's a
23  very troubling situation that the country is in.  That it's
24  the kind of thing where we can't stay, we can't go.  So, it's
25  a little bit troubling to be at the mercy of that kind of

59

1  randomness on foreign policy.  I just believe it's something
2  that has to be worked out one way or another.
3    MR. JEFFRESS:  Does what's happened with respect to
4  the Iraq war, does it make you question the credibility of
5  members of the Bush Administration?
6    THE JUROR:  At times, yes.
7    MR. JEFFRESS:  Let's suppose -- you know, Vice
8  President Cheney could well testify in this case.  Do you
9  have an opinion about Vice President Cheney's credibility
10  that, you know, might affect your consideration of his
11  testimony?
12    THE JUROR:  If Vice President Cheney were to
13  testify under oath, I would consider his statements to be his
14  recollection to the best of his knowledge.
15    MR. JEFFRESS:  Would that apply to any others?
16    THE JUROR:  Yes, sir.
17    MR. JEFFRESS:  Who are members of the
18  Administration?
19    THE JUROR:  Yes, sir.  I'm sitting here giving you
20  answers to the best of my knowledge and recollection.  So I
21  would consider anyone else who takes this seat to also be
22  that way.
23    MR. JEFFRESS:  Now, you mentioned recollection.  Do
24  you remember Judge Walton asked you some questions when you
25  were out about how memory works and how you would --

60

1    THE JUROR:  Yes.
2    MR. JEFFRESS:  Has it ever happened to you that you
3  were absolutely sure something happened one way, and then you
4  come to find out you were wrong?
5    THE JUROR:  Yes, sir.  That happened all the time
6  between me and my parents.
7    MR. JEFFRESS:  Well, could you have been wrong some
8  of those times?
9    THE JUROR:  I certainly could have been wrong.
10    MR. JEFFRESS:  And in connection with your partner
11  who works for the federal public defender, how long has she
12  worked there?
13    THE JUROR:  She's worked there since 1997, '98, I
14  believe.  It's been a while.
15    MR. JEFFRESS:  But presently?
16    THE JUROR:  Yes.
17    MR. JEFFRESS:  Is that in the District of Columbia
18  or in the suburbs?
19    THE JUROR:  Yes, sorry, it's here in D.C.
20    MR. JEFFRESS:  Here in D.C.?  Okay.
21    Thank you, Your Honor.
22    MR. FITZPATRICK:  Just one question.
23    If someone were to have given an account of events
24  and then you were later to be convinced the events happened
25  quite differently, how would you, in your mind, figure out

62

1  whether or not the person made an honest mistake and just
2  described it wrong or whether they lied to you?
3        THE JUROR:  That is a difficult question to answer.
4  I'm not sure how I would answer something like that.  The
5  difference between a faulty recollection versus intentionally
6  lying about something, I suppose would be, there might be --
7  I don't know.
8        You just, it's sometimes a gut feeling that you
9  would have to listen to the person, the things that they're
10 saying, how earnestly they're expressing themselves, how they
11 answer other questions.  But it would have to be confined to
12 whatever it was they were expressing at that particular
13 moment.
14       MR. FITZPATRICK:  Okay.  Thank you.
15       THE COURT:  Have a seat down in one of those black
16 seats right in front of the railing for a minute.
17       (Bench conference.)
18       THE COURT:  Counsel.  Any position?
19       MR. JEFFRESS:  No.
20       MR. FITZPATRICK:  No.
21       (Open court.)
22       THE COURT:  Thank you, sir.
23       We won't be able to complete this process today.
24 Hopefully we'll be able to tomorrow, but we won't need you
25 back until 3:00 o'clock tomorrow.  So you're excused.

63

1  legislative initiatives they've brought out.
2        THE COURT:  In reference to the war, what are your
3  concerns in that regard?
4        THE JUROR:  That we shouldn't have gone there.  I
5  have a sense that the financial interests were more important
6  there than diplomacy or bringing peace in the Middle East.  I
7  disagree with --
8        THE COURT:  You don't think we should have gone to
9  war for the reasons given?
10       THE JUROR:  Correct.
11       THE COURT:  Do you think the reasons given were
12 honest reasons or not?
13       THE JUROR:  I think there was some selective
14 choosing of intelligence of questionable merit.  I think they
15 chose particular bits that would make the case to go.  And
16 maybe they made the case was based on other things as well
17 that were not communicated at the time.
18       THE COURT:  I suspect there will be members of the
19 Bush Administration or, either present or former, who may
20 testify in this case.  Would that be a strike against them if
21 they testify in this case as far as you assessing their
22 credibility?
23       THE JUROR:  It's hard for me to say.  I'm trained
24 as a scientist.  I'd like to think we look at data first and
25 then we make judgments.  I feel I'm generally objective.  I

64

1  don't agree with, as I mentioned before, the case going to
2  Iraq.
3        On an individual basis, having somebody before me
4  testifying, I don't think that would, I would discount them
5  just because of those decisions before they, before I hear
6  what they have to say.
7        THE COURT:  Let me ask it this way.  If you were
8  sitting at this table, and somebody else was sitting there,
9  and that person had the same mind set that you have.  Would
10 you feel confident that you would get a fair adjudication of
11 your culpability in a case?
12       THE JUROR:  I think so.  Like I say, because I
13 don't agree with the decisions they made in Iraq, doesn't
14 mean on an individual basis, I don't believe them as
15 individuals.  I don't doubt their credibility in general.
16       THE COURT:  Let me ask it like this.  If you felt
17 that someone who was a member or former member of the Bush
18 Administration who was charged with a crime had not been
19 proven guilty beyond a reasonable doubt by the Government,
20 would you nonetheless convict them because of your feelings
21 about the policy?
22       THE JUROR:  No, I would not.
23       THE COURT:  If somebody from the Bush
24 Administration, current or present, testifies and somebody,
25 who is not a member of the Administration, testified about

62 (second column)

1        You can go down and let them know at the juror's
2  lounge that you're leaving, and that you're to be back at
3  3:00 o'clock.  Don't talk about the case with anybody, and
4  don't have any contact with media because it could have some
5  impact on your ability to serve.  Have a nice evening.
6        THE JUROR:  Thank you.
7        THE COURT:  We'll take a ten-minute break.
8        (A brief recess was taken.)
9        THE COURT:  You're Juror 0475; is that right?
10       THE JUROR:  Yes.
11       THE COURT:  You had a couple of responses, but let
12 me ask you about your response to Question Number 6B, which
13 asks whether you have any difficulty fairly judging the
14 believability of a former or present member of the Bush
15 Administration.  You want to tell me your feelings about
16 that?
17       THE JUROR:  I hesitated in checking that off.  I
18 just thought I have feelings about members of the Bush
19 Administration, about their politics.  It's hard for me to
20 say if it would affect my judgment.
21       THE COURT:  What are your concerns?
22       THE JUROR:  I don't agree with some of the
23 decisions that they've made.
24       THE COURT:  In particular?
25       THE JUROR:  With the war and some of the other

66

```
 1  that same thing, would you tend to believe the non Bush
 2  Administration person over the Bush Administration person
 3  because of your concerns about the Bush Administration
 4  policies?
 5          THE JUROR:  I don't think so.
 6          THE COURT:  I know it's sometimes difficult to --
 7          THE JUROR:  No, I'm fairly confident, I can say.
 8  I'm not prejudging them because of their association with the
 9  Bush Administration.
10          THE COURT:  All right.  Let me ask specifically.
11  In reference to Mr. Libby, do you have any opinions about his
12  guilt or innocence based upon the fact that he's been charged
13  or based upon anything that you may have heard about this
14  case?
15          THE JUROR:  No.  I have read many accounts in the
16  newspaper of course.  I mean, I know what's been presented,
17  but I have not prejudged that he's guilty.  Actually, and to
18  be honest, I can't recall the details that were first put out
19  in the media when the case first broke.  I can't recall all
20  the details of the case.
21          THE COURT:  What do you remember?
22          THE JUROR:  Well, that he was working as President
23  and Vice President Cheney's Chief of Staff at the time that
24  there were a lot of questions of who said what to whom, at
25  what point and how did this get into the media about the CIA
```

67

```
 1  upon what you hear and see in the courtroom.  Would you be
 2  able to put out of your mind those news reports that you may
 3  have had contact with and not let them influence how you
 4  decide the case?
 5          THE JUROR:  I think I could.
 6          THE COURT:  You have to be able to do that.
 7          THE JUROR:  Yes.
 8          THE COURT:  Are you confident you can do that?
 9          THE JUROR:  Yes, I can do that.
10          THE COURT:  You also had a response to Question
11  Number 19, which asks whether you, close friends or relatives
12  have ever held a position in law enforcement or applied for
13  such a position.  You want to tell me about that?
14          THE JUROR:  My brother-in-law is a state trooper
15  for Pennsylvania State Police for 17 years.
16          THE COURT:  Do you ever talk to him about his work?
17          THE JUROR:  Sometimes.  He does undercover drug
18  enforcement in the Reading, Pennsylvania area, which
19  apparently is a bit of a haven for drugs arriving in the U.S.
20  or in that part of the country.  He can never disclose any
21  details about the cases he works on.
22          THE COURT:  Have you formed any opinions as a
23  result of those discussions that might in some way cause you
24  to favor one side or the other in this case?
25          THE JUROR:  No.
```

66

```
 1  agent's identity.
 2          I can't remember.  And then I do recall that
 3  charges were brought up because he was accused of not telling
 4  the truth to the Grand Jury during this investigation.  The
 5  details of the time lapse between who said what to the
 6  reporter and who originally said it and what his role was in
 7  that and how much he knew, I don't remember.
 8          I just remember there were other people involved
 9  and I was interested.  I followed it in the paper.  It looked
10  like something that, any kind of scandal that touches high
11  levels of government is interesting.
12          THE COURT:  Do you presume that he is innocent at
13  this time?
14          THE JUROR:  Yes.
15          THE COURT:  Would you hold the Government to its
16  burden of proving his guilt beyond a reasonable doubt?
17          THE JUROR:  Yes, I would.  I mean, like I say, I
18  would have to be convinced that they have the evidence that
19  he has done something.
20          THE COURT:  If you were not convinced, would you
21  have any problem saying not guilty if you thought that was
22  appropriate?
23          THE JUROR:  I don't think I would have any problem
24  with that.
25          THE COURT:  You have to decide this case based only
```

68

```
 1          THE COURT:  Would the fact that you have this
 2  brother-in-law who does that type of work, would that have
 3  any impact on your fairly judging the testimony of a law
 4  enforcement official?
 5          THE JUROR:  No.
 6          THE COURT:  It wouldn't tend to cause you to either
 7  favor or disfavor that law enforcement official's testimony
 8  as compared to somebody else's?
 9          THE JUROR:  No.
10          THE COURT:  You also had a response to Question
11  Number 30, which asks whether you, close friends or relatives
12  have ever been the victim of a crime, someone charged with a
13  crime or a witness to a crime.  Can you tell me about that?
14          THE JUROR:  My family we're from, many of my family
15  members still live in Philadelphia and several of them have
16  been mugged.  My mother's house has been broken into, her
17  passport and many things stolen.  Kind of small things here
18  but that has to do with my car.  And to that, I don't, you
19  know, someone have tried to steal my car.  They have actually
20  stolen the air bags out of my car but that to me is not a
21  personal assault.
22          THE COURT:  Did you report that, the situations
23  here to the police?
24          THE JUROR:  Yes.
25          THE COURT:  Were you satisfied with the law
```

69

1  enforcement's response to your complaint?
2        THE JUROR:  Yeah, they're never going to find those
3  people.
4        THE COURT:  What about your family members?
5  Anybody ever arrested?
6        THE JUROR:  No, nobody was ever arrested.
7        THE COURT:  Do they feelings about whether the
8  police did what they could have done?
9        THE JUROR:  No, I think they accepted the
10 limitations of what the police can do in many cases like
11 that.  I'm sorry, they did catch the guy right after he was
12 mugged.  He came out.  He was walking through a tunnel and
13 there was an undercover person there.  He said were you just
14 mugged, and he said yes, and he went and they got the guy.
15 So in one case they did get him.
16       THE COURT:  Do you think any of those experiences,
17 either that you or your family have had as crime victims,
18 would cause you to favor one side or the other in this case?
19       THE JUROR:  No.
20       THE COURT:  So are you totally confident you could
21 be fair to both sides?
22       THE JUROR:  Yes.
23       THE COURT:  Government?
24       MR. FITZPATRICK:  Good afternoon.
25       Can you tell us what you do day-to-day at work?

70

1        THE JUROR:  Okay.  I'm well trained as an engineer.
2  I'm a scientist.  I was doing research for a number of years.
3  And now I work in public affairs for a large scientific
4  society in geophysics.  So I do legislative affairs.  I work
5  with Congress and I work with some of the administration, the
6  agencies, the science agencies.
7        MR. FITZPATRICK:  For how long have you been
8  involved with public affairs?
9        THE JUROR:  Two years.
10       MR. FITZPATRICK:  And to return to some of Judge
11 Walton's questions, you understand that the Government has to
12 prove its case beyond a reasonable doubt?
13       THE JUROR:  Yes.
14       MR. FITZPATRICK:  And you feel comfortable that the
15 Government fell short if we prove our case by less than a
16 reasonable doubt, you understand your duty is to acquit,
17 correct?
18       THE JUROR:  Yes.
19       MR. FITZPATRICK:  Anything about your feelings
20 about the Administration that would cause you to feel
21 uncomfortable with the fact that you could follow your duty
22 in a case involving a Bush Administration official, and if
23 the proof wasn't there, you would vote to acquit?
24       THE JUROR:  No.
25       MR. FITZPATRICK:  Thank you.

71

1        THE COURT:  Defense?
2        MR. WELLS:  Good afternoon.
3        Where did you grow up?
4        THE JUROR:  In Philadelphia, well actually a suburb
5  of Philadelphia, lower Bucks County.
6        MR. WELLS:  And could you give me your educational
7  background?
8        THE WITNESS:  I have a Bachelor's degree in
9  mechanical engineering from Case Western Reserve, and a
10 Master's and a Ph.D. in civil engineering from Stanford.
11       MR. WELLS:  What year did you get out of Stanford?
12       THE JUROR:  In 1993.
13       MR. WELLS:  Could you give me your work history
14 after leaving Stanford?
15       THE JUROR:  I moved to Paris, France, and I did
16 research there for almost six years.  From there, I came to
17 Washington to work for the same scientific society that I
18 work for today.
19       MR. WELLS:  What type of research did you do in
20 Paris, France?
21       THE JUROR:  I studied contaminant and sediment
22 transport in the Seine River and the Seine Estuary.  And then
23 I did some numerical modeling of biogeochemical cycles in the
24 Mediterranean Sea in the coastal parts of France.
25       MR. WELLS:  So it's fair to say that you view

72

1  yourself primarily as a scientist, although your present job
2  is in public affairs, right?
3        THE JUROR:  Correct.
4        MR. WELLS:  Return to the question that Judge
5  Walton was probing with you, and that is how your feelings
6  about the Bush Administration might affect your ability to be
7  impartial in this case.
8        What the defense is concerned about, to be candid,
9  is how any preexisting bias you may have about the Bush
10 Administration may affect your judgment in terms of assessing
11 the credibility of different witnesses when it's a close
12 question.  Do you have any opinion on that?  What is your
13 view?
14       THE JUROR:  It's very hard to predict.  I've never
15 served on a jury of any case.  So, regardless of these other
16 circumstances, I -- let me just say, in my work, I work with
17 Congress.  I work with the Republican Congress.  A lot of my
18 members of the scientific society, I work for them.  I'm also
19 a member of the society.
20       Many are on both sides of the political spectrum.
21 I work with many people here in Washington that are on both
22 sides.  At work we discuss issues.  We have debates.  I'm
23 open to hearing arguments from different points of view.  And
24 I try to approach them without prejudging them before.
25       MR. WELLS:  Let me ask you this.  If there was a

73

1  debate going on, and one position in the debate was being
2  advanced by a person who you had a great respect for.  And
3  the other position was being advanced by somebody who you had
4  some level of skepticism about their credibility.
5        How do you think that might impact, not only on how
6  you would judge the rightness of the various positions, but
7  how you might process the information?  Would you be able to
8  look at the arguments being advanced in the same way as if
9  you did not have these preexisting views of the debaters, be
10  it, on one hand, somebody who you respected a great deal, on
11  the other hand, somebody who you perhaps did not respect at
12  all?
13        THE JUROR:  I think I could.  In my experience the
14  last few years and having these debates and arguments, I've
15  come to realize that sometimes people, who I don't think have
16  good ideas or I don't respect some of their points of view,
17  make extremely good, positive, solid arguments for one case
18  or another, whatever we're talking about.
19        So just because I have some, disagree with their
20  politics, doesn't mean that I can't listen to an argument or
21  that I find them completely not credible on everything.
22        MR. WELLS:  Sure.  But as I understand your
23  feelings about the Bush Administration, it goes beyond the
24  question of disagreeing with the policies.  That part of your
25  hesitation and the reason you checked the box is a feeling

74

1  that some persons in the Bush Administration have perhaps not
2  been candid with the American public about the reasons why we
3  went to war.
4        And the issue of candor and credibility, you would
5  agree, is different from just agreeing or not agreeing with a
6  particular policy, correct?
7        THE JUROR:  Yes.
8        MR. WELLS:  And what we're trying to explore with
9  you, given that this is a jury trial and your role as a juror
10  will require you to make credibility determinations and to
11  evaluate credibility and perhaps to choose between
12  conflicting stories, how that preexisting feeling you have
13  about the candor and trustworthiness of persons in the Bush
14  Administration might impact your decision-making process.
15  That's what we're trying to get at.
16        When I put it that way, do you still feel that you
17  would be able to be a fair and impartial juror and to set
18  aside whatever preexisting biases you might have about the
19  candor and credibility of persons in the Bush Administration?
20        THE JUROR:  I can't -- I think I can, but you know,
21  I can't say with a hundred percent certainty.
22        MR. WELLS:  Well, to go back to Judge Walton's
23  question to you, if you were in the position of Mr. Libby's
24  counsel, as I am, and you were trying to decide whether I
25  should select you as a juror to sit in judgment of Mr. Libby,

75

1  what would be your view?  How would you call it?  I'm
2  flipping it on you.
3        THE JUROR:  That's your job.  I think I can judge
4  people without being completely colored by previous
5  impressions of their credibility.
6        MR. WELLS:  And if Vice President Cheney were to be
7  a witness, you would be able to judge him just like any other
8  witness and you would be able to separate any preexisting
9  feelings you may have about whether he's been candid or not
10  with the public about the reasons for going to war?
11        THE JUROR:  Yes.
12        MR. WELLS:  And you promise me that, if I were to
13  select you as a juror, that you would be a fair and impartial
14  juror and follow all of Judge Walton's instructions?
15        THE JUROR:  Yes.
16        MR. WELLS:  Do you ever watch Meet The Press?
17        THE JUROR:  No, I don't watch TV.  I listen to the
18  radio.
19        MR. WELLS:  Do you have any opinions about Tim
20  Russert or Andrea Mitchell, who were both reporters for NBC?
21        THE JUROR:  No.
22        MR. WELLS:  In your experience, have you ever had
23  an occasion where you thought that a particular event had
24  happened one way, then it turned out you learned later that
25  you were mistaken and actually it had happened another way?

76

1        THE JUROR:  Yes.
2        MR. WELLS:  Okay.  I have no further questions.
3        MR. FITZPATRICK:  Just one question.  If you were
4  to hear that someone gave an account of events and then you
5  were to be convinced that the events happened completely
6  different than that account, how would you, in your mind, try
7  to sort out whether or not the person who gave the wrong
8  account made an honest mistake or whether they told a lie?
9        THE JUROR:  I would have to understand the reason
10  for the different account and what reason would that person,
11  maybe that person misunderstood the events or got the timing
12  wrong or confused two things or something like that.
13        MR. FITZPATRICK:  Okay.  Thank you.
14        MR. WELLS:  In terms of how you have to engage in
15  the analytical process, the decision-making process for Mr.
16  Fitzpatrick's hypothetical, will you be able to follow the
17  instruction of Judge Walton that, for purposes of making that
18  decision, your job as a juror is to decide whether the
19  Government has established beyond a reasonable doubt that the
20  defendant engaged in intentional lying?  That is the issue.
21        We're not in equal poised in what do you think
22  about this question versus what do you think about that
23  question.  Your job as a juror is to decide one issue and one
24  issue alone, whether the Government has established its case
25  beyond a reasonable doubt.  Would you be able to follow that

78

```
 1  instruction?
 2          THE JUROR:  Yes, I could follow his instructions.
 3          THE COURT:  Miss, would you have a seat on one of
 4  those black seats there in the first row right before the
 5  railing?
 6          (Bench conference.)
 7          THE COURT:  Any position?
 8          MR. WELLS:  We've got some concerns on the defense
 9  side.  But given the state of the record and her answers, I
10  don't think, in good faith, I have sufficient evidence in the
11  record to make a challenge.  But I will say we do have some
12  concerns.
13          THE COURT:  Very well.
14          (Open court.)
15          THE COURT:  Okay.  Miss, I hope we can move the
16  process along and maybe be able to get to the final stages of
17  the jury selection by 3:00 o'clock tomorrow.  So we'll need
18  you back at 3:00 o'clock tomorrow.
19          Report to the juror's lounge on the fourth floor as
20  you did today.  Don't talk about the case and don't have any
21  contact with media coverage about this case.  Thank you.
22          Good afternoon.
23          THE JUROR:  Good afternoon.
24          THE COURT:  You're Juror Number 0907?
25          THE JUROR:  Yes.
```

79

```
 1          THE JUROR:  Yes.  I worked at Quality Inn Hotel for
 2  about 30 years.
 3          MR. FITZPATRICK:  Can you tell us what you did day
 4  to day when you worked at the Quality Inn Hotel?
 5          THE JUROR:  I was a maid.
 6          MR. FITZPATRICK:  Have you retired from that?
 7          THE JUROR:  Yes, I am.
 8          MR. FITZPATRICK:  Do you have a family?
 9          THE JUROR:  Yes.
10          MR. FITZPATRICK:  Do you have children who are
11  working age?
12          THE JUROR:  Yes.
13          MR. FITZPATRICK:  Can you tell us what they do?
14          THE JUROR:  I have one is a security guard in
15  Maryland.  And the other, I got one going to school.  I have
16  two going to school, two girls.
17          MR. FITZPATRICK:  What level of school are they at
18  now?
19          THE JUROR:  They go to U.D.C.  They're going to be
20  a teacher.
21          MR. FITZPATRICK:  Both are studying to be teachers?
22          THE JUROR:  Yes.
23          MR. FITZPATRICK:  When did you actually retire,
24  what year approximately?
25          THE JUROR:  I retired in, I've been retired for
```

80

```
 1          THE COURT:  You didn't mark anything on the page.
 2  You didn't have a yes response to any of the questions?
 3          THE JUROR:  No.
 4          THE COURT:  Have you heard anything about this
 5  case?
 6          THE JUROR:  No.
 7          THE COURT:  You know nothing about it?
 8          THE JUROR:  No, sir.
 9          THE COURT:  Are you totally confident you can be
10  fair to both sides in this case?
11          THE JUROR:  Yes.
12          THE COURT:  Government?
13          MR. FITZPATRICK:  Good afternoon.
14          THE JUROR:  Good afternoon.
15          MR. FITZPATRICK:  Can you tell us where you grew
16  up?
17          THE JUROR:  South Carolina.
18          MR. FITZPATRICK:  Can you tell us briefly how you
19  got from South Carolina to being here in D.C.?
20          THE JUROR:  My brother and those were here, so I
21  just come up and start living up here with them.
22          MR. FITZPATRICK:  What year was that approximately?
23          THE JUROR:  It was 1947.
24          MR. FITZPATRICK:  Okay.  Can you tell us what
25  you've done for school or work since that time?
```

```
 1  about five years.
 2          MR. FITZPATRICK:  Do you read papers day to day or
 3  not?
 4          THE JUROR:  Yes.
 5          MR. FITZPATRICK:  Any particular paper you read?
 6          THE JUROR:  The Washington Post.
 7          MR. FITZPATRICK:  Have you read anything in The
 8  Washington Post about this case?
 9          THE JUROR:  No.
10          MR. FITZPATRICK:  Do you watch any TV news shows on
11  a regular basis?
12          THE JUROR:  I just watch the TV stories.
13          MR. FITZPATRICK:  Not interested in the news?
14          THE JUROR:  No.
15          MR. FITZPATRICK:  Okay.  Thank you.
16          THE COURT:  Defense?
17          MR. JEFFRESS:  Good afternoon.  Just a few
18  questions.
19          Would it be true that, until you came to court
20  yesterday, you had never heard Mr. Libby's name?  You didn't
21  know anything about him?
22          THE JUROR:  No.
23          MR. JEFFRESS:  Do you have any opinions about
24  President Bush or Vice President Cheney?
25          THE JUROR:  No.
```

81

1          MR. JEFFRESS:  You have no negative feelings about
2    either one of them?
3          THE JUROR:  No.
4          MR. JEFFRESS:  Have you ever heard anybody express
5    opinions, people close to you, people in your family perhaps,
6    express negative opinions about Vice President Cheney in
7    particular?
8          THE JUROR:  No.
9          MR. JEFFRESS:  Yesterday, you remember Judge Walton
10   asked some questions when you were seated out here about
11   memory and how you think memory works?
12         THE JUROR:  Yes.
13         MR. JEFFRESS:  Do you remember that?
14         Do you think that it happens that people are
15   absolutely certain that something happened one way and then
16   they come to find out they're completely wrong?  Does that
17   happen?
18         THE JUROR:  Yes, I have heard it.
19         MR. JEFFRESS:  You've heard it?
20         THE JUROR:  Yeah.
21         MR. JEFFRESS:  Sometimes people have violent
22   disagreements about how things happen, but do you conclude
23   that sometimes they're both honest in their recollections?
24   They're just different?
25         THE JUROR:  Well, I don't know about other people,

82

1    but I'm just saying about myself.
2          MR. JEFFRESS:  Okay.
3          You've never, you've never served on a jury I
4    guess, is that right?
5          THE JUROR:  Yes, I've served on jury a many time.
6          MR. JEFFRESS:  You have?
7          THE JUROR:  This is probably the fifth time I've
8    been on jury duty.
9          THE COURT:  Criminal cases or civil cases?
10         THE JUROR:  I've served on criminal cases and on
11   the other one.
12         THE COURT:  In this court or Superior Court?
13         THE JUROR:  I've served over there, too.
14         THE COURT:  Here and over there?
15         THE JUROR:  Yes.
16         THE COURT:  What type of criminal cases did you
17   serve on?
18         THE JUROR:  I served on, the time when those guys
19   killed the lady and her husband and a lot of peoples over
20   there on, it was on Fifth Street, Northeast.
21         THE COURT:  Did you actually sit as a juror on that
22   case?
23         THE JUROR:  Sure.
24         THE COURT:  Was a decision rendered in that case?
25         THE JUROR:  Yes.

83

1          THE COURT:  Did you participate in the decision?
2          THE JUROR:  Yes.
3          THE COURT:  Okay.
4          Any other time that you served as a juror in a
5    criminal case where you participated in the decision?
6          THE JUROR:  I really, I don't remember now.  It's
7    been so long.
8          THE COURT:  But you do know you've served about
9    five times?
10         THE JUROR:  Yes, I have.  I served over here one
11   time.  And about, about four times over there, too.
12         THE COURT:  What type of case was it that you sat
13   on over here?
14         THE JUROR:  When they killed all those peoples.
15         THE COURT:  That's the same case?
16         THE JUROR:  Yes.
17         THE COURT:  Okay.
18         MR. JEFFRESS:  Have you ever served on a Grand
19   Jury?  Do you know what a Grand Jury is?
20         THE JUROR:  Yes.  No, I haven't served on there.
21         MR. JEFFRESS:  You haven't served on a Grand Jury.
22         If you were to serve as a juror on this case and
23   you were instructed that the burden is on the Government to
24   prove that the defendant is guilty beyond a reasonable doubt,
25   now, if you decided in your own mind that the Government had

84

1    failed to carry that burden to prove him guilty beyond a
2    reasonable doubt, would you have any trouble voting not
3    guilty as to Mr. Libby?
4          THE JUROR:  No, I wouldn't have no trouble about
5    it.
6          MR. JEFFRESS:  Thank you.
7          MR. FITZPATRICK:  One question about that memory.
8    If you were to be told that a person described things
9    happening one way and then you were convinced that things
10   really happened in a very different way, how would you sort
11   out whether or not someone told you the wrong story because
12   they made an honest mistake or whether they had told a lie?
13         THE JUROR:  Repeat that again now.
14         MR. FITZPATRICK:  Sure.  If someone told you that
15   something happened.  And you were convinced that it really
16   didn't happen that way.  How would you try to figure out
17   whether the person told you something wrong because they made
18   a mistake, they remembered it wrong, or whether they were
19   telling you a lie?
20         THE JUROR:  Well, I figure they was telling me a
21   lie if I figure, you know, did, if they were lying, I just
22   figure it out the best I could.
23         MR. FITZPATRICK:  Thank you.
24         THE COURT:  Have you ever had a situation where one
25   of your children told you something about what happened and

85

```
1   the other one told you about that same thing, something
2   totally different?
3            THE JUROR:  Yes, I have had that problem.
4            THE COURT:  Did you have to make a decision on
5   which one was telling the truth?
6            THE JUROR:  Yes.
7            THE COURT:  How did you do that?
8            THE JUROR:  Well, I would just sit them down and I
9   would just figure out which one was lying and which one was
10  not lying.
11           THE COURT:  How did you make that decision?
12           THE JUROR:  Well, as a matter of fact, I would
13  just, I would ask both of them.  Then if one said one thing,
14  I just look at them and, you know, figure it out my way.
15           THE COURT:  What is your way?
16           THE JUROR:  I would figure out who was telling the
17  truth and who wasn't telling the truth.
18           MR. FITZPATRICK:  Thank you.
19           THE COURT:  Anything else?
20           MR. JEFFRESS:  Just one thing.  When you said you
21  had to sit down and decide which is lying and which isn't, is
22  sometimes you find that although people disagree that they're
23  both being honest and they just have different recollections?
24  Is that one possible thing you could decide?
25           THE JUROR:  Yes.
```

86

```
1            MR. JEFFRESS:  Thank you.
2            THE COURT:  Okay.  Miss, if you could have a seat
3   on one of those black seats right down in the front row.
4            Counsel approach.
5            (Bench conference.)
6            THE COURT:  Any position?
7            MR. JEFFRESS:  No position.
8            MR. FITZPATRICK:  No position.
9            (Open court.)
10           THE COURT:  Okay.  Hopefully we can finish this
11  tomorrow.  I'm not sure we can, but we'll need you back here
12  at 3:00 o'clock tomorrow.  So report to the fourth floor at
13  3:00 o'clock like you did today.  Don't talk about the case.
14  Don't read anything in the newspaper.  Don't listen to the
15  radio or TV as far as the news is concerned, okay?  Have a
16  nice evening.
17           You are Juror Number 0145?
18           THE JUROR:  Yes, sir.
19           THE COURT:  You responded to Questions Number 6A, B
20  and C.  Those questions related to attitudes or feelings you
21  may have about present or former members of the Bush
22  Administration.  Do you feel that you could give somebody who
23  was a present or former member of the Bush Administration a
24  fair trial?
25           THE JUROR:  Yes.
```

87

```
1            THE COURT:  You indicate, however, in reference to
2   those responses that, and I asked, would the fact that a
3   former or present member of the Bush Administration would be
4   a witness, whether that would impair your ability to be
5   totally fair and impartial and you checked that.
6            You also checked whether you would have any
7   difficulty fairly judging the believability who was a present
8   or former member of the Bush Administration.  You also said
9   you had feelings or opinions about Vice President Cheney that
10  might in some way affect your ability to fairly judge him as
11  a witness.  You want to tell us what your feelings are in
12  those respects?
13           THE JUROR:  Sure.  Primarily, it's I disagree with
14  how the war in Iraq is being handled.  That's the main issue
15  that I have.
16           THE COURT:  In what regard do you have concerns
17  about that?
18           THE JUROR:  I disagree with why we went to war.  I
19  understand that we really don't have a clear way out right
20  now, and we need to finish what we've started.  So, I
21  understand the reasoning for being there now.  But officially
22  I was not in favor of going to war and the reasons behind it.
23           THE COURT:  Why didn't you feel we should have
24  gone?  Why do you think we shouldn't have gone to war?
25           THE JUROR:  I think we should not have gone to war
```

88

```
1   because following 9-11, I don't think it was the appropriate
2   action, as well as I do not believe that Iraq possessed
3   weapons of mass destruction.
4            THE COURT:  You didn't believe that?
5            THE JUROR:  No.
6            THE COURT:  Why didn't you believe that was the
7   case?
8            THE JUROR:  I didn't believe that the proof I had
9   seen through the news, I just didn't believe that it was
10  there.  It was the wrong reason for us to go to war.
11           THE COURT:  Now, Mr. Libby is on trial here.  And
12  he was Vice President Cheney's Chief of Staff and National
13  Security Advisor and also an assistant to the President.
14  Would the fact that he held those positions at the time the
15  country went to war have any impact on your ability to fairly
16  judge him?
17           THE JUROR:  No, sir.
18           THE COURT:  The Government has the burden of
19  proving his guilt, and they must prove his guilt beyond a
20  reasonable doubt.  Do you understand that?
21           THE JUROR:  Yes, sir.
22           THE COURT:  Would you hold them to that proof?
23           THE JUROR:  Yes, sir.
24           THE COURT:  Would you in any way lessen their
25  obligation regarding that proof and foster your feelings
```

89

```
1   about the Bush Administration and the war?
2           THE JUROR:  No, sir.
3           THE COURT:  Mr. Libby has to be presumed innocent.
4   Can you and do you presume him innocent at this time?
5           THE JUROR:  Yes.
6           THE COURT:  If you felt that the Government had not
7   proven that he was guilty beyond a reasonable doubt, would
8   you nonetheless convict him because of your feelings about
9   the war?
10          THE JUROR:  No, sir.
11          THE COURT:  If Vice President Cheney or somebody
12  else, who was a member of the Bush Administration, currently
13  or formerly, testified and they testified about one thing and
14  somebody else testified who was not a member of the
15  Administration about that same matter and it was clear that
16  both could not be telling you the truth, would you tend to
17  have a strike against the person that was a member of the
18  Bush Administration as compared to the other person because
19  of your feelings about the war?
20          THE JUROR:  No, sir.
21          THE COURT:  You also said that you have had media
22  contact with this case?
23          THE JUROR:  Yes, sir.  I've read about the case
24  initially in the newspaper and also seen the news on TV.
25          THE COURT:  What exactly do you remember hearing
```

90

```
1   about the case?
2           THE JUROR:  Really just that there was a leak of
3   the name of a CIA agent.  That was primarily it.  And then
4   the folks that were associated with that in the story.
5           THE COURT:  Did you form any opinions about the
6   culpability of anyone based upon what you've heard in the
7   media?
8           THE JUROR:  No, because most of what I read was
9   initial reports, and I have a tendency to not believe what I
10  hear at first especially out of the media.
11          THE COURT:  Would you be able to put out of your
12  mind what you heard in the media and judge this case solely
13  upon what you hear and see in the courtroom?
14          THE JUROR:  Yes, sir.
15          THE COURT:  You also had a response to Question
16  Number 2.  And that was asking about Mr. Libby and whether
17  you had any feelings about him and whether that would in any
18  way impair your ability to be fair and impartial in this
19  case.  Have you heard his name before?
20          THE JUROR:  Yes, I have.
21          THE COURT:  Have you formed any opinions about Mr.
22  Libby based upon what you've heard?
23          THE JUROR:  No, I have not.
24          THE COURT:  And I think I've already asked you
25  this, but would the fact that he held those positions with
```

91

```
1   the Bush Administration cause you to not be able to fairly
2   judge him?
3           THE JUROR:  No.
4           THE COURT:  You also responded to, I guess that was
5   actually it.  So, are you totally confident you can be fair
6   to both sides in this case?
7           THE JUROR:  Yes.
8           THE COURT:  Government?
9           MR. FITZPATRICK:  Good afternoon.
10          THE JUROR:  Good afternoon.
11          MR. FITZPATRICK:  Can you tell us where you grew
12  up?
13          THE JUROR:  Binghamton, New York.
14          MR. FITZPATRICK:  When did you move to D.C.?
15          THE JUROR:  Let's see, in August of 2003.
16          MR. FITZPATRICK:  Can you tell us what you do day
17  to day in your job?
18          THE JUROR:  I'm a policy analyst with the Homeland
19  Security Policy Institute at George Washington University.
20          MR. FITZPATRICK:  On a given day, what do you do?
21          THE JUROR:  Research policy, work on specific
22  projects that my boss assigns me to, do research, writing
23  papers, also working on our external affairs, developing a
24  strategy and a plan for our office since it's fairly new.
25          MR. FITZPATRICK:  If you heard any evidence in this
```

92

```
1   trial about people working on policy matters, could you put
2   aside what you know from your day job and just judge the case
3   based upon the evidence you hear in the courtroom?
4           THE JUROR:  Yes.
5           MR. FITZPATRICK:  Thank you.
6           THE COURT:  Defense?
7           MR. WELLS:  Good afternoon.
8           THE JUROR:  Good afternoon.
9           MR. WELLS:  Could you give me your educational
10  background?
11          THE JUROR:  Sure.  Did my undergraduate at Sienna
12  College in Albany, New York.  I graduated in the year 2003,
13  with a Bachelor's in marketing management and am currently
14  pursuing my Master's in public administration at the George
15  Washington University.
16          MR. WELLS:  Tell me what the Homeland Security
17  office at George Washington University does?
18          THE JUROR:  Primarily we bring together folks in
19  regard to a specific issue that we're working on to discuss
20  current policies and try and come up with possible solutions
21  for policymakers to some of the issues related to Homeland
22  Security.
23          MR. WELLS:  Could you give me a couple of examples
24  of those issues?
25          THE JUROR:  Sure, most recently, we did work on a
```

93

```
 1  prison radicals issue, looking at radicalization of folks in
 2  prison, primarily mostly inmates, the process of
 3  radicalization and our U.S. prison system and some solutions
 4  to better secure that process.
 5          MR. WELLS:  How does that relate to Homeland
 6  Security?
 7          THE JUROR:  It's working to try to prevent.  It's
 8  more a preventative solution to try to catch folks who may be
 9  vulnerable to radical ideas and also being prey among
10  recruiters.
11          MR. WELLS:  Thank you.
12          In terms of your feelings about the Bush
13  Administration, in this particular case, the factual backdrop
14  will involve various newspaper articles that raised the issue
15  of whether or not the Bush Administration was candid with the
16  American public about the reasons for going to war.
17          There may be a number of officials from the Bush
18  Administration who testify, including Vice President Cheney.
19  If Vice President Cheney testifies, will you be able to set
20  aside whatever feelings you have about him or the Bush
21  Administration and judge him like any other witness?
22          THE JUROR:  Yes, sir.
23          MR. WELLS:  And the fact that Mr. Libby was a Chief
24  of Staff for the Vice President, you will be able to set any
25  feelings you have about the Bush Administration aside and
```

94

```
 1  judge him in a fair and impartial fashion?
 2          THE JUROR:  Yes, sir.
 3          MR. WELLS:  Do you ever watch Meet The Press?
 4          THE JUROR:  Not regularly, no.
 5          MR. WELLS:  Do you have any feelings about Tim
 6  Russert?
 7          THE JUROR:  No, I do not.
 8          MR. WELLS:  Have you ever experienced a situation
 9  in your life where you had a recollection that a particular
10  event had happened one way then it turned out later that you
11  were mistaken?
12          THE JUROR:  Yes.
13          MR. WELLS:  Have you also experienced situations
14  where you and your friends might have a disagreement about
15  what took place?  You thought it happened one way.  Your
16  friend thought it happened another way.  Have you had that
17  type of situation?
18          THE JUROR:  Yes.
19          MR. WELLS:  Would you agree that, in those
20  situations, you don't jump to the conclusion that the person
21  who was wrong was lying as opposed to just having a
22  misrecollection about the events, right?
23          THE JUROR:  Yes.
24          MR. WELLS:  I have no further questions.
25          THE COURT:  Sir, anything else?
```

95

```
 1          MR. FITZPATRICK:  No.
 2          THE COURT:  Would you have a seat on one of those
 3  black chairs in the front row.
 4          Counsel, approach.
 5          (Bench conference.)
 6          THE COURT:  Any position?
 7          MR. WELLS:  No.
 8          MR. FITZPATRICK:  No.
 9          (Open Court.)
10          THE COURT:  Okay, sir, hopefully we can get back to
11  you tomorrow by 3:00 o'clock.  So, you're excused until then.
12  When you come back, report to the fourth floor like you did
13  today.  Don't talk about the case.  Avoid all media regarding
14  this case.  Just avoid the media, okay?  Thank you.  Have a
15  nice evening.
16          You're Juror Number 1820?
17          THE JUROR:  Correct.
18          THE COURT:  You had a response to Question Number
19  3A, that you had a question mark by that, which asks whether
20  you personally knew anything about the case.  And then you
21  also had a response to Question Number 3B, which asks whether
22  you've read or heard anything about the case in the media.
23  You want to explain what that is?
24          THE JUROR:  I think, after you asked B, at first I
25  thought it might be just have we heard about it.  Then I
```

96

```
 1  thought it was personal involvement.  So I was just unsure on
 2  A, what you meant.
 3          THE COURT:  Which one is it?
 4          THE JUROR:  I don't have any personal involvement.
 5  I had heard about it.
 6          THE COURT:  What have you heard about it?
 7          THE JUROR:  Well, just the outlines of the case and
 8  the charges.
 9          THE COURT:  What do you recall?
10          THE JUROR:  Well, I mean it all started with the
11  two columns by Wilson and Novak, and then the investigation,
12  culminating in, I think, charges of perjury and obstruction
13  of justice but no charges relating to the release of the
14  name.
15          THE COURT:  Did you form any opinions about the
16  case based upon what you heard or read in the media?
17          THE JUROR:  No, no.
18          THE COURT:  Do you have any impressions at this
19  time as to whether Mr. Libby is innocent or not guilty based
20  upon what you heard in the media?
21          THE JUROR:  No, I don't.
22          THE COURT:  Do you presume that he is innocent at
23  this time?
24          THE JUROR:  Absolutely.
25          THE COURT:  Would you hold the Government to its
```

97

```
1   burden of proving his guilt beyond a reasonable doubt?
2        THE JUROR:  Absolutely.
3        THE COURT:  Do you think what you heard in the
4   media would in any way affect how you decide this case?
5        THE JUROR:  No.
6        THE COURT:  You have to totally put that out of
7   your mind.  You can't judge this case based upon what you
8   heard in the media.  You have to judge it based only upon
9   what you hear and see in the courtroom.  Can you do that?
10       THE JUROR:  Yes.
11       THE COURT:  You also had a response to Question
12  Number 29, which asks whether you previously served as a
13  juror?
14       THE JUROR:  Yes.
15       THE COURT:  You want to tell me about that?
16       THE JUROR:  I was the -- I've been called a few
17  times, but I was, 15 years ago, the foreman on a murder case
18  in Massachusetts, second degree murder case.
19       THE COURT:  Was a decision reached in that case?
20       THE JUROR:  It was.
21       THE COURT:  Did you participate in that decision?
22       THE JUROR:  Yes, I was the foreman.
23       THE COURT:  Was there anything about the process
24  that you went through in that case that you think might
25  affect your ability to be fair and impartial in this case?
```

98

```
1        THE JUROR:  No, no.
2        THE COURT:  Did you form any opinion about the
3   defense lawyer or the prosecutor in that case as a result of
4   how they conducted themselves that might in any way cause you
5   to favor one side or the other in this case?
6        THE JUROR:  No, my impression was that the system
7   worked well.
8        THE COURT:  You also had a response to Question
9   Number 30, which asks whether you, close friends or relatives
10  have ever been a victim of a crime, someone charged with a
11  crime or a witness to a crime.  You want to tell me about
12  that?
13       THE JUROR:  Yes, just a break-in in my house in the
14  District maybe eight years ago, non violent.  They just broke
15  in and stole something.
16       THE COURT:  Did you report it to the police?
17       THE JUROR:  I did, yes.
18       THE COURT:  Did the police respond?
19       THE JUROR:  They came out, took fingerprints, took
20  a report.
21       THE COURT:  Were you satisfied with their efforts?
22       THE JUROR:  Sure.
23       THE COURT:  Do you think that experience as a crime
24  victim would in any way cause you to favor one side or the
25  other in this case?
```

99

```
1        THE JUROR:  No.
2        THE COURT:  So are you totally confident you can be
3   fair to both sides?
4        THE JUROR:  Yes.
5        THE COURT:  Government?
6        MR. FITZPATRICK:  Good afternoon.
7        Can you tell us what kind of work you do day to
8   day?
9        THE JUROR:  I'm an economist by training, and I do
10  telecommunications consulting, mainly with regulators, many
11  of them overseas, sort of like the FCC, but overseas.
12       MR. FITZPATRICK:  Can you tell us your educational
13  background?
14       THE JUROR:  I have a Ph.D. in economics from
15  M.I.T., and undergraduate degree from Bowdin College.
16       MR. FITZPATRICK:  What papers do you read day to
17  day?
18       THE JUROR:  At home, I get The New York Times.  At
19  work we get The Wall Street Journal and often I'll buy The
20  Washington Post as well.
21       MR. FITZPATRICK:  And have you followed the press
22  coverage of the investigation and any particular issues that
23  came up during the investigation?
24       THE JUROR:  Well, I mean I think just in general
25  terms as someone interested in the news, I followed it.  No,
```

100

```
1   I mean, I haven't formed any particular opinions.
2        MR. FITZPATRICK:  When you read a paper, do you
3   read the whole paper or do you focus on particular sections?
4        THE JUROR:  Well, I tend to focus on the national
5   news, the editorials and opinions, and then some sports and
6   then other business for my work.
7        MR. FITZPATRICK:  Anything you've read in any of
8   the editorials about this case at any time, would that affect
9   how you'd view the evidence before you if you were sitting as
10  a juror?
11       THE JUROR:  No, absolutely not.
12       MR. FITZPATRICK:  Thank you.
13       THE COURT:  Defense?
14       MR. JEFFRESS:  Good afternoon.
15       Could you tell me, do you tend to read the
16  newspaper every day?
17       THE JUROR:  Yes.
18       MR. JEFFRESS:  Do you watch TV news shows?
19       THE JUROR:  I do not.
20       MR. JEFFRESS:  Would you say you've followed this
21  case fairly closely since the first news about the
22  investigation came out?
23       THE JUROR:  I wouldn't say fairly closely, no.
24  But, you know, as it's been in the news, I've followed it,
25  and of course there have been editorials and opinions.
```

101

1    MR. JEFFRESS:  Have you ever read anything that Joe
2  Wilson has said publicly about it?
3    THE JUROR:  Have I ever heard anything?  No.  I may
4  have seen him on a show, but it was a talk show.  I mean, it
5  wasn't a news show.  It might have been the daily show or
6  something.  I can't remember.
7    MR. JEFFRESS:  Have you watched or read anything
8  Tim Russert has said about this case?
9    THE JUROR:  No.
10    MR. JEFFRESS:  Anything that any of the lawyers in
11  this room have said about the case, either at the time the
12  indictment was returned or since?
13    THE JUROR:  No.
14    MR. JEFFRESS:  Is there any fact that sticks in
15  your mind?  Obviously you picked up some facts here and there
16  at least as reported by the newspaper, but is there any fact
17  that sticks in your mind that you think you know that it
18  would take some evidence to change?
19    THE JUROR:  That I think I know?  Not relating to
20  these charges.  I mean, it's clear what, you know, that
21  Valerie Plame's name was released and it changed her job
22  status, but I know that that's not what the charges here
23  relate to.  Relating to these charges, no, I don't think
24  there are any facts like that.
25    MR. JEFFRESS:  Well, concerning her job status,

102

1  you've probably read somewhere that she was covert at one
2  time?
3    THE JUROR:  I have read that, yeah.
4    MR. JEFFRESS:  Now, in this particular case, if the
5  Judge were to instruct you that, look, whether she was covert
6  or not is not a question in this case and you're to make no
7  assumption one way or another as to whether she was or
8  wasn't.  Is that an instruction you think you could follow?
9    THE JUROR:  That's actually what I believe is the
10  case, that it's not relevant.
11    MR. JEFFRESS:  Do you have any -- did you know that
12  there is controversy about the credibility of President Bush
13  and other members of the Administration on reasons we went to
14  war in Iraq, right?
15    THE JUROR:  Yes.
16    MR. JEFFRESS:  You've probably discussed that issue
17  with people as well as read about it?
18    THE JUROR:  Yes.
19    MR. JEFFRESS:  And what is your opinion about that?
20  Do you have an opinion about the credibility of the
21  Administration and the reasons that were given for the war in
22  Iraq?
23    THE JUROR:  Well, I mean, it's clear that they
24  didn't find weapons of mass destruction.  It's clear that
25  there was a goal that was successful of deposing Saddam

103

1  Hussein.  Whether or not they knew at the time that there
2  weren't any weapons or not, I have no way of knowing.
3    I was born in Israel and so the goal of democracy
4  and all of that I think is a fine one.  I believe that that
5  is the case and that that was a goal of going in there.
6    MR. JEFFRESS:  And you know Vice President Cheney
7  may well testify in this case.  Do you have any opinion about
8  Vice President Cheney or about his credibility that might
9  make him kind of start in your eyes a little bit behind where
10  other witnesses would be?
11    THE JUROR:  No, I don't believe that I do.
12    MR. JEFFRESS:  Okay.  You could listen to him just
13  like you could listen to any other witness and judge his
14  credibility accordingly?
15    THE JUROR:  Sure.
16    MR. JEFFRESS:  Now, do you think you know anything
17  other than the fact that Mr. Libby has been charged, other
18  than the fact that he once was Vice President Cheney's Chief
19  of Staff but had to resign?  Do you think, as you sit here
20  today, you know anything else about him?
21    THE JUROR:  No, no.  I mean, with all due respect
22  to his service, his public service, I don't believe that I
23  saw his name come up in other facets of what he did for Vice
24  President and for the Administration.
25    MR. JEFFRESS:  Until this started?

104

1    THE JUROR:  Yes.
2    MR. JEFFRESS:  That's all I have, Your Honor.
3  Thank you.
4    THE COURT:  Sir, could you have a seat on the first
5  row in one of those black seats?
6    (Bench conference.)
7    THE COURT:  Any position?
8    MR. JEFFRESS:  No position.
9    MR. FITZPATRICK:  No, Your Honor.
10    (Open court.)
11    THE COURT:  Sir, you can go home for the evening.
12  Hopefully, we'll be able to get back to you by 3:00 o'clock.
13  So you need to be back on the fourth floor in the juror's
14  lounge at 3:00 o'clock tomorrow.  Don't talk about the case.
15  Don't have any media contact.
16    THE JUROR:  I understand.
17    THE COURT:  Have a nice evening.
18    THE JUROR:  Thank you.
19    THE COURT:  You're Juror Number 0419?
20    THE JUROR:  Yes.
21    THE COURT:  You checked one question.  That was
22  Number 3B, indicating that you have heard or read something
23  about this case?
24    THE JUROR:  Yes.
25    THE COURT:  Do you remember what you've heard or

105

1  read?

2  THE JUROR:  I read newspaper, and I don't remember

3  very well.  But I remember them talking about someone working

4  for CIA, a lady work for CIA and her husband is, used to be

5  Ambassador or something.

6  Then the couple complain that this could be some

7  kind of a political, they tried to embarass the lady or

8  something like that, but I don't know very well about that.

9  THE COURT:  That's all you remember hearing about

10  the case?

11  THE JUROR:  That's right.

12  THE COURT:  Did you form any opinions as a result

13  of what you heard?

14  THE JUROR:  No, I did not.

15  THE COURT:  Do you have any feelings right now as

16  to whether Mr. Libby, who has been charged in this case,

17  whether he's guilty or not guilty?

18  THE JUROR:  I didn't think about that.

19  THE COURT:  Can you presume and do you presume that

20  he's innocent at this time?

21  THE JUROR:  I don't know.

22  THE COURT:  Well, you have to be able to presume

23  that he's innocent.  Can you do that?

24  THE JUROR:  Okay, yes, yes.  That's, presume that

25  he's innocent before you have evidence.

106

1  THE COURT:  You can do that?

2  THE JUROR:  Right.

3  THE COURT:  You understand it's the Government who

4  has to present that evidence to you?

5  THE JUROR:  That is correct.

6  THE COURT:  And they have to prove his guilt beyond

7  a reasonable doubt?

8  THE JUROR:  That's correct.

9  THE COURT:  Would you hold them to that burden?

10  THE JUROR:  Yes, I will.

11  THE COURT:  So are you totally confident you could

12  be fair to both sides in this case?

13  THE JUROR:  I don't have anything view otherwise.

14  THE COURT:  So you can be fair to both sides?

15  THE JUROR:  I think so.

16  THE COURT:  Do you have any questions about whether

17  you could be fair?

18  THE JUROR:  Not really.  At this moment, I don't

19  have anything that come to my mind.

20  THE COURT:  Government?

21  MR. FITZPATRICK:  Good afternoon.

22  Can you tell us where you grew up?

23  THE JUROR:  Taiwan.

24  MR. FITZPATRICK:  When did you leave Taiwan?

25  THE JUROR:  I left Taiwan to pursue advanced study

107

1  in this country.

2  MR. FITZPATRICK:  About what year was that?

3  THE JUROR:  1965.

4  MR. FITZPATRICK:  Tell us where you went to school

5  when you got here?

6  THE JUROR:  In here?

7  MR. FITZPATRICK:  Yes.

8  THE JUROR:  First time I went to Texas, I mean,

9  Kansas State University.  Then, after I got that degree, a

10  Master degree, I went to University of Texas in Austin.

11  MR. FITZPATRICK:  Okay.  What did you get the

12  Master's degree in from Kansas State?

13  THE JUROR:  Political Science.

14  MR. FITZPATRICK:  Then did you get a Ph.D. at Texas

15  Austin?

16  THE JUROR:  I went to Austin to study accounting.

17  MR. FITZPATRICK:  Okay.  When did you graduate from

18  Austin?

19  THE JUROR:  Technically, I was graduate in '72 but

20  before that, I worked a couple of years at accounting firm.

21  THE COURT:  Did you get a degree from Austin?

22  THE JUROR:  Yes, Master's in accounting.

23  MR. FITZPATRICK:  Okay.  Did you do any further

24  schooling after your two Master's degrees?

25  THE JUROR:  No.

108

1  MR. FITZPATRICK:  Can you briefly describe your job

2  history since you graduated from Austin with your second

3  Master's degree?

4  THE JUROR:  I worked about 11 years for a company

5  called United Planning Organization.  That is advocate for

6  poor people, and I work as an accountant over there.  Then

7  after that, I passed the C.P.A. test, and then I start on my

8  accounting firm

9  MR. FITZPATRICK:  For how long have you run your

10  own accounting firm?

11  THE JUROR:  Twenty-two years.

12  MR. FITZPATRICK:  You still work full time day to

13  day?

14  THE JUROR:  Yes.

15  MR. FITZPATRICK:  How big is your firm just in

16  terms of number of people who work there?

17  THE JUROR:  Right now we have four people.

18  MR. FITZPATRICK:  What papers do you read day to

19  day?

20  THE JUROR:  What?

21  MR. FITZPATRICK:  What newspapers do you read day

22  to day?

23  THE JUROR:  Usually I read Washington Post.

24  MR. FITZPATRICK:  Do you watch any particular TV

25  shows, news shows on TV?

109

```
1        THE JUROR:  Not really.  I mostly enjoy ABC, CBS,
2   NBC and occasionally I would, I will open CNN.
3        MR. FITZPATRICK:  Do you have any adult children
4   who work?
5        THE JUROR:  Yes, two.
6        MR. FITZPATRICK:  What do they do?
7        THE JUROR:  One working as for trade company.  And
8   another work for a law firm but not a lawyer, but as a
9   economic analyst.  But that's a lady.  Now she quit.  She
10  joined Peace Corps.
11       MR. FITZPATRICK:  Okay.  Thank you very much.
12       THE COURT:  Defense?
13       MR. JEFFRESS:  Good afternoon.
14       THE JUROR:  Good afternoon.
15       MR. JEFFRESS:  I gather you do watch news on
16  television from time to time, correct?
17       THE JUROR:  Yes.
18       MR. JEFFRESS:  Do you remember seeing anything on
19  television that had to do with this case or Mr. Libby in
20  particular?
21       THE JUROR:  As I said, I just explained, I did
22  watch once, a couple times and I know, a gentleman complained
23  that this could be a political embarassment for the couple.
24  The gentleman's wife, I remember was working for CIA and this
25  is the case.
```

110

```
1        MR. JEFFRESS:  And the gentleman, do you remember
2   his name or his wife's name?
3        THE JUROR:  I don't remember.
4        MR. JEFFRESS:  Do you know whether you've ever seen
5   him who was complaining, seen him or his wife on television?
6        THE JUROR:  No.  I think I just watched a couple
7   times and I can't remember.
8        MR. JEFFRESS:  All right.  Do you know anything
9   about the CIA?
10       THE JUROR:  I know CIA is something for security,
11  national security but could be worldwide.
12       MR. JEFFRESS:  Worldwide?
13       THE JUROR:  Yes.
14       MR. JEFFRESS:  Do you know how many people that
15  work for the CIA are covert or undercover?  You don't know
16  very much about it?
17       THE JUROR:  No.
18       MR. JEFFRESS:  In terms of news, do you read blogs?
19  Do you look at news on the internet?
20       THE JUROR:  No, I don't.  I don't know how to
21  operate the internet.
22       MR. JEFFRESS:  I'm sorry.
23       THE JUROR:  I don't know how to operate the
24  internet.  Too old, I don't know how to operate the internet.
25       MR. JEFFRESS:  You don't know how to operate the
```

111

```
1   internet.  Okay.  All right.
2        Do you have any opinions about the credibility of
3   President Bush's Administration, members of the
4   Administration?
5        THE JUROR:  I try to shy away from this kind of
6   debate because, to me, view to be an accountant, you have to
7   be neutral rather than form some kind of an opinion.  Look
8   like this is a political matter.
9        MR. JEFFRESS:  Political matter?
10       THE JUROR:  Political matters.  So I try not to
11  form opinion and I just, by look at television, I just forget
12  about it.
13       MR. JEFFRESS:  In terms of the war in Iraq and the
14  reasons why we went to war in Iraq, have you read or heard
15  anything about any controversy about the credibility of the
16  President's intelligence and his statements before the war?
17       THE JUROR:  Of course, for many years already, from
18  television, from newspaper, should be able to get some kind
19  of ideas of pros and cons.
20       MR. JEFFRESS:  Did you ever have an opinion?  Have
21  you ever expressed an opinion about --
22       THE JUROR:  I don't know which side -- I cannot
23  tell you from my own opinion.
24       MR. JEFFRESS:  How about Vice President Cheney, in
25  particular, do you have any opinion about Vice President
```

112

```
1   Cheney?
2        THE JUROR:  Actually, sir, I don't know him  I
3   don't know him.  I don't know him very well.
4        MR. JEFFRESS:  I gather, have you been in D.C., how
5   long have you been in the District?
6        THE JUROR:  Thirty-one years.
7        MR. JEFFRESS:  Thirty-one years, and all that time,
8   have you served on a jury in all that time?
9        THE JUROR:  Never been selected.
10       MR. JEFFRESS:  Do you believe that, in a criminal
11  case -- you understand this is a criminal case, these charges
12  are criminal charges -- do you believe that the defendant has
13  any obligation to come forward with evidence to prove his
14  side of the case?
15       THE JUROR:  I think, if I'm right, I have seen the
16  defendants that have to prove rather than the other side got
17  to prove guilty.
18       MR. JEFFRESS:  Have you heard the term beyond a
19  reasonable doubt?
20       THE JUROR:  Yes, I do.
21       MR. JEFFRESS:  Would you have any problem, if you
22  sat as a juror on this case, would you have any difficulty
23  listening to the Government's evidence, and if that evidence
24  fails to satisfy you beyond a reasonable doubt, would you
25  have any difficulty finding Mr. Libby not guilty?
```

113

```
1          THE JUROR:  I don't know why I have to have some
2    kind of difficulty.  I don't think so.
3          MR. JEFFRESS:  You don't think so.
4          Could I have just a moment?  I have nothing
5    further, Your Honor.
6          THE COURT:  Anything else?
7          MR. FITZPATRICK:  No, Judge.
8          THE COURT:  Sir, could you step down and have a
9    seat in one of those black seats out there by the railing.
10         (Bench conference.)
11         THE COURT:  Any position either side?
12         MR. JEFFRESS:  No position.
13         MR. FITZPATRICK:  No position.
14         (Open court.)
15         THE COURT:  Sir, you can go home for the evening,
16   and we'll need you back at 3:00 o'clock tomorrow.  Go to the
17   fourth floor to the juror's lounge at 3:00 o'clock.  Don't
18   talk about the case and don't read anything in the newspaper.
19   Also don't listen to news programs on the TV or on the radio,
20   okay?
21         You're Juror Number 1824?
22         THE JUROR:  Yes, sir.
23         THE COURT:  You checked Question Number 35, which
24   asks whether you have any problems either speaking or
25   understanding the English language.
```

114

```
1          THE JUROR:  Sometimes.
2          THE COURT:  Sometimes?
3          THE JUROR:  Yes.
4          THE COURT:  Which one?  Is it understanding or
5    speaking?
6          THE JUROR:  In speaking.
7          THE COURT:  In speaking?
8          THE JUROR:  Uh-huh.
9          THE COURT:  Do you think you have the ability to
10   speak well enough to participate as a juror in this case?
11         THE JUROR:  I'm not sure, sir.
12         THE COURT:  You're not sure?
13         THE JUROR:  No.
14         THE COURT:  How long have you been in the U.S.?
15         THE JUROR:  Five years.
16         THE COURT:  What's your native language?
17         THE JUROR:  Spanish.
18         THE COURT:  Spanish, so you would have some
19   concerns about whether you could engage in dialogue or
20   discussion with your fellow jurors?
21         THE JUROR:  Can you repeat again?
22         THE COURT:  You think you would have some problems
23   talking to your fellow jurors about this case?
24         THE JUROR:  Sometimes I have problem.
25         THE COURT:  Sometimes?
```

115

```
1          THE JUROR:  Yes.
2          THE COURT:  Any objection?
3          MR. FITZPATRICK:  No objection.
4          MR. WELLS:  No objection.
5          THE COURT:  We'll let you be excused.  Thank you.
6          THE JUROR:  Okay.
7          THE COURT:  Go to the fourth floor to the juror's
8    lounge and tell them you were excused from this case.  Thank
9    you.
10         You're Juror Number 0207?
11         THE JUROR:  Correct, sir.
12         THE COURT:  You had a couple responses.  You
13   indicated a response to Question Number 3B indicating that
14   you've either heard or read something about this case?
15         THE JUROR:  Yes.
16         THE COURT:  Which one was it?
17         THE JUROR:  I don't know.  At the time I was having
18   my lower back fused.  So, all I remember is a name.
19         THE COURT:  That's all you remember?
20         THE JUROR:  That's all I remember.
21         THE COURT:  What name do you remember?  Mr. Libby's
22   name or some other name?
23         THE JUROR:  No, it was Scooter.
24         THE COURT:  Scooter, okay, and did you form any
25   conclusions about the case based upon --
```

116

```
1          THE JUROR:  I was in the hospital under morphine so
2    no.
3          THE COURT:  Okay.  You also had a response to
4    Question Number 19, which asks whether you, close friends or
5    relatives have ever been employed in a law enforcement
6    position or applied for such a position.  You want to tell me
7    about that?
8          THE JUROR:  My mother was a correctional officer
9    for Dade County, Miami over 25 years ago.  And then, she
10   worked as a secretary, a judge's secretary here in Washington
11   for Small Claims I believe it was.
12         THE COURT:  Did you ever talk to her about her
13   work?
14         THE JUROR:  No.  I wasn't living with her, so.
15         THE COURT:  Would the fact that she's done this
16   kind of work, would that cause you to side with one side or
17   the other in this case?
18         THE JUROR:  No, sir.
19         THE COURT:  You also had a response to Question
20   Number 29, which asks about prior jury service.  You want to
21   tell me about that?
22         THE JUROR:  I've done District Court jury service.
23         THE COURT:  This court?
24         THE JUROR:  No.
25         THE COURT:  Superior Court?
```

117

```
 1          THE JUROR:  Superior Court.
 2          THE COURT:  How many times?
 3          THE JUROR:  I believe it was twice.  Then once I
 4  was just in the room.
 5          THE COURT:  Criminal cases that you served on?
 6          THE JUROR:  I believe so.
 7          THE COURT:  What type of cases?
 8          THE JUROR:  Drug cases.
 9          THE COURT:  Both were drugs?
10          THE JUROR:  Yes.
11          THE COURT:  Were decisions rendered in those cases?
12          THE JUROR:  Only one.
13          THE COURT:  What happened in the other case?
14          THE JUROR:  The person died before it could be
15  deliberated.
16          THE COURT:  And was there anything about what
17  happened in those cases that might affect your ability to be
18  fair in this case?
19          THE JUROR:  No, not at all.
20          THE COURT:  Or would cause you to favor one side or
21  the other in this case?
22          THE JUROR:  No, sir.
23          THE COURT:  You also had a response to Question
24  Number 30, which asks whether you, close friends or relatives
25  have ever been a victim of a crime, someone charged with a
```

118

```
 1  crime or a witness to a crime.  You want to tell me about
 2  that?
 3          THE JUROR:  My brother was arrested for stealing
 4  his own car.
 5          THE COURT:  How did that happen?
 6          THE JUROR:  His car was stolen.  There was a
 7  mistake, you know, through the PD out in Maryland that either
 8  the computers went doing or something wasn't entered
 9  correctly, and they didn't get the response out to the police
10  officers on duty that the car was found.  So, he was driving
11  his car, and he was pulled over by seven police officers,
12  seven different cars.  Had to be handcuffed, taken down to
13  the station, the whole thing.
14          THE COURT:  And I guess he wasn't too happy about
15  that, right?
16          THE JUROR:  No.
17          THE COURT:  Do you have any bad feelings towards
18  the police as a result of what happened to him?
19          THE JUROR:  No.
20          THE COURT:  So you wouldn't hold against either
21  side in this case what happened to him?
22          THE JUROR:  No.  But it happened, you know, it just
23  happens.
24          THE COURT:  Anything else besides that as far as
25  crime is concerned?
```

119

```
 1          THE JUROR:  No, not that I know of.
 2          THE COURT:  So are you totally confident you could
 3  be fair to both sides?
 4          THE JUROR:  Yes, sir.
 5          THE COURT:  Government?
 6          MR. FITZPATRICK:  Good afternoon.
 7          THE JUROR:  Good afternoon.
 8          MR. FITZPATRICK:  Can you tell us where you grew
 9  up?
10          THE JUROR:  All over the United States and Canada.
11  I was a military brat.
12          MR. FITZPATRICK:  When did you end up moving to
13  D.C.?
14          THE JUROR:  It's been 15 years ago.  I kept getting
15  a job here in D.C.  I was a travel agent for many years.  And
16  then, one day I just moved into the city and I can't leave.
17          MR. FITZPATRICK:  Okay.  Was your father in the
18  military?
19          THE JUROR:  Both my father and then my mother.  My
20  father was Air Force.  My mother was Coast Guard.
21          MR. FITZPATRICK:  Do you know if either your mother
22  or father had a security clearance in the military?
23          THE JUROR:  I know my mother had one.
24          MR. FITZPATRICK:  Did you ever talk to her about
25  it?
```

120

```
 1          THE JUROR:  I think I know the name of it, but
 2  that's about it.
 3          MR. FITZPATRICK:  Anything about your parents
 4  having a military background or security clearance would not
 5  affect how you would decide a trial?  The fact that some of
 6  the information may or may not have been classified may have
 7  just come up?
 8          THE JUROR:  No, we didn't discuss things like that.
 9  We were not really close, as a whole knit family we didn't
10  discuss things like that.
11          MR. FITZPATRICK:  Where did you go to school?
12          THE JUROR:  Which time?
13          MR. FITZPATRICK:  Starting with high school?
14          THE JUROR:  High school was, had to have been
15  California, Petaluma, California actually.
16          MR. FITZPATRICK:  Did you go to school after high
17  school?
18          THE JUROR:  Yes, I went to junior college in
19  northern California, Santa Rosa.  And then I moved out here
20  and went to Stayer University.  Then I'm trying to decide,
21  and Florida, when I went to travel school.
22          MR. FITZPATRICK:  Any particular area you focused
23  on when you went to Strayer?
24          THE JUROR:  Computer programming I think.
25          MR. FITZPATRICK:  On a day-to-day basis, what
```

121

1   papers do you read?
2       THE JUROR:   The Express and Examiner to do those
3   Sudoku puzzles.  I don't like reading newspapers.
4       MR. FITZPATRICK:  Do you watch any TV news shows?
5       THE JUROR:   Sometimes, usually its turned on just
6   as a noise, a back noise.
7       MR. FITZPATRICK:  Any particular programs you
8   follow regularly?
9       THE JUROR:   Heroes, Jericho, and things like that
10  and Judge Judy works for laughing.
11      MR. FITZPATRICK:  Okay.  Thank you.
12      THE JUROR:   Thank you.
13      THE COURT:  She's not a real judge.  She just makes
14  a lot of money.
15      THE JUROR:   I know.  She's a mediator, I know.
16      MR. WELLS:  How are you doing?
17      THE JUROR:   All right.  How about yourself?
18      MR. WELLS:  Just fine.  Thank you.
19      Do you have any feelings about the controversy
20  concerning whether or not the Bush Administration lied to the
21  American public about the reasons for going to war in Iraq?
22      THE JUROR:   I don't believe in that stuff where
23  people say this, people say that, unless you go straight to
24  that person and find out because there are three sides to
25  every story, his side, her side and then the truth.

122

1       MR. WELLS:  Well let me ask you.  If Vice President
2   Cheney were to be a witness in this case, well my first
3   question is, do you have any feelings about the credibility
4   of Vice President Cheney?
5       THE WITNESS:  No.
6       MR. WELLS:  If he were to be a witness in this case
7   you'd be able to treat him just like any other witness?
8       THE JUROR:   Yes, sir.
9       MR. WELLS:  Have you ever had a situation in your
10  life where you had a recollection about how something
11  happened.  Then you found out two or three months down the
12  road that you were mistaken?
13      THE JUROR:   Uh-huh.
14      MR. WELLS:  Have you ever had a situation where one
15  friend or a friend of yours thought it happened this way and
16  you thought it happened that way, and it turned out that you
17  perhaps were mistaken or your friend was mistaken?
18      THE JUROR:   Well, yeah, it's happened before in the
19  past, yeah.
20      MR. WELLS:  Okay.
21      THE JUROR:   And it was over something stupid, a
22  doll.
23      MR. WELLS:  Okay.  I don't have any further
24  questions.
25      MR. FITZPATRICK:  If you were to learn that someone

123

1   gave an account of events and then you were to be convinced
2   that that account was all wrong, how would you go about
3   figuring out whether or not the person who gave you the wrong
4   account because of an honest mistake or they gave you a wrong
5   account because they were lying?
6       THE JUROR:   By all taking, you know, everything,
7   finding out everything and taking all of it into
8   consideration.  It's not just one particular thing.
9       MR. FITZPATRICK:  Thank you.
10      MR. WELLS:  Is it fair to say that you recognize
11  that if two different people have a different recollection
12  about an event doesn't mean that either of them are lying,
13  right?
14      THE JUROR:   Right, it doesn't mean that they're all
15  telling the truth either.
16      MR. WELLS:  Right.  And you could have a situation
17  where both of them might be a little bit right and a little
18  bit wrong?
19      THE JUROR:   Uh-huh.
20      MR. WELLS:  Or both of them might be totally wrong?
21      THE JUROR:   Yup.
22      MR. WELLS:  And if Judge Walton were to tell you
23  that, for purposes of this trial, the sole issue for you as a
24  juror is to decide whether or not the Government has proved
25  beyond a reasonable doubt that Mr. Libby engaged in

124

1   intentional lying and that's the sole question, would you be
2   able to follow that instruction?
3       THE JUROR:   Yes.
4       MR. WELLS:  Is the fact that Mr. Libby has been
5   indicted, does that mean to you that maybe he's done
6   something or else he wouldn't have been indicted?
7       THE JUROR:   No.
8       MR. WELLS:  You understand that the indictment is
9   nothing but a formal way to bring charges?
10      THE JUROR:   Yes, sir.
11      MR. WELLS:  And Mr. Libby is --
12      THE JUROR:   Innocent until proven otherwise.
13      MR. WELLS:  That's right.  And unless they prove
14  otherwise, he is presumed innocent at all times?
15      THE JUROR:   Yes, sir.
16      MR. WELLS:  No further questions.
17      THE COURT:  Have a seat on the one of those black
18  seats right in front of the railing.
19      (Bench conference.)
20      THE COURT:  Any position?
21      MR. FITZPATRICK:  No.
22      THE COURT:  We're going to have 12 more to qualify
23  or if we need those other two, 14 more.  So there is a chance
24  that we'll get this done.
25      MR. WELLS:  Do you think would it make any sense to

125

```
 1  qualify a couple more just in case we run into any --
 2       THE COURT:  We're trying to do the checks now.
 3  There, the people we've talked to today, those came back,
 4  those were all good.
 5       MR. WELLS:  But if somebody doesn't come back in,
 6  just to give us a little --
 7       THE COURT:  We'll know tomorrow at 3:00.
 8       MR. WELLS:  Fair enough.  That's all I'm asking.
 9       MR. FITZPATRICK:  If we go to the end of the day
10  tomorrow, the things that we were going to do tomorrow to
11  clear up, would they be handled Monday?
12       THE COURT:  I have a full calendar on Friday.  I
13  don't know, it depends on how much time it would take.  I
14  could do it later in the day.
15       MR. FITZPATRICK:  I'm concerned that if we're going
16  to do anything on Monday, you may not want to instruct the
17  jury.
18       THE COURT:  Friday afternoon, I may have two hours
19  if that will be enough time.
20       MR. FITZPATRICK:  I think we just have a few jury
21  instructions issues.  I don't think we have much.
22       THE COURT:  We can convene at 3:00 and try to
23  finish up everything.  That way I do the instructions first
24  thing Monday morning and go right into the opening
25  statements.
```

126

```
 1       MR. FITZPATRICK:  Thank you, Judge.
 2       MR. WELLS:  Thank you.
 3       (Open court.)
 4       THE COURT:  Miss, we're not going to be able to
 5  finish this jury selection process today.  Hopefully around
 6  3:00 o'clock, we'll be in a position to move forward.  So
 7  we'd ask you be back at 3:00 o'clock, report to the fourth
 8  floor to the juror's lounge.  Don't talk about the case.
 9  Don't have any contact with the newspaper, radio or TV news
10  coverage.
11       THE JUROR:  Not a problem.
12       THE COURT:  Thank you.  Have a good evening.
13       You're Number 1139?
14       THE JUROR:  Yes.
15       THE COURT:  You checked Question Number 36 about
16  the anticipated length of the trial.
17       THE JUROR:  Yes.  That no longer applies.  I was
18  involved in some litigation in the state of Tennessee.  I
19  talked to my lawyer.  He said I would not be needed down
20  there.
21       THE COURT:  So you're all right to serve?
22       THE JUROR:  Yes.
23       THE COURT:  You also had a response regarding
24  Question Number 3B, which asks you about whether you had any
25  contact with media coverage about this case.  You want to
```

127

```
 1  tell me about that?
 2       THE JUROR:  No, I don't think I, if I checked that,
 3  that was a mistake.
 4       THE COURT:  Have you heard anything about the case?
 5       THE JUROR:  No.  As a matter of fact, I didn't know
 6  the defendant, who the defendant was.
 7       THE COURT:  So you've never heard anything about
 8  this controversy?
 9       THE JUROR:  I know that this woman in the CIA was
10  out and there was controversy about it.  But I didn't bother
11  to read all about it.  It's not the thing that interests me.
12       THE COURT:  Did you reach any conclusion about the
13  culpability of anybody in reference to --
14       THE JUROR:  No, because I really don't know what
15  the issues are.
16       THE COURT:  You also had a response to Question
17  Number 5, and you indicated that you recognized some of the
18  names?
19       THE JUROR:  Well, I wrote down I think Robert
20  Bennett was one of the names, and I work for a federal agency
21  that oversaw Fannie Mae, and I think that he was either an
22  attorney for Frank Raines or Fannie Mae at one time.  I just
23  wanted to --
24       THE COURT:  That was the only name you recognized?
25       THE JUROR:  Right.
```

128

```
 1       THE COURT:  Would the fact that his name might be
 2  mentioned in this trial, would that have any impact on your
 3  ability to fairly judge this case?
 4       THE JUROR:  No.
 5       THE COURT:  You also had a response to Question
 6  Number 29, which asks whether you've previously served as a
 7  juror?
 8       THE JUROR:  Yes, on a, I think it was like on a
 9  felony case.
10       THE COURT:  Was that this court or Superior Court?
11       THE JUROR:  It was D.C. Superior Court.
12       THE COURT:  One time you served?
13       THE JUROR:  One time on an actual trial, yes.
14       THE COURT:  And do you remember what type of case
15  it was?
16       THE JUROR:  Yes, I do.  It was attempted murder was
17  the charge.  It was a road rage incident.
18       THE COURT:  Was a decision reached by the jury?
19       THE JUROR:  Yes.
20       THE COURT:  Was there anything about your
21  participation in that case that might in any way cause you to
22  favor one side or the other in this case?
23       THE JUROR:  No.
24       THE COURT:  So are you totally confident you can be
25  fair to both sides?
```

129

1    THE JUROR: Yes.

2    THE COURT: Which agency do you work for?

3    THE JUROR: I'm retired now. I worked for the

4    Office of Federal Housing Enterprise Oversight for 11 years,

5    OFHEO they called it.

6    THE COURT: Is that at HUD?

7    THE JUROR: Yes, it is.

8    THE COURT: Questions, Government?

9    MR. FITZPATRICK: Can you tell us what you did day

10   to day in your job before you retired?

11   THE JUROR: For 11 years before I retired I was

12   with OFHEO, and during that time I was in charge of credit

13   risk at Fannie Mae and then I was part of the special

14   investigation team there. Then prior to that, for 23 years,

15   I worked with the controller of the currency as a national

16   bank examiner.

17   MR. FITZPATRICK: What did you do as a, with the

18   special investigators?

19   THE JUROR: I worked on the audit issues.

20   MR. FITZPATRICK: Where did you grow up?

21   THE JUROR: In Jackson, Mississippi.

22   MR. FITZPATRICK: When did you move to the D.C.

23   area?

24   THE JUROR: 1980.

25   MR. FITZPATRICK: Day-to-day, what papers do you

130

1    read?

2    THE JUROR: Washington Post, I subscribe to and

3    read that in hard copy. Then online, I read CNN, The New

4    York Times and the BBC home page.

5    MR. FITZPATRICK: Okay. Thank you.

6    THE COURT: Defense?

7    MR. JEFFRESS: Good afternoon. How recently did

8    you retire?

9    THE JUROR: June 30th of last year, 2006.

10   MR. JEFFRESS: All right. So you were there during

11   the special exam of Freddie Mac as well as Fannie Mae?

12   THE JUROR: Yes.

13   MR. JEFFRESS: You worked on both of those?

14   THE JUROR: I worked tangentially on Freddie Mac.

15   I was, just helped, assisted other people from time to time

16   when they got behind in some of the things they were doing

17   since I had things I was doing, too. But since that was a

18   priority, sometimes they would pull us off as assisting but

19   not full time.

20   MR. JEFFRESS: What was your role in that

21   investigation? Did you do analyses of documents or write up

22   findings or what?

23   THE JUROR: I did and analyzed informtion and then

24   presented it to the person who was in charge of that area for

25   their consideration.

131

1    MR. JEFFRESS: Did you attend or help conduct any

2    of the interviews of Fannie Mae personnel or others in that

3    special exam?

4    THE JUROR: I was very involved in the interviews

5    of KPMG. I led those interviews of the KPMG. Then I sat in

6    on interviews of certain Fannie Mae staff, but I don't

7    recollect exactly who. I sat in on the interview of Leanne

8    Spencer. I remember that.

9    MR. JEFFRESS: That, of course, more or less a law

10   enforcement role, correct? I mean a special exam, at least

11   that special exam was more less to decide whether charges

12   ought to be brought against either Fannie Mae or personnel?

13   THE JUROR: Well, justice I think. I know we were

14   involving justice. We present what we find and yes, I don't

15   know how to answer that. We see the issues and think what

16   ought to be done about it. It has to go through the court

17   system or however it's done. Justice then has to get

18   involved and they have to look at it and decide whether

19   they're going to take it.

20   MR. JEFFRESS: Did you personally have any dealings

21   with the criminal division of the Department of Justice with

22   respect to the Fannie Mae matter?

23   THE JUROR: No.

24   MR. JEFFRESS: Do you feel that having served on a,

25   what is essentially a law enforcement activity or law

132

1    enforcement role, do you think that would have any affect on

2    your judgment in a criminal case where you were asked to

3    decide whether the Government has carried its burden in a

4    criminal case?

5    THE JUROR: No, I don't think that would affect my

6    judgment. It's funny. I never saw myself as a law enforcer.

7    I always thought I was analytical and just analyzing things

8    and looking at things. But no, to answer your question.

9    MR. JEFFRESS: Were you still there when the

10   notice, when OFHEO's report was issued in late '04 of Fannie

11   Mae?

12   THE JUROR: The report was issued for Fannie Mae in

13   '06, Freddie Mac --

14   MR. JEFFRESS: Freddie Mac '04.

15   THE JUROR: -- was earlier. I was there for both

16   of those. I started working on OFHEO in 1995.

17   MR. JEFFRESS: You helped participate in writing at

18   least the Fannie Mae report, perhaps not Freddie Mac?

19   THE JUROR: Yes, that's correct.

20   MR. JEFFRESS: Obviously, if you attended

21   interviews, you dealt with a number of defense lawyers. I

22   don't know about Mr. Bennett, but perhaps others who would

23   accompany Leanne Spencer or others who would come; is that

24   right?

25   THE JUROR: Yes.

133

1    MR. JEFFRESS:  Did you form any opinion about the
2  defense lawyers?  Did you have any resentment about any of
3  their conduct or tactics during the course of your work?
4    THE JUROR:  No.  During the KPMG interviews, it
5  seemed like there was one lawyer that we had a timeframe we
6  were operating over.  It wasn't like an open-ended timeframe,
7  to get these questions done.  It seemed like he would keep
8  asking questions to repeat the question and explain the
9  question when it seemed pretty obvious what the question was.
10  So that was a little irritating but other than that.
11    MR. JEFFRESS:  It was irritating that he was
12  wasting your time?
13    THE JUROR:  Yes.
14    MR. JEFFRESS:  Now, about the, you said you read
15  The Washington Post and you read some other things online.
16  Do you also watch television news?
17    THE JUROR:  For the most part, yes.
18    MR. JEFFRESS:  On a daily basis?
19    THE JUROR:  I'd say more than three times a week.
20    MR. JEFFRESS:  What shows do you tend to watch?
21    THE JUROR:  I tend to watch Channel 5 news.  That's
22  the one I look at mostly, then Channel 9.
23    MR. JEFFRESS:  Channel 9, CBS?
24    THE JUROR:  Yes.
25    MR. JEFFRESS:  Do you watch Meet The Press on

134

1  Sundays?
2    THE JUROR:  No, it's not the type of thing that
3  interests me.  I get bored with that kind of stuff.
4    MR. JEFFRESS:  When you say that kind of stuff, do
5  you mean politics?
6    THE JUROR:  Yes.  I'm not a political person.
7    MR. JEFFRESS:  Let's go right to it.
8    THE JUROR:  I even tell my friends, politics is not
9  something that flicks my switch.
10    MR. JEFFRESS:  Well, as long as we're on politics,
11  let me ask you a question about that.  Are you familiar with
12  the controversy over the credibility of the reasons given by
13  the President and the Bush Administration for going to war in
14  Iraq?
15    THE JUROR:  I know that there are people, there is
16  a public debate going on, the issues of why we're there.
17    MR. JEFFRESS:  Do you have a position --
18    THE JUROR:  That's yes.
19    MR. JEFFRESS:  Do you have a position in that
20  debate?
21    THE JUROR:  Well, it's like, I have an opinion but
22  I'm not so certain that I'm correct.  I don't have enough
23  information.  You get what you got there and you've just got
24  a person saying this and a person saying that.  And you're
25  going like, well why are you saying this and you don't really

135

1  find that out.  At least I have.
2    MR. JEFFRESS:  The reason we ask obviously is Mr.
3  Libby was top assistant to Vice President Cheney and others
4  who are high Administration officials may testify in this
5  case.  The question is do you have an opinion about the
6  credibility of those officials, including Mr. Libby, that you
7  would start off with if you served as a juror in this case?
8    THE JUROR:  I'd have to say no, I do not have an
9  opinion about their credibility.
10    MR. JEFFRESS:  You could treat them just like
11  somebody who is a total stranger and judge their
12  believability without reference to any opinion you have about
13  the war in Iraq or anything like that?
14    THE JUROR:  It's my belief I can.
15    MR. JEFFRESS:  You mentioned that you, I guess,
16  were involved in some litigation in Tennessee.  I don't need
17  the details of that.
18    THE JUROR:  I would be glad to give you the
19  details.
20    MR. JEFFRESS:  Okay.  What was that all about?
21    THE JUROR:  I built a house down there, my
22  retirement house actually.  Unfortunately, I got hooked up
23  with a builder who was less than honest.  So, it's an issue
24  of that.  He is suing me.  I'm suing him
25    MR. JEFFRESS:  Have you testified in that matter?

136

1    THE JUROR:  We're trying to get it to moved to U.S.
2  District Court down there.  That's the reason I did not know.
3  I just spoke to my lawyer this morning, got through to him.
4  No, there is not, it has not gone to trial yet.
5    MR. JEFFRESS:  Have you ever testified as a witness
6  in any matter?
7    THE JUROR:  No.
8    MR. JEFFRESS:  Do you remember that yesterday, in
9  the general questions, Judge Walton asked some questions
10  about memory and your belief as to how memory works and how
11  people can have mistakes in memory?
12    In your personal experience, do you believe that
13  people can be absolutely certain that something happened and
14  then later find out that they were wrong?
15    THE JUROR:  Yes, it has happened to me.
16    MR. JEFFRESS:  Honestly?
17    THE JUROR:  Yes.
18    MR. JEFFRESS:  Did your wife already say, I told
19  you that already and you swore you --
20    THE JUROR:  I don't have one of those.  But I
21  thought something was true and then when I found out, I'm
22  going like, I thought I said something or whatever and found
23  out that I didn't.
24    MR. JEFFRESS:  Okay.
25    THE JUROR:  Or at least more than one person told

137

1  me that I was wrong.

2      MR. JEFFRESS:  Then finally, in connection with

3  what you did read or hear about this case, I know you

4  indicated that there was somebody at the CIA who was outed,

5  do you remember that?

6      THE JUROR:  Yes.

7      MR. JEFFRESS:  Did you make an assumption as to

8  whether she, this woman -- do you remember her name by the

9  way?

10     THE JUROR:  No, I'll tell you the context that I

11 found it out.  I was at the dentist, and I picked up a People

12 magazine.  There was this picture of an attractive blond

13 woman in a convertible.  The line under the photograph talked

14 about her being CIA.  I think her husband was sitting next to

15 her in this convertible and I went to the next article.

16     MR. JEFFRESS:  Her husband and her, had you ever

17 read anything they've said about this case, either in that

18 article or otherwise, said about the whole matter, the

19 background of this case?

20     THE JUROR:  No.

21     MR. JEFFRESS:  Would you be willing, if you served

22 as a juror and the Judge were to instruct you that, you know,

23 whether this woman whose picture you saw, whether she

24 actually had any kind of covert role in the CIA is not an

25 issue in this case and you are not to make any assumption one

138

1  way or another about that, would you have any trouble

2  following that instruction?

3      THE JUROR:  No, I would not have trouble.

4      MR. JEFFRESS:  That's all I have, Your Honor.

5      THE COURT:  One question.

6      MR. FITZPATRICK:  If you were to learn that someone

7  gave you an account of facts, a specific account of facts

8  that turned -- and you were then to be convinced that that

9  account was quite wrong, how would you go through, in your

10 mind, to determine whether the person gave you the wrong

11 account by honest mistake or by lying?

12     THE JUROR:  Could you --

13     MR. FITZPATRICK:  Yes.  If someone told you a

14 version of events, which you were then convinced was wrong,

15 how would you determine whether they gave you an honestly,

16 they had made an honest mistake or whether they lied to you?

17     THE JUROR:  Okay.  Their version of events

18 conflicts with what is the question like what I think the

19 version of events is and so who is right?

20     MR. FITZPATRICK:  Right.  If you were convinced

21 that the other person was wrong, how would you decide whether

22 they made an honest mistake or whether they lied?

23     THE JUROR:  I would try to collaborate what they

24 said with someone, maybe that was there or might have been

25 witness to that.  If it's them just versus me, I guess I

139

1  would have to say why do you think this.  And then try to

2  tell them why I think that.  That's a toughie.

3      MR. FITZPATRICK:  If you weren't a party to the

4  proceedings but you were just to find out that someone gave a

5  version of events to someone else, perhaps an examiner, then

6  that version proved to be wrong, what would you look to to

7  determine whether or not the person gave the version by

8  accident or intentionally?

9      THE JUROR:  I would ask the examiner what he or she

10 thought first.  Then, of course, then we would have to

11 discuss this other version that this other person had a

12 different view on this.  And then quite honestly, I'd need

13 more information to be able to make up my mind on it.

14     Right now, I don't have a path of how you'd get

15 that information, but I'm basically an analytical person.  So

16 I'm going like, okay, we've got a problem here.  We need to

17 do something to try to find out, to talk to some people, to

18 look at some documents, whatever, to see who looks like they

19 might be right and wrong.  Does that make sense?

20     MR. FITZPATRICK:  Yes.  Thank you.

21     THE COURT:  Anything else?

22     MR. JEFFRESS:  Yes, Your Honor.  I apologize.  I

23 just forgot to ask this.

24     Is your training in accounting or what?

25     THE JUROR:  No, no, my background is finance.

140

1      MR. JEFFRESS:  You have a Master's degree?

2      THE JUROR:  I have an M.S. in finance, and then I

3  have a M.B.A.

4      MR. JEFFRESS:  Where did you get your M.S. in

5  finance?

6      THE JUROR:  Mississippi State University.

7      MR. JEFFRESS:  Thank you very much.

8      THE COURT:  Approach.

9      (Bench conference.)

10     THE COURT:  Any position?

11     MR. JEFFRESS:  No position.

12     MR. FITZPATRICK:  No position.

13     (Open court.)

14     THE COURT:  Okay.  Sir, we hope we can finish this

15 process tomorrow, so we'll need you back at 3:00 o'clock.  So

16 please report to the fourth floor to the juror's lounge at

17 3:00 o'clock.  Don't talk about the case.  Don't have any

18 contact with any media.  Thank you.  Have a nice evening.

19     THE JUROR:  Thank you.

20     (Juror out.)

21     THE COURT:  As I indicated, contingent on what

22 happens tomorrow with those two jurors we made reference to

23 earlier, we either have 12 additional jurors to qualify or

24 14.  I would think at the rate that we moved today, hopefully

25 by 3:00 o'clock we'll be finish with all the voir dire, then

141

1  be in a position to proceed with the strikes.

2          If it takes a little longer, I've talked to court

3  staff, they're available to stay a little later. So, we will

4  sit beyond 5:00 o'clock because I do want to complete this

5  process tomorrow before we break.

6          There are, as you know, some other preliminary

7  matters that we have to resolve, and hopefully we can do that

8  within two hours. We'll reconvene to finish those matters at

9  3:00 o'clock on Friday afternoon. Hopefully be finished with

10 those before the end of the day so that we can have

11 preliminary instructions first thing on Monday and proceed

12 with the opening statements.

13         You all can consult with my law clerk before you

14 leave and let him know those matters that you think we're

15 going to have to address on Friday, including any additional

16 preliminary instructions I need to work on so I can look at

17 those tonight and be in a position to resolve those matters

18 on Friday.

19         Any other matters?

20         MR. FITZPATRICK: No, judge.

21         MR. WELLS: No, Your Honor.

22         THE COURT: Have a nice evening.

23         THE COURT: Thank you.

24         (Whereupon, at 5:15 p.m. the above

25            proceeding were adjourned.)

142

3          CERTIFICATE OF REPORTER

4      I, Lisa Walker Griffith, certify that the

5  foregoing is a correct transcript from the record of

6  proceedings in the above-entitled matter.

12 Lisa Walker Griffith, RPR                1-18-07



RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 MAR 27  AM 10: 28

NANCY M.
MAYER-WHITTINGTON
CLERK